**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 22-cv-1763-KLM

ESTATE OF KELROY NEWMAN, by and through
putative personal representative, Bryanne Watts-Lucero;
J.W. a minor child, by and through next friend and
mother, Elisa Wilson;

       Plaintiffs,

v.

BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF MONTEZUMA, COLORADO;
SHERIFF STEVEN NOWLIN, individually and in his official capacity;
ZACHARY SUMMERS, individually;
ANDREW DAULTON, individually;
SOUTHWEST HEALTH SYSTEM, INC, d/b/a Southwest Memorial Hospital;
RANDY GENE DAVIDSON, MD, individually,

       Defendants.

---

**FIRST AMENDED CIVIL RIGHTS COMPLAINT**
**WITH REQUEST FOR TRIAL BY JURY**

---

Plaintiffs, by and through their attorneys of HOLLAND, HOLLAND EDWARDS & GROSSMAN, LLC and HOMIAK LAW LLC, complain against Defendants and request a trial by jury as follows:

## I.     INTRODUCTION

1. Kelroy Newman was a 30-year-old pre-trial detainee at the Montezuma County Detention Center ("MCDC") who was abandoned by Defendants for more than 24 hours while suffering the symptoms of severe alcohol withdrawal that ultimately culminated in his death.

2. Kelroy Newman was arrested on July 17, 2021, by the Cortez Police Department and taken to MCDC, where he was found to have a dangerously high blood-alcohol concentration ("BAC") of .421% and visible serious injuries to his head and face.

3.     He was taken to Southwest Memorial Hospital to be "cleared" to go to MCDC, but no blood tests, imaging studies, or meaningful examination were conducted, and he was there for less than half an hour.

4.     After he was negligently discharged from the hospital, he was booked at MCDC and kept in a holding cell for more than 24 hours, despite his repeated requests to go back to the hospital, persistent vomiting, and other symptoms of severe alcohol withdrawal. MCDC recklessly had no medical staff on the weekend, no alcohol withdrawal protocols, no deputies properly trained in monitoring detainees experiencing alcohol withdrawal, and no deputies trained in how to properly administer CPR.

5.     Mr. Newman was also kept at MCDC despite his cellmate's repeated requests to staff to obtain medical care for him, the need for which was obvious to him.  Rather than provide any treatment, medical assessment, or perform the requisite gatekeeper functions and return him to the hospital, deputies at MCDC callously told Mr. Newman to "go lay down."

6.     Having refused Mr. Newman medical care and treatment in a known medical crisis for hours, MCDC staff found him unresponsive in his cell, but still alive at approximately 11:43 a.m. on July 18, 2021.

7.     Deputies tried to revive Mr. Newman but were reckless and negligent in the performance of CPR. MCDC did not have the correct equipment available, the deputies were insufficiently trained (or not trained at all) with respect to alcohol withdrawal and CPR provision, refused to perform mouth-to-mouth resuscitation on Mr. Newman, and—once they finally found the correct equipment after several crucial minutes passed—performed little to no resuscitation on him before paramedics arrived. Mr. Newman was pronounced dead at 12:20 p.m.

8.      Mr. Newman died a preventable death in his cell from complications of alcohol withdrawal at the age of 30.

9.      MCDC has officially adopted policies and practices that are deliberately indifferent to respond to inmates' medical emergencies or to manage their withdrawal from alcohol or drugs. Mr. Newman is at least the sixth pre-trial detainee to have died in the custody of MCDC from 2013 to the present—including 33-year-old Michael McMordie, 38-year-old Harrison Begay, 47-year-old Dani Miller, 47-year-old Scott Watson, and 61-year-old Edward Grant Lyen. These deaths were the result of MCDC's unconstitutional policies in assessing and treating alcohol withdrawal or drug overdose, as well as its unconstitutional widespread custom and practice of failing to have medical staff present on nights and weekends to assess and monitor inmates facing withdrawal, overdose, or other medical emergencies.

## II.      JURISDICTION AND VENUE

10.     This action arises under the Constitution and laws of the United States, including Article III, Section 1 of the United States Constitution and 42 U.S.C. § 1983 and 42 U.S.C. § 1988. The jurisdiction of this Court is further invoked pursuant to 28 U.S.C. §§ 1331, 1343, 2201 and 2202.

11.     This case is instituted in the United States District Court for the District of Colorado pursuant to 28 U.S.C. § 1391 as the judicial district in which all relevant events and omissions occurred and in which Defendants maintain offices and/or reside.

12.     Supplemental pendent jurisdiction is based on 28 U.S.C. § 1367 because the violations of federal law alleged are substantial and the pendent causes of action derive from a common nucleus of operative facts.

13.     Pursuant to the Colorado Governmental Immunity Act ("CGIA"), sovereign immunity is waived for negligence in the operation of a jail and negligence in the operation of a hospital. *See* Colo. Rev. Stat. § 24-10-106. Plaintiff filed timely written notice of claims to the hospital and County related defendants, pursuant to § 24-10-109, C.R.S.

### III.     PARTIES

14.     Mr. Newman had one child, J.W., a minor child who is a resident of the State of New Mexico. Plaintiff J.W. brings suit through her mother and next friend, Elisa Wilson, who is also a resident of New Mexico.

15.     At all times pertinent hereto, the decedent, Kelroy Newman, was a resident of the State of Colorado and a citizen of the United States of America. The Estate of Kelroy Newman has been opened in Montezuma County and his mother, Bryanne Watts-Lucero, has applied to be the personal representative of that Estate. She brings the Estate claims as the putative personal representative.

16.     Defendant Board of County Commissioners of the County of Montezuma ("BOCC") is a governmental entity chartered under the laws of the State of Colorado. Defendant BOCC represents, oversees, and sets policy for Montezuma County, Colorado. Among other things, BOCC operates MCDC, located at 730 East Driscoll Street in Cortez, Colorado. Under COLO. REV. STAT. § 30-11-105, the BOCC is the proper party in an action against Montezuma County. BOCC has statutory and constitutional obligations to assure adequate medical care and treatment for inmates and pretrial detainees at MCDC.

17.     At all times relevant hereto, Defendant Steven Nowlin was a resident of the State of Colorado and the Sheriff of Montezuma County, Colorado. Sheriff Nowlin has continuously served as the Sheriff of Montezuma County since he was elected in 2015.

18.     Sheriff Nowlin is sued in his official capacities for violations of 42 U.S.C. § 1983 and negligence in the operation of a jail, as he was the person in charge of running MCDC, with statutory and constitutional obligations to assure proper and constitutional medical care, staffing, medical policies and protocols, and medical equipment.

19.     The BOCC and Sheriff Nowlin are herein collectively referred to as "County Defendants" or "MCDC."

20.     At all times relevant hereto, Zachary Summers was an employee of MCDC working as a deputy in MCDC. He is a resident of Colorado and citizen of the United States of America acting within the scope and course of his employment and under color of state law.

21.     At all times relevant hereto, Andrew Daulton was an employee of MCDC working as a deputy in MCDC. He is a resident of Colorado and citizen of the United States of America acting within the scope and course of his employment and under color of state law.

22.     Defendants Summers and Daulton are referred to herein as "Individual Defendants."

23.     Southwest Health System, Inc, d/b/a Southwest Memorial Hospital, is a Colorado nonprofit corporation located at 1311 N. Mildred Road, Cortez, Colorado, 81321. It is vicariously liable for the actions of its employees and agents herein including the medical team who cared for and had a patient relationship with decedent.

24.     Montezuma County Hospital District is a special hospital taxing entity for Montezuma County related to Southwest Health System Hospital in the State of Colorado located at 1 West Main Street, Suite #5, Cortez, Colorado 81321.

25.     Southwest Health System, Inc. and the Montezuma County Hospital District are jointly referred to as "SMH" throughout.

26.     Randy Gene Davidson, MD, was the doctor who treated Mr. Newman prior to his incarceration. At all times relevant hereto, Dr. Davidson had a physician-patient relationship with Mr. Newman and was acting as an employee or agent of Southwest Health Systems and/or Montezuma County Hospital District or its related entities. Dr. Davidson is believed to be a resident of Colorado and a specialist in emergency medicine.

## IV.     STATEMENT OF FACTS

27.     Plaintiffs incorporate all of the foregoing allegations as if they were fully set out again herein.

### A.     Mr. Newman Was Arrested with a Blood-Alcohol Concentration of .421.

28.     Mr. Newman was arrested on Saturday, July 17, 2021, by the Cortez Police Department and booked into MCDC around 10:00 a.m. that day.

29.     Mr. Newman was a pre-trial detainee, as he had two misdemeanor level charges that had not been adjudicated.

30.     He had visibly serious injuries all over his face from being assaulted prior to being arrested, which included several bruises and wounds on his face, a swollen jaw, two black eyes, and a red and bloody knot on his forehead above his right eye. The right side of his face was

bruised from his eye to his chin, and there were scabbed wounds on the back of his head—one of which was open and bleeding.

31.     He was booked into MCDC by BOCC Deputies Zachary Summers and Andrew Daulton, and other MCDC booking staff, where he was found to have an extremely high BAC of .421%.

32.     Because of his high BAC and facial injuries, he was taken to SMH to be cleared for admission to MCDC at approximately 10:37 a.m.

**B.     Mr. Newman Received No Treatment for His Acute Intoxication at SMH or Injuries.**

33.     At SMH, Mr. Newman was seen by emergency physician Defendant Dr. Randy Davison at approximately 10:42 a.m.

34.     Mr. Newman was at the hospital for less than half an hour, and Dr. Davidson appears to have spent approximately 10 minutes in total evaluating and treating him before clearing him to return to MCDC.

35.      Neither Dr. Davidson nor any of the SMH staff identified Mr. Newman's obvious signs and symptoms of intoxication—including a tachycardic resting heart rate of 110 beats per minute.

36.     SMH staff and Dr. Davidson negligently and/or recklessly ignored Mr. Newman's very high BAC and facial injuries, and completely failed to properly work him up for these obvious medical problems.

37.     Dr. Davidson did not order any blood-alcohol tests or any other related laboratory tests for Mr. Newman, and he did not diagnose Mr. Newman with any alcohol-related conditions.

38.     Dr. Davidson and the SMH staff also negligently failed to obtain IV access to correct any electrolyte abnormalities, determine whether Mr. Newman was at risk of aspiration, place a nasogastric tube in his stomach to evacuate the contents of his stomach, give him any medications, or transfer him to a detox center.

39.     Despite Mr. Newman's obvious facial injuries, Dr. Davidson did not even order any imaging studies to evaluate Mr. Newman's facial or head injuries or rule out a brain bleed.

40.     Dr. Davidson and the SMH did not provide Mr. Newman any treatment whatsoever for his extreme alcohol intoxication or withdrawal.

41.     In fact, despite having a blood alcohol level that required medical clearance, Mr. Newman's medical records from SMH do not even mention his extremely high BAC or his obvious acute intoxication.

42.     SMH staff and Dr. Davidson did not even ask Mr. Newman if he had consumed any alcohol that day, conclusory charting that he had "no altered level of consciousness."

43.     Dr. Davidson did not provide the deputies with any discharge instructions to ensure that Mr. Newman was properly monitored or treated for alcohol withdrawal, nor did he prescribe Mr. Newman any medications to treat his withdrawal symptoms.

44.     In his "prisoner medical clearance" signed at 10:53 a.m. on July 17, Dr. Davidson baselessly stated, given Mr. Newman's acute level of intoxication and Dr. Davidson's gross failure to treat him under a reasonable standard of care, that "I have examined the prisoner and find him acceptable for admission to the jail. I have no specific suggestions regarding the care of the prisoner for the condition for which I have examined him."

45.     Hospital related Defendants knew that this recklessly insufficient medical clearance would cause Mr. Newman to be booked into jail where he obviously would not be able to come back to the hospital on his own.  Despite this knowledge, they instructed Mr. Newman to "return to this practice within as needed."

46.     SMH and MCDC regularly interact with each other on matters of "medical clearance" at the jail, and SMH doctors and staff are aware that MCDC has no medical clinic or staff to manage medical needs of inmates detoxing or withdrawing, and that on nights and weekends there is no nurse or other medical provider present at MCDC to evaluate or monitor detainees for signs or symptoms of detoxing or withdrawal.

47.     SMH doctors and staff are similarly aware that there is no ability to monitor for changes in condition at the jail related to head and facial injuries on the nights and weekends.

48.     Dr. Davidson and hospital staff nevertheless "cleared" Mr. Newman to be admitted to MCDC, knowing that he would not have access to any medical treatment or monitoring there.

49.     It was grossly negligent to discharge Mr. Newman to a jail with no medical staff and without having evaluated his alcohol consumption, withdrawal risk, or facial injuries.

**C.     Mr. Newman Experienced Severe Alcohol Withdrawal and Worsening Condition for 26 Hours without Treatment or Monitoring.**

50.     When Mr. Newman returned to MCDC, he was immediately placed in a holding cell without any medical screening.

51.     MCDC has no doctor or other medical provider on staff who is qualified to render medical diagnoses to inmates or detainees (like a physician's assistant or nurse practitioner).

52.     MCDC only has one nurse on staff, and the nurse only works from 7:00 a.m. to 4:00 p.m. on weekdays. MCDC's nurse also does not work on the weekends from 4:00 p.m. on Friday to 7:00 a.m. on Monday.

53.     MCDC also has no Clinical Institute Withdrawal Assessment for Alcohol Withdrawal ("C.I.W.A.") protocol or other alcohol or drug withdrawal protocol in place.

54.     Thus, there was no nurse or any other licensed healthcare provider present at MCDC for the 26 hours that Mr. Newman there, and no alcohol withdrawal protocol was instituted for Mr. Newman, who had a life-threatening blood alcohol level.

55.     MCDC does not even have in place a system to ask inmates about their use of alcohol or drugs that may cause withdrawal. Nobody even asked Mr. Newman how much he drank, or what time he stopped drinking in order to assess the possibility of him experiencing severe alcohol withdrawal.

56.     Because MCDC had no policies, procedures, practices, or customs in place to ensure that highly intoxicated inmates were appropriately monitored or treated for symptoms of alcohol withdrawal when they were placed in a holding cell, Mr. Newman underwent severe alcohol withdrawal and declining medical condition for the next 26 hours without receiving any medical assessment, monitoring, or treatment.

57.     All of the Deputy Defendants were aware that Mr. Newman was heavily intoxicated with a BAC of .421%, but none of them were trained on how to assess or manage detainees with symptoms of severe alcohol withdrawal.

58.     Deputies Zachary Summers, Andrew Daulton, Daniel Ruiz, Daylan Guttridge, and Bryce Durbin were obligated to regularly check on Mr. Newman to make sure his alcohol

withdrawal and head injuries did not become an acute emergency, and if it did, to get him to the hospital as soon as possible.

59.     MCDC and Deputies Summers, Daulton, Ruiz, Guttridge, and Durbin were required to monitor Mr. Newman's vital signs, hydration, orientation, nausea, vomiting, excessive sweating, anxiety, and other symptoms for indications of worsening alcohol withdrawal, and to document the results of their assessments.

60.     MCDC and Deputies Summers, Daulton, Ruiz, Guttridge, and Durbin recklessly failed to conduct any such monitoring or assessments on Mr. Newman because they were never trained on how to conduct this assessment and monitoring.

61.     Despite the Deputy Defendants being well-aware of Mr. Newman's extremely high blood alcohol level and face injuries, Mr. Newman's vital signs were never taken at MCDC, his symptoms were never documented, and none of the Deputy Defendants made any effort to ensure he was properly hydrated during the 26 hours that he was held at MCDC.

62.     Mr. Newman received no medical care or monitoring whatsoever during the 26 hours between when he was booked and when he was found unconscious.

63.     Instead of being on an appropriate alcohol withdrawal protocol, Mr. Newman was put on a basic observation schedule that had no specific alcohol-related observations requirements or other monitoring, care, or treatment. Mr. Newman was put on a standard half-hour rounding observation, which was not completed as required and which contained demonstrably false information—including deputies repeatedly charting that he was sleeping and calm when he was vomiting and restless, and even that he was calmly sleeping at the time he was found unresponsive and experienced the botched resuscitation described below.

64.    It is medically likely that Mr. Newman experienced tachycardia (rapid heart rate), an increased respiratory rate, an increased blood pressure, seizures, delirium, persistent vomiting, dry heaving, and other symptoms of extreme alcohol withdrawal over this 26-hour period—all of which would have been readily identifiable by Montezuma County deputies or medical professionals if he had been appropriately monitored, but none of which was documented by the Deputy Defendants.

65.    MCDC is a small jail and Deputy Defendants knew that Mr. Newman was vomiting because they could hear him and because his cellmates told them, but the Deputy Defendants did nothing to help him.

66.    During this period, Mr. Newman's cellmate, Robert Salt, observed Mr. Newman repeatedly getting up to wash his face and vomiting.  Mr. Salt repeatedly banged on the door and pushed the emergency call button to try and get MCDC staff to stop ignoring Mr. Newman's obviously serious medical crisis.

67.    Mr. Newman repeatedly asked to go to the hospital.

68.    On the morning of July 18, Mr. Newman complained repeatedly to these Deputies and other MCDC staff about his symptoms of alcohol withdrawal and his worsening headaches.

69.    The Deputy Defendants also knew that persistent severe headaches were a sign of a severe traumatic brain injury, especially when accompanied by persistent vomiting.

70.    By that time, Mr. Newman's facial injuries had significantly worsened, and the swelling around his forehead, jaw, and neck was even more obvious.

71.    Mr. Newman's cellmate believed he was going through alcohol withdrawal, so he banged repeatedly on the door and told deputies that Mr. Newman needed to go to the hospital.

72.     Although the Deputy Defendants could see and hear Mr. Newman and his cellmate complaining about his condition, the Deputy Defendants deliberately indifferently ignored them, did nothing to address them, and did not document any of these concerns or complaints in Mr. Newman's MCDC records.

73.     When breakfast was brought to the cell that morning, Mr. Newman complained again about his serious and worsening symptoms to no avail.

74.     Mr. Newman told Deputy Summers he could hardly eat, his head hurt, he was vomiting, and he needed to go to the hospital.

75.     Deputy Summers ignored Mr. Newman's concerns, told him lay back down, that he had already been to the hospital, and that he just needed to stay there and would be fine.  Deputy Summers responded by saying "we already took you," and slammed the door closed.

76.     Deputy Summers refused Mr. Newman's request to send him to the hospital—the only place he could get the medical care he obviously needed for his severe alcohol withdrawal.

77.     He was again told to just go lay down.

78.     Shortly before noon on July 18, Mr. Salt got ready to go to lunch and kicked Mr. Newman's foot to let him know.

79.     Mr. Salt go no response at all from Mr. Newman and called for help.

**D.      Deputies Negligently Try to Revive Mr. Newman without Proper Procedures or Equipment.**

80.     At approximately 11:43 a.m., Deputy Summers and another deputy believed to be Deputy Daulton arrived at the cell to find the long-neglected Mr. Newman unresponsive and not breathing.

81.     Mr. Salt was then removed from the cell, and when he later complained to Deputies that they had ignored a man in an obvious medical crisis, he was put in the hole in retaliation for complaining about the abandonment of his cellmate.

82.     The Deputies summoned by Mr. Salt to help the unresponsive Mr. Newman were clearly negligently untrained in basic first aid techniques.

83.     They did not even bring functioning CPR equipment.

84.     Deputies fumbled around in a negligently untrained, objectively unreasonable, and recklessly incompetent effort to revive Mr. Newman.

85.     Mr. Newman was still alive and groaning when Deputy Summers first began assessing him.

86.     Deputy Summers did not know whether to start chest compressions.

87.     Once compressions started, they were negligently and recklessly inadequate.

88.     Deputies did not even switch off to relieve each other to complete the strenuous work of adequate chest compressions.

89.     Deputy Summers repeatedly asked another Deputy believed to be Andrew Daulton to bring a breathing mask—acknowledging aloud that there was no point in compressions without providing oxygen to Mr. Newman's body.

90.     Because there was no mask or "ambu bag" readily accessible, and the involved deputy defendants were unwilling to do or untrained in mouth-to-mouth resuscitation, no breaths were given to Mr. Newman in between compressions—depriving his brain and organs of oxygen as he was dying.

91.     Lifesaving minutes passed while deputies looked for equipment and tried to figure

out how to use it.

92.     Even once the deputies found the mask, they negligently performed several cycles of breathing into it before they realized that the mask had not been opened to a functional position.

93.     None of the deputies or MCDC staff ever called a code blue for Mr. Newman, nor did any MCDC deputy or staff even try to find a defibrillator to use on him.

94.     EMT personnel arrived and began CPR, but Mr. Newman was already in asystole. He was declared dead at 12:20 p.m.

95.     Because of the negligence of SMH and its staff, and the negligence and deliberate indifference of BOCC and its staff and deputies, Mr. Newman died a preventable death at the age of thirty.

**E.     Mr. Newman Experienced a Life-Threatening Medical Emergency and Died in His Cell Because of the Jail's Deliberately Indifferent Withdrawal Policies and Lack of Staff to React to Medical Emergencies.**

96.     The risk of death and other serious manifestations of alcohol withdrawal are so widespread that government officials, entities, and employees in the field of corrections are well-aware of them. It is well known that drug and alcohol withdrawal is one of the leading causes of death of pre-trial detainees in local jails. After suicide and heart disease, drug and alcohol withdrawal represent the third-highest cause of death among local jail inmates nationwide.

97.     It is well known that, without treatment, symptoms of alcohol withdrawal generally begin within 6 to 24 hours of the last drink or a sudden reduction in chronic alcohol consumption. It is well known that failing to manage withdrawal symptoms can lead to serious health complications—including anxiety, depression, seizures, vomiting, dehydration, hypernatremia (elevated blood sodium level), tachycardia, heart problems, hallucinations, tremors, and death.

98.     Abrupt cessation of alcohol consumption unmasks the adaptive responses to chronic alcohol use, resulting in overactivity of the central nervous system culminating in the more severe symptoms of alcohol withdrawal—including seizures (onset as early as 12 hours of abstinence from drinking), alcohol hallucinosis (onset as early as 12 hours of abstinence), and delirium tremens (onset as early as 48 hours of abstinence).

99.     Individuals experiencing seizures caused by alcohol withdrawal are often unable to breathe—which, in turn, causes brain hypoxia that can lead to death or permanent severe brain damage.

100.     The *Performance Based Standards for Adult Local Detention Facilities*, the *Core Jail Standards* promulgated by the American Correctional Association, and the *Standards for Health Services in Jail* promulgated by the National Commission on Correctional Health Care all require that detoxication be conducted "only under medical supervision."

101.     The *Standards for Health Services in Jail* are extremely clear on how to supervise detainees suffering from alcohol withdrawal. They provide as follows:

> As a precaution, **severe withdrawal symptoms must never be managed outside of a hospital.** Deaths from acute intoxication or severe withdrawal have occurred in correctional institutions. In deciding the level of symptoms that can be managed safely at the facility, the responsible physician must take into account the level of medical supervision that is available at all times.

102.     Thus, MCDC was required at a *minimum* to always have at least one medical professional on site to screen, assess, monitor, and treat patients undergoing severe withdrawal symptoms at the jail.

103.     With appropriate medical management, alcohol withdrawal symptoms can be safely treated to avoid any long-term adverse effects. Among other things, the presence of a

licensed medical professional at MCDC was necessary to appropriately prescribe and administer medications like benzodiazepines and phenobarbital to treat symptoms of severe alcohol withdrawal—including withdrawal-induced seizures and delirium.

104.    County Defendants chose to staff MCDC such that there were no medical workers at night or on the weekend. Instead, they recklessly chose to rely on Deputies and other MCDC staff (none of whom are medical personnel) to evaluate, supervise, and monitor detainees who may be withdrawing from alcohol without any specific alcohol-related withdrawal treatment or monitoring, and without any training on how to assess, monitor, or treat detainees with symptoms of alcohol withdrawal or drug overdose.

105.    As part of its alcohol withdrawal or "C.I.W.A." protocol, MCDC should have either had nurses administer and complete a validated withdrawal severity scale or, at a minimum, provided for medication administration and provide protocols for its deputies with a validated withdrawal severity scale to be used to track signs and symptoms throughout the course of withdrawal.

106.    Among other things, this scale (or form) allows deputies and health care providers to ensure that signs and symptoms are not worsening, that inmates and detainees are responding as expected to medication (if provided), and that signs and symptoms are not persisting beyond the expected timeline of withdrawal. This scale provides an objective evaluative tool for recognizing worsening symptoms and can generate a "score" that deputies can then report to medical professionals that would help them better understand how a person should be treated or how they are responding to treatment.

107.     County Defendants did not have a withdrawal scale in place and did not even have any policies or practices in place to ensure that inmates' vital signs were taken or documented by deputies or other non-medical personnel at MCDC.

108.     Further, County Defendants medical care and emergency policies are recklessly insufficient to adequately provide for the medical needs of the inmate population generally, but especially on weekends when there is no medical staff in the jail. There was not even a policy, procedure, or practice in place to ensure that MCDC staff could call a doctor, nurse, or other medical provider if they had any questions or concerns about detainees experiencing symptoms of alcohol withdrawal or drug overdose.

109.     MCDC's policies list several "emergencies"—all of which require diagnosis and/or the ability to monitor vital signs that cannot be performed without a medical professional. The jail's guideline for emergency care for inmates who have been booked into the jail requires hospitalization for certain blood sugars, heart attacks, strokes, certain seizures, fractures, excessive bleeding, wounds that require sutures, and certain blood pressures. Most of the hospitalization criteria require a diagnosis by a doctor or at least a medically licensed staff member to take vitals or blood work or provide health care assessments.

110.     This means that there is never anyone at MCDC qualified to evaluate the identified "emergencies" on nights and weekends, and during weekdays there is no one who can diagnose the conditions listed, as there is never a doctor present at MCDC and rendering medical diagnoses is outside the scope of practice for a nurse. County Defendants thus adopted policies that give no functional guidance or requirements to non-medical staff requiring hospitalization for potentially serious medical conditions if they don't fit into one of these recklessly narrow categories.

111.    As a result of these constitutionally deficient policies at MCDC, no medical screening was completed on Mr. Newman when he was booked, he did not (and could not) receive any of the necessary medication, monitoring, or other treatment for his alcohol withdrawal symptoms, and his declining change in condition on the morning of July 18, 2021, was not addressed until he was nonresponsive.

112.    Mr. Newman's death was a highly predictable consequence of County Defendants' failure to have any medical staff on-site on the weekends at MCDC, its failure to ensure proper medical screening on intake, its failure to implement an appropriate alcohol withdrawal or other medical emergency protocol, and its failure to use any medical protocols for formal monitoring and treatment of detainees facing withdrawal symptoms or acute changes/worsening in condition after they were booked into MCDC.

**F.      Montezuma County's Custom, Policy, and Practice of Failing to Provide Any Treatment to Detainees Experiencing Alcohol Withdrawal and Drug Overdoses or Medical Emergencies.**

113.    Unfortunately, Mr. Newman's death at MCDC in July 2021 was not an isolated incident.

114.    In addition to Mr. Newman, at least four other detainees at MCDC have experienced alcohol withdrawal- or drug overdose-related deaths under strikingly similar circumstances since 2013.

115.    All of these deaths were the result of County Defendants' failure to have appropriate medical staff on-site during the night and on weekends at MCDC, its failure to ensure proper medical screening on intake at MCDC, its failure to implement appropriate alcohol withdrawal protocols at MCDC, its failure to use any medical protocols for formal monitoring or

treatment of detainees facing withdrawal symptoms after they were booked into MCDC, and its failure to implement proper CPR or resuscitation protocols for inmates or detainees facing medical emergencies.

116.    Every one of these deaths would have been prevented if BOCC had implemented an appropriate intake medical screening, assessment, treatment, and referral process for detainees with substance abuse disorders at MCDC.

117.    Sheriff Nowlin, a BOCC final delegate, and his predecessor, have been or were aware of this constitutionally deficient training, staffing, policies, and supervision, and of this widespread unconstitutional custom and practice since at least October 2015—when the BOCC and former Sheriff Spruell were sued by the family of Harrison Begay in Colorado federal court.

118.    Defendant Nowlin, his predecessor and the BOCC failed to undertake any remedial measures in response to the deaths of several detainees at MCDC.

119.    Upon information and belief, no MCDC policies were changed due to these detainee deaths since 2013.

*i.   Harrison Mann Begay – October 2013*

120.    According to a lawsuit filed related to his death, on October 25, 2013, 38-year-old Harrison Mann Begay was admitted to a local emergency homeless shelter in the City of Cortez at about 8:30 p.m. with a BAC of .223%—almost three times the legal limit of .08%.

121.    On October 25, 2013, at 10:51 p.m., and still acutely intoxicated, Mr. Begay checked himself out of the homeless shelter, and returned to the Cortez Walmart, where he drank a significant amount of mouthwash with the intention of becoming intoxicated.

122.    About two hours later, the Cortez Police found Mr. Begay heavily intoxicated on the floor of the bathroom in the Cortez Walmart.

123.    Mr. Begay was arrested by the Cortez Police for trespassing and transported to the SMH emergency room by paramedics.

124.    Like Mr. Newman, Mr. Begay was evaluated at SMH for approximately ten minutes and cleared for release to MCDC without undergoing a BAC test or a proper assessment for intoxication and alcohol withdrawal.

125.    At 1:22 a.m., Mr. Begay was discharged to MCDC with diagnoses of "[a]lcohol intoxication, [d]ependence acute [, and a] head injury."

126.    Because he was so intoxicated, Mr. Begay could not answer booking and medical questions during the early morning hours of October 26, 2013, when he was booked into MCDC.

127.    There was no nurse, doctor, or other medical provider at MCDC when Mr. Begay was booked into MCDC, so he did not receive any medical treatment or examination at that time.

128.    MCDC did not undertake any alcohol withdrawal or "C.I.W.A." protocols to monitor or treat Mr. Begay's alcohol withdrawal in any way.

129.    Like Mr. Newman, Deputies at MCDC placed Mr. Begay on a watch at 1:50 a.m. on October 26, 2013, which required that he be visually checked at least every 30 minutes.

130.    The lawsuit related to his death alleged that MCDC deputies failed to check on Mr. Begay every 30 minutes, however, and failed to provide him any medical care or monitoring whatsoever for the next 26 hours, despite knowledge of his extreme alcohol intoxication and the near certainty that he would experience life-threatening symptoms of alcohol withdrawal.

131.   Mr. Begay was found unresponsive and not breathing in his cell at approximately 3:08 a.m. on October 27, 2013.

132.   Mr. Begay was not discovered as part of any visual checks, but instead only because MCDC deputies were placing another detainee in the same cell.

133.   At that time, MCDC Deputy Vigil attempted to perform CPR but, either because she was improperly trained or because she lacked the necessary equipment to do so, she did not attempt to perform resuscitations on Mr. Begay.

134.   Mr. Begay was pronounced dead at approximately 3:15 a.m.

135.   MCDC Deputy Vigil stated during a subsequent investigation that she thought she was the last person to see Mr. Begay alive at approximately 9:30 p.m. on October 26, 2013.

136.   The Montezuma County Coroner determined that rigor mortis had set in and confirmed Mr. Begay had likely passed away between 12:00 a.m. and 12:30 a.m.—meaning that he lay dead in his cell for approximately three hours before MCDC deputies or staff noticed.

137.   Another detainee was placed in the same cell as Mr. Begay at MCDC at approximately 11:55 p.m. on October 26, 2013, and that detainee confirmed that Mr. Begay never moved, changed positions, responded to any questions, or said anything to him the entire time that they shared the cell—again, confirming that he likely passed away around midnight that night.

138.   These facts confirm that Mr. Begay either was not observed at all by MCDC deputies or staff for five-and-a-half hours between 9:30 p.m. on October 26, 2013 and 3:00 a.m. on October 27, 2013, or that any visual checks during this period of time were wholly inadequate.

139.   Had any proper monitoring been conducted at MCDC, Mr. Begay would have been discovered much earlier, and his life may have been saved.

140.     Dr. Robert Kurtzman performed an autopsy on Mr. Begay, and he determined that his cause of death was "complications of chronic alcohol use."

141.     Dr. Kurtzman also advised that Mr. Begay did not suffer any physical trauma that led to his death.

142.     Mr. Begay's family filed a wrongful death suit against Montezuma County, former Sheriff Burell, and others, in October 2015—several months after Defendant Sheriff Steve Nowlin was elected Sheriff of Montezuma County.

143.     The case was settled with the County in 2016.

144.     Although Mr. Begay's death was investigated by the Montezuma County Sheriff's Office, no deputies or MCDC staff were disciplined, suspended, reprimanded, or received any additional training as a result of his death.

*ii.  Scott Watson – December 2013*

145.     47-year-old Scott Watson was arrested by Cortez Police Officers on the evening of December 26, 2013, on a charge of driving under the influence.

146.     Mr. Watson was booked into MCDC at 8:49 p.m. on December 26, 2013.

147.     According to his postmortem examination report, Mr. Watson was highly intoxicated upon his admission to MCDC, with an extremely high BAC of .277%.

148.     However, Mr. Watson was not placed on proper alcohol withdrawal or drug overdose precautions, nor was he properly monitored or treated for symptoms of alcohol withdrawal after he was booked into MCDC.

149.     Like Mr. Newman and Mr. Begay, Mr. Watson was placed on "cell-checks" which consisted of staff looking into the cell through the window and without opening the door every half hour.

150.     The next morning, deputies noticed that Mr. Watson "didn't look good."

151.     At approximately 7:00 a.m. and 7:35 a.m. on December 27, 2013, Mr. Watson called a friend and told her that he was experiencing alcohol withdrawal.

152.     Mr. Watson told Deputy Rebekah Morris that a friend would be dropping off some medication for him because he had high blood pressure, and that she planned to bond him out.

153.     Rather than informing medical staff of Mr. Watson's condition or attempting to secure any blood pressure medication or other treatment for Mr. Watson, Deputy Morris blithely told Mr. Watson that he would need a BAC of .000% before he could be bonded out.

154.     Around the time breakfast was served, Mr. Watson's cellmates noticed that he was struggling to breathe and gasping for air. One of his cellmates tried to wake him up by yelling at him but was unsuccessful.

155.     Deputy Morris entered the cell at approximately 8:44 a.m. after hearing gargling sounds coming from his cell. She noticed Mr. Watson was lying on his back, making gargling noises and with a foaming liquid coming out of his mouth—which are symptoms of an alcohol-withdrawal induced seizure.

156.     Deputy Morris called out his name several times and tried to wake him, up but was unsuccessful. Only at that point did Deputy Morris summon MCDC Nurse Anna Utley by radio (who had arrived at MCDC at 7:40 a.m. for an 8:00 a.m. shift) to evaluate Mr. Watson.

157.     Prior to her arriving to assist with CPR, Nurse Utley did not evaluate Mr. Watson, provide him any treatment, or advise any of the deputies regarding his care.

158.     Before Mr. Watson was found unresponsive in his cell at approximately 8:44 a.m., no MCDC staff or deputies had informed Nurse Utley that Mr. Watson needed evaluation or treatment for alcohol withdrawal, nor did Nurse Utley perform any "rounding" checks on him.

159.     This was because, upon information and belief, MCDC had no system, policy, or procedure in place requiring Nurse Utley to round or check on inmates or detainees facing withdrawal or overdose symptoms when she arrived for her shift in the morning.

160.     When she finally saw Mr. Watson at approximately 8:44 a.m., Nurse Utley attempted to perform CPR and noted that he was non-responsive to verbal stimuli, was making a loud gurgling sound, and had no pulse present.

161.     Because Mr. Watson had no pulse, a code blue should have been called and a crash cart or defibrillator should have been immediately brought into the cell to attempt to revive him.

162.     No code was called, and any defibrillator or other equipment that Nurse Utley needed to revive Mr. Watson was not readily accessible.

163.     MCDC Deputy Casey Zahorka spent several crucial minutes trying to locate a defibrillator, as he either was not trained on its proper location, or the defibrillator was not placed where it should have been.

164.     After several minutes passed, he found a defibrillator and took it to the cell where CPR was being performed on Mr. Watson—when he realized that there were no pads for the defibrillator so it could not be used.

165.   Lifesaving minutes passed while Deputy Zahorka looked for a defibrillator that actually worked.

166.   At approximately 8:51 a.m. (*i.e.*, seven minutes after Mr. Watson was first discovered), Deputy Zahorka found a second defibrillator with the requisite pads. By the time he returned to Mr. Watson's cell, however, the paramedics had already arrived, and he made no attempt to use it on Mr. Watson.

167.   Mr. Watson was then taken to SMH, where he was pronounced dead at 9:03 a.m.

168.   Mr. Watson received no medical evaluation or treatment whatsoever from when he was booked into MCDC at 8:49 p.m. on December 26, 2013, and when he was found unresponsive at 8:44 a.m. on December 27, 2013.

169.   A postmortem examination was performed, and Mr. Watson's cause of death was identified as dissecting aortic aneurysm.

170.   In a subsequent investigation by the Montezuma County Sheriff's Office, Deputy Morris claimed to have performed a "cell check" on Mr. Watson at 8:21 a.m. on December 27, 2013.

171.   Deputy Morris acknowledged, however, that there were two other detainees in the cell in addition to Mr. Watson, and that she did not enter the cell, did not speak to Mr. Watson, and did not see his face since he was laying on his side facing the wall with a blanket over him.

172.   Deputy Morris initially claimed that Mr. Watson appeared to be breathing when she did her cell check at 8:21 a.m. but, when the investigator pointed out that Mr. Watson was lying on his side and facing away from her with a blanket over him, she claimed not to remember one way or another and could not remember how long she looked into the cell for her "cell check."

173.    The County associated this death with alcohol. Thus, after Mr. Watson's death became public, then-Undersheriff of Montezuma County Lynda Carter told the *Cortez Journal* that MCDC was under-resourced to handle inmates that are extremely intoxicated, and that the series of inmate deaths at MCDC connected to alcohol could be better avoided if the County had a proper detox center.

174.    Specifically, Undersheriff Carter told the *Cortez Journal* that "[w]e need a detox center here so bad."

175.    Although Mr. Watson's death was investigated by the Montezuma County Sheriff's Office, no deputies or MCDC staff were disciplined, suspended, reprimanded, or received any additional training as a result of Mr. Watson's death.

                        *iii.   Dani Miller – October 2015*

176.    47-year-old Dani Miller was arrested by Cortez Police Officers on October 23, 2015, on an outstanding warrant for failing to appear in court.

177.    Ms. Miller was booked into MCDC at 12:19 p.m. on October 23, 2015, with a blood alcohol level of .289%—more than three times the legal limit.

178.    Upon information and belief, Ms. Miller did not receive any medical or mental health screening, and she did not receive any medications or other treatment for her withdrawal symptoms.

179.    Upon information and belief, Ms. Miller was not placed on proper alcohol or drug withdrawal precautions at MCDC.

180.    Like Mr. Newman, Mr. Begay, and Mr. Watson, Ms. Miller was placed on "cell-checks" which consisted of staff looking into the cell through the window and without opening the door every half hour.

181.    At 3:49 a.m. the following morning, Ms. Miller was found unresponsive in her holding cell with two other inmates.

182.    Ms. Miller was not discovered as part of a "cell check," but was instead found because Deputy Cynthia Guerrero wanted to bring her out to finish the booking process.

183.    Deputy Guerrero entered the cell and called Ms. Miller's name a few times with no success, so she shook her leg and received no response.

184.    She then tried to find a pulse on Ms. Miller's wrist but was unable to locate one and observed that Ms. Miller felt cold to the touch.

185.    MCDC Detentions Sgt. Braveheart then entered the cell, called Ms. Miller's name, and did not receive a response.

186.    Rather than initiating a code or CPR, Sgt. Braveheart rubbed his arm on hers and she did not respond.

187.    Sgt. Braveheart then pushed Ms. Miller's mat onto the floor and rolled her over such that she was lying on her head with head against the wall with her arm covering her face—which prevented her from getting any oxygen in her airway.

188.    Sgt. Braveheart fumbled around in a negligently untrained, objectively unreasonable, and recklessly incompetent effort to revive Ms. Miller.

189.    He later claimed to have attempted CPR for about thirty seconds but said he stopped when he could not get Ms. Miller's mouth open.

190.    He instead tried to give her chest compressions.

191.    Because there was no mask or "ambu bag," and Sgt. Braveheart was unwilling or untrained to do mouth-to-mouth resuscitation, no breaths were given to Ms. Miller in between compressions—depriving her brain and organs of oxygen as she was dying.

192.    No attempt was made by Sgt. Braveheart or anyone else to obtain or use a defibrillator to revive Ms. Miller.

193.    Ms. Miller was pronounced dead at 3:57 a.m.

194.    Ms. Miller received no medical evaluation or treatment whatsoever from when she was booked into MCDC at 12:19 p.m. on October 23, 2015, until she was found unresponsive at 3:49 a.m. on October 24, 2015.

195.    A postmortem examination was performed, and Ms. Miller's cause of death was identified as complications of chronic alcohol abuse.

196.    Sheriff Steve Nowlin admitted to local media outlets that MCDC was not an approved health care facility with medically trained staff and acknowledged the need for medically appropriate detoxing to safely handle withdrawal and acute intoxication.

197.    Sgt. Braveheart later acknowledged to investigators that deputies do not actually open the cell doors, check vital signs, talk to detainees, or interact with them in any way during "cell-checks" at MCDC.

198.    Instead, according to Sgt. Bravehart, "all they do is look through the [cell] window to make sure everyone is ok."

199.    Although Ms. Miller's death was investigated by the Montezuma County Sheriff's Office, no deputies were disciplined, suspended, reprimanded, or received any additional training as a result of Ms. Miller's death.

200.    Instead, the Montezuma County Sheriff's Office—at least in part—blamed Ms. Miller for her death at MCDC, stating: "It is apparent that D. Miller suffered from alcoholism, which may have been a factor in her death."

     *iv. Michael McMordie – May 2019*

201.    33-year-old Michael McMordie was arrested by Cortez Police Officers on the evening of May 21, 2019, on a warrant for failing to appear in court on a trespassing charge.

202.    Cortez Police Officers observed that Mr. McMordie was "pretty high" when he was arrested.

203.    Mr. McMordie was booked into MCDC at approximately 10:00 p.m. on May 21, 2019.

204.    At that time, BOCC Deputy Angelita Topaha observed Mr. McMordie as being "all over the place with his body movement and how shaky his hands were."

205.    BOCC Deputy Alexander Kennedy also said that he could tell Mr. McMordie was high based on his prior experiences with Mr. McMordie and his body movements.

206.    BOCC Deputy Kennedy searched Mr. McMordie and found a glass meth pipe and a container with approximately 6 grams of methamphetamine.

207.    Although Mr. McMordie showed obvious signs of overdose and/or withdrawal and was arrested with a significant quantity of methamphetamine, there was no nurse, doctor, or other medical provider at MCDC when he was booked into MCDC in the late hours of May 21, 2019,

so he did not receive any medical or mental health screening, and he did not receive any medications or other treatment for drug or alcohol withdrawal or overdose symptoms.

208.   Mr. McMordie did not receive any medical or mental health screening, and he did not receive any medications or other treatment for her withdrawal symptoms.

209.   Mr. McMordie was not placed on proper alcohol or drug withdrawal precautions at MCDC.

210.   Although Mr. McMordie was visibly intoxicated and possessed a significant amount of methamphetamine and related paraphernalia, no blood test was performed at MCDC to determine the amount of methamphetamine in his system.

211.   MCDC staff and deputies did not perform any formal medical monitoring of Mr. McMordie after intake, nor did they document his vital signs or symptoms.

212.   Instead, like Mr. Newman, Mr. Begay, Mr. Watson, and Ms. Miller, Mr. McMordie was placed on "cell-checks" which consisted of staff looking into the cell through the window and without opening the door every half hour.

213.   At approximately 10:30 p.m. that evening, Mr. McMordie asked Sgt. Steven Smith for a cup for water, and Sgt. Smith refused the request and said he would bring him a cup at the next cell check.

214.   When Sgt. Smith returned at approximately 11:00 p.m., he gave Mr. McMordie the cup and asked how much drugs he had done, and Mr. McMordie responded that he had done "2 to 3 grams" of methamphetamine that day—a significant amount that can provide anywhere from 20 to 75 "hits" or doses.

215.   Mr. McMordie told Sgt. Smith: "I just need some water."

216.     Rather than seeking any medical treatment or monitoring for Mr. McMordie, Sgt. Smith ignored the obvious signs and symptoms of methamphetamine overdose and took no steps to ensure Mr. McMordie's safety.

217.     At approximately 11:55 p.m., Deputy Topaha observed Mr. McMordie through the cell window laying on the floor continuing to shake as he had done during booking, but she did not take his vital signs or seek any medical treatment or monitoring for him.

218.     At some point in time, Mr. McMordie began vomiting blood (an obvious sign of an overdose or withdrawal), and he vomited so much blood that it ended up on his boxers, under the table in his cell, on his blanket, and on the floor next to the toilet.

219.     Although it was only 76 degrees Fahrenheit in the cell, Mr. McMordie was so overheated and sweating so profusely in his cell that he tried to wipe himself down with water using his boxers, his shirt, and the blanket—another obvious sign of overdose.

220.     Although these severe symptoms of overdose would have been obvious to anyone who had even taken a cursory glance into Mr. McMordie's cell, no MCDC staff or deputy noticed these symptoms or sought any treatment for him.

221.     At approximately 2:06 a.m. the following morning, Mr. McMordie was found unresponsive and not breathing in his cell by Deputy Kennedy.

222.     Although Deputy Kennedy knew Mr. McMordie had ingested methamphetamine (as Deputy Kennedy had discovered the meth himself), he administered Narcan (a treatment for opioid overdose) to Mr. McMordie—which was unsuccessful at reviving him.

223.     Sgt. Smith entered the cell and immediately noticed that Mr. McMordie's body was discolored, he was cold to the touch, and rigor mortis had set in—indicating that he had been dead for at least an hour.

224.     Sgt. Smith did not order a code or ask anyone to bring him a defibrillator.

225.     He instead tried to give Mr. McMordie chest compressions for approximately one minute before deciding that there was nothing he could do.

226.     Because there was no mask or "ambu bag," and Sgt. Smith was unwilling or untrained to do mouth-to-mouth resuscitation, no breaths were given to Mr. McMordie between chest compressions.

227.     Mr. McMordie was declared dead at 4:00 a.m. on May 22, 2019.

228.     Mr. McMordie received no medical evaluation or treatment whatsoever from when he was booked into MCDC at 10:00 p.m. on May 21, 2019, until he was found unresponsive at 2:06 a.m. the following morning.

229.     After Mr. McMordie's death became public, Sheriff Nowlin claimed to the *Cortez Journal* that Mr. McMordie did not show signs of distress when he was booked into MCDC.

230.     An autopsy was performed and Mr. McMordie's cause of death was identified as methamphetamine toxicity, with his manner of death listed as "accident."

231.     Thus, despite the County being repeatedly placed on notice of the constitutionally deficient policies, procedures, protocols, customs, and staffing plans at MCDC, at of the time of Mr. Newman's death, no mechanism to conduct medically appropriate detoxing of inmates had been established, and the jail continued to have no plan for dealing with acute intoxication, most medical emergencies, or withdrawal.

## V.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
*42 U.S.C. § 1983*
*Fourteenth Amendment – Monell Liability*
**(Plaintiff Estate against County Defendants)**

232.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

233.    County Defendants are liable under § 1983 because they (i) did not have alcohol and drug withdrawal policies in the jail and had a constitutionally deficient intake medical screening, assessment, treatment, and referral process; (ii) had a deliberately indifferent staffing plan that failed to have a medical clinic or even a medical provider at the jail at all times to assess and treat detainees for alcohol and drug withdrawal and overdose; and (iii) had a widespread custom and practice of failing with deliberate indifference to provide any treatment to detainees experiencing symptoms of alcohol or drug withdrawal or overdose.

234.    County Defendants adopted, and failed to adopt, policies and staffing plans that did not provide for a proper medical and mental health assessment or institute a "C.I.W.A." protocol on intake—necessary actions that would have ensured that people suffering from withdrawal symptoms, like Mr. Newman, received follow-up monitoring at MCDC for signs of withdrawal throughout the detoxification process.

235.    Specifically, the challenged practices of these defendants in adopting policies, procedures, protocols, customs, and staffing plans that don't allow for monitoring of serious withdrawal symptoms, monitoring of serious medical needs of inmates include:

(a)    Implementing medical policies that don't allow for or require medical monitoring of inmates likely to experience serious withdrawal symptoms;

(b)     Implementing policies that allow booking of acutely intoxicated inmates on the nights and weekends without any available medical monitoring;

(c)     Implementing policies that do not provide its deputies with a validated withdrawal severity scale to be used to track people's signs and symptoms throughout the course of withdrawal;

(d)     Implementing policies of known to be ineffectual 30-minute cell checks without any associated medical evaluation even when inmates were known to be intoxicated and/or injured;

(e)     Implementing policies that defer identification of inmates who are likely to withdraw or detox from substances until the next week day;

(f)     Implementing medical emergencies policies that require medical staff to implement without medical staff in the jail on nights and weekends;

(g)     Implementing medical emergencies policies that don't provide for worsening changes in condition or have any system or staff to evaluate serious medical needs on nights and weekends;

(h)     Implementing polices that allow the keeping of inmates whose serious medical needs cannot be attended to on nights and weekends when no medical personnel are staffed.

236.    These practices constitute formally promulgated policies, well-settled custom and practice, and final decisions by municipal policy makers.

237.    While these polices are formally promulgated in unconstitutional form that caused the violation of Mr. Newman's 14th Amendment right to medical care in jail, they also constitute custom and practice, and the purposeful decision of the municipal policy maker, Sheriff Nowlin in his official capacity, to promulgate only these policies and to deliberately staff the jail in this way without medical staff on nights and weekends.

238.    The existence of a widespread custom of deliberate indifference to detainees' serious medical needs, particularly as related to detainees suffering from symptoms of alcohol and drug withdrawal, is further demonstrated by the deaths of MCDC detainees Michael McMordie,

Harrison Begay, Dani Miller, and Scott Watson—all of whom died under circumstances strikingly similar to Mr. Newman's death, and whose deaths all put County Defendants on notice of its constitutionally deficient policies and practices.

239.    The existence of this widespread custom of deliberate indifference to the serious medical needs of MCDC detainees facing symptoms of severe drug and alcohol withdrawal is also evidenced by the statements of Montezuma County Sheriff's Office officials following detainees' deaths, which acknowledged that the MCDC was under-resourced to handle inmates facing alcohol or drug withdrawal, and that the County needed a detox center to properly handle such individuals.

240.    The existence of a widespread custom of deliberate indifference to the serious medical needs of MCDC detainees facing symptoms of severe drug and alcohol withdrawal is also evidenced by Defendants' failure to take any remedial action to prevent such withdrawal and overdose deaths from occurring at MCDC after the deaths of Michael McMordie, Harrison Begay, Dani Miller, and Scott Watson—including by failing to impose any formal or informal discipline or additional training or supervision on any MCDC staff or deputies as a result of these deaths.

241.    County Defendants' deliberate indifference in adopting the described herein policies, practices, customs, and staffing plan were deliberately indifferent to the rights of inmates to receive constitutionally adequate medical care.

## SECOND CLAIM FOR RELIEF
### *Negligence in the Operation of a Jail resulting in Wrongful Death*
**(Plaintiff J.W. against County Defendants)**

242.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set for the herein.

243.    Pursuant to the Colorado Governmental Immunity Act, CO ST. § 24-10-106, ("CGIA") governmental immunity is waived for any action by a pre-trial detainee for injuries, which lie in tort or could lie in tort, resulting from the negligent operation of any correctional facility or jail.

244.    At all times relevant hereto, Mr. Newman was incarcerated at MCDC based on allegations that had not yet been adjudicated, and thus was being held as a pre-trial detainee.

245.    County Defendants are directly liable for their own negligent policies and practices and are vicariously liable for the negligent acts and omissions by their agents and/or employees, including, but not limited to Zachary Summers, Daniel Ruiz, Andrew Daulton, Daylan Guttridge, Bryce Durbin, Vici Pierce, and Garet Talley, all of whom at all relevant times were acting within the scope of their employment.

246.    At all times relevant to this action, Mr. Newman was in the custody and care of MCDC staff.

247.    The operation of a correctional facility for purposes of the CGIA includes adequate provision of medical and mental health care necessary for basic health.

248.    Defendant Sheriff Nowlin, in his official capacity, had a duty to provide reasonable medical care to pre-trial detainees in his custody like Mr. Newman. This duty includes, but is not limited to the following:

    (a)    A duty to implement reasonable alcohol withdrawal or "C.I.W.A." policies and protocols;

    (b)    A duty to provide reasonable medical care to detainees who are suffering from alcohol withdrawal symptoms;

    (c)    A duty to staff medical workers on the weekend;

(d)     A duty to implement sufficient emergency policies and procedures for inmates experiencing changes in condition;

(e)     A duty to reasonably train MCDC staff on how to provide first aid and CPR to detainees in medical crisis;

(f)     A duty to reasonably provide and maintain functional first aid and CPR equipment; and

(g)     A duty to timely transport a detainee in medical crisis, who cannot receive the necessary medical care at MCDC, to a healthcare facility able to provide the higher acuity medical care they need to survive and maintain basic health and safety.

249.     As alleged herein, Defendants breached these duties of care by the complained-of negligent acts and omissions, including, but not limited to the following:

(i)     Failing to implement reasonable alcohol withdrawal or "C.I.W.A." policies and protocols;

(j)     Failing to provide reasonable medical care to detainees who are suffering from alcohol withdrawal symptoms;

(k)     Failing to staff medical workers on the weekend;

(l)     Failing to implement sufficient emergency policies and procedures for inmates experiencing changes in condition;

(m)     Failing to reasonably train MCDC staff on how to provide first aid and CPR to detainees in medical crisis;

(n)     Failing to reasonably provide and maintain functional first aid and CPR equipment; and

(o)     Failing to timely transport a detainee in medical crisis, who cannot receive the necessary medical care at MCDC, to a healthcare facility able to provide the higher acuity medical care they need to survive and maintain basic health and safety.

250.     Through their actions and omissions, or those of their employees, Defendants breached their respective standards and duties of care and were negligent in failing to provide for

the monitoring and treatment of withdrawal symptoms, provision of health care, timely transfer to the hospital, and provision of competent CPR, causing Mr. Newman's death.

251.     Mr. Newman is survived by his daughter J.W., who suffers emotional distress and anguish as a result of the loss of her father.

252.     As a direct and proximate result of these Defendants' unlawful acts and omissions, Plaintiff has suffered damages, losses and injuries in an amount to be determined by the jury at trial. These damages include, *inter alia*, emotional upset, grief, loss of companionship, and all other purely non-economic damages as allowed under the Colorado Wrongful Death Act.

253.     Plaintiff J.W. also has suffered and will continue to suffer economic and non-economic damages due to Defendants' negligent conduct toward Mr. Newman including, but not limited to, economic and non-economic damages for grief, loss of Mr. Newman as a parent, and emotional distress.

254.     Plaintiff J.W. is therefore entitled to general and compensatory damages for such pain and suffering and emotional distress and to special damages in amounts to be ascertained in trial.

### THIRD CLAIM FOR RELIEF
***Negligence in the Operation of a Hospital and Medical Negligence Causing Wrongful Death***
**(Plaintiff J.W. Against Southwest Health System, Inc., d/b/a Southwest Memorial Hospital, Montezuma County Hospital District, and Dr. Davidson)**

255.     Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

256.     Pursuant to the Colorado Governmental Immunity Act, CO ST. § 24-10-106, ("CGIA") governmental immunity is waived for any action resulting from the negligent operation of a public hospital.

257.    Dr. Davidson was an emergency medicine physician who had a physician-patient relationship with and provided medical care to Mr. Newman.

258.    Dr. Davidson had a duty to Mr. Newman to properly and reasonably assess, diagnose, treat, and admit Mr. Newman to the hospital, but instead he violated this duty of care by failing to reasonably assess, diagnose, treat, or admit Mr. Newman, causing Mr. Newman's death.

259.    Defendant Hospital and Hospital Special District are vicariously liable for the negligent acts and omissions by their nursing agents and/or employees, as alleged in this claim for relief and in the incorporated statement of facts.

260.    Defendant Davidson, the Defendant Hospital, and the Defendant Hospital Special District, through nursing and other allied health care professional staff, and/or directly, all had duties of due care to provide or ensure provision of reasonable medical, nursing or other health care to Mr. Newman by qualified caregivers.

261.    All involved caregivers failed to fulfill their duty as nurses, doctors, and other health care workers to properly assess, diagnose, admit, and treat Mr. Newman, causing his death.

262.    With respect to their care and treatment of Mr. Newman, Defendant Hospital, and Hospital Special District each owed him a duty to exercise the degree of care, skill, caution, diligence, and foresight exercised by and expected of hospital, nursing, allied health professional personnel and physicians including national standards for emergency medicine physician specialists like Dr. Davidson.

263.    Through their actions and omissions, or those of their employees, Dr. Davidson, Defendant Hospital, and Hospital Special District breached their respective standards and duties of care and were negligent in failing to properly assess, monitor, treat, advocate and care or provide

for the admission, diagnosis and proper care and treatment of Mr. Newman by properly qualified caregivers as set forth herein in the incorporated statement of facts.

264.    As a direct and proximate result of these Defendants' unlawful acts and omissions, Plaintiff J.W. has suffered damages, losses, and injuries in an amount to be determined by the jury at trial. These damages include, *inter alia*, emotional suffering, upset, grief, loss of a parent, and all other purely non-economic damages as allowed under the Colorado Wrongful Death Act.

265.    Plaintiff J.W. also has suffered and will continue to suffer economic and non-economic damages due to Defendants' negligent conduct toward Mr. Newman including, but not limited to, economic and non-economic damages for grief, loss of Mr. Newman as a parent, and emotional distress.

266.    Plaintiff J.W. is therefore entitled to general and compensatory damages for such pain and suffering and emotional distress and to special damages in amounts to be ascertained in trial.

## FOURTH CLAIM FOR RELIEF
### Colo. Rev. Stat. § 13-21-131
### Cruel and Unusual Punishment and Deprivation of Due Process
### Violation of Colorado Constitution, Article 2, Sections 20 & 25
**(Plaintiff Estate against Defendants Deputy Summers and Deputy Daulton in their individual capacities)**

267.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

268.    Plaintiff Estate brings this claim against Defendant Deputy Summers and Defendant Deputy Daulton in their individual capacities.

269.    At all times relevant to this Amended Complaint, Individual Defendants were acting under the color of state law in their capacities as Montezuma County Sheriff Department Deputies, peace officers as defined by Colo. Rev. Stat. § 24-31-901(3).

270.    Mr. Newman had a constitutional right under Article 2, Section 20, of the Colorado Constitution to be free from cruel and unusual punishment, including the right to receive adequate medical care while incarcerated.

271.    As a relatively new statute, the Colorado Supreme Court has not determined the precise standard for claims under Article 2, Section 20, of the Colorado Constitution to be free from cruel and unusual punishment. Specifically, it has not determined whether as a pre-trial detainee, this right includes the right to receive objectively reasonable medical care, or non-deliberately indifferent medical care, and this is thus a matter of first impression. *See* Colo. Rev. Stat. § 13-17-201(2).

272.    The Colorado Supreme Court has also not determined whether the constitutional right under Article 2, Section 25, of the Colorado Constitution to due process includes the right to receive objectively reasonable or non-deliberately indifferent medical care as a pretrial detainee. *See* Colo. Rev. Stat. § 13-17-201(2).

273.    Mr. Newman had a constitutional right under Article 2, Section 20 and 25 of the Colorado Constitution, to receive objectively reasonable and non-deliberately indifferent medical care, including CPR and withdrawal care, as a pretrial detainee.

274.    Individual defendants were aware of the substantial risk of harm to the detainees at the jail by only providing medical care on the weekdays and having no alcohol withdrawal protocols to assess a detainee like Mr. Newman as he began experiencing severe withdrawal

symptoms. Individual defendants were also aware of the substantial risk of harm to detainees at the jail by having staff under-trained or untrained in the provision of reasonable CPR, and of not having adequate equipment to provide such lifesaving care.

275.    Despite knowing of the obligation to provide competent staff and equipment and competent objectively reasonable assessments and CPR, Individual Defendants violated those obligations causing the death of Mr. Newman.

276.    As a direct and proximate result of these Defendants' unlawful acts and omissions, Plaintiff has suffered damages, losses and injuries in an amount to be determined by the jury at trial. These damages include, *inter alia*, pain and suffering, upset, grief, loss of life, loss of society and companionship, anger, depression, and all other purely non-economic damages as allowed under all applicable statutes.

277.    Plaintiff Estate also has suffered and will continue to suffer economic and non-economic damages due to Individual Defendants conduct toward Mr. Newman including, but not limited to, economic and non-economic damages for grief, loss of Mr. Newman as a parent, and emotional distress.

278.    Plaintiff Estate is therefore entitled to general and compensatory damages for such pain and suffering and emotional distress and to special damages in amounts to be ascertained in trial.

## VI.    PRAYER FOR RELIEF

Plaintiffs pray that this Court enter judgment for the Plaintiffs and against each of the Defendants and enter the following relief:

(a)    All appropriate relief at law and equity;

(b)     Declaratory relief that such conduct is unlawful;

(c)     Economic losses on all claims allowed by law;

(d)     Compensatory and consequential damages, including damages for emotional distress, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

(e)     Punitive damages on any claims allowed by law, including upon suitable amendment upon proper motion with respect to health care providers;

(f)     Attorneys' fees on all claims allowed by law together with costs associated with this action, including expert witness fees;

(g)     Pre- and post-judgment interest at the highest lawful rate; and

(h)     Any further relief that this Court deems just and proper.

**PLAINTIFFS REQUEST TRIAL BY JURY.**

Respectfully submitted this 1st day of September, 2022.

*/s/ Anna Holland Edwards*
Anna Holland Edwards
John Holland
Dan Weiss
HOLLAND, HOLLAND EDWARDS & GROSSMAN, LLC
1437 High Street
Denver, Colorado, 80218
303-860-1331
anna@hheglaw.com

and

*/s/ Kevin D. Homiak*
Kevin D. Homiak, Esq.
HOMIAK LAW LLC
1001 Bannock Street, Suite 238
Denver, Colorado 80204
505-385-2614
kevin@homiaklaw.com

*Attorneys for Plaintiff*

## **<u>CERTIFICATE OF REVIEW</u>**

This is to certify that undersigned counsel has conferred, pursuant to Colorado statutes, with  person who have expertise in the areas of alleged negligence, including the medical and emergency medical negligence, and this person has reviewed the known facts, including such records, documents, and other materials as they have found to be relevant to the complaint allegations of negligent acts and omissions and have concluded that the filing of this complaint does not lack substantial justification and in fact is substantially meritorious within the meaning of C.R.S. § 13-20-602 with violations of the standards of care involved by all of the defendants.

*<u>/s/ Anna Holland Edwards</u>*
Anna Holland Edwards