# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. 22-cv-1763-PAB-KAS

ESTATE OF KELROY NEWMAN, by and through
putative personal representative, Bryanne Watts-Lucero;
J.W., a minor child, by and through next friend and
mother, Elisa Wilson;

    Plaintiffs,

v.

BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF MONTEZUMA, COLORADO;
SHERIFF STEVEN NOWLIN, individually and in his official capacity;
ZACHARY SUMMERS, individually;
SOUTHWEST HEALTH SYSTEM, INC, d/b/a Southwest Memorial Hospital;
RANDY GENE DAVIDSON, MD, individually,

    Defendants.

---

## MOTION FOR LEAVE TO AMEND COMPLAINT TO ADD PUNITIVE DAMAGES REMEDY UNDER STATE LAW NEGLIGENCE CLAIM

---

Plaintiffs seek leave to amend the Complaint, pursuant to Fed. R. Civ. P. 15(a), and as grounds therefore state as follows:

Pursuant to D.C.COLO.LCivR 7.1(a), counsel has conferred with Counsel for Defendant Southwest Memorial Hospital ("SMH" of "Hospital"), who opposes the requested amendment.

### I. INTRODUCTION

The current proposed Second Amended Complaint adds an exemplary damages remedy under the state law negligence claim against Defendant SMH, an entity against whom exemplary

damages are already sought under 42 U.S.C. §1983 in the April 7, 2023 proposed complaint.[1] The Scheduling Order in this case directs that motions to amend the pleadings to seek state law punitive damages shall be governed by the Health Care Availability Act ("HCAA"). Doc. #43, p. 15. Under the HCAA, exemplary damages may not be sought prior to completion of substantial discovery and must be accompanied by a proffer. C.R.S. §§13-64-302.5; 13-21-102.

Plaintiffs now seek to add a punitive damages remedy under the state law negligence claim based on the recklessly insufficient system SMH established and maintained with regard to medically clearing inmates for incarceration, causing Mr. Newman's death. The allegations forming the basis of the negligence and § 1983 claims against SMH were included in the Proposed Second Amended Complaint filed in April. Doc. #67.1. This motion is timely as the parties have now completed substantial discovery, and Plaintiffs have gathered the evidence necessary to put forth the evidentiary proffer required by state law. This timely amendment should be granted as Plaintiffs readily meet the 'lenient' standard of establishing a *prima facie* case of this triable issue.

## II.  LEGAL STANDARD

Pursuant to F.R.C.P. 15(a)(2), the Court should allow amendment of pleadings "when justice so requires." Leave should only be denied for "undue delay, undue prejudice to the opposing party, bad faith or dilatory motive, failure to cure deficiencies by amendments previously

---

[1] On April 7, 2023, Plaintiffs filed a Motion for Leave to Amend Complaint (Doc. #66), seeking to add an Emergency Medical Treatment and Labor Act ("EMTALA") claim against the hospital, and §1983 deliberate indifference claims against the Hospital and Dr. Davidson. That motion is still pending. This motion, with the proposed complaint as **Ex. 1**, simply seeks to add a punitive damages remedy under the state law negligence claim to the prior Proposed Second Amended Complaint that was filed on April 7, 2023 and incorporated herein by reference. **Ex. 2** is a Redline Complaint identifying the changes made in two different colors for ease of reference. Pink identifies proposed changes included in the April 7, 2023, Proposed Second Amended Complaint. Yellow highlight identifies additional changes to the state law claim related to this Motion.

2

allowed, or futility of amendment." *Duncan v. Manager, Dep't of Safety, City and County of Denver,* 397 F.3d 1300, 1315 (10th Cir. 2005); *Foman v. Davis*, 371 U.S. 178, 182 (1962).

Here, plaintiffs must make a *prima facie* showing that "the injury complained of is attended by circumstances of fraud, malice, or willful and wanton conduct" by "a showing of a reasonable likelihood that the issue will ultimately be submitted to the jury for resolution" and may be made "through discovery, by evidentiary means, or by offer of proof." *Stamp v. Vail Corp,* 172 P.3d 437, 449 (Colo. 2007); C.R.S. § 13–21–102(1)(a). Willful and wanton "means conduct purposely committed which the actor must have realized as dangerous, done heedlessly and recklessly, without regard to consequences, or of the rights and safety of others, particularly the plaintiff." C.R.S. §13–21–102(1)(b). Where "the defendant is conscious of his conduct and the existing conditions and knew or should have known that injury would result, the statutory requirements" are met. *Coors v. Sec. Life of Denver Ins. Co.,* 112 P.3d 59, 66 (Colo. 2005).

The showing required is "a lenient standard," and "[a] plaintiff should have an opportunity to test the merits of any claim for relief that is supported by the underlying facts of a case." *Stamp*, 172 P.3d at 450. The Court should consider only the "preliminary question" of whether Plaintiffs made a *prima facie* case, not whether they will be entitled to those damages at trial. *See, e.g., Am. Econ. Ins. Co. v. William Schoolcraft,* No. 05–cv–01870–LTB–BNB, 2007 U.S. Dist. LEXIS 3261, *11-12 (D. Colo. Jan. 17, 2007); *Bituminous Cas. Corp. v. Hartford Cas. Ins. Co.,* No. 12-CV-00043-WYD-KLM, 2013 U.S. Dist. LEXIS 178103, at *11 (D. Colo. Dec. 18, 2013) ("[t]he Court emphasizes that this Order does not evaluate or address the merits of awarding punitive damages in this case, but is limited to the recognition that the issue of punitive damages may be properly included in the pleadings at this point.").

3

There is no undue delay, bad faith, or futility in this timely motion and amendment will not cause cognizable prejudice. "Prejudice in this context 'means undue difficulty in prosecuting [or defending] a lawsuit as a result of a change of tactics or theories on the part of the other party.'" *Qdoba Rest. Corp. v. Taylors, LLC*, No. 08-cv-01179-MSK-KLM, 2008 WL 4426009, *3 (D. Colo. Sept. 25, 2008) (internal citations omitted). Such prejudice does not exist here, as Defendant Hospital has long been defending Plaintiffs' claims based on these facts and conduct.

### III. EVIDENTIARY SHOWING

Plaintiffs make the following showing (including depositions, documents, and expert reports) of a triable issue whether SMH was "conscious of [its] conduct and the existing conditions and knew or should have known that injury would result." *Am. Econ. Ins. Co.* 2007 WL 160951, at *3-4 (finding deposition testimony and expert opinions appropriate to establish *prima facie* case).

Unlike many county jails, Montezuma County Detention Center ("MCDC" or "Jail") employed no health care staff at the jail on nights or weekends in 2021. There was no medical provider in the jail or on call at any time. **Ex. 3**, Nowlin Depo, 23:3-13. Rather, the jail employed one nurse, who worked from 7am-4pm on weekdays. **Ex. 4**, Hernandez Depo, 23:5-25, 31:14-19. The deputies working in the Jail had no training about monitoring inmates experiencing alcohol withdrawal, and were not provided any tools to evaluate withdrawal, such as a Clinical Institute Withdrawal Assessment for Alcohol (CIWA) protocol. **Ex. 5**, Durbin Depo, 29:17-30:12, 56:1-58:4 ("Q: What training, if any do you get as a deputy working in the jail on withdrawal from various kind of substances? A: None that I can think of"); **Ex. 6**, Guttridge Depo, 30:3-33:10; **Ex. 4**, 27:12-28:9, 78:22-80:18; **Ex. 7**, Ruiz Depo, 47:9-48:10; 68:4-69:18.

As there was no medical unit in the jail, medical clearances, medications, and doctor-level

4

care were outsourced to SMH through the emergency room and clinics.[2] **Ex. 4**, 39:10-22, 61:21-24; **Ex. 5**, 17:3-18, 70:8-14; **Ex. 7**, 40:10-14. SMH was fully aware of the Jail's limitations as it first contracted to provide health care for inmates housed at MCDC as early as 2010. **Ex. 8**; *see* County Response to Interrogatory No. 16, describing later informal understanding that SMH would conduct medical clearances, **Ex. 9**. SMH was also fully aware of the Jail's limitations when it agreed to conduct medical clearances for incarceration.

SMH agreed to take on the duties arising from essentially being the Jail's sole provider, and performing medical clearances, but established a recklessly insufficient system for satisfying those duties. It utterly failed to train or inform its staff about the obligation to consider the needs of patients discharged to jail, and to provide information needed to safely house intoxicated and withdrawing inmates without medical staff. SMH was consciously aware that its grossly negligent practices were causing deaths at the jail, but refused to change its approach or train its employees, leading to Mr. Newman's preventable death from complications from alcohol withdrawal. **Ex. 10**, Dr. Kerbel Report, p. 5; **Ex. 11**, Dr. Peerwani Report, p. 13. *See* Order Granting Plaintiffs' Motion to Amend Complaint to Include the Remedy of Punitive Damages, *Goplin v. SCL Health-Front Range, Inc.*, No: 2020CV31044 (Dist. Ct. Jefferson County, Nov. 5, 2021).

A. <u>SMH Agreed to Conduct Medical Clearances for Incarceration, Meaning that the Inmates Were Medically Evaluated and Safe to be Housed at the Jail from a Medical Perspective.</u>

MCDC policies require that certain medical conditions, including anyone with a BAC of over .2 be medically cleared for incarceration before being booked into the jail. **Ex. 12**. Medical clearances for incarceration are intended to assess whether inmate patients can be safely housed in

---

[2] See ¶¶ 133-137 of Doc 67.1 and **Ex. 1**, laying out the relationship between the Hospital and the jail. The underlying evidence supporting those allegations is attached and summarized herein.

jail. Medical clearance for incarceration involves assessing both whether the patient has an emergency that given second from a condition (such as acute alcohol intoxication), but also whether the person is likely to suffer an emergency in the near future from the natural consequence of their known condition (such as a .421 BAC and the abrupt cessation of alcohol intake in jail). As Chief Nursing Officer and Hospital Administrator Craig Felty opined: the standard of care requires that where "frequent observation of the detainee is necessary or concern exists about the progression of a medical problem that would require the patient to return in a relatively short amount of time, the patient should be admitted." **Ex. 13**, Felty Report, p. 5.

Sheriff Nowlin, and 30(b)(6) witness for the policies and practices of the jail, confirmed what medical clearances mean in terms of jail housing. He testified that when the hospital says an intoxicated inmate is 'medically cleared for jail' it is his understanding and expectation that the hospital had "evaluated the emergent conditions associated with that acute intoxication, which is intoxication problems and withdrawal problems." **Ex. 3**, 102:7-14; 95:24-96:17. Clearly the County does not send inmates to the hospital to learn if they are safe to be incarcerated just in the minute they are at the hospital, but also to ensure that the "inmate is safe to be housed at the jail from a medical perspective." *Id.* at line 17 ("Yes, that's what it is intended for.") Nurse Hernandez testified that medical clearances means that the inmate has been deemed "medically stable" and that it's safe to maintain them in the jail "for the rest of their stay." **Ex. 4**, 84:14-87:17.

Deputies widely understood that if an inmate had been medically cleared at SMH, they were safe to be incarcerated for the near future and relied on the medical clearance in determining whether to seek additional care. Thus, Deputy Summers testified that he understands that "with a high BAC there is obviously withdrawals from alcohol" and that he relies on medical clearances

6

when interacting with inmates, understanding that a medical clearance for an intoxicated inmate "means that they can safely withdraw outside the presence of medical professionals." **Ex. 14**, Summers Depo, 36:16-39:21, 84:13-87:17; **Ex. 5**, 9:5-10:8 (Inmates with a BAC over .2 have to be medically cleared to "make sure that they're – we are cleared to hold them inside our facility, that he is healthy enough to come in."); **Ex. 6**, 14:16-16:1 (Deputies get medical clearances to ensure "they're fit enough to be incarcerated" at the jail), 93:11-94:18. As the booking officer, when Deputy Guttridge sends inmates for medical clearance related to intoxication, it is to obtain a "more in-depth investigation if they're fit to be incarcerated and he understands they are "being evaluated for whether they can safely detox in a jail." **Ex. 6**, 15:17-16:17.

SMH clearly understood the purpose of medical clearances, as it is a rural hospital that works closely with the jail and has been performing its clearances on a daily basis for years. SMH collaborated with the Sheriff's Office to create and maintain a "Prisoner Medical Clearance" form the hospital expected its staff and doctors to utilize. This form expressly called for instructions to the jail staff and strongly demonstrates that SMH understood its employees were supposed to be considering the patients evolving condition when clearing patients for incarceration. **Ex. 22**.

B. <u>SMH Recklessly Failed to Train its Staff About Medical Clearances for Incarceration.</u>

Hospitals that treat inmates have the duty of establishing adequate systems of communication with the correctional institutions to which they discharge patients. The standard of care requires that "all ED staff who service the inmate population in the area" know the "communication options with the correctional facility and the healthcare services available at the detention facility." **Ex. 13**, p. 5. It is crucial that hospitals train and inform their staff and doctors about the healthcare resources and limitations at the correctional facility they are sending patients

7

to, so that staff can consider such conditions when determining whether to admit or discharge a patient and/or create fulsome and realistic discharge plans. **Ex. 13**, pp. 4-5.

Despite taking on the role of performing medical clearances for the jail, and knowing that such clearances were relied on by the Sheriff and deputies, SMH failed to train or even inform its employees, including nurses and doctors, regarding the purpose of medical clearances and the resources and limitations available at MCDC. Thus, while routinely conducting medical clearances for incarceration, SMH employees Nurse Gaddis, Dr. Fowler, and Dr. Davidson, all testified that they were unaware of the specific medical care that could be provided at MCDC, and purportedly were under the impression that their exams were to be limited in scope – focused only on whether the patient was experiencing an acute emergency medical condition at that very moment in time. **Ex. 15**, Davidson, Depo, 50:17-53:20, 77:8-23, 93:18-94:7, 112:18-113:15; **Ex. 16**, Fowler Depo, 36:12-39:8, 47:14-52:13, 57:25-58:16, 61:10-64:12, 67:15-21; **Ex. 17**, Gaddis Depo, 66:10-67:19. The Hospital did not even establish a reliable method for communicating the specific condition which triggered the need for medical clearance. **Ex. 7**, 78:1-7; **Ex. 17**, 68:13-17, 69:24-70:9; *see*, **Ex. 12**, listing conditions which require medical clearance by SMH before intake.

SMH also recklessly failed to provide its employees any education or training about MCDC's capabilities and resources to monitor for withdrawal, and SMH routinely discharged intoxicated patients likely to experience withdrawal with no medications, follow-up care instructions, or even information about what symptoms to monitor. **Ex. 18**; **Ex. 16**, 36:12-39:8, 43:9-44:1, 57:25-58:16, 61:10-64:12, 71:2-73:16, 79:23-80:22; **Ex. 7**, 48:5-10; **Ex. 6**, 12:5-25, 30:3-21; **Ex. 5**, 35:1-36:10; **Ex. 9**, County Response to RFA 19; **Ex. 15**, 50:17-53:20. While SMH was fully aware that inmates receiving medical clearances on nights and weekends would be

discharged to the jail with no nurse on duty, SMH doctors have testified that they were discharging them to "a structured environment where there are people who will observe and watch him," who "are familiar with this type of patient," and "should be able to recognize someone who needs to come back to the emergency department." **Ex. 15**, 83:9-23, 100:19-101:8, 108:14-109:4, 112:18-113:15; **Ex. 16**, 57:25-58:16, 61:10-64:12, 64:18-65:6; **Ex. 19** at ¶21.

Similarly, SMH took no steps to develop discharge protocols that took into consideration the lack of any medical monitoring at the jail or the fact the patents were incarcerated, leading doctors to simply tell inmates to "return to this practice…as needed," with no acknowledgement that it is not up to these incarcerated patients when they can leave the jail for medical care. **Ex. 20**, pp. 2-4; **Ex. 21**, Dr. Roscoe Report, pp. 10-11 ("While the County has an arrangement to have initial clearances and orders done at the hospital, in 2021 the hospital was treating those as cursory and not providing the county with the information it needed to safely house intoxicated inmates without medical staff on the nights and weekends."). The only established tool for communicating information between SMH and MCDC was a recklessly insufficient "Prisoner Medical Clearance Report" form, which was sent with the patient when discharged to MCDC usually without any medical content actually filled out. **Ex. 5,** 9:5-10:8, 69:19-70:14; **Ex. 22**; **Ex. 17**, 63:6-65:13. The Hospital did not train its staff, regarding what information should be included on the form. **Ex. 23**, Davidson Third Supplemental Response to ROG 5; **Ex. 24**, Hospital First Supplemental Response to ROG 1; **Ex. 25**, County Third Supplemental Response to ROG 14. As a result, intoxicated patients were routinely cleared for incarceration and discharged to the MCDC with absolutely no follow-up instructions or other guidance to the deputies who had exclusive authority to contact the nurse or return a patient to the ER if, in their medically untrained judgment and discretion, it was

appropriate. **Ex. 15**, 74:10-76:1; **Ex. 7**, 75:4-18; **Ex. 6**, 30:3-5, 31:10-23, 75:12-14, 93:11-94:18.

SMH's complete failure to educate its staff about the healthcare services available at the Jail resulted in recklessly insufficient discharge instructions, in part, because staff were apparently not sufficiently trained on the nature of medical clearances for incarceration, and also because they purportedly falsely believed that inmates were being medically monitored. Thus, SMH doctors rarely provided MCDC staff with any follow-up care guidance. *E.g.*, **Ex. 18**. They did so despite knowing that inmates would not be able to bring themselves back to the Hospital independently, and purportedly without knowing that a patient cleared on the weekend would not have access to a nurse or receive a jail intake screening until Monday at the earliest. *See, e.g.*, **Ex. 22**; **Ex. 20**, p. 7; **Ex. 26**, p. 1; **Ex. 15**, 74:24-75:19; **Ex. 18**; **Ex. 17**, 67:12-19.

C. <u>SMH Continuously Failed to Train its Staff About Medical Clearances for Incarceration Despite Knowing it Exposed Their Inmate Patients to Serious Harm and Caused Deaths.</u>

SMH's recklessness in this regard led to employees routinely performing grossly negligent screenings and discharges. SMH was consciously aware that its staff and doctors were spending only *three to ten minutes* with patients, that a sufficient medical clearance exam could not occur within that short period, and that any patient cleared on a weekend would not receive a jail intake assessment or have access to medical personnel until Monday at the earliest. **Ex. 15**, 68:23-69:3; **Ex. 27**, Osborn Depo, 29:15-30:7, 36:22-24; **Ex. 29**, Becker Report at § I(7), V.

As Hospital Expert Felty, opined:

> Such practice is evidence of a conscious disregard of the risk and safety of this subset of patients. . . Further, Officer Osborn testified that, in his experience, medical screening exams for intoxication and clearance for jail related to intoxication generally consist of a five-minute doctor and a five-minute nursing visit. This is a truly short ED length of stay experienced by very few patients in my many years of ED Nursing Experience and raises the question of a different standard of care provided to patients like Kelroy Newman who are in police custody. Failure to conduct a comprehensive medical screening exam as

> required by EMTALA placed Kelroy Newman in a dangerous situation when he was discharged to jail without treatment for his alcohol intoxication, head and facial trauma, and lack of assessment for potential alcohol withdrawal.

**Ex. 13**, p. 5.

Dr. Becker, an expert in Emergency Medicine, has also opined that, "Dr. Davidson's inadequate and unacceptably cursory exam of Mr. Newman" is most likley part of a "dangerous and degrading pattern of shoddy medical practice and willful neglected directed at Mr. Newman and other prisoner patients." Clearing those under arrest in such a manner, "especially in regards to alcohol intoxication and withdrawal" to go to a facility with such limited medical personnel, "creates an obvious and unreasonable risk of serious harm and death." **Ex. 29**, at V.

SMH was fully aware that the system it had set up was likely to result in serious harm to patients, as several patients the hospital had perfunctorily cleared for incarceration were subsequently dying shortly thereafter in jail, and SMH had already been sued following one of these deaths. **Ex. 16**, 64:18-65:8; **Ex. 19**; **Ex. 28**, p. 5 ("In the last half of 2013, three other inmates died while in custody at the county jail, including a 47-year-old Cortez man and a 38-year-old Arizona man who were both highly intoxicated and cleared by hospital staff"). Indeed, SMH expressly knew of the Sheriff's and deputies' reliance on the medical clearances, as articles about the prior deaths in the local media quoted the former Sheriff as defending the jail's role by pointing to the fact that they had been cleared by SMH as safe for incarceration. See **Ex. 28** (Sheriff Spruell "also said it was unfair to lambaste the sheriff's office for the three jail deaths, which included a suicide, a death from an aneurysm and a death related to chronic drinking. 'What would you have done to prevent that?" Spruell said. 'Tell people to lead a better lifestyle? There's nothing they [jail staff] could have done. The inmates were medically cleared before they came in'").

11

Despite these deaths, SMH persisted in its haphazard approach and failed to implement any systems to ensure thorough assessment, timely communication with MCDC, or train its own staff on the need for reality-based discharge planning given the Jail's limitations. SMH's persistence in adhering to a woefully insufficient system, even after numerous patient deaths, evidences "conduct purposefully committed" which it "must have realized as dangerous, done heedlessly and recklessly, without regard to consequences, or of the rights and safety" of Mr. Newman. *Coors*, 112 P.3d at 66; *Bituminous Cas. Corp.*, 2013 WL 6676157, *3. Plaintiffs' expert has opined that all of the herein described Hospital practices "were reckless and put patients like Kelroy Newman at an obvious risk of serious harm or death." **Ex. 13**, pp. 5-6.

D. <u>SMH'S Willful Failures to Train and Implement Proper Procedures for Medical Clearances Caused Newman's Death.</u>

Kelroy Newman was arrested on Saturday, July 17, 2021, by the Cortez Police Department and taken to MCDC, where he was found to have a critically and dangerously high blood-alcohol concentration ("BAC") of .421% and visible serious injuries to his head and face. **Ex. 30**; **Ex. 31**. Pursuant to the agreement to outsource medical clearances and doctor level care to the Hospital, Mr. Newman was taken to SMH to be "cleared" for incarceration at MCDC.

It is axiomatic that intoxicated chronic drinkers may experience potentially fatal withdrawal as their BAC comes down, and that some intoxicated patients should be monitored "in an emergency department, hospital, or treatment center until [their] BAC comes down and it's safe for [them] to go home." **Ex. 16**, 79:23-80:22; **Ex. 20**, pp. 8-10; **Ex. 11**, p. 11; **Ex. 15**, 42:3-43:21; **Ex. 29**, §§ I(5)-(6), (14), II(2). Mr. Newman was one such patient, but SMH staff and doctors were empowered to disregard the potential for future complications or progression of his medical

condition, because they had not been trained regarding the Jail's medical capabilities or that tailored medical instructions for discharged inmates must be given.

Predictably, Mr. Newman came back a half hour later, "cleared" for jail, with no specific instructions for his monitoring. **Ex. 14**, 67:10-74:4. No SMH staff member had asked about Mr. Newman's BAC, drinking habits, or withdrawal history, including Nurse Gaddis who performed the initial nurse screening, even though he smelled of alcohol and Dr. Davidson assumed he was intoxicated and knew he was brought for a medical clearance due to intoxication. **Ex. 15**, 66:7-67:24, 95:4-10; **Ex. 27**, 51:9-15; **Ex. 14**, 81:20-22; **Ex. 24**, Hospital Supplemental Response to RFA 1; **Ex. 32**, Davidson Second Supplemental Response to RFA 1, 4, 6; **Ex. 29**, §§ I(3)-(7). Mr. Newman was cleared for incarceration after about 10 minutes with Nurse Gaddis and Dr. Davidson, who asked no questions and ordered no tests related to the condition that triggered the transport. **Ex. 15**, 68:23-69:3; **Ex. 27**, 29:15-30:7, 36:22-24; **Ex. 24**, Hospital Supplemental Response to RFA 1-2; **Ex. 17**, 71:10-72:17, 99:4-25; **Ex. 20**, p. 1; **Ex. 21**, p. 6.[3]

Dr. Davidson then discharged him to a facility without any guidance about what signs of symptoms the medically untrained deputies should watch for related to head injury, alcohol intoxication, or withdrawal, purportedly because he erroneously believed that Mr. Newman was going to a structured environment with observation protocols executed by people trained to

---

[3] SMH failed to establish any mechanism for obtaining pertinent medical information related to the clearance, despite it these clearances being routinely done by SMH. Thus, although MCDC obtained the potentially fatal .421 BAC triggering the need for a clearance, SMH did not ensure that information was obtained by its staff on intake. *See*, **Ex. 30**. Rather, SMH relied exclusively on medically untrained transporting officers (in this case not even a member of MCDC staff), to verbally relay information. **Ex. 7**, 78:1-7; **Ex. 17**, 68:13-17, 69:24-70:9, 76:20-77:3; **Ex. 15**, 64:20-65:13, 66:7-67:24; **Ex. 27**, 18:3-12, 39:2-5. MCDC also had pertinent information about Mr. Newman's withdrawal history, additional information relevant to his clearance that was not obtained by SMH. **Ex. 6**, 29:7-11; **Ex. 5**, 9:5-10:8; **Ex. 33**; **Ex. 15**, 62:4-10; **Ex. 16**, 12:16-13:15.

recognize the symptoms of alcohol withdrawal. **Ex. 17**, 71:10-72:17, 99:4-25; **Ex. 20**, p. 1; **Ex. 23**, Davidson Responses to RFAs 1-5; **Ex. 22**.[4]

Craig Felty, has opined that the hospital failed:

> to provide comprehensive individually tailored discharge instructions to Kelroy Newman and his correctional care givers regarding his conditions and injuries that would need to be assessed and monitored while he was incarcerated. These instructions should have included information to watch for in Mr. Newman related to his acute alcohol intoxication, head and facial trauma, and high potential for alcohol withdrawal, particularly given that he was being discharged to a known facility without access to alcohol (Only way to prevent withdrawal) and /or on-site medical care 24/7 (or at all during the weekend, which was when Mr. Newman was incarcerated) – all conditions that could have and did have life threatening consequences for Kelroy Newman.

**Ex. 13**, p. 6.

Because the Hospital failed to communicate the requirements of medical clearances to its staff, the medical clearances were perfunctory and insufficient, while deputies nevertheless relied on such medical clearances, a reliance that had fatal consequences for Mr. Newman. The morning after Mr. Newman was cleared, he was experiencing alcohol withdrawal. He told Deputy Summers that his head hurt and he wanted to see a doctor.[5] Deputy Summers knew he had been cleared for a very high BAC and head/facial injuries the day before and the jail and told Mr. Newman the hospital had already cleared him. **Ex. 34**, p. 2. Deputy Summers observed that the bruises and

---

[4] Further demonstrating the utter lack of communication and nursing negligence, although it was Mr. Newman's potentially fatal BAC that caused him to be taken to SMH, Nurse Gaddis charted that Mr. Newman was in need of medical clearance for jail due to facial injury. **Ex. 20**, pp. 5-6; **Ex. 17**, 68:13-17, 69:24-70:9; **Ex. 27**, 42:13-21, 44:21-24.

[5] In addition to his head hurting enough to ask to see a doctor, Mr. Newman had been experiencing other symptoms of withdrawal, including nausea, dry heaving, sweating, anxiety, and dehydration that went unnoticed by deputies, in part, because they had no training or direction from the Hospital or MCDC about what symptoms to monitor. **Ex. 35**, Salt Declaration at ¶¶ 8-12; **Ex. 15**, 85:4-7; **Ex. 17**, 37:4-19; **Ex. 36**. The deputies' "checks" were essentially limited to making sure the person was still breathing. **Ex. 14**, 55:20-56:5; **Ex. 5**, 34:4-6; **Ex. 7**, 46:13-47:1.

contusions on Mr. Newman's head and face had worsened and knew about his over .4 BAC the day before but "relied" on the medical clearance "paperwork" to indicate that he was "safe to be housed at the jail;" "safely come down and withdraw from that acute intoxication of the high .421 in the jail;" and "safe to be housed in the jail … related to his facial injuries." **Ex. 14**, 73:22-75:1, 82:11-16. Based on this reliance, Deputy Summers determined to keep Mr. Newman at MCDC rather than immediately return him to the ER. Deputy Summers also discussed Mr. Newman's request to go to the hospital with Shift Supervisor, Deputy Jewell, and they determined to take Mr. Newman to the hospital later that day. They both agreed there was "no immediate urgency" because the hospital had "medically cleared him the night before, said that he was safe to be in jail." **Ex. 14**, 126:17-128:2; 129:14-131:8.

Mr. Newman should never have been medically cleared and discharged to jail with no medical staff and no instructions for monitoring. A .421 is not simply 'intoxicated'. Most people who are not alcohol dependent would be dead. And, usually, people know when they need medical care and can return themselves, much like Mr. Newman asked to here. Yet when Mr. Newman developed concerning symptoms, and asked to go the hospital, he was unable to return because the deputies relied on the medical clearance that he was safe to be in jail. He died hours later.

WHEREFORE, Plaintiff requests that the Court grant Plaintiffs' Motion.

Respectfully submitted this 19th day of September, 2023.

/s/ Rachel Kennedy
Rachel Kennedy
Anna Holland Edwards
Erica Grossman
HOLLAND, HOLLAND EDWARDS & GROSSMAN, LLC
1437 High Street
Denver, CO 80218
*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on the 19th day of September, 2023, the foregoing was filed using the CM/ECF system. I hereby certify I will send electronic notification of said filing to the following recipients.

Ann Smith
Gordan Vaughan
VAUGHAN & DEMURO
asmith@vaughandemuro.com
gvaughan@vaughandemuro.com
*Attorneys for County Related Defendants*

Amy Cook Olson
Angela Lund Klein
KLEIN COOK OLSON, LLC
acookolson@kco-law.com
aklein@kco-law.com
*Attorneys for Southwest Health Defendant*

Mark B. Collier
Matthew W. George
MESSNER REEVES, LLP
mcollier@messner.com
mgeorge@messner.com
*Attorney for Defendant Davidson*

                */s/ Brooke Thiele-LaForest*
                Brooke Thiele-LaForest, Paralegal