Exhibit 3

# ZOOM VIDEOCONFERENCE DEPOSITION OF
# STEVEN D. NOWLIN

## 6/19/23

---

Civil Action No. 22-cv-1763-PAB-KLM

# ESTATE OF KELROY NEWMAN, et al. vs BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF MONTEZUMA, COLORADO, et al.

---

### District Court
### County of Montezuma, State of Colorado

ANIMAS REPORTING SERVICE
919 County Road 142
Durango, Colorado 81303
877.385.4268/970.385.4268
animas@animas.net
animasreporting.com

Exhibit 3
1.877.385.4268    970.385.4268
**STEVEN D. NOWLIN**

Page 21

1  A  (Turning to.)
2  Q  -- that is -- that's her hours that she was working?
3  Those were her work shifts that she was assigned at the jail in
4  July of 2021, right?
5  A  Yes.
6  Q  And what was her license, or what is her license?
7  A  She's a registered nurse.
8  Q  Okay.  And there's no medical unit at the jail, in
9  July of 2021, right?
10         MS. SMITH:  Form (clearing throat).  Form.
11  Excuse me.
12  A  What -- explain what your question is about a medical
13  unit.
14  Q  (BY MS. GROSSMAN)  Sure.  I -- I have seen a lot of
15  jails, and a lot of times they'll say, "We're gonna send an
16  inmate to the medical office, nurses."  Then they go to a
17  medical office.  There's medical cells where they get watched.
18  And there are places where they get checked out, and there's
19  just like a medical kind of unit and office in the jail.
20  A  Like an infirmary?
21  Q  Yes, like an infirmary.
22  A  Okay.
23  Q  That's actually a better way to say it.
24  A  All right.  We have a medical room with an exam and
25  where the nurse's office is at.

Page 22

1  Q  Okay.
2  A  But they're not housed there.
3  Q  And that's basically -- that one nurse, Virginia
4  Hernandez, was the only person medically on staff in July of
5  2021, right?
6        MS. SMITH:  Form.
7  A  I had an EMT who was a detention deputy.
8  Q  (BY MS. GROSSMAN)  Did he work as an EMT in the --
9  A  No, he was a detention deputy.  He was just a
10  certified EMT.  He volunteered for a fire department.
11  Q  What is -- what's his name?
12  A  Daylan Guttridge.
13        THE REPORTER:  I'm sorry?
14        THE WITNESS:  Daylan Guttridge.  Sorry.
15        MS. GROSSMAN:  That's G-U-T-T-R-I-D-G-E.
16        THE REPORTER:  Uh-huh.
17        THE REPORTER:  I didn't hear the first name.
18  Q  (BY MS. GROSSMAN)  Was he working as an EMT in the
19  sense that, if there were medical problems that arose in the
20  jail, he could address them in some way?
21  A  Well, he would assist like everyone else, yes.
22  Q  Was it the expectation --
23  A  It would not be his primary function, no.
24  Q  But was it the expectation that his training as an
25  EMT was part -- he was supposed to be assisting medically, in a

Page 23

1  medical capacity as a -- as an EMT?
2  A  No, that's not in his job description.
3  Q  Okay.  So the only person that was assigned to
4  address medical problems in July of 2021 was Virginia Hernandez
5  as an RN, right?
6  A  Yes.
7  Q  And she worked the day shift on weekdays, right?
8  A  Yes.
9  Q  And there were no detoxification units or cells in
10  July of 2021, right?
11  A  Separate cells?  No.
12  Q  Or a detox unit?
13  A  No.
14  Q  Did you feel that the jail needed a detox center?
15        MS. SMITH:  Form.
16  A  No, not the jail.
17  Q  (BY MS. GROSSMAN)  Well, I -- if not the jail, what
18  -- was there some other place that you're thinking in your head
19  that a detox center could be useful?
20  A  Well, yes.
21  Q  Where?
22  A  Well, anywhere in Cortez.
23  Q  If you look at Exhibit 23 --
24  A  (Turning to.)
25  Q  -- this is an article where you're quoted.  There's a

Page 24

1  picture of you on the front.
2  A  Wow.  Just like there is today.
3  Q  Are you in this?
4  A  Yep.
5  Q  There's a lot of discussions about COVID as well.
6  A  Uh-huh.
7  Q  And if you look at the last page --
8  A  (Turning to.)  It's a long article.  Okay.  I think.
9  Q  Let me see.
10  A  I don't know.  No.
11  Q  My last page is right -- oh, no, I guess it's the --
12  okay.  It's not marked, I guess.  Do you have a page that looks
13  like this (indicating)?
14  A  Oh, there it is.  Sorry.  I went -- it was stuck
15  together.  Okay.
16  Q  Do you see where it says "A call for a detox center"?
17  A  Uh-huh.
18  Q  And it says:  "Needs for the jail include expanding
19  the facility and adding a detox center, Nowlin said."  And this
20  was an article from January 2022.
21  A  Right.
22  Q  Do you feel that the needs for the jail include
23  expanding the facility and adding a detox center --
24  A  Well, it wouldn't --
25  Q  -- in January of 2022?

1.877.385.4268                                                                                            970.385.4268

**STEVEN D. NOWLIN**

Page 93

1   wondering.
2      A   I don't know that there's any one of them that are
3   more common or not.
4      Q   Okay.  Alcohol intoxication is a pretty common one,
5   though, right?
6      A   That happens, yes.
7      Q   All right.  Can you look at Exhibit 1, Page 2.  We
8   can go through them.
9      A   (Turning to.)  Okay.
10     Q   So these are the specific conditions considered to be
11  potentially emergent by the jail that required medical
12  clearance before being booked in, in July of 2021, right?
13     A   Yes.
14     Q   And the first one is a BAC greater than .2?
15     A   Uh-huh.
16     Q   Yes?
17     A   Yes.
18     Q   Was it your decision to make this a requirement?
19     A   Yes.
20     Q   And why -- why was it important for someone that has
21  a .2 or higher to be medically cleared for emergent conditions
22  before being booked into the jail?
23     A   For the safety of the person being incarcerated, as
24  well as for the safety of the jail.
25     Q   Can you elaborate by safety?

Page 94

1      A   Well, again, it could be a medical thing.  It could
2   be anything, yeah.
3      Q   Okay.  Because intoxication is a potentially emergent
4   or fatal condition, right?
5      A   Potentially it can be.
6          MR. COLLIER:  Form and foundation.
7      Q   (BY MS. GROSSMAN)  Intoxication can be --
8          MS. COOK OLSON:  Join.
9      Q   (BY MS. GROSSMAN) -- an emergent condition, correct?
10     A   It can be.
11         MR. COLLIER:  Form.
12         MS. SMITH:  Form.
13         MS. COOK OLSON:  Form.
14     Q   (BY MS. GROSSMAN)  And alcohol withdrawal from
15  intoxication can be an emergent condition, right?
16         MS. SMITH:  Form and foundation.
17         MR. COLLIER:  Form and foundation.
18     A   I don't know.  It could be.  It just depends.
19     Q   (BY MS. GROSSMAN)  Right.  It's not always?
20     A   No.
21     Q   But it can be?
22         MR. COLLIER:  Form and foundation.
23     A   It can be, yes.
24         MS. SMITH:  Join.
25         MS. COOK OLSON:  Same objection.

Page 95

1      Q   (BY MS. GROSSMAN)  But alcohol withdrawals have been
2   serious problems in the jail, right?
3          MS. SMITH:  Form.
4      A   Well, there have been problems.  I don't know about
5   serious.  I mean -- but it's a serious medical condition that
6   could happen, yes.
7      Q   (BY MS. GROSSMAN)  People have suffered medical --
8   serious medical problems in the jail based on alcohol
9   intoxication and withdrawals?
10         MS. SMITH:  Form.
11         MS. COOK OLSON:  Form.
12     A   Yes.
13     Q   (BY MS. GROSSMAN)  Inmates have died from alcohol
14  intoxication or drug intoxication and withdrawals in the jail?
15         MS. SMITH:  Form and foundation.
16     A   Yes.
17     Q   (BY MS. GROSSMAN)  Okay.  And one of the -- and then
18  you're making a policy that they get medically cleared in order
19  to avoid potentially emergent problems in your jail, right?
20     A   I don't know if it would avoid it or not.  That's my
21  problem, yes.  That's everybody's problem.
22     Q   And was it -- was it your hope?
23     A   Well, sure.
24     Q   Was it your expectation that sending them to the jail
25  (sic) to be medically cleared would then help to rule out

Page 96

1   potentially emergent conditions before being booked into the
2   jail?
3          MS. SMITH:  Form.
4      A   Yes.
5      Q   (BY MS. GROSSMAN)  And, in your view, safe for jail
6   and a medical clearance would mean that an inmate --
7          THE REPORTER:  I'm sorry, I didn't hear
8   you.
9          MS. GROSSMAN:  I'm sorry.
10     Q   (BY MS. GROSSMAN)  In your view, safe for jail and a
11  medical clearance from Southwest Memorial would mean that an
12  inmate is safe to be housed at the jail, from a medical
13  perspective; is that fair?
14         MR. COLLIER:  Form and foundation.
15         MS. COOK OLSON:  Form and foundation.
16         MS. SMITH:  Join.
17     A   Yes, that's what it's intended for.
18     Q   (BY MS. GROSSMAN)  Yeah.  And the purpose -- one of
19  the reasons you made this policy is to be evaluated by a
20  medical professional, to make sure that their intoxication
21  would not make them unsafe to be housed at the jail, right?
22         MR. COLLIER:  Form.
23     A   Well, along with everything else that's listed there.
24  There could be a medical-condition issue.
25     Q   (BY MS. GROSSMAN)  Sure.  And with respect to medical

24 (Pages 93 to 96)

**ANIMAS REPORTING SERVICE**
animas@animas.net

Exhibit 3

**1.877.385.4268**  **970.385.4268**

**STEVEN D. NOWLIN**

| Page 101 | Page 103 |
|---|---|
| 1  accident prior to arrest, reports or obvious head injury,<br>2  reports or obvious bodily injury, bleeding, a fever or<br>3  temperature over 100.5, excessively combative, uncooperative,<br>4  altered mental status, and reports chest pain and pressure.<br>5  Those are all the requirements that are -- that are -- if you<br>6  have any of those conditions, a medical clearance is mandated<br>7  pursuant to jail policy, right?<br>8      A   Yes.<br>9      Q   And there might be others?<br>10     A   Yes.<br>11     Q   And that would be at the discretion of the people<br>12 working in the jail at the time, right?<br>13     A   Yes.<br>14     Q   So just then -- and then when the -- when the<br>15 clearance comes back, and they say "medically safe for jail,"<br>16 it's based on the condition that you -- that they are being<br>17 sent out to evaluate, or is it the position that they've<br>18 evaluated for any emergent condition?<br>19             MS. SMITH:  Form and foundation.<br>20             MR. COLLIER:  Join.<br>21             MS. COOK OLSON:  Join.<br>22     A   They can request an evaluation for whatever they feel<br>23 is necessary and needed.<br>24     Q   (BY MS. GROSSMAN)  And "they" being the --<br>25     A   Deputy. | 1  expect the medical clearance -- if they said that they were<br>2  stable and safe for jail, you would've expected them to<br>3  evaluate the obvious head injury and whether there are any<br>4  emergent conditions associated with that, right?<br>5      A   Yes, I would.<br>6             MR. COLLIER:  Form and foundation.<br>7      Q   (BY MS. GROSSMAN)  What type of -- in terms of<br>8  communication when they're discharged after the medical<br>9  clearance, what type of communication do the deputies have with<br>10 then the arresting officer, the transporting officer, regarding<br>11 the results of the medical clearance exam?<br>12     A   I don't know.  It just depends on what communication<br>13 there would be.<br>14     Q   Would you expect the -- them to talk about the<br>15 results of the medical clearance or just hand them the form?<br>16     A   Maybe.  Not necessarily.<br>17     Q   Do deputies regularly talk to the hospital about<br>18 medical clearances that were done?  Do they call them?  Are<br>19 they trained to do that?  Is it at their discretion?<br>20     A   Yes --<br>21            MS. SMITH:  Form.<br>22     A   -- they would if there was a question, sure.<br>23     Q   (BY MS. GROSSMAN)  Is it a routine thing for them to<br>24 just call the hospital and talk to them about medical<br>25 clearances that happened? |

| Page 102 | Page 104 |
|---|---|
| 1      Q   -- deputy?<br>2      A   (Nodding head.)<br>3      Q   So let's just talk about the first one.  Let's say<br>4  you're requesting an intoxication medical clearance because you<br>5  have a .2 or higher, okay?<br>6      A   Uh-huh.  Yes.<br>7      Q   ==In that case, in that case, when a -- there's a==<br>8  ==medical clearance, and Southwest Memorial says "medically==<br>9  ==cleared for jail," is it your understanding and expectation==<br>10 ==that they've evaluated the emergent conditions associated with==<br>11 ==that acute intoxication, which is intoxication problems and==<br>12 ==withdrawal problems?==<br>13            ==MS. SMITH:  Form and foundation.==<br>14     A   ==Yes.==<br>15     Q   (BY MS. GROSSMAN)  Okay.  I think I finally<br>16 understood what you were getting at.  And, so, when they come<br>17 back with a medical clearance that says, "Okay, they're stable<br>18 and safe for jail," it's both that they can safely be housed in<br>19 jail at the time and that they can safely withdraw from their<br>20 acute intoxication, correct?<br>21            MS. SMITH:  Form -- form and foundation.<br>22            MR. COLLIER:  Form and foundation.<br>23     A   Yes, that they can be incarcerated safely.  Yes.<br>24     Q   (BY MS. GROSSMAN)  And with respect to reports or<br>25 obvious head injury, would it be the same -- what would you | 1      A   That has happened, yes.<br>2      Q   In what circumstances?<br>3      A   Oh, when somebody has obvious injuries, and they have<br>4  questions about any type of treatment or anything that is<br>5  needed, oftentimes they communicate with the hospital.<br>6      Q   Is there a special line the jail can call, or is it<br>7  just the regular number?<br>8      A   Just the regular ER line.<br>9      Q   Small town.<br>10     A   We don't have a red phone, yeah.<br>11     Q   Okay.  So, when -- when people that are then cleared<br>12 by the hospital and -- for alcohol-related issues, after a BAC<br>13 of over .2, they're monitored in the jail; is that right?<br>14     A   Yes.<br>15     Q   And why is monitoring important?<br>16            MS. SMITH:  Form.<br>17     A   Just to observe, to make sure that there isn't any<br>18 complications, yes.<br>19     Q   (BY MS. GROSSMAN)  Well, because intoxication<br>20 withdrawal can be life-threatening, right?<br>21     A   Just like --<br>22            MS. SMITH:  Form and foundation.<br>23     A   -- drugs, yes.<br>24            THE REPORTER:  I didn't hear the answer.<br>25     A   Just like other drugs, yes. |

26 (Pages 101 to 104)

**ANIMAS REPORTING SERVICE**
**animas@animas.net**