Exhibit 4

# ZOOM VIDEOCONFERENCE DEPOSITION OF
# VIRGINIA HERNANDEZ

## 2/16/23

---

Civil Action No. 22-cv-1763-PAB-KLM

## ESTATE OF KELROY NEWMAN, et al. vs BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF MONTEZUMA, COLORADO, et al.

_____

United States District Court
District of Colorado

ANIMAS REPORTING SERVICE
919 County Road 142
Durango, Colorado 81303
877.385.4268/970.385.4268
animas@animas.net
animasreporting.com

1.877.385.4268                                                                                   970.385.4268

**VIRGINIA HERNANDEZ**

Page 21

1  Q  And that's a different nurse who performs that role?
2  A  Correct.
3  Q  What's her name again?
4  A  Kelly.
5  Q  Kelly. Do you know her last name?
6  A  Marsten.
7  Q  Can you spell it?
8  A  M-A-R-S-T-E-N, I think, but --
9  Q  And is she an RN?
10 A  Correct.
11      THE REPORTER: Is "Kelly" K-E-L-L-Y?
12      THE WITNESS: Correct.
13 Q  (BY MS. HOLLAND EDWARDS) Since Health Partners or
14 SHP took over the medical care in the jail, is there now an
15 assigned physician?
16 A  There's a nurse practitioner.
17 Q  What's that person's name?
18 A  Shaina NawrocKi.
19 Q  Can you just spell -- go ahead and spell the first
20 name and last name for us.
21 A  "Shaina" is S-H-A-I-N-A. "Nawrocki" is
22 N-A-W-R-O-C-K-I.
23 Q  And is she local?
24 A  Correct.
25 Q  Where is she located?

Page 22

1  A  I -- somewhere in Montezuma County. I don't honestly
2  know where she lives.
3  Q  Does she come into the jail?
4  A  Correct.
5  Q  What days does she come in?
6  A  Thursdays.
7  Q  And what type of -- what's her role on Thursdays?
8  A  She'll see inmates who have medical issues that need
9  to be seen.
10 Q  At any point since you've worked here, has the jail
11 been NCCHC-certified?
12 A  Not as far as I know. They could be, but I don't
13 know that.
14 Q  Do you know anything about the process of -- well, do
15 you know whether there was like a request for proposal where
16 multiple companies put in to be the -- the jail medical
17 provider?
18 A  I don't know that.
19 Q  Does Nurse Practitioner Nawrocki perform on-call
20 duty?
21 A  Correct.
22 Q  Is she on call just all the time?
23 A  Correct.
24 Q  What are -- is there an on-call nurse also?
25 A  Yes.

Page 23

1  Q  Is that you?
2  A  Yes.
3  Q  Is it ever Kelly?
4  A  No. No.
5  Q  And when you were -- when you were the only nurse
6  here, from 2018 to the end of 2022, were you on call 24/7?
7  A  Yes.
8  Q  What would happen if you were out of town?
9  A  They'd call me.
10 Q  Okay. No rest for the weary?
11 A  (No response.)
12 Q  Was there anyone else who was on call at any point
13 from 2018 to 2022?
14 A  They have multiple people on call within the jail. I
15 don't know all of who they are.
16 Q  Multiple medical people?
17 A  No.
18 Q  Okay. Was there any other medical person to call
19 between 2018 and 2022 besides you?
20 A  No.
21      MR. VAUGHAN: Just form objection. Go ahead.
22 Q  (BY MS. HOLLAND EDWARDS) And when I say medical
23 person, I'm talking about, you know, CNA, LPN, RN, NP, PA, or
24 doctor.
25 A  No.

Page 24

1  Q  Okay.
2      MR. VAUGHAN: Same objection. Go ahead.
3  Q  (BY MS. HOLLAND EDWARDS) Do you have a -- or when --
4  during that time period, let's start with 2021, did you have a
5  County-issued cellphone?
6  A  Yes.
7  Q  And that's what was used for on call?
8  A  Yes.
9  Q  What is the provider for that? Like, was it, you
10 know, Verizon or --
11 A  I have no idea.
12 Q  Do you still have that same phone number?
13 A  Uh-huh.
14 Q  Yes? I think you said "Yes," right?
15 A  Yes.
16 Q  Okay. That's fine. I can ask the County.
17 A  Yeah.
18 Q  And is that -- do you have a personal phone also, or
19 do you --
20 A  I do.
21 Q  Okay. So that -- that's just for work?
22 A  Uh-huh.
23 Q  Yes?
24 A  Yes. Sorry.
25 Q  Was your number posted somewhere in the jail in 2021?

6 (Pages 21 to 24)

Exhibit 4

1.877.385.4268                                            970.385.4268

**VIRGINIA HERNANDEZ**

Page 25

1  A  I'm assuming that it is, 'cause they call me all the
2  time.
3  Q  Okay. How often would you say in '21 you would get
4  calls when you were off duty?
5  A  I have no idea. I don't remember. I'm sorry.
6  Q  So the only way to know that would be to look at your
7  cellphone records, through your County phone?
8  A  (Nodding head.)
9  Q  Yes?
10 A  Yes. And my private phone, 'cause they use them
11 both.
12 Q  They use them both?
13 A  Uh-huh. Yes.
14 Q  Yeah. So you wouldn't say that because that would
15 complicate things but -- okay.
16    So we've gone over -- I've tried to go over, without
17 belaboring too much, your medical work history. Have you ever
18 worked in an emergency setting?
19 A  Never.
20 Q  Have you ever worked, besides at this jail, in a jail
21 setting?
22 A  No.
23 Q  Have you ever worked in any hospital where inmates
24 were brought to the hospital --
25 A  Yes. Sorry.

Page 26

1  Q  Were -- were you providing care to those inmates?
2  A  Yes.
3  Q  Where was that?
4  A  At Palomar Hospital.
5  Q  And were you only providing care to the ortho
6  inmates, or -- or was there like a -- was it just anything they
7  brought inmates in for?
8  A  It could be a variety. I'd say generally it was
9  orthopedic. Sometimes we had overflow, and it just depended on
10 -- on population and how crowded the hospital was and what type
11 of patient we would get.
12 Q  At any point, were you providing like clearance --
13 medical clearances for jail?
14 A  No.
15 Q  Now that SHP is involved, are there like nursing
16 protocols that they provide?
17    MR. VAUGHAN: Form and foundation objection.
18    THE WITNESS: Do I answer?
19    MR. VAUGHAN: You can answer, yes.
20 A  We have medical protocols. There are some.
21 Q  (BY MS. HOLLAND EDWARDS) And when I -- so what a
22 protocol means to me, in this context, is almost like a
23 standing order for a nursing diagnosis.
24    So, if you -- you know, if it's headache, then you
25 can pull up the headache protocol, and there's questions to ask

Page 27

1  and orders to implement. Is that what you're talking about
2  when you said there's protocols?
3  A  Like for infections. There's several different types
4  of protocols.
5  Q  Are there any for acute intoxication?
6  A  We have protocols for -- yes, currently.
7  Q  And are there any withdrawal protocols?
8  A  That's what I would --
9     MR. COLLIER: Object to form.
10 A  -- call what you were referring to previous. I mean,
11 that's a withdrawal protocol.
12 Q  (BY MS. HOLLAND EDWARDS) Okay. So, what? Do you
13 have CIWA protocol now?
14 A  CIWA is a tool. It's not a protocol, so -- we don't
15 -- we have an alcohol withdrawal protocol, and we have a drug
16 withdrawal protocol.
17 Q  Do you use CIWA in the -- in the jail currently?
18 A  Currently as a tool?
19 Q  Yes.
20 A  Sure.
21 Q  Were you using CIWA in the jail as a tool prior to
22 SHP coming in?
23 A  I started about a year ago, uh-huh.
24 Q  After Mr. Newman's death?
25 A  It happened to be after his death, but it wasn't

Page 28

1  related to that.
2  Q  I'm not suggesting that there was a change --
3  A  Oh, okay.
4  Q  -- or people, you know --
5  A  No.
6  Q  -- reacted -- hang on -- reacted to Mr. Newman's
7  death. I am just asking -- wanting to know if it was in place
8  at the time of his death.
9  A  No.
10 Q  So you started using -- why did you start using CIWA
11 as a tool?
12 A  I had some education at that time on it, and I
13 thought it was a good tool.
14    MR. VAUGHAN: (Coughing), pardon me.
15 Q  (BY MS. HOLLAND EDWARDS) Where did you get that
16 education?
17 A  Online.
18 Q  Was it a required -- like an ongoing
19 nursing-education-type course?
20 A  Not required, but I did it myself. I mean --
21 Q  Okay. So you went and sought out a course on alcohol
22 withdrawal?
23 A  Uh-huh.
24 Q  Yes?
25 A  Yes, correct.

7 (Pages 25 to 28)

Exhibit 4

1.877.385.4268                                                             970.385.4268

**VIRGINIA HERNANDEZ**

Page 29

1  Q   And was your motivation for that at all related to
2  Kelroy Newman's death?
3  A   No.
4  Q   What was your motivation for seeking out that course?
5  A   Working in the jail. And we see multiple, multiple
6  people come in with alcohol problems and drug problems. We
7  don't have detox in the county.
8  Q   Once you started using CIWA as a tool, did the
9  deputy -- did you instruct any of the deputies on what type of
10 observations to be making on checks?
11 A   No.
12 Q   So only you were using CIWA?
13 A   Correct.
14 Q   Are you using COWS?
15 A   Currently?
16 Q   Yes.
17 A   Yes.
18 Q   When did that start?
19 A   About a year ago.
20 Q   And the withdrawal protocol that you have
21 currently --
22 A   Uh-huh.
23 Q   -- how -- what -- what kind of -- what are the steps
24 on it?
25 A   I would have to have it in front of me.

Page 30

1  Q   Does it call for, you know, a specific number of
2  checks?
3  A   I'd have -- I'd have to read it. I don't have it
4  memorized right now.
5  Q   Is it available in the jail?
6  A   Correct.
7  Q   Okay. Well, maybe on a break we could get a copy of
8  it.
9      Let me ask you about -- 'cause CIWA and COWS both
10 have serial observations that are made over the course of some
11 number of days or hours, right?
12 A   I don't think -- I would have to look at the CIWA --
13 well, both of those, to see if it has that, the recommended
14 time periods of when to check. I -- I honestly don't think it
15 does.
16     It's just what to look for, but I don't think it
17 tells you how often to do it. But I honestly don't recall that
18 either, so...
19 Q   Do you have a personal view of -- you do a COWS check
20 once-a-shift, twice-a-shift, or just --
21 A   I would follow our protocol that we have in place
22 right now.
23 Q   Well, the year -- before SHP came in and you had the
24 protocol and you implemented CIWA and COWS, did you have an
25 opinion about how often those checks should be implemented?

Page 31

1  A   At least once-a-shift.
2  Q   By a nurse, or could the deputies do it?
3  A   Nurse.
4  Q   And the -- do -- did you -- in the version that you
5  implemented for CIWA, let's start out with, did you have any
6  vitals component to that?
7  A   Yes.
8  Q   So you would take vitals once-a-shift?
9  A   Yes.
10     MR. VAUGHAN: What -- just -- when you're
11 talking about a shift, are you talking about her shift?
12     MS. HOLLAND EDWARDS: Yes.
13     MR. VAUGHAN: Okay.
14 Q   (BY MS. HOLLAND EDWARDS)  And -- I mean, your shift,
15 as I understand it, was basically 7:00 a.m -- you know, 0700 to
16 1600 every weekday?
17 A   (Nodding head.)
18 Q   Is that right?
19 A   Correct.
20 Q   Once you attended this online course and implemented
21 some tools, did you update or change what you asked deputies to
22 look for during the night?
23 A   No.
24 Q   Why not?
25 A   They have their policies. Detention has their

Page 32

1  policies and what they look for.
2  Q   Where are those? Where are the policies of what the
3  deputies look for?
4  A   You'd have to --
5      MR. VAUGHAN: Object to form and foundation.
6  A   -- ask them.
7  Q   (BY MS. HOLLAND EDWARDS)  I mean, your -- for that
8  year, you were the only medical person working here, right?
9  A   Correct.
10 Q   And, in the morning, I assume you would come in, and
11 they would tell you what they observed over the night about any
12 patients or inmates with medical issues, right?
13 A   If they have issues, correct.
14 Q   But you didn't see it as -- at all related to your
15 position to tell them what to look for so they could alert you?
16 A   They --
17     MR. VAUGHAN: Form and foundation objection.
18 You can answer. Just --
19 A   They have their policies. I would refer to detention
20 on medical.
21 Q   (BY MS. HOLLAND EDWARDS)  And there's no -- so
22 there's no medical person at night, right?
23 A   Correct.
24 Q   And you haven't given -- you didn't give any guidance
25 on what should happen at night?

8 (Pages 29 to 32)

# VIRGINIA HERNANDEZ

Page 37

1  through are the ones on CIWA protocols, right?  Or CIWA tools,
2  right?
3          MR. VAUGHAN:  Form and foundation.
4      A   I would -- I don't believe the headache is on there,
5  but I think the other -- tremors, sweating, yes.
6      Q   (BY MS. HOLLAND EDWARDS)  When you started using
7  CIWA, did you -- was there a specific form that you were using?
8      A   The CIWA form.
9      Q   Is it like the official one that -- I'm just
10 wondering:  Did you make any changes to it?
11     A   No.
12     Q   Where did you find it?
13     A   Online.
14     Q   And did you post it anywhere?
15     A   No.  In -- in my office.
16     Q   Okay.  And that was sometime in 2022, or you said
17 about a year ago --
18     A   (Nodding head.)
19     Q   -- right?  So the end of 2021 or 2022?
20     A   '22.
21     Q   '22?  Do you know what month it was that you started?
22     A   No.
23     Q   Do you know what season?
24     A   No.
25     Q   Before SHP came on, did you have access to any

Page 38

1  prescription medications to assist with alcohol withdrawal?
2      A   Only if they were prescribed by a physician or a
3  provider.
4      Q   Did you have anyone to call to ask them to prescribe
5  them?
6      A   No.  They would need to go to the ER.
7      Q   If you had someone here who was detoxing from
8  alcohol, would you send them to the ER to get those type of
9  orders?
10     A   Correct.
11         MR. VAUGHAN:  Excuse me, foundation.
12     Q   (BY MS. HOLLAND EDWARDS)  And, so, that would be in
13 the situation where someone had been booked in; and then when
14 you saw them, you felt they were experiencing withdrawal
15 symptoms?
16     A   Correct.
17     Q   What type of withdrawal symptoms would cause you to
18 send them to the ER?
19         MR. VAUGHAN:  Foundation.
20     A   Uhmm, tremors, beginnings of hallucinating.  Trying
21 to -- if the CIWA score was high enough.
22         THE REPORTER:  If the what?
23         MS. HOLLAND EDWARDS:  CIWA.
24         THE WITNESS:  CIWA score was high enough.
25     Q   (BY MS. HOLLAND EDWARDS)  Do you know what number is

Page 39

1  the threshold?
2      A   You know what?  I -- I don't.  They have a mild,
3  moderate, and then severe.  I would have to look at the scoring
4  tool to tell you.
5      Q   And before you were using CIWA, what -- what would
6  prompt you to send someone to the ER for withdrawal?
7      A   Tremors, hallucinations, intractable vomiting.
8      Q   The current -- well, I won't say until we try and get
9  a copy.
10         Before SHP came in, were you -- if you were on duty
11 when someone came in with a high BAC, could you perform the
12 medical clearance, or did it have to be at the hospital?
13     A   It has to be at the hospital.
14     Q   Okay.  Let me ask you something about these policies.
15 And what's your understanding about why it has to be at the
16 hospital?
17     A   I can't give a medical clearance.  I'm not a
18 provider.
19     Q   So your understanding of the type of clearance that
20 you need for someone with a high BAC is that it needs to have a
21 provider-level evaluation?
22     A   Correct.
23     Q   So Exhibit 1 in front of you, on Page 32.
24     A   (Turning to.)
25     Q   So the -- the sideways ones are --

Page 40

1      A   Oh.  Oh, okay.  I see.
2      Q   But if you get past those, they're easier to --
3      A   Oop.  Went too far.  Sorry.  Okay.
4      Q   So this is the "Medical Clearance" policy, and you
5  can see it's 300.3.2.  It says:  "Prisoner's that appear to
6  have been injured, intoxicated or ill may be required to have
7  medical clearance from qualified medical staff.  Medical
8  clearance may be done by the facility nurse when on duty
9  otherwise Southwest Memorial Hospital shall be utilized."
10 (Sic.)
11         Do you see that?
12     A   Yes.
13     Q   That's different from your understanding of your role
14 here, right?
15     A   Correct.
16     Q   What do you understand is part of a medical clearance
17 for intoxication at the hospital?
18         MS. COOK OLSON:  Foundation.
19     A   I guess I don't understand that question.
20     Q   (BY MS. HOLLAND EDWARDS)  Well, I mean, you said that
21 it needs to have a provider.  So I'm wondering what other
22 things you think it needs to have.
23         MS. COOK OLSON:  Objection to form.
24         MR. VAUGHAN:  And foundation.  And one
25 objection is good for all?

10 (Pages 37 to 40)

### Page 61

1    the question.
2           MS. HOLLAND EDWARDS:  Initial
3    administration.
4       Q    (BY MS. HOLLAND EDWARDS)  And do you -- what role do
5    you play -- or did you play in the passing out of meds in 2021?
6       A    I passed meds also.
7       Q    Do deputies -- and you said deputies still do med
8    pass?
9       A    The evening med pass, yes.
10          THE REPORTER:  The what?
11          THE WITNESS:  The evening med pass.
12      Q    (BY MS. HOLLAND EDWARDS)  When a nurse is on duty, is
13   it -- with SHP, is it -- is it the requirement that it be a
14   nurse that do med pass?
15      A    For each med pass?
16      Q    For each med pass that a nurse is on duty, is it
17   supposed to be a nurse?
18      A    Yes, or it could also be a deputy if that nurse was
19   unavailable.  You know, like if they were not -- had to go to a
20   doctor's appointment or something like that.
21      Q    And I don't -- I'm sorry if I asked you this.  I'll
22   try to keep it all straight.  Before SHP, was there a doctor or
23   mid-level provider that the deputies could call?
24      A    No.
25      Q    And now there's a NP at least, right?

### Page 62

1       A    Correct.
2       Q    Is there anybody -- is there a doctor also or just
3    the NP?
4       A    Just the NP.
5       Q    What was of the communication from the County about
6    why they were switching to a private jail medical provider?
7       A    Why?
8       Q    Yes.
9       A    Current laws that are changing.
10      Q    Tell me more about that.
11          MR. VAUGHAN:  Foundation objection.  You can
12   answer.
13      A    I believe -- and I can't -- I can't be certain of all
14   of this, because I'm not sure.  But that there may be laws that
15   are gonna be passed that, when inmates come in that are
16   currently seeing a rehab doctor, and especially in regards to
17   opiates, that if they're on suboxone or buprenorphine, that we
18   would need to continue that while they're in jail.
19      Q    (BY MS. HOLLAND EDWARDS)  These are the
20   medication-assisted treatment laws?
21      A    Yeah, the med.
22      Q    And up until that -- before then, were you detoxing
23   people off suboxone or buprenorphine?
24      A    With the detox protocol?
25      Q    Yeah, like what -- what -- before SHP came in, what

### Page 63

1    would you do with an inmate who came in who was on suboxone?
2           MR. VAUGHAN:  I -- just -- just -- I mean, I'm
3    allowing a lot of leeway, but -- I mean, we're now talking
4    about detoxing on something that's not related to this case.
5    So I'm gonna give you some -- some leeway on it but --
6           MS. HOLLAND EDWARDS:  Yeah.  And, to me,
7    this case --
8           MR. VAUGHAN:  -- we're getting pretty far
9    afield.
10          MS. HOLLAND EDWARDS:  Sorry.  To me, this case
11   is about detox, but -- but if we hit a line, let me know.
12      A    It was individually looked at.
13      Q    (BY MS. HOLLAND EDWARDS)  Could you administer
14   suboxone here?
15      A    If they had a prescription for it, yes.
16      Q    So there was some inmates who would be taken off
17   suboxone?
18      A    I'm trying to remember if we had anybody taken off.
19   I don't believe so.  They -- we've had inmates come in who
20   wanted to start it while they're here, and we can't do that,
21   but --
22      Q    Okay.  You weren't --
23      A    I had --
24      Q    -- cold turkey?
25      A    No.

### Page 64

1           THE REPORTER:  Just a minute, just a
2    minute.
3           MS. HOLLAND EDWARDS:  Sorry.
4       Q    (BY MS. HOLLAND EDWARDS)  When an inmate comes back
5    from the hospital for medical clearance for intoxication, have
6    you ever seen where the physician issues orders for, like,
7    frequency of checks or medications?
8       A    Medications, uh-huh.
9       Q    What medications have you seen ordered by the
10   hospital doctor from a medical clearance?
11      A    For?  Alcohol?
12      Q    Yes.
13      A    Librium.
14      Q    What's your understanding about what that is to treat
15   or prevent?
16      A    It helps them with the detox process, uh-huh.
17      Q    Have you ever seen the hospital doctor, after a
18   clearance, order any, you know, medications to help prevent
19   seizures?
20      A    Like Librium?
21      Q    Well, that's -- is that what you -- one of the things
22   you think it helps prevent?
23      A    It can.  So, yes.
24      Q    I think the CIWA protocol, if you -- if you have a
25   high enough level, it's benzos that it contemplates using,

16 (Pages 61 to 64)

Page 77

1   Q   Well, have --
2   A   I haven't been involved --
3   Q   -- you been --
4   A   -- huh-uh.
5   Q   Well, in 2021, you were the only clinical worker,
6   right?
7   A   Uh-huh.
8   Q   Yes?
9   A   Yes. Sorry.
10  Q   So were you involved in any clinical reviews of any
11  deaths during your time here?
12  A   Clinical reviews, no.
13  Q   And, so, in connection with Kelroy Newman's death
14  were you -- did you participate in any kind of review of what
15  his medical needs were prior to his death?
16  A   Prior to his death?
17  Q   Yes.
18  A   No.
19  Q   No, what his needs were prior to his death. I know
20  you didn't review his death prior to his death. Did you --
21  after he died, did you participate in any review -- clinical
22  review of the events leading up to his death?
23  A   No.
24  Q   And you weren't asked to by the County, right?
25  A   No.

Page 78

1   Q   "Carter said," in this quote, in this next paragraph,
2   "she believes the series of inmate deaths connected to alcohol
3   could better be avoided if the county had a proper detox
4   center. She said the jail is under-resourced to handle inmates
5   that are extremely intoxicated."
6       Do you agree with that?
7       MR. VAUGHAN: Form and foundation.
8   A   What year was this? I don't know if it was before my
9   time.
10  Q   (BY MS. HOLLAND EDWARDS) Well, do you agree --
11  A   I don't have an opinion of that at all.
12  Q   I'm sorry, I interrupted you. At your -- during your
13  time before SHP, do you think the jail is under-resourced to
14  handle -- do you think the jail was under-resourced to handle
15  inmates that were extremely intoxicated?
16      MR. VAUGHAN: Form and foundation objection.
17  A   No.
18  Q   (BY MS. HOLLAND EDWARDS) "'We need a detox center
19  here so bad,' Carter said."
20      Do you agree with that?
21  A   Yes.
22  Q   If an inmate, in 2021, asks to go to the hospital,
23  what is your understanding -- and the nurse was not in the
24  building, what was your understanding of what deputies were
25  supposed to do?

Page 79

1   A   Depends on what the complaint is. If the complaint
2   is something like -- if the complaint is chest pain, shortness
3   of breath, something that indicates that they're -- you know,
4   abdominal pain, then they go. They just -- they take them.
5   They go to the ER.
6       If it's something like -- that is not as emergent,
7   then they would wait and observe them.
8   Q   And it's up to the deputies to determine whether it's
9   a wait-and-see one or go-out one?
10  A   And sometimes they would call me on those.
11  Q   But that's also up to them, right? Whether to call
12  you?
13  A   It is.
14      MR. VAUGHAN: Foundation.
15  Q   (BY MS. HOLLAND EDWARDS) And is there -- have you
16  conducted any training of the deputies on when you expect -- or
17  in 2021 -- by 2021, had you conducted any training of the
18  deputies on what type of complaints were emergent versus
19  wait-and-see?
20  A   Not me personally, no.
21  Q   Are you aware of any training they had on that?
22  A   I believe they have training on it, but I honestly am
23  not sure.
24  Q   Were -- do the deputies or did the deputies in 2021
25  take vital signs?

Page 80

1   A   On occasion, yes.
2   Q   And did you provide them any reference ranges for
3   what's normal or not normal?
4   A   Me, personally, no.
5   Q   What's your understanding about how they determine
6   whether to escalate a vital sign to your attention?
7   A   If they're -- if they had -- they do recognize high
8   blood pressure and -- and elevated heart rate.
9   Q   Deputy -- I think it was Deputy Durbin. Do you know
10  him?
11  A   Yes.
12  Q   He testified that he just -- he Googles the reference
13  ranges to decide whether to call a nurse or not. Is that a
14  practice you're familiar with, with the deputies using?
15  A   Familiar with it, that they use it? No, I'm not
16  familiar with it. But it -- it -- it's appropriate.
17  Q   It's appropriate?
18  A   Yes.
19  Q   And -- so, if an inmate -- what about like headaches
20  or severe -- increasing head pain after a head injury? Would
21  that be the type of -- would that be an observe-and-see, or a
22  call-you, or a send-out, in your opinion?
23      MR. VAUGHAN: Form and foundation objection.
24  A   You know, it would depend.
25  Q   (BY MS. HOLLAND EDWARDS) On what?

20 (Pages 77 to 80)

**VIRGINIA HERNANDEZ**

Page 81

1  A   Each individual.  I mean, headaches are -- can be
2  caused from a lot of different things.  Especially, if they're
3  alcohol-related, that is not uncommon, to have a headache.
4  It's also not uncommon when they're dehydrated.  And, so,
5  hydration can make that headache go away.
6      Q   Can deputies diagnose the cause of a headache?
7      A   No.  Neither can I.
8      Q   Right.  So neither -- no one who worked at the jail
9  in 2021 could diagnose or rule out the cause of a headache,
10 right?
11     A   True.
12     Q   And so the only role really that can be played in
13 diagnosing is a gate-keeping role of deciding when someone goes
14 out to get a diagnosis, right?
15         MR. VAUGHAN:  Form and foundation.
16     A   Say that again.
17     Q   (BY MS. HOLLAND EDWARDS)  The only role -- either you
18 or a deputy.  The only role that you could have in diagnosing
19 whether a person's symptoms were -- had a serious cause or not
20 is in deciding whether to get -- to go get a diagnosis, right?
21         MR. VAUGHAN:  I have a form and foundation
22 objection.
23     A   Headache is a really broad term and -- emergency
24 services are for emergency things, and some -- I believe for a
25 headache, I would step back and observe for a while longer.

Page 82

1      Q   (BY MS. HOLLAND EDWARDS)  Have you --
2      A   Vital signs might help, okay.
3      Q   So, if a deputy -- well, let's just look at the
4  situation for headache.  You can turn to Exhibit 15.
5      A   Oh.  Sorry.  (Turning to.)
6      Q   That's okay.  You can set the articles up here.  I'm
7  done asking about those, and we'll get them out of your way.
8          Have you reviewed -- this is a -- part of the
9  investigation that was done after Mr. Newman died.  Have you
10 read this?
11     A   No.
12     Q   If you could turn to the second page.
13     A   (Turning to.)
14     Q   And, you know, before I ask you about this, did you
15 know that Mr. Newman -- at some point you've learned that
16 Mr. Newman blew a -- over .4, right?
17     A   Yes.
18     Q   You also learned at some point that he had head and
19 facial injuries?
20     A   I don't -- I don't remember being told about that,
21 no.
22     Q   I need to look at one other thing before this then.
23 In the EFORCE system, the deputies answer medical questions in
24 EFORCE, right?  And it generates a medical form?
25     A   I'm sorry, I was reading.

Page 83

1      Q   That's okay.  I just realized you need a little more
2  background before we talk about that one.
3          So, in the EFORCE system, the deputies ask some
4  questions on booking that generate medical forms, right?
5      A   Yes.
6      Q   And those forms are available to you, right?
7      A   Yes.
8      Q   And have you looked at Mr. Newman's medical form for
9  the time when he was here and died?
10     A   No.
11     Q   Did you look at it at the time?
12         MR. VAUGHAN:  Form objection.
13     A   When he died?
14     Q   (BY MS. HOLLAND EDWARDS)  Yeah.
15     A   No.
16     Q   Like after he died -- when you came in on Monday, did
17 you look at it?
18     A   No.
19     Q   All right.  You can return to Exhibit 19.  Let's look
20 at that, and then we'll come back.
21     A   (Turning to.)
22     Q   So on Page 2 of Exhibit 19, this is a printout that
23 we made yesterday from the EFORCE medical section.  Do you see
24 here that Deputy -- I'll represent to you this is Deputy
25 Summers' form.  That the deputy noted "...Swelling, Infection,

Page 84

1  or Skin Marks," is the first checkmark.  Are you on --
2      A   I think we're on the wrong page.
3          MR. VAUGHAN:  I don't think we're on the same --
4          MS. HOLLAND EDWARDS:  Page 2.
5          MR. VAUGHAN:  Go to Page 2.
6          THE WITNESS:  Oh.
7          MR. VAUGHAN:  Page 3.
8          MS. HOLLAND EDWARDS:  Or Page 3.  I'm sorry, I
9  remembered.
10         MR. VAUGHAN:  Uh-huh.
11         MS. COOK OLSON:  What exhibit number is that?
12         MS. HOLLAND EDWARDS:  19.  Maybe.  I moved
13 mine around, but didn't change the marks.
14     Q   (BY MS. HOLLAND EDWARDS)  Okay.  Page 3.  So do you
15 see that the deputy checked off that there was "...Evidence of
16 Swelling, Infection, Or Skin Marks"?
17     A   Yes.
18     Q   And "...Visible Signs Of Alcohol/Drug Influence?"
19 right?
20     A   Uh-huh.  Yes.
21     Q   And the person complained of pain, right?
22     A   Yes.
23     Q   And there was "...Visible Trauma Or Bleeding?"
24     A   Yes.
25     Q   And then on the other section, he also checked off

21 (Pages 81 to 84)

Exhibit 4

1.877.385.4268                                                              970.385.4268

**VIRGINIA HERNANDEZ**

Page 85

1   that there was a "Recent Head Injury"?
2       A   Yes.
3       Q   And that, in the "Medical Detail," on the second
4   line, that he "Got Into A Fight Today And Was Hit In The Head"?
5       A   Yes.
6       Q   Okay.  So I wanted you to have that context for
7   talking about Exhibit 15.  All right.  So, on the second page
8   of Exhibit 15 --
9       A   (Turning to.)
10      Q   -- Inv. McClellan, now Huff, in the last paragraph
11  says that -- you know, she gets there and talks to Deputy
12  Summers.
13          She says: "Deputy Summers told me that at 0741 that
14  same morning, Newman told him that his head hurt and wanted to
15  go to the hospital.  Deputy Summers told him that he just came
16  from the hospital..."
17          Do you see that?
18      A   Actually, no.  Must be on the next page.
19          MS. COOK OLSON:  You're on the wrong exhibit.
20      Q   (BY MS. HOLLAND EDWARDS)  Are you on Exhibit 15?
21      A   I believe I am.
22      Q   Here, that looks like the right one.  It's at the
23  bottom -- it's the last paragraph on this page.
24      A   Oh, there we go.  Okay, sorry.  Okay.
25      Q   So, if you take this as -- at face value, that this

Page 86

1   -- that Deputy Summers had booked him in.  Then, we had a head
2   injury.
3       A   Uh-huh.
4       Q   And that then the next morning he said that his head
5   hurt, and he wanted to go to the hospital.  Where does this
6   fall on the wait-and-see, call-you, or go-to-the-hospital?
7       A   Well, he was cleared at the --
8           MR. VAUGHAN:  Excuse me just a second.  Form and
9   foundation.  Go ahead.
10      A   Okay.  He had been to the hospital, to the ER --
11      Q   (BY MS. HOLLAND EDWARDS)  Right.
12      A   -- and he had been cleared --
13      Q   Okay.
14      A   -- all right?  So, with a clearance, our expectation
15  is that they're cleared to come here and that they're medically
16  stable to come.
17      Q   Right.  Is that the end of your answer?
18      A   Uh-huh.
19      Q   Okay.  Because, before, you told me anything can
20  happen after they get to the jail from the hospital?
21      A   That is true, because they could be reinjured, and
22  anything else can happen.  If he was at the ER, and they
23  informed him that he had a head injury, our expectation is that
24  they're cleared for alcohol and the head injury.
25      Q   And can be safely maintained there, right?

Page 87

1           MS. COOK OLSON:  Objection to form and
2   foundation.
3           THE REPORTER:  I'm sorry?
4           MS. COOK OLSON:  Objection to form and
5   foundation.  Sorry.
6       A   That they're cleared to go, and they're safe to come
7   here.
8       Q   (BY MS. HOLLAND EDWARDS)  Right.  But, earlier, I
9   asked a bunch of questions about whether they were safe to be
10  maintained here, and you said anything can happen.
11      A   Well, hang on.
12      Q   And now you're saying that Deputy Summers could rely
13  on the clearance from the day before.
14          And so I'm wanting to understand whether you take the
15  medical clearance to mean that they have been cleared and it's
16  safe to maintain them there.
17      A   For the rest of their stay.
18          MR. VAUGHAN:  Excuse me.  Form and foundation.
19          MR. COLLIER:  Agree.  Misstates her
20  previous testimony.
21          MR. VAUGHAN:  I'm sorry to interrupt.
22          THE WITNESS:  No, that's fine.
23      A   Uhhhha.  Well, yes.  All right.  They were cleared,
24  and we assumed that they are cleared to come here and to be
25  safe.  Again, anything can happen.  This is true.  They could

Page 88

1   be reinjured, and they could -- their status could change, and
2   they could -- need to go back.
3       Q   (BY MS. HOLLAND EDWARDS)  But as the highest-level
4   clinical person working for the jail in 2021, do you think it
5   would be okay for Deputy Summers to know about a head injury
6   the day before, hear complaints of worsening head pain, and
7   request to go to the hospital, and rely on the observation --
8   on the medical clearance from the day before?
9           MR. VAUGHAN:  Form and foundation.
10      A   Did he have a CT scan?
11      Q   (BY MS. HOLLAND EDWARDS)  No.  Would you know that,
12  though, working in the jail?
13      A   Yeah, we would.  We would have that information.
14      Q   So, then, it would be available to Deputy Summers to
15  know that he hadn't had a CT scan?
16      A   It would be.
17      Q   So what does that mean in terms of whether it would
18  be reasonable to rely on the clearance?
19          MR. VAUGHAN:  Form and foundation.
20      A   Let's see.  Ask me again.  I'm tired.
21      Q   (BY MS. HOLLAND EDWARDS)  I understand.  Do you think
22  that it is consistent with the practices and expectations at
23  this sheriff's office and jail to tell a deputy -- tell an
24  inmate they can't go to the hospital, in the context of a head
25  injury the day before, complaints of pain and asking to go to

22 (Pages 85 to 88)