Exhibit 6

# ZOOM VIDEOCONFERENCE DEPOSITION OF
# DAYLAN GUTTRIDGE

2/15/23

_____

Civil Action No. 22-cv-1763-PAB-KLM

# ESTATE OF KELROY NEWMAN, et al. vs BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF MONTEZUMA, COLORADO, et al.

_____

United States District Court
District of Colorado

ANIMAS REPORTING SERVICE
919 County Road 142
Durango, Colorado 81303
877.385.4268/970.385.4268
animas@animas.net
animasreporting.com

Exhibit 6
1.877.385.4268                                                                970.385.4268
**DAYLAN GUTTRIDGE**

Page 9

1  A  So my understanding was he -- on his original intake,
2  he had a high BAC.  And so we would do an observation on them
3  until they're blowing zeros or they're sober enough to answer
4  our medical questions.
5  Q  And -- so you -- you have said that you look for
6  normal respirations a couple of times.  Are you measuring their
7  respiratory rate?  Like, is there any medical device, or are
8  you just looking in to see that they have chest rise and fall?
9  A  So I was looking in and looking for equal chest rise
10 and fall on both sides of the chest.
11 Q  Okay.  Do you -- if they have a blanket on, can you
12 see both sides?
13 A  You can see if there's gonna be, like, see-sawing on
14 the blanket or anything like that.  And you can also kind of
15 look up at the neck, see where the -- like, when you breathe
16 in, your chest muscles -- they expand.  You can generally see
17 pretty well that way.
18 Q  Okay.  And so you said you're looking for
19 orientation, normal respirations, and to make sure they're not
20 vomiting -- like, aspirating vomit?
21 A  Yes, ma'am.
22 Q  And, so, what do you look -- how do you evaluate
23 their orientation?
24 A  So if they're, like, aware where they're at and
25 what's going on.

Page 10

1  Q  So only -- you have to do a verbal really to get that
2  sense --
3  A  Yes.
4  Q  -- right?
5  A  Yes, ma'am.
6  Q  How many verbals did you do on him?
7  A  I don't recall.
8  Q  Do you recall doing any verbals?
9  A  I believe I did one or two of them.  But when they're
10 sleeping at night, I try to let them sleep and -- so that we're
11 not interrupting them too much.
12 Q  And in terms of making sure they're not aspirating
13 vomit, what do you look at for that?
14 A  So I look at how they're sleeping and if there's any
15 fluid or anything like that.
16 Q  Like, around their head?
17 A  Yeah.
18 Q  Why is it important to look for aspirating?
19 A  So just to make sure that they're able to maintain
20 their airway and it's not compromised.
21 Q  Okay.  'Cause that could be fatal, right?
22 A  Yes.
23 Q  Do you understand that alcohol -- significant --
24 serious intoxication and withdrawal can both be fatal?
25 A  Yes, ma'am.

Page 11

1  Q  Have you -- what training have you had at the jail on
2  monitoring people with high BACs?
3  A  So, before I actually started working in the jail, I
4  was actually an EMT with the Dove Creek Ambulance District.
5      MS. HOLLAND EDWARDS:  Hang on.
6      MR. COLLIER:  Yeah, can you -- (conferring
7  with Mr. Vaughan.)  Just one second.
8      MS. HOLLAND EDWARDS:  For some reason, my phone
9  is trying to talk to me.  So let me just stop that.
10     (Comments off record.)
11 Q  (BY MS. HOLLAND EDWARDS)  Okay.  So you sound like
12 you have a little more medical training, and then you were just
13 telling me what it was, and I missed it.  So tell me again what
14 your job was.
15 A  I was an EMT basic with the Dove Creek Ambulance
16 District.
17 Q  With the what district?
18 A  Dove Creek Ambulance District.
19 Q  And where is that?
20 A  Dolores County, just north of Cortez.
21 Q  How long did you do that?
22 A  About six months.
23 Q  EMT basic, okay.  And -- and, so, from that training
24 you know about -- you know that alcohol withdrawal and alcohol
25 intoxication can both be dangerous, right?

Page 12

1  A  Yes, ma'am.
2  Q  Do you also know that withdrawal from drugs can be
3  dangerous?
4  A  Yes, ma'am.
5  Q  ==In terms of specific training at the County, did you==
6  ==have any training from the County about what to look for in==
7  ==doing 30-minute checks for someone who had a high BAC?==
8  ==A  So, with the County, it's -- we put them on an==
9  ==observation watch and monitor them and make sure they weren't==
10 ==gonna choke on their own vomit or aspirate and that they're not==
11 ==gonna get violent towards others or themselves.==
12     ==And a lot of it is:  Wait until they're sober enough==
13 ==that we can get them more care.==
14 ==Q  What more care are you waiting to get them?==
15 ==A  So we can get them -- get them hydrated and get them==
16 ==some nausea medication so that they're not gonna be losing a==
17 ==whole bunch of fluids from throwing up.==
18 ==Q  So do you wait until they're sober to give them==
19 ==nausea meds?==
20 ==A  Yes.  So that they don't throw it up, so that they're==
21 ==more effective.  And a lot of times the hospital won't even==
22 ==prescribe them until they're sober.==
23 ==Q  Okay.  So what nausea meds do you have that you give?==
24 ==A  There's the Tums and then the Pepto, is the ones that==
25 ==we have access to.==

3 (Pages 9 to 12)

Exhibit 6

1.877.385.4268                                                          970.385.4268

**DAYLAN GUTTRIDGE**

Page 13

1    Q    And do you need to call a nurse to give those?
2    A    Yes, ma'am.  Most of the time -- so, if we had
3    someone come in, we would have to wait to give medications till
4    they've been there for at least 24 hours, so that the nurse can
5    visit with them, make sure they're not gonna have any allergic
6    reactions or anything.
7    Q    Okay.  So any medicine you have that would help with
8    withdrawal you can't really give until they're sober --
9    A    Yes, ma'am.
10   Q    -- is that right?  And, regardless, you have to wait
11   24 hours for the nurse to evaluate them, right?
12   A    Yes, ma'am.
13   Q    Did you have any access to medications to help
14   prevent seizures?
15   A    No, ma'am.
16        MR. VAUGHAN:  Just -- by "access," you mean
17   something they can go grab on site?
18        MS. HOLLAND EDWARDS:  Right.
19   A    So you're -- are you talking about like Keppra, like
20   prescription medication that's prescribed to the person that's
21   having the seizure?
22   Q    (BY MS. HOLLAND EDWARDS)  Well, I'm only aware of
23   prescription medications that will help with -- help prevent
24   seizures in someone who's withdrawing.  If there are
25   nonprescription ones, though, I -- I'm trying to include those.

Page 14

1    So I wanna know if you had the ability as, a deputy
2    at the jail in the summer of 2021, to give someone -- an inmate
3    who was withdrawing any type of medication that you understood
4    to be designed to prevent seizures.
5    A    I don't believe so.
6    Q    Are you familiar, from your EMT work, with the CIWA
7    withdrawal scale?
8    A    No.
9    Q    C-I-W-A.
10   A    No.
11   Q    What about COWS?  C-O-W-S.
12   A    No, ma'am.
13   Q    They're more for when people are withdrawing which --
14   and I think -- I don't know if they would come up for an EMT
15   but -- so, when you are -- well, let's back up.
16        If a person comes in with a blood alcohol level above
17   .2, and you're the booking deputy, what are you supposed to do?
18   A    We send them to Southwest Memorial Hospital to obtain
19   a med clearance from the ER staff.
20   Q    And what do you understand that the hospital is doing
21   during that med clearance?
22   A    So they're checking their vitals.  And from my
23   understanding, they should be the ones that are able to say,
24   "Yes, they're fit enough to be incarcerated at the Montezuma
25   County Detention Center."

Page 15

1    Q    Do you have any understanding about what tests they
2    do on people who have a high blood alcohol at the jail?
3    A    No, ma'am.
4    Q    Do you assume that they're taking blood alcohol
5    levels themselves?
6         MR. COLLIER:  Object to the form and foundation.
7    Q    (BY MS. HOLLAND EDWARDS)  If you know.
8    A    At Southwest?
9    Q    Yeah.
10   A    No, ma'am.  I'm --
11   Q    You don't assume that?
12   A    No, ma'am.
13   Q    Why not?
14   A    It's kinda outside my realm of working in the
15   detention center.  So I rely on the expertise of the hospital
16   with medical clearance.
17   Q    Well, even -- I mean, as an EMT basic, wouldn't you
18   think that any reasonable screening of a person for
19   intoxication would involve assessing how intoxicated they are?
20        MR. COLLIER:  Object to the form and
21   foundation.  That calls for an inappropriate opinion from
22   someone not qualified.
23   Q    (BY MS. HOLLAND EDWARDS)  Go ahead.
24   A    So I would somewhat expect them to have a more
25   in-depth investigation on how they should be -- or I guess I

Page 16

1    should rephrase that.  More in-depth investigation if they're
2    fit to be incarcerated.
3    Q    Right.  So you are -- as the booking officer, when
4    you send the inmate off and receive them back, your
5    expectation -- your understanding, I should say, is that they
6    are being evaluated for whether they can safely detox in a
7    jail?
8         MR. COLLIER:  Form and foundation.  Misstates
9    testimony.
10        MR. VAUGHAN:  Could you -- and, I'm sorry, could
11   read that back?  I apologize.  I don't want to interrupt.  I
12   just didn't get all of it.
13        MS. HOLLAND EDWARDS:  That's okay.
14        (Record read back by reporter.)
15        MR. VAUGHAN:  Form objection, foundation
16   objection.  Go ahead.
17   A    Yes, ma'am.
18   Q    (BY MS. HOLLAND EDWARDS)  In 2021, on a night or
19   weekend, if there was any danger -- well, let me start over.
20        In 2021, on a night or weekend, there was no medical
21   person available to help if a detoxing person had serious
22   symptoms, right?
23   A    No, ma'am.
24   Q    I mean, that's right they -- there was no medical
25   person?

4 (Pages 13 to 16)

Exhibit 6

1.877.385.4268                                                                      970.385.4268

**DAYLAN GUTTRIDGE**

Page 29

1  any of the withdrawal questions or -- or fill out the EFORCE
2  section that -- the medical section of the EFORCE system until
3  after they're back from screening, right?
4      A   After they've got the medical clearance?
5      Q   Right.
6      A   Yes, ma'am.
7      Q   What if you have, like, prior information from an
8  earlier booking?  Do you print out any previous documents that
9  you know about from last time someone was there for the
10 hospital?
11     A   No, ma'am.
12     Q   When the person comes back from being -- medical
13 clearance, have you ever seen -- so Deputy Durbin told us
14 yesterday that sometimes the -- the clearing physician will
15 give orders about how frequent the checks should be.  Have you
16 ever seen that?
17     A   Yes, ma'am.
18     Q   And is it in discharge paperwork, or where do you see
19 it?
20     A   In the discharge paperwork.  It's normally on the
21 back page.
22     Q   On the back page?
23     A   (Nodding head.)
24     Q   Can you give me -- like, what kind of recommendations
25 have you seen or orders have you seen from the hospital for

Page 30

1  observations?
2      A   15 and 30 minutes.
3      Q   Are there ever -- have you ever seen, like, orders
4  for specific vital signs to monitor for?
5      A   No, ma'am.
6      Q   If they don't say whether it's 15 or 30 minutes, how
7  do you decide what the frequency is?
8      A   We do a 30-minute observation watch if their BAC is
9  over a .2.
10     Q   And Deputy Durbin testified that his personal
11 practice is, if it's over .4, he would do 15-minute checks.
12 Have you heard -- is that a common practice in the jail?
13         MR. VAUGHAN:  Foundation objection, form
14 objection.
15     A   It depends on the scenario.  We can't just give a
16 blanketed "Well, you have to do this for this."  You have to --
17 it's by a case-by-case basis.
18     Q   (BY MS. HOLLAND EDWARDS)  So it's up to your
19 discretion as the deputy whether to do 15- or 30-minute checks;
20 is that fair?
21     A   Yes, ma'am.
22     Q   And -- and you haven't had any training from the jail
23 on which situation should be 15 or 30, right?
24     A   Yes, ma'am.
25     Q   So you told me earlier what you're looking for on --

Page 31

1  on 30-minute checks.  You know, there's orientation,
2  aspiration, and breathing, right?
3      A   Uh-huh.
4      Q   "Yes"?
5      A   Oh, yes.
6      Q   Is there any expectation -- have you ever been
7  trained by the jail that you should be looking for -- just ask
8  people if they're nauseous on those 30-minute checks?
9      A   No, ma'am.
10     Q   Have you ever been trained to have them -- they hold
11 their hands out in front of them with their arms extended and
12 their fingers spread to see if they have tremors?
13     A   You -- no, ma'am.  But you can normally see that when
14 they're just shaking.
15     Q   And has that happened where someone's shaking enough
16 you can see them through the window?
17     A   Yes, ma'am.
18     Q   And when you see that, do you have to call the nurse
19 and tell them?
20     A   No, ma'am.
21     Q   It's up to your discretion whether to consider that a
22 serious symptom, right?
23     A   Yes, ma'am.
24     Q   Do you -- were you trained at any point that, on
25 these 30-minute checks, you should ask if people feel nervous?

Page 32

1      A   No, ma'am.
2      Q   Have you been trained at any point by the jail to ask
3  people on 30-minute intoxication checks about whether they
4  have -- like, feel bugs crawling or, you know, tactical -- I
5  mean, tactile disturbances?
6      A   No, ma'am.
7      Q   Have you been trained at any point by the jail to ask
8  on these 30-minute withdrawal or intoxication checks about
9  auditory or visual disturbances?
10     A   No, ma'am.  Most of the time, you're -- you can
11 hear -- well, they'll be talking, or they'll be -- they'll say
12 something.
13     Q   If they're hallucinating, you might find out about
14 it, right?
15     A   Yes, ma'am.
16     Q   But if just the lights seem really bright or noises
17 seem really loud, you haven't been trained to ask for that,
18 right?
19     A   No, ma'am.  And on night shift, we have the lights
20 dimmed so that they can get a nice sleep.  So it's not too
21 obnoxious to them.
22     Q   When you do these 30-minute intoxication checks or
23 withdrawal checks, have you ever -- have you been trained to
24 ask whether people have headaches or whether their head feels
25 full?

8 (Pages 29 to 32)

ANIMAS REPORTING SERVICE
animas@animas.net

## Page 33

1  A   No, ma'am.
2      Q   Have you been trained to ask on these checks whether
3  people are -- you know, questions to determine whether they're
4  oriented?  Like, what day it is.
5      A   What day of the week it is, where they're at, like --
6  and what year, what's their name, (nodding head).
7      Q   All right.  So you do those every 30 minutes?
8      A   No, ma'am.
9      Q   You just do that on intake?
10     A   Yes, ma'am.
11     Q   Are you aware of whether the jail has -- you know,
12 even like the nurse, whether the nurse could give any
13 benzodiazepines to help with withdrawal?
14     A   I'm not aware that she can prescribe medication.  And
15 from -- from my understanding, they have to have that
16 prescribed to them by someone that is capable prescribing
17 medications.
18     Q   And some jails will have a -- like, a standing order
19 from a doctor that the nurse can follow, that has on it, you
20 know, medications.
21         Are you -- have you ever -- are you aware of any
22 standing orders that the nurse can follow here to give
23 medications like benzos?
24     A   No, I'm not aware of that.
25     Q   Do you have anyone with prescriptive authority or --

## Page 34

1  I really wanna ask about 2021 'cause I know there have been
2  some changes.
3         So, in the summer of 2021, did you have on call or
4  access to call anyone with prescriptive authority?
5      A   So, for that, we would transport them to Southwest,
6  so we could have a physician prescribe it.
7      Q   So, if something rises to the level that you're
8  concerned as a deputy needs a prescription medication, they
9  need to go to the hospital for that?
10     A   Yes, ma'am.
11     Q   And there was no physician or mid-level on call for
12 you?
13     A   No, ma'am.
14     Q   Would it -- was it common in your experience for
15 people to -- to get benzo description -- uhh -- subscriptions
16 (sic) to prevent withdrawal symptoms from the hospital?
17     A   Not that I recall.
18     Q   There's -- these are the exhibits in the case so far.
19         MS. HOLLAND EDWARDS:  And, Gordon, you
20 might wanna watch your coffee when we do this, but...
21     Q   (BY MS. HOLLAND EDWARDS)  If you go to Exhibit 16 --
22 well, can you think -- can you ever think of a time where you
23 sent someone out to the hospital for withdrawal symptoms and
24 they came back with a prescription for benzos?
25     A   I -- it's been such a long time, I don't remember.

## Page 35

1      Q   Can you recall anytime where a person came back from
2  medical -- medical clearance with prescription meds to help
3  with withdrawal?
4      A   With, like, nausea and stuff like --
5      Q   (Nodding head.)
6      A   Yes, ma'am.
7      Q   What type of prescription is it?
8      A   I don't really recall -- remember.  But one of them
9  is to control, like, nausea.  And I believe that was
10 prescribed, like, every four hours.
11     Q   And what about to control or prevent seizures?  Can
12 you recall anytime where they came back from a medical
13 clearance at the hospital with medications designed to prevent
14 seizures?
15     A   Yes, ma'am.  Such as Keppra.
16     Q   Keppra?
17     A   Yeah.
18     Q   And was that -- the time that you're thinking about
19 with Keppra, was that a withdrawal situation or just someone
20 with a seizure disorder?
21     A   With a seizure disorder.
22     Q   Okay.  So can you think of anytime when a person came
23 back from medical clearance at the hospital with a prescription
24 for medications to prevent seizures from withdrawal?
25     A   I don't believe so.

## Page 36

1      Q   Exhibit 16 in front of you -- so, you see the tabs?
2  Are you --
3      A   Yes.
4      Q   -- already on 16?
5      A   (Indicating.)
6      Q   Okay.  So this is Kelroy Newman's booking documents
7  and other, you know, scanned documents from a June detention.
8  Do you -- have you looked through this in preparation for
9  today?
10     A   No, ma'am.
11     Q   Do you know if you were one of the deputies involved
12 in his detention --
13     A   No.
14     Q   -- that time?  Sorry.
15     A   No, ma'am.
16     Q   Okay.  I don't see your name on the 30-minute checks.
17 I just wasn't sure.
18         When -- so after a person -- in the sally port you
19 determine they go to the hospital.  They go to the hospital and
20 get cleared and come back, and then they come inside to the
21 booking area, right?
22     A   They go into the reports room, where the officer does
23 their initial intake booking.  So they get their basic
24 information, their address, and education level, preferred
25 religion.  And then they input the charges and add their

9 (Pages 33 to 36)

**DAYLAN GUTTRIDGE**

Page 73

1  before he passed away, indicates that he wasn't able to do the
2  booking for the bulk of the morning shift, right?
3         MR. VAUGHAN:  Foundation objection.
4     A   So, for the morning shift, that -- what I'm seeing on
5  here is they had to release one, and also they had another
6  intake, too.  So that tied them up.  And --
7     Q   (BY MS. HOLLAND EDWARDS)  Okay.
8     A   -- with the medications, the meals being passed, that
9  eats up a lot of time when you only have three deputies --
10 three or four deputies on.
11    Q   How many bookings do you think you can do in a
12 morning shift?
13    A   Everyone is different.
14    Q   What's the range?  Like --
15    A   One to maybe four, if they're fast and proficient.
16    Q   The -- you know, when we were looking at the EFORCE
17 document for this admission, when it showed what time -- this
18 is Exhibit 19, Page -- I think you said it was 3 on yours?
19    A   (Turning to.)  Yes.
20    Q   Can you tell what time this was completed from this
21 document?
22    A   On Page 3?
23    Q   Yeah.
24    A   No, I can't.
25    Q   But we know it's when he's back from the hospital,

Page 74

1  right?
2     A   Yes.
3     Q   Is that BAC that's listed here -- would you expect
4  that to be a new one upon returning from the hospital?
5     A   No.
6     Q   So it would be the one from the sally port?
7     A   Yes.
8     Q   Is there video in the sally port?
9     A   Yes.
10    Q   Do you -- have you seen any video of Mr. Newman in
11 the sally port?
12    A   No, ma'am.
13    Q   Do you know how long that video is maintained?
14    A   I'm not too sure.
15    Q   What is the expectation for -- if an inmate asks to
16 go to the hospital?
17        MR. VAUGHAN:  Form and foundation objection.
18    A   So, for that, it's mainly what -- their main reason
19 why they want to go.  And if it's, like, head injuries and
20 something like that, once they're reported to us, we normally
21 contact the nurse and tell her, "This is what's going on."
22        And then she'll tell us, "Yes, send them to the
23 hospital and -- or call 9 -- or call dispatch and have them
24 send over some medics."
25    Q   (BY MS. HOLLAND EDWARDS)  Okay.  The first -- the

Page 75

1  first thing is you ask why they wanna go to the hospital?
2     A   Yes.
3     Q   And then you describe, if it's a head injury, what
4  you are supposed to do, right?
5     A   Yes.
6     Q   And are there any other complaints that you are
7  supposed to call the nurse for?
8     A   So, like, stomach issues.  So, if they're just saying
9  stomach hurts, we'll ask questions like "What's going on?
10 When's the last time you used the bathroom?"  Something along
11 those lines.
12    Q   What other -- so what I wanna know first is:  What
13 complaints are you required to call the nurse over?
14    A   That's up to the officer's discretion.
15    Q   Okay.  So are there any conditions that you're
16 required to call the nurse over?
17    A   No, we -- "I," I guess I should say.  I would call
18 her and get a second opinion.
19    Q   For which type of complaints?
20    A   Any of 'em.
21    Q   Okay.  So, when people told you they wanted to go to
22 the hospital, you would call the nurse?
23    A   Depending on what it was.  Like, if it was chest
24 pains or if it's something that you can -- like, a seizure or
25 something, I would send them to the hospital and give the nurse

Page 76

1  a heads-up about "I sent this person to the hospital, and
2  here's why."
3     Q   Okay.  So the -- you would at least call the nurse?
4     A   Yes.
5     Q   If it was more serious, you might just send them out?
6     A   I'd send them first, get them to the hospital, and
7  then contact the nurse.
8     Q   Was there any -- were you ever trained on any
9  expectations about -- like, obtain vitals if someone asked to
10 go to the hospital?
11        MR. VAUGHAN:  Form, foundation.
12    A   Like, are you asking if I was trained how to take
13 vitals?
14    Q   (BY MS. HOLLAND EDWARDS)  Trained that you should if
15 someone asks to go to the hospital.
16    A   I -- that really depends on what -- what it was.  So,
17 if it's like chest pains, it was, "No, let's get 'em there and
18 get it taken care of by people that are more qualified and
19 better prepared to handle if anything comes up."
20    Q   What if someone said -- you know, what if someone
21 with a head injury was saying that they're -- the pain was
22 getting worse in their head and they wanted to go to the
23 hospital?  What would you --
24        MR. VAUGHAN:  Foundation objection.  I'm
25 sorry.

19 (Pages 73 to 76)

Page 93

1    also have a pair of leg irons on as well.
2        Q   Okay.  And, so, if that happens, at least one person
3    in the jail is dedicated to having to leave the facility and go
4    to the hospital and act as security during the time that
5    they're there; is that correct?
6        A   Yes, sir.
7        Q   Now, I'm not suggesting that any particular inmate
8    does or does not need that.  That's just protocol for anyone;
9    is that fair?
10       A   Yes, sir.
11       Q   Okay.  So is every single complaint that an inmate
12   comes in with, and which they think they need to see a doctor,
13   one that you send them to the hospital?
14       A   No, sir.
15       Q   You mentioned officer discretion; is that correct?
16       A   Yes, sir.
17       Q   And with -- and is every -- is there a cookie-cutter
18   approach that you can use for those situations?
19           In other words, "If they say this, then this"?  Or is
20   there -- or what do you do?  What do you bring to bear?
21       A   We ask follow-up questions.  We dive further into it
22   and see what's going on.  Like, if someone is complaining of a
23   headache and they're coming down off a high BAC, like normal
24   people, when you're -- after you've been drinking and you're
25   sobering up, you normally have a headache.  You're dehydrated,

Page 94

1    and you just wanna sleep.
2        Q   Okay.  So you would -- would you necessarily on all
3    occasions with someone that has that presentation have an
4    immediate reaction of getting them to the hospital?
5        A   No, sir.  We recommend they drink water, try to get
6    active, and just continually hydrate.
7        Q   Would the fact that they've already been to a medical
8    clearance within 24 hours have any -- play any part in what a
9    officer might use for discretion, in determining whether they
10   need to go to the hospital?
11       A   So that would depend on what they're seen for --
12       Q   Okay.
13       A   -- and we'd be using the expertise of the medical
14   professionals that gave us -- saying that they're fit for the
15   incarceration.
16       Q   Okay.
17       A   And -- but if we felt that they needed to be sent,
18   we'd still send them.
19       Q   Okay.  Do you, in any of your interactions with
20   inmates, observe situations in which inmates just want to get
21   out of the facility?
22       A   Yes, sir.
23       Q   Is that something you have to also consider?
24       A   Yes, sir.
25       Q   And when they're away from the facility, even though

Page 95

1    you may have an officer there, that's a security risk, isn't
2    it?
3        A   Yes, sir.
4        Q   I mean, it's not -- the hospital is not a secure
5    facility?
6        A   No, sir, it is not.
7        Q   Okay.
8            MR. VAUGHAN:  That's all the questions that I
9    have.
10           MS. HOLLAND EDWARDS:  The way it works is:  If
11   it prompts more, then I can ask you more, okay?  So I'll try
12   and keep it brief, but...
13                   FURTHER EXAMINATION
14   BY MS. HOLLAND EDWARDS:
15       Q   I was -- a couple of topics I was confused about on
16   your follow-up questions.  I thought you told me that you
17   didn't know or remember whether you went in and talked to
18   Mr. Newman; and just described that sometimes in checks, you'll
19   knock on the window.
20           Do you -- do you know if you did knock on the window
21   with Mr. Newman, or are you just describing sometimes what you
22   do?
23           MR. VAUGHAN:  Asked and answered objection.
24       A   So I don't recall, but that's when I would go in and
25   check on him, is when I didn't get a response from just

Page 96

1    knocking on the window first.
2        Q   (BY MS. HOLLAND EDWARDS)  Okay.  But you don't have
3    any specific recollection of trying to get his attention and
4    him not responding, right.
5        A   Yes, ma'am.
6        Q   And you said that you saw one medical screening on an
7    FTO?
8        A   Yes, ma'am.
9        Q   What -- can you describe what medical screening or
10   clearance you saw?
11       A   It was -- we came to the jail, and the individual had
12   a high BAC.  So we transported him to Southwest Memorial
13   Hospital, and they checked the vitals and performed an
14   assessment.
15       Q   Okay.  Where did that assessment take place?
16       A   In Southwest Memorial ER.
17       Q   Inside the building?
18       A   Yes, ma'am.
19       Q   And what did the assessment consist of?
20       A   The vitals -- and I don't -- and I know there's a
21   physical assessment as well, and they asked them if they had
22   any complaints or anything.
23       Q   What did they do on the physical assessment?
24       A   They did a touch assessment where they physically
25   went around and asked if -- felt for swelling or pain or