# ZOOM VIDEOCONFERENCE DEPOSITION OF
# **DANIEL RUIZ**

## **2/14/23**

---

**Civil Action No. 22-cv-1763-PAB-KLM**

# **ESTATE OF KELROY NEWMAN, et al. vs BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF MONTEZUMA, COLORADO, et al.**

---

**United States District Court
District of Colorado**

ANIMAS REPORTING SERVICE
919 County Road 142
Durango, Colorado 81303
877.385.4268/970.385.4268
animas@animas.net
animasreporting.com

1.877.385.4268                                      970.385.4268

## DANIEL RUIZ

---

### Page 37

1  A  Yes.
2  Q  Okay. So the person actually administering the
3  medications would be command staff?
4  A  No.
5  Q  Okay. It would be not a medical-trained person?
6      MR. VAUGHAN: Form and foundation objection.
7  A  It would be whoever was QMAP. Qualified, they went
8  to the class.
9  Q  (BY MS. HOLLAND EDWARDS) Okay. But it would usually
10 be a deputy or a sergeant that took a QMAP class; is that
11 right?
12 A  Yes.
13 Q  And would the nurse oversee the administration of the
14 medications?
15 A  While they were passed?
16 Q  Yes.
17 A  Not always. You could assist her in passing during
18 the day. But in the evenings, you would not be there. Then
19 two deputies would pass medication without the nurse being
20 there.
21 Q  Okay. And did you have, like, a med cart?
22 A  Yes.
23 Q  And did it have -- are you -- were you QMAP-certified
24 at the time?
25 A  Yes.

---

### Page 38

1  Q  And so you were -- there were times you would pass
2  medication on nights and weekends?
3  A  I've done it. I did it at the very end before
4  leaving the jail.
5  Q  Do you know what a MAR is?
6  A  Vaguely. It's their medical sheet, what their dosage
7  is, and how many pills they take, I believe.
8  Q  So would you -- when you were handing out
9  medications, would you make, like, marks on the person's
10 medication administration record, of whether they got their
11 medication or refused it?
12 A  You would sign your initials.
13 Q  In like each little square for each inmate that got
14 medicine, right?
15 A  Yes, whether they took it or refused it. The inmate
16 would sign as well.
17 Q  And that was -- and there was no med tech with you at
18 that point, right?
19 A  Another QMAP'd person. That label now, but...
20 Q  Okay. So there would be another -- you would do it
21 with two deputies or a deputy and sergeant --
22 A  Yes.
23 Q  -- but there would not be a nurse or a med tech with
24 you while the two of you were doing that?
25 A  Correct.

---

### Page 39

1  Q  Well, that answers -- I was curious how people got
2  medications on the weekends.
3      What would happen if someone got booked in on a
4  weekend and didn't yet have -- haven't seen the nurse? How
5  would they get their medications?
6  A  So you would relay the info. They would tell you.
7  You would ask them in their medical, "Do you take any
8  medications?" They would let you know what they were.
9      And then you would have to let a sergeant know. Or
10 they come with medication, "Hey, this certain person has his
11 medication."
12     And they would -- if it was something -- procedures
13 or something, then they would relay that to the nurse, call her
14 on the weekend. "We have this individual that has heart
15 medication," or stuff like that. And then I believe they
16 would -- she would delegate what -- what would go on from
17 there.
18 Q  Okay. So whoever books them in would flag the need
19 for medication to a sergeant; the sergeant would call an
20 on-duty or an on-call nurse; is that right?
21 A  Our nurse.
22     MR. VAUGHAN: Form and foundation.
23 Q  (BY MS. HOLLAND EDWARDS) And then --
24     THE REPORTER: I'm sorry, I didn't hear
25 the answer.

---

### Page 40

1      THE WITNESS: Our nurse.
2  Q  (BY MS. HOLLAND EDWARDS) The same Virginia --
3  Virginia Hernandez?
4  A  (Nodding head.)
5  Q  Yes?
6  A  Yes.
7  Q  And then she would direct whether the person got the
8  medication or not?
9  A  Yes.
10 Q  Is there an on-call doctor or nurse practitioner?
11 A  Not that I can remember.
12 Q  Or was there ever an on-call physician's assistant,
13 that you know of?
14 A  Not that I can remember.
15 Q  I can't remember -- this Policy 500 that I showed
16 you, you said you had seen that before today, right?
17 A  Yes.
18 Q  Had you seen it when you were working as a jail
19 deputy?
20 A  Yes.
21 Q  All personnel working in a jail have to be
22 CPR-qualified, right?
23 A  I've done CPR. I don't -- I couldn't answer that yes
24 or no.
25 Q  Okay. And who trained you in that?

---

10 (Pages 37 to 40)

## ANIMAS REPORTING SERVICE
### animas@animas.net

fc3a7ce7-ac20-4e58-a83c-31178e96927a

1.877.385.4268

970.385.4268

**DANIEL RUIZ**

---

Page 45

1    Q   And is the officer in charge necessarily a sergeant,
2  or might it be another deputy?
3    A   They're not labeled the sergeant, but they're --
4  they're who are running shift.
5    Q   They are who are running shift?
6    A   Yes.
7    Q   But they are -- they didn't have to be a sergeant?
8    A   Correct.
9    Q   Would you be the OIC sometimes?
10   A   I did it once for two hours, three hours.
11   Q   Was that just because you were short-staffed?
12   A   Yes.
13   Q   Were you aware there being a time where there was an
14  orientation deputy to help the nurse evaluate medical needs?
15   A   Say that again, please.
16   Q   Well, I'm gonna show you -- you've been given -- go
17  to Exhibit 3.  This was an audit that was done of the -- of the
18  jail.  On Page 2 -- you know, I only put some of it in
19  here.  But there's all these different categories where people
20  are compliant or -- you know, where the jail is considered to
21  be compliant or not compliant.
22        And, so, the second-to-last one on Page 2 of this
23  exhibit, the second page --
24   A   (Turning to.)
25   Q   -- and then -- you're -- you're right.

---

Page 46

1    A   Oh, okay.
2    Q   It says -- this is the -- the jail is being audited
3  for it's medical screening practices.  And it says medical
4  "questions are asked during the booking process.  An
5  orientations deputy position has been created to help the nurse
6  evaluate medical needs during the first 48 hours."  (Sic.)
7        I'm asking if you are aware of anytime you worked in
8  the jail where there was an orientation deputy to help the
9  nurse identify medical needs in the first 48 hours?
10   A   A specific?  I do not believe so.  I believe that one
11  of our sergeants would assist with taking inmates down to the
12  nurse.  How long that went on, I do not remember.
13   Q   When you had a person who had had a high blood
14  pressure -- I mean, a high BAC, I'm sorry, and they come back
15  from their medical screening, what type of watches would they
16  be put on?
17        MR. VAUGHAN:  Foundation objection.
18   A   I believe it's an observation watch.
19   Q   (BY MS. HOLLAND EDWARDS)  How often did that need to
20  be?
21   A   30-minute.
22   Q   What would you look for during those watches?
23        MR. VAUGHAN:  Foundation -- excuse me.
24  Foundation objection.  Go ahead.
25   A   Make sure that they're asleep; that they're

---

Page 47

1  breathing.
2    Q   (BY MS. HOLLAND EDWARDS)  Did you ever conduct those?
3        MR. VAUGHAN:  Were you done with your answer?
4        THE WITNESS:  Yes.  Yes, sir.
5        MR. VAUGHAN:  All right.
6        MS. HOLLAND EDWARDS:  Yeah, and please tell me.
7  I don't ever mean to step on your answers.
8        THE WITNESS:  Okay.
9    Q   (BY MS. HOLLAND EDWARDS)  Did you ever conduct
10  30-minute watches because someone had had a high BAC?
11   A   Yes.
12   Q   And you would look for -- your understanding of what
13  you should be evaluating is whether they were breathing?
14   A   While they were asleep, if they were breathing.  If
15  they're throwing up or -- I don't know -- needed assistance of
16  some kind.
17   Q   Did you have any form that told you what to ask?
18   A   No, no.
19   Q   Have you ever heard of a CIWA scale?  C-I-W-A, all
20  caps.
21   A   I might've heard of that.
22   Q   Did you use any type of CIWA or -- which is -- any
23  kind of withdrawal assessment tool to do -- do periodic checks
24  on people who are intoxicated?
25   A   Not that I can remember.

---

Page 48

1    Q   Did you -- was it up to your discretion what
2  questions to ask and what to look for?
3        MR. VAUGHAN:  Form and foundation objection.
4    A   I'm sorry, say it again.
5    Q   (BY MS. HOLLAND EDWARDS)  On these 30-minute checks
6  that you were -- observations checks that you have conducted on
7  inmates who had previously had a high BAC, was it up to your
8  own discretion what types of signs and symptoms to look for?
9        MR. VAUGHAN:  Same objection.
10   A   Yes.
11   Q   (BY MS. HOLLAND EDWARDS)  Every 30 minutes, when you
12  check on someone, would you ask, "Do you feel sick to your
13  stomach?  Have you vomited?"
14   A   We'd ask them if they were doing okay.  And if they
15  were actively throwing up, we'd ask whoever was in charge if it
16  would be possible to get them Gatorade or something,
17  electrolytes, to help with the DTs or something like that.
18   Q   And what are the DTs, to your knowledge?
19   A   To my knowledge, DTs, withdrawing from alcohol.
20   Q   And, so, if you saw them vomiting, then you would
21  take steps to see if you could get them something to help with
22  dehydration and electrolytes?
23   A   Yes.
24   Q   But if you didn't see them vomiting, were you
25  expected or did you understand it to be part of your job to ask

---

12 (Pages 45 to 48)

**ANIMAS REPORTING SERVICE**
animas@animas.net

fc3a7ce7-ac20-4e58-a83c-31178e96927a

1.877.385.4268                                      970.385.4268

## DANIEL RUIZ

---

Page 65

1    A   It gets filled out, and it's on their -- on their
2  EFORCE deal, which we use in the jail.
3    Q   EFORCE is the -- like a computer program?
4    A   Yes.
5    Q   And, so, there's a medical section where you are
6  asked about your observations, right?
7    A   Yes, it's questions that we ask them, and then we
8  mark the --
9    Q   The response?
10   A   Yes.
11   Q   And when it says "Officer Observations" here, it -- I
12  wasn't clear whether it was talking about the arresting officer
13  or the deputies.  But you were -- you were answering this,
14  correct?
15   A   Yes.
16   Q   And you said your observations were "ETOH," which
17  means alcohol, right?
18   A   Yes.
19   Q   And then you said "Medical Clearance SWMH," meaning
20  Southwest --
21   A   Memorial Hospital.
22   Q   -- Memorial Hospital?
23   A   (Nodding head.)
24   Q   And you gave as the reason the BAC, correct?
25   A   Yes.

---

Page 66

1    Q   So, from looking at this, does it appear that you
2  sent Mr. Newman to get medical clearance on this date because
3  of his BAC?
4    A   Either I sent him or maybe they had it with them when
5  they came in.
6        THE REPORTER:  Maybe what?
7    A   Maybe they had it -- they had the clearance with them
8  when they came in.  It doesn't say exactly if I sent him or --
9  either way, they were medically cleared.
10   Q   (BY MS. HOLLAND EDWARDS)  Okay.  Well, if you go to
11  574, you can see the "...Medical Clearance Report" --
12   A   Okay.
13   Q   -- of -- signed at 2325, which is after your -- you
14  got that BAC, correct?
15   A   Where was it?
16   Q   You can see it on 572.
17   A   Okay.  Say the question again, please.
18   Q   So I'm just pointing out the BAC you obtained was at
19  2215.
20   A   Yes, ma'am.
21   Q   And the medical clearance is 2325, correct?  For the
22  time that they're brought back to the jail?  Is that what that
23  means?
24   A   I -- I think that's the time that they --
25       MR. VAUGHAN:  Foundation objection.

---

Page 67

1    A   That might've been the time they got back, or got to
2  the hospital.  I'm not --
3    Q   (BY MS. HOLLAND EDWARDS)  So, from looking at these
4  documents, can you tell whether you sent Mr. Newman to the
5  hospital to get cleared, or whether he just was brought in post
6  clearance?
7    A   I can't tell.
8    Q   The handwriting -- the document with the COVID
9  questions on it, that we saw, where it had the -- the BAC
10  written in the corner, that was your handwriting indicating the
11  BAC you took, correct?
12   A   I believe so.  And I was the one that signed that.  I
13  think so.
14       MR. VAUGHAN:  Do you remember the Bates stamped
15  page or not?
16       MS. HOLLAND EDWARDS:  I'm still learning this
17  document.
18       THE WITNESS:  Here it is.
19       MR. VAUGHAN:  He found it.  It's Bates stamped
20  569, MONTEZUMA 569.
21   A   Okay.  I believe that is my handwriting.
22   Q   (BY MS. HOLLAND EDWARDS)  So either you got that and
23  sent him to the hospital as a result, or that's what you got
24  when he came in post clearance?
25   A   Yes.

---

Page 68

1    Q   And, so, would that explain why he was on these
2  30-minute watches that we saw your name on, at MONTEZUMA 566?
3    A   Yes.
4    Q   So was it your normal practice, if someone came in
5  and still had a high BAC, to put them on 30-minute watches?
6    A   Absolutely.
7    Q   And was that a requirement?
8    A   Yes.
9    Q   And the thing you're looking for in the middle of the
10  night, at least, is whether you can see if they're breathing,
11  right?
12   A   Yes.
13       MR. VAUGHAN:  Foundation, form.
14   Q   (BY MS. HOLLAND EDWARDS)  If they're asleep, you
15  don't go in and ask any evaluation questions, right?
16   A   Correct.
17   Q   All right.  Let's go MONTEZUMA 584.
18   A   Now -- could I add something to the last answer?
19   Q   Sure.
20   A   It was recommended that you would go into a cell.  I
21  would say at your discretion and see how -- how somebody who
22  had a BAC was doing.  Wake them up.  We call it doing a verbal
23  check.
24   Q   Okay.
25   A   Yeah.

---

17 (Pages 65 to 68)

ANIMAS REPORTING SERVICE
animas@animas.net

fc3a7ce7-ac20-4e58-a83c-31178e96927a

1.877.385.4268                                      970.385.4268

**DANIEL RUIZ**

---

Page 69

1    Q   And, so, was it -- that -- was that the expectation,
2    or up to your discretion whether to do?
3    A   That was an expectation, yes.
4    Q   And, so, every 30 minutes, it's not just the one;
5    "Should we go in and wake them up?"
6    A   That wasn't required specifically, but you could do
7    it after an hour.
8    Q   Okay.  So you said it was an expectation.  I'm just
9    trying to understand what the specific expectation is.
10       How often, when someone had a high BAC, were you
11   expected to wake them up and see how they were doing?
12   A   It would be at your discretion --
13   Q   Okay.
14   A   -- if that answers better.
15   Q   And when you did do it, there was not a specific set
16   of questions you had to ask every time, correct?
17   A   That is correct.  You would have the control deputy
18   log that you did a verbal check, though.
19   Q   Okay.  And where would that show up in the record?
20   A   That would be on the -- the control log.
21   Q   Okay.  So let's -- I'll write down to keep an eye out
22   for that.  Okay.  Okay.  So now can we go to MONTEZUMA 584.
23   A   (Turning to.)
24   Q   What is this form?
25   A   This is another "...Medical Screening Form."

---

Page 70

1    Q   And this form has some questions about substance
2    abuse, right?
3    A   Yes.
4    Q   And, so, this asks -- it looks like Officer -- or
5    Deputy Durbin did this form, right?
6    A   Yes.  Provided the form, yes.
7    Q   And then Deputy -- is it Deputy McKinney?
8    A   Yes.
9    Q   Received the form, correct?
10       MR. VAUGHAN:  Foundation.
11   A   (BY MS. HOLLAND EDWARDS)  Here I don't -- this is --
12   A   He could've received the form --
13   Q   Okay.
14   A   -- and he could've completed the form, possibly.
15   Q   Okay.
16   A   Yes.  Maybe it wasn't finished all the way, possibly.
17   Q   Okay.  So, in the "Substance Abuse" section, it says:
18   Have you -- No. 5:  "Have you ever had drug or alcohol
19   withdrawals?"  And the answer here for Mr. Newman was
20   "Yes," right?
21   A   Correct.
22   Q   And "Have you ever felt you ought to cut down on your
23   drinking or drug use?"  And the answer is "Yes," correct?
24   A   Yes.
25   Q   "Have people annoyed you by criticizing your drinking

---

Page 71

1    or drug use?"  The answer is "Yes," right?
2    A   Yes.
3    Q   "Have you ever felt bad or guilty about your drinking
4    or drug use?"  And the answer is "Yes," right?
5    A   Yes.
6    Q   "Have you ever had a drink or used drugs first thing
7    in the morning to steady your nerves?"  And the answer is
8    "Yes," right?
9    A   Yes.
10   Q   We talked earlier about how, you know, you would know
11   that you needed to look for -- or seek medical assistance with
12   withdrawal if someone was known to have seizures from
13   withdrawal.
14       And you thought it might be on one of the intake
15   forms.  Is this the form you were thinking might have asked
16   that question?
17   A   No.
18   Q   Is there another form that you think would inquire
19   about seizures?
20   A   It would be in the Booking Report, on that medical
21   page.
22   Q   So we had --
23   A   On the --
24   Q   -- this "Medical Report" at 572.
25   A   (Turning to.)  So, on the program, on EFORCE, it'll

---

Page 72

1    list what you asked them.  And you select "Yes" or "No," and
2    then it'll pop up on the medical form there.  And your
3    comments -- their answer should be in the box below.
4    Q   Okay.  So, if you look at 572, in this "Medical
5    Report" part of the EFORCE, there are more questions than just
6    this?
7    A   Yes, yes.
8    Q   And do you know whether -- like, do you have to log
9    into the computer to see it?
10   A   Yes.
11   Q   Okay.
12       MS. HOLLAND EDWARDS:  Gordon, if we could
13   try to figure out if there's more information in the Medical
14   Report for Mr. Newman sometime while we're here in the next day
15   or so.
16       MR. VAUGHAN:  Uhmm --
17       MS. HOLLAND EDWARDS:  We can talk off the
18   record, in between.
19       MR. VAUGHAN:  Yeah, that's what I was gonna
20   suggest.  Let's -- make sure I know exactly what I'm looking
21   for.
22       MS. HOLLAND EDWARDS:  Okay.
23   Q   (BY MS. HOLLAND EDWARDS)  So, then, if you go to
24   MONTEZUMA 5686 (sic).
25   A   What number was that?

---

18 (Pages 69 to 72)

fc3a7ce7-ac20-4e58-a83c-31178e96927a

Exhibit 7

1.877.385.4268                                                        970.385.4268

DANIEL RUIZ

## Page 73

1   Q   586.
2   A   Okay.  (Turning to.)
3   Q   Do you see here this is a "Nursing Assessment" done
4   by -- well, it says "VH."  Do you see that?
5   A   Yes.
6   Q   And those are the initials of the nurse that works at
7   the Montezuma County Jail, correct?
8   A   I believe so.  Virginia Hernandez.
9   Q   And she noted that her "Nursing Assessment" was
10  alcohol problems, right?
11  A   Okay.
12  Q   Do you agree -- I mean, does it say that?
13  A   Yes.
14  Q   Did you know personally of Mr. Newman to have
15  problems with alcohol?
16  A   He came in intoxicated.  That's -- was all that I
17  knew.  And I didn't see him stumbling on the street, things
18  like that, so...
19  Q   You did or did not?
20  A   I did not know.
21  Q   But both times you interacted with him in the jail,
22  he was on watches for having a high BAC, right?
23  A   I -- the last report that I saw.  I don't remember
24  the first.  Is this the first --
25  Q   That's the first.  This is June.

## Page 74

1   A   Okay.  So, yes, both times I saw him, he was
2   under alcohol.
3   Q   And, then, are booking deputies expected to take a
4   picture of the person in booking on that date?
5   A   If you can, yes.
6   Q   And when do you?
7   A   I'm sorry, what?
8   Q   When would you not be able to?
9   A   If they're refusing or if their attitude does not
10  allow it.  They're really sick or staggering; you can't hold
11  them up.  Something like that.
12  Q   And if they're staggering or you can't hold them up,
13  is that a level of drunkenness that requires that you call the
14  nurse?
15  A   Not that I'm aware of.
16  Q   And you're not taking their picture until they've
17  been medically cleared, right?
18      MR. VAUGHAN:  When you say taking picture,
19  are we talking about booking photograph?
20      MS. HOLLAND EDWARDS:  Yeah, mugshot.
21      MR. VAUGHAN:  Mugshot, okay.  Go ahead.
22  A   That is correct.
23  Q   (BY MS. HOLLAND EDWARDS)  So that means, if one is
24  drunk enough that they can't -- you can't hold them up and
25  they're staggering, you can't stand them up, but they're having

## Page 75

1   a mugshot taken, then that would be after the clearance
2   process, right?
3   A   Yes.
4   Q   And, so, you can still -- you're allowed, as a
5   booking deputy, to take them into the jail so drunk they can't
6   stand up as long as they've been cleared, right?
7   A   Yes.
8   Q   How often does that happen?  That -- you know, was it
9   frequent that you would have someone that was staggering or
10  not -- you couldn't really hold them up for the mugshot?
11  A   Not very -- not very often.  For the mugshot, no.  To
12  carry somebody in on intake, very rarely.  Usually walk in on
13  their own.  Their slurred speech or something would be more
14  common than that one.
15  Q   Okay.  It's common -- it's more common at least to
16  have people who are still intoxicated to the point of slurred
17  speech even after they've been cleared?
18  A   Yes.
19  Q   The -- also, in this, there's two documents that
20  reference "TurnKey."  Do you know what Turnkey is?
21  A   TurnKey is the system that allows them to use the
22  phone.  It generates an pin code for them to use --
23  Q   Okay.
24  A   -- and that -- that allows them to use the phone
25  under their account.

## Page 76

1   Q   Okay.  Because --
2   A   Kinda the money that they come in with.  That'll go
3   into that account, to their name.
4   Q   There's a Turnkey company that provides medical care
5   in jails.  You're not aware of any Turnkey nurses working here?
6   A   No, no.
7   Q   Okay.  Let's turn now to the other incarceration or
8   other detention period.  Do you go to Exhibit 9 in front of
9   you -- and we're gonna go back to the book.  Or it's actually
10  6.  Sorry.
11  A   (Turning to.)
12  Q   So this is the "Prisoner Medical Clearance Report"
13  from July 17, 2021, correct?
14  A   Yes.
15  Q   And on the other one we saw from June, this top part
16  was filled out by the arresting officer, right?
17  A   I believe it was.
18  Q   And then -- here, we can go back to the exhibit, if
19  you want.
20  A   Sometimes they're not filled out, from what I can
21  remember.
22  Q   What I wanna know:  Does that tell us anything about
23  whether a person comes to the jail first and then the hospital
24  versus the hospital and then the jail?
25  A   I think it's maybe the arresting agency, that

19 (Pages 73 to 76)

ANIMAS REPORTING SERVICE
animas@animas.net

fc3a7ce7-ac20-4e58-a83c-31178e96927a

1.877.385.4268                                    970.385.4268

## DANIEL RUIZ

Page 77

1  individual signs that or not.
2      Q  Okay.  So if you're looking for it, it's 574.
3      A  (Turning to.)
4      Q  So, on the 574 one, the -- "Brought to jail by:
5  King."  Is that a Cortez Police Officer?
6      A  I believe he was.  He's been a couple different
7  things, so...
8      Q  And then you were the booking deputy and signed the
9  same document, right?
10     A  Yes.
11     Q  And the physician signed it before you signed it,
12  right?  Or I don't know if that's -- this "0005" is -- you
13  put -- supplied that time, right?
14     A  Yes.
15     Q  And then at the bottom, the "2314," did you supply
16  that time?
17     A  No, I did not.
18     Q  Okay.  So, then, if we go back to Exhibit 6 --
19     A  Okay.  (Turning to.)
20     Q  -- there -- at least on this one, there's nothing
21  filled out by the officer or the booking deputy, correct?
22     A  Correct, it's empty.
23     Q  And are the booking deputies supposed to sign that
24  these received these forms?
25     A  I believe so.

Page 78

1      Q  And you may have answered this, but is there any
2  process by which the booking deputy, who's sending someone out
3  to get a clearance, communicates with the hospital why they
4  want a clearance?
5      A  No.  We don't make any contact with the hospital.
6      Q  So is that up to the arresting officer to convey?
7      A  Yes.
8      Q  Let's go to Exhibit 7.
9      A  (Turning to.)
10     Q  This, also, like we looked at before, looks like the
11  booking document for Kelroy Newman, except for this time it's
12  for July, right?
13     A  Yes.
14     Q  And the booking deputy, at least on this document, is
15  listed as Andrew Daulton, right?  Or Deputy Summers?
16     A  "Received By," Deputy Summers.
17     Q  Okay.  So would that make -- if you're reading this
18  document, as a person working in the jail, you would consider
19  Deputy Summers the booking deputy for this Booking Report?
20     A  Not necessarily.
21     Q  Okay.
22     A  There could be a booking deputy that's doing
23  fingerprinting on the individual, and there could be a deputy
24  that's up at housing that doesn't -- doesn't have a task.  He
25  could come down and assist with the intake of this individual.

Page 79

1      Q  Okay.  And if a person is -- if you're unable to
2  obtain a mugshot of a person on booking, do you -- should you
3  make a note of that anywhere?
4      A  That would be relayed to the next shift if that
5  individual is not booked in.  "This individual, he's halfway
6  booked in."
7      And they would say, "Okay, what is he missing?"
8      "He's missing his mugshot and fingerprints" or
9  something along those lines.
10     Q  Well -- so, in this instance, the same photo was used
11  from the June booking.
12     A  Okay.
13     Q  Is that an option at the discretion of the booking
14  deputy, to use a recent mugshot?
15     A  We're supposed to get updated mugshots.  Supposed to.
16  Every time an individual comes in, supposed to have a new one.
17     And the next deputy would go to that checklist, where
18  the signatures are, and see that "Okay, the mugshot hasn't been
19  taken.  I need to do the mugshot now, 'cause -- I have this
20  individual out.  I'm completing his booking."
21     Q  Where would that checklist be?  Is it in the computer
22  or on paper?
23     A  It's on paper.
24     Q  So, if you want to turn to Exhibit 8 -- let's see --
25  is this the type of checklist you're talking about?

Page 80

1      A  (Turning to.)  No.
2      Q  Okay.
3      A  We -- we saw it earlier.
4      Q  Oh, we did?
5      A  With the initials on it all down the line.  Mostly --
6  it was mostly mine and Summers.  Where is that?
7      Q  So, in exhibit -- we marked that as 16, right?
8      THE WITNESS:  Almost (indicating to
9  Mr. Vaughan).
10     MR. VAUGHAN:  Not that one?
11     THE WITNESS:  No, it's the small lines
12  with the initials on it.
13     MR. VAUGHAN:  Here.  Can we go off the record
14  for just a second?
15     MS. HOLLAND EDWARDS:  Sure.
16     (Discussion off record.)
17     THE WITNESS:  This (indicating).
18     Q  (BY MS. HOLLAND EDWARDS)  Okay.  So 571 you're
19  talking about is this "Booking Check List"; is that right?
20     A  Yes.
21     Q  And so where is mugshot on this?
22     A  The fifth -- fifth line down.
23     Q  Okay.  And, so, if you -- so we could tell -- okay.
24  I think I understand.  So that's where you look and say, "Oh, I
25  still need to take fingerprints," right?  If -- if for some --

20  (Pages 77 to 80)

fc3a7ce7-ac20-4e58-a83c-31178e96927a