Exhibit 14

# ZOOM VIDEOCONFERENCE DEPOSITION OF
# **ZACKARY SUMMERS**

## **6/20/23**

---

## **Civil Action No. 22-cv-1763-PAB-KLM**

## **ESTATE OF KELROY NEWMAN, et al. vs BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF MONTEZUMA, COLORADO, et al.**

---

## **District Court**
## **County of Montezuma, State of Colorado**

ANIMAS REPORTING SERVICE
919 County Road 142
Durango, Colorado 81303
877.385.4268/970.385.4268
animas@animas.net
animasreporting.com

1.877.385.4268

ZACKARY SUMMERS

970.385.4268

---

Page 33

1    A   Obviously, if the inmate is uncooperative with me and
2    if -- just talking to the inmate, it's like, you know, "Okay,
3    we're gonna take your mugshot."  If they're not cooperating
4    with me at first or they're just not in the mood and it's gonna
5    escalate the situation, then it's best if I just pause, let
6    them go to the cell, breathe a little, and then come back to
7    it.
8    Q   But would you then house them in a pod or admit them
9    without having a mugshot because they've had a previous
10   incarceration, you had a photo on file?
11   A   What do you mean into the pod?  Do you mean in
12   booking still or move up to housing?
13   Q   Move up to housing.
14   A   No.
15   Q   And why not?
16   A   Because we need a very recent photo.
17   Q   And I know Mr. Newman didn't have his photo taken on
18   July 17, 2021.  Yet, when he was being booked into the jail,
19   was that because he was too intoxicated?
20       MS. SMITH:  Form, foundation.  Well, form.
21   A   There's -- there's multiple factors of why.
22   Q   (BY MS. GROSSMAN)  Can you tell me then?
23   A   Yeah.  Mr. Newman -- he'd came in.  He was very
24   intoxicated from his BAC.  But while standing there,
25   Mr. Newman -- he could stand there, and he was fine.  But he

---

Page 34

1    was just upset that he had came to jail.
2        And, so, when I was going through the questions
3    before I got to the mugshot, he seemed very agitated.  Not
4    really uncooperative, but he was just upset and agitated.
5        And I didn't wanna escalate anything.  So I just
6    asked him if he'd like to lay down for a little bit and we'd
7    get back to it later.
8        And he said, "Please."  And, so, I just let him.
9    Q   So he was clearly intoxicated?
10   A   Yes.
11   Q   And not uncooperative but just not wanting to -- just
12   wanted to lay down and not wanting to take his photo at that
13   time?
14   A   Yeah, and he wasn't really answering my questions.
15   He was just agitated that he came to jail.
16   Q   What about fingerprinting?  When -- when do you not
17   do that right away at booking?
18   A   If we don't have all the information, obviously, you
19   can't do the fingerprints yet.
20   Q   What information do you need for that?
21   A   For the system, you need all the inmate's personal
22   information, their charges in the system, and everything else.
23   And then you're able to submit it on the computer system, and
24   it shoots over to the fingerprinting system.
25       But if all the information isn't on there, then that

---

Page 35

1    information won't shoot over to the fingerprint machine.
2    Q   In terms of medical clearances, as a booking deputy,
3    that was a pretty common and frequent occurrence, that you had
4    to get medical clearances before booking someone into the jail?
5    A   Yes.
6    Q   How frequent would you say it would be?
7    A   Pretty frequent.
8    Q   Every shift?
9    A   Every shift probably had a medical clearance, that it
10   had to happen.
11   Q   And what was the main reason that medical clearances
12   were obtained?
13   A   Alcohol.
14       That just stands out as the obvious --
15   A   Yes.
16   Q   Yes.  And would you say that medical -- most medical
17   clearances were alcohol-related?
18   A   Yes.
19   Q   What triggered the requirement for an alcohol-related
20   medical clearance?
21   A   If the inmate had blown over our -- the PBT machine
22   that we had, if they had blown over a .2, then it was an
23   instance where they were sent to the hospital for medical
24   clearance.
25   Q   And was that always the case when you were working as

---

Page 36

1    a deputy from 2019 on?
2    A   Yes.
3    Q   It was always a .2?
4    A   Yes.
5    Q   And what's your understanding of why the inmate
6    needed to be cleared if they had a .2 or higher?
7    A   It was -- from -- to my understanding, that anything
8    over a .2 was a health risk for an inmate.  Because that much
9    alcohol, that's not common for the human body.
10   Q   And what types of health risks -- what was your
11   understanding of what types of health risks are associated with
12   someone who has a .2 or higher?
13       MS. SMITH:  Form and foundation.
14   A   I'm not a medical expert, but I would -- I would say
15   probably alcohol poisoning or something such as that.
16   Q   (BY MS. GROSSMAN)  And then is it your understanding
17   also that coming down off of a high and acute intoxication of a
18   .2 or higher could have complications from withdrawal?
19       MS. SMITH:  Form and foundation.
20   A   I understand with a high BAC there is obviously
21   withdrawals from alcohol.
22   Q   (BY MS. GROSSMAN)  And what -- when someone is
23   cleared and determined by Southwest Memorial to be safe for
24   jail and medically stable --
25   A   Uh-huh.

9 (Pages 33 to 36)

ANIMAS REPORTING SERVICE
animas@animas.net

1.877.385.4268                          970.385.4268

ZACKARY SUMMERS

---

Page 37

1    Q   -- is that -- well, is that what you understand a
2    medical clearance to be, when they say that they're cleared for
3    jail, that they're safe and able to be housed in the jail?
4        A   Yes.
5        Q   And in terms of alcohol intoxication, when you're
6    going to get someone cleared -- an inmate cleared of alcohol
7    intoxication, when they're then cleared from the hospital, is
8    it your understanding that they're safe to be housed in the
9    jail both for their intoxication and also their coming down
10   from that intoxication, for alcohol withdrawal?
11       A   It's kind of --
12           MR. COLLIER:  Form and foundation.
13       A   It's kind of a big question.
14       Q   (BY MS. GROSSMAN)  Sure.
15       Can you make that shorter for me?
16       Q   So -- well, tell me what your understanding is when
17   you go and you say, "I need a medical clearance," and they sign
18   off, and they say they're medically cleared.  What's your
19   understanding of what that means?
20       That the inmate is okay to be housed inside the jail;
21   that there's no immediate health risks present.
22       Q   Okay.  So, then, if they're saying that they're
23   medically cleared to be able -- to stay in jail, if they blow a
24   .2 or higher, is it your understanding that they are safe from
25   the immediate risks of alcohol intoxication?

---

Page 38

1           MR. COLLIER:  Form, foundation.
2       A   To my knowledge, that's what I understand from that.
3       Q   (BY MS. GROSSMAN)  And when they're cleared from
4    Southwest Memorial for a .2 or higher, is it also your
5    understanding that they're cleared from the immediate risks of
6    alcohol withdrawal?
7           MS. SMITH:  Form, foundation.
8           MR. COLLIER:  Foundation.
9       A   Can you repeat the question?
10      Q   (BY MS. GROSSMAN)  That the medical clearance, when
11   they say that they're safe and stable to be able to be in jail
12   and housed --
13      A   Uh-huh.
14      Q   -- that they're also saying that they are safe from
15   the immediate risks of alcohol withdrawal?
16      A   To my knowledge --
17          MR. COLLIER:  Foundation.
18          MS. SMITH:  Form and foundation to that one.
19      A   Okay.  To the immediate risk of alcohol withdrawals?
20   Yes.
21      Q   (BY MS. GROSSMAN)  And that they can be safely housed
22   in the jail based on that acute intoxication, despite the high
23   BAC and despite possible withdrawal risks?
24          MR. COLLIER:  Object to the form.
25          MS. SMITH:  Same.

---

Page 39

1       A   To my knowledge, yes.
2       Q   (BY MS. GROSSMAN)  And do you rely on those medical
3    clearances when you interact with inmates?
4           MS. SMITH:  Form.
5       A   Yes.
6           MR. COLLIER:  Join.
7       Q   (BY MS. GROSSMAN)  And does the fact that someone has
8    been to the hospital before, perhaps in the last 24 hours, mean
9    to you that they've been cleared for emergent conditions that
10   you had sent them to the hospital to be cleared for?
11          MS. SMITH:  Form.
12          MR. COLLIER:  Join.
13      A   For -- I'm confused about that question.
14      Q   (BY MS. GROSSMAN)  Sure.
15      Can you repeat it?
16      Q   Okay.  When someone has gone to the hospital for a
17   medical clearance --
18      A   Uh-huh.
19      Q   -- do you rely on that clearance in terms of whether
20   they need to go back to the hospital again for the same type of
21   condition?
22          MR. COLLIER:  Foundation.
23      A   No.
24      Q   (BY MS. GROSSMAN)  Can you tell me why?
25      A   Well, because --

---

Page 40

1           MS. SMITH:  Form objection.  Go ahead.
2       A   Okay.  Because there could be other problems that
3    occur later that I would have to take them back to the hospital
4    for.
5       Q   (BY MS. GROSSMAN)  Okay.  So clearing for
6    intoxication means that they can safely be intoxicated outside
7    the presence of medical professionals; is that fair?
8           MR. COLLIER:  Foundation.
9       A   To my knowledge, yes.
10      Q   (BY MS. GROSSMAN)  And then clearing someone for
11   intoxication of a .2 or higher means that they can safely
12   withdraw outside the presence of medical professionals, right?
13          MS. SMITH:  Form and foundation.
14          MR. COLLIER:  Join.
15      A   To my knowledge, yes.
16      Q   (BY MS. GROSSMAN)  As a booking deputy or actually
17   any -- working at the -- as the rover or the shift supervisor
18   or in control, have you ever communicated with hospital staff
19   about the medical condition of an inmate?
20      A   Not that I can recall.
21      Q   Never called over to the ER?
22      A   Not that I could recall.
23      Q   And what about just the walk-in clinic?  Have you
24   have ever called over there?
25      A   Not that I could recall offhand.

---

10 (Pages 37 to 40)

1.877.385.4268                    970.385.4268

**ZACKARY SUMMERS**

---

Page 53

1 alcohol intoxication or withdrawal?
2       MS. SMITH: Form and foundation.
3    A No.
4    Q (BY MS. GROSSMAN) Have you heard of any other deputy
5 doing that?
6       MS. SMITH: Same objections.
7    A Not that I could recall.
8    Q (BY MS. GROSSMAN) Okay.
9       MS. GROSSMAN: Do you wanna take a break?
10       MS. SMITH: Sure, yeah.
11       (Recess taken at 9:13 a.m. and back in
12    session at 9:24 a.m.)
13       MS. GROSSMAN: Okay. You ready?
14       THE WITNESS: Yes, I am.
15    Q (BY MS. GROSSMAN) I wanna go back to the checks and
16 the monitoring. What determines whether an inmate is gonna be
17 monitored on 15-or-30-minute checks?
18    A Well, again, it depends on the scenario. So
19 15-minute checks roughly mean an inmate with severe -- I don't
20 know how to really explain that, but with like just severe
21 issues happening. That could range from just about anything.
22 Or the 15 also associates with the 15-minute suicide watch.
23       And then the 30-minute watch, it can range from
24 anything. It's discretionary, but also there's certain
25 instances where it's required. So the 30-minute -- when it's

---

Page 54

1 discretionary, it's for inmates, you know, clearly -- you know,
2 like, if they were in a fight, you know, and they have injuries
3 or someone came in and they have an injury on their arm. Just
4 with like major injuries, you just wanna keep a close watch on
5 them. That's the 30-minute. And there's others.
6       But the mandatory 30 is when, again, an inmate is
7 dealing with -- depending on the charges that they come in
8 with, plus with any injuries or any other situations they may
9 have. So any medical problems that they may have.
10    Q And is there a certain BAC number that triggers
11 monitoring?
12    A Yes. Over a .2 as well for the 30-minute.
13    Q Mr. Newman had two cellmates in the incarceration in
14 July 2021, right?
15    A Yes.
16    Q Were they on checks as well?
17    A Not that I could recall. I can't remember.
18    Q Do you remember their names?
19    A I know one of them was Robert Salt. I can't exactly
20 remember the second one.
21    Q Okay. And you don't remember if those two were on
22 any checks at all?
23    A Not that I could remember.
24    Q And there's no discretion for monitoring someone who
25 has a .2 or higher; is that right?

---

Page 55

1    A Yes.
2    Q And is it the booking deputy that puts the monitoring
3 in place?
4    A Yes, the booking deputy would notify the shift
5 supervisor and -- with the BAC, and then the booking deputy
6 would put in the watch.
7    Q So, for the 30-minute checks, how long is each check
8 supposed to be? I don't mean how long in between 'cause that's
9 30 minutes. What I mean is: When you do a check, how long is
10 that?
11       MS. SMITH: Form.
12    A It can range from any time. It's discretionary
13 again. Like, if I was doing a verbal check on a 30-minute
14 watch, I could be there for about -- a long time, sittin' there
15 talking to the guy.
16       Or it could be just a simple, you know, 30-second
17 look or 10-second look or just a quick glance. Like, if the
18 guy is walking around, then he's fine. Again, it's depending
19 on the situation or circumstances.
20    Q (BY MS. GROSSMAN) And what are you looking for when
21 you do a check?
22    A Which type?
23    Q The -- not the verbal. What's the other type called?
24 Is it the visual?
25    A Uh-huh, yes.

---

Page 56

1    Q Okay, the visual check.
2    A Visual check, again, if the person is up, walking
3 around. If they're not doing that, is he breathing? Looking
4 around his cell, obviously, to see if anything is disturbed or
5 looks kind of suspicious or out of place.
6    Q Okay. What about taking vitals? You ever take
7 vitals of inmates when you're doing -- when you're monitoring
8 them?
9    A Yes.
10    Q In what circumstances?
11    A Inmates -- they would complain of -- that they're
12 having problems breathing; they have chest pains. That's all I
13 can remember as of now.
14    Q Was it common to do -- to take vitals?
15    A It was moderate. Not -- not necessarily -- I mean,
16 it wasn't common but uncommon. It was sort of like, "Okay,
17 we'll" -- I don't know how to explain that.
18    Q Would you say you did it on every shift?
19    A Like once every shift?
20    Q Yes.
21    A No.
22    Q Would you say you did it within a week of work?
23 Months?
24    A Yes.
25    Q Okay. And do other deputies take vitals as well?

---

14 (Pages 53 to 56)

Exhibit 14

1.877.385.4268

970.385.4268

**ZACKARY SUMMERS**

Page 65

1  time.
2      Q   What about the next day, on July 18th during your
3  shift?
4      A   I wasn't the booking deputy, but I was a rover.
5      Q   Right.  And then -- but I didn't -- do you remember
6  taking any BACs of Mr. Newman that day?
7      A   No.
8      Q   Do you not -- like, do you believe you did or didn't,
9  or do you have a strong memory of not doing it, or do you not
10 remember either way?
11     A   Yeah, not doing it.
12     Q   Okay.  Can you tell me why?
13     A   Because I wasn't the booking deputy at the time.
14     Q   Okay.
15     A   And plus the supervisor was training a new guy down
16 in booking, so he was getting to that.
17     Q   I just want to -- the EFORCE documents that I'm
18 looking at, if you'd go to Exhibit 19.
19     A   Is that the black or -- white notebook?
20     Q   Yes.
21     A   And what number?
22     Q   19.
23     A   (Turning to.)  Okay.
24     Q   If there were follow-up BACs done after the .421,
25 would it be in this "Medical History" form?

Page 66

1      A   Yes.
2      Q   Okay, thank you.  So the general practice would be at
3  least a couple times a shift for follow-up BACs to be done?
4      A   At least two to three times.
5      A   At least two to three times a shift?
6      A   Yes.
7      Q   So, if Mr. Newman is booked in around 11:00 on the
8  20 -- sorry, 11:00 on July 17th, passes away a little over 24
9  hours later, there should be -- it's gonna be bad -- around
10 five or six --
11     A   Six.
12     Q   -- six BACs done for him over that time period?
13         MS. SMITH:  Form and foundation.  Go ahead.
14     Q   (BY MS. GROSSMAN)  Is that fair?
15     A   Six or five, yeah.
16     Q   And what is the point of taking additional BACs, from
17 your understanding?
18     A   Is so that they can be sober to go to court, because
19 you can't go to court under the influence.
20     Q   And also --
21     A   And also to wait for them to -- coming off of alcohol
22 so that we can determine at that point that they are sober.
23     Q   And then also that's when you fill out the intake
24 screening form; is that right?
25     A   At that point, you're able to complete the booking

Page 67

1  process, because one of the paperworks they're not allowed to
2  fill out yet until they complete it.
3      Q   Okay.  So I wanna kinda now turn to booking in
4  Mr. Newman and going to that day.  And if you look at Exhibit
5  11 --
6      A   (Turning to.)
7      Q   -- the "Montezuma County Detention Center Movement
8  Sheets," are you familiar with these documents?
9      A   Yes.
10     Q   Okay.  So he comes in at 10:25 on July -- AM on
11 July 17, 2021, right?  Kind of go down to the middle of the
12 page.
13     A   At what time?  I'm sorry.
14     Q   (Pointing.)
15     A   At 10:25, yes.
16     Q   And that's you, "ZS," right?  Those are your
17 initials?
18     A   Yes.
19     Q   And then do you remember what BAC he had?  I can show
20 you.  I just wanna know if you remember.
21     A   Yeah, can I see it?
22     Q   Of course.
23     A   I know it was 0 -- it was a .4 something, but...
24     Q   Sure.  .421.  But it's on Exhibit 4.
25     A   (Turning to.)  .421, yes.  Okay.

Page 68

1      Q   That's your handwriting, right?
2      A   Yes.
3      Q   And your signature is down on this sheet as well?
4      A   Yes.
5      Q   And then -- that's a high BAC, right?
6      A   Very high.
7      Q   Very high.  Is it one of the highest you've seen?
8          MS. SMITH:  Form.
9      A   I can't really recall.
10     Q   (BY MS. GROSSMAN)  Does it stand out to you as
11 extremely high?
12         MS. SMITH:  Form.
13     A   It stands out as a high BAC.
14     Q   (BY MS. GROSSMAN)  Were inmates frequently blowing
15 over a .4?
16         MS. SMITH:  Form.
17         MR. COLLIER:  Join.
18     A   Not that I could recall.
19     Q   (BY MS. GROSSMAN)  So either way, of course, you then
20 send him out for medical clearance, right?
21     A   Yes.
22     Q   And what was -- can you tell me every reason you sent
23 him out for medical clearance?
24         MS. SMITH:  Form, foundation.
25     A   Whenever I'd went into the sally port, the officer

17 (Pages 65 to 68)

1.877.385.4268                    ZACKARY SUMMERS                    970.385.4268

---

### Page 69

1   who had brought him in said that he was in a recent fight.  And
2   whenever I took his BAC, he blew over a 2 (sic).
3       Q   Did you send him out for clearance for facial
4   injuries as well as intoxication?
5       A   When the officer had stated that he was in a fight
6   because he was -- was -- as he said, jumped by kids in the
7   skate park, and he was hit with skateboards, yes, I sent him
8   out for his injuries and the intoxication.
9       Q   Was it one more than the other, or was it both
10  equally the same, that you were sending him out for medical
11  clearance for intoxication and facial injuries, or was it -- it
12  was more --
13      A   It --
14      Q   -- one -- sorry, let me just finish -- was one more
15  of a concern for you?
16          MS. SMITH:  Form.
17      A   No, it was --
18          MS. COOK OLSON:  And, Erica, can you slow
19  down a bit?  Again, you've kind of gotten into a pattern of
20  talking very fast and not talking loud enough, so you can't
21  really hear it over Zoom.
22          MS. GROSSMAN:  Sure.  I will -- I've been
23  trying real hard.  I will keep trying.
24          MS. COOK OLSON:  Yeah, just -- just -- and
25  if you could speak a little louder --

### Page 70

1           MS. GROSSMAN:  Yeah.
2           MS. COOK OLSON:  -- so if there's
3   something to object to --
4           MS. GROSSMAN:  I can definitely speak
5   louder.
6           MS. COOK OLSON:  -- I can make my
7   objection.
8           MS. GROSSMAN:  I can definitely speak
9   louder.  No problem.
10      A   They were both equal.
11      Q   (BY MS. GROSSMAN) And how do you convey -- how does
12  it get conveyed to the hospital what this inmate is being
13  cleared for, as being sent to a clearance for?
14          MS. SMITH:  Foundation.
15      A   That's up to the officer who arrested him.  So, if I
16  tell the officer, "Hey, you need to take him to the hospital
17  because he was beat up and has injuries, and plus he was super
18  intoxicated," that's out of my responsibility at that point.
19  That's the arresting officer's.
20      Q   (BY MS. GROSSMAN) And did you tell the officer what
21  his BAC was, and that he was super intoxicated and had a recent
22  fight?
23          MS. SMITH:  Form.
24      A   Well, yeah, he told me he was in a fight.  And I had
25  to tell him what his BAC was.  It was obviously over a 2 (sic).

### Page 71

1   So, yeah.
2       Q   (BY MS. GROSSMAN)  So you discharged your duty.  You
3   conveyed all the relevant information about his BAC and his
4   injuries or his recent fight to the arresting officer?
5           MS. SMITH:  Form.
6       A   Yes.
7       Q   (BY MS. GROSSMAN)  Okay.  And you would expect the
8   arresting officer to then convey his BAC and the recent fight
9   information to the hospital, right?
10      A   To my knowledge.
11      Q   And he comes back, if you look at Exhibit 11, from
12  the ER at 11:10 AM; is that right?
13      A   Yes.
14          MS. SMITH:  You can keep that open and in front
15  of you.
16          THE WITNESS:  Oh, okay.  I'll-- I didn't
17  know if -- we all weren't looking at it.
18      A   Yeah, 11:10 he's back.
19      Q   (BY MS. GROSSMAN)  Okay.  And he was medically
20  cleared, right?  If you want to go to go Exhibit 6, that is the
21  medical clearance form.
22      A   Okay.  (Turning to.)  Yes, he was medically cleared.
23      Q   Okay.  And you can see on the medical clearance
24  form -- "Prisoner Medical Clearance Report" in Exhibit 6 that
25  the top is not filled out.  Do you see that?

### Page 72

1       A   This part?
2       Q   Yes.
3       A   Yes.
4       Q   And that -- is that something that the jail usually
5   fills out, or the booking deputy fills out?
6       A   No.  It kind of depends.  But, no.  The arresting
7   officer is supposed to fill that part out.
8       Q   Well, can you tell me -- it says:  "We have declined
9   to accept the above prisoner into the Montezuma County
10  Detention Center, pending medical clearance, for the following
11  reasons:"
12          So it seems to me it's something that the jail would
13  fill out, but am I wrong?
14          MS. SMITH:  Form.
15      A   That's what I would fill out.
16      Q   (BY MS. GROSSMAN)  Yes.
17      A   Uhmm --
18      Q   'Cause it says "Signature of booking Deputy," right?
19      A   Yes.
20      Q   And can -- and is it your practice to normally fill
21  those out, or not?
22      A   Depending on the circumstances.  I clearly did not
23  fill this out that day.  But, no, it's not a normal --
24      Q   And is the purpose of this to convey to the hospital
25  what they're clearing the prisoner for?

18 (Pages 69 to 72)

Exhibit 14

1.877.385.4268                                              970.385.4268

**ZACKARY SUMMERS**

Page 73

```
1        A   No, this is to tell me that -- that he is allowed to
2    come to our jail.
3        Q   But the top part, do you have any understanding of
4    what the purpose of the top part might be?
5        A   No.
6        Q   Okay.  And do you have any understanding of why you
7    didn't fill it out that day?  Is it just not your practice to
8    do that, or you just didn't do it in this circumstance?
9        A   I did not do it in this circumstance.
10       Q   Okay.  And, either way, you conveyed to the arresting
11   officer the relevant information for him to convey to the
12   hospital about why the jail was needing him to be medically
13   cleared, right?
14       A   Yes.
15       Q   Okay.  And then you get back a clearance report from
16   Dr. Randy Davidson, which says:  "I have examined the prisoner
17   and find him...acceptable for admission to the jail.  I have no
18   specific suggestions regarding the care of this prisoner for
19   the condition for which I have examined him."
20           And that's checked, right?
21       A   Yes.
22       Q   The hospital didn't give you or the jail any
23   instructions -- any further instructions for anything that
24   needed to be done for Mr. Newman, right?
25           MR. COLLIER:  Object to the form,
```

Page 74

```
1    foundation.
2            MS. COOK OLSON:  Object to the form,
3    foundation.
4        A   From on here, again, nothing specific for Mr. Newman.
5        Q   (BY MS. GROSSMAN)  And they said he was medically
6    cleared to be booked and housed into the jail, right?
7        A   From what it shows here, yes.
8        Q   And based on your understanding, that's -- you relied
9    on that to monitor Mr. Newman, but you also relied on that that
10   he was safe to be housed in the jail, right?
11           MR. COLLIER:  Object to form, foundation.
12   It's been asked and answered about six times now.
13       A   Yes.
14       Q   (BY MS. GROSSMAN)  Okay.  And that meant that he
15   could be safely intoxicated with a high .42 -- he could be
16   safely -- let me just start over.
17           That means that he could be safely held in the jail
18   for his high intoxication of .421; is that fair?
19           MR. COLLIER:  Object to the form.
20       A   From this paperwork, yes.
21       Q   (BY MS. GROSSMAN)  And it meant to you that he could
22   safely come down and withdraw from that acute intoxication of
23   the high .421 in the jail; is that fair?
24           MS. SMITH:  Form and foundation.
25           MR. COLLIER:  Form and foundation.
```

Page 75

```
1        A   From this paperwork, yes.
2        Q   (BY MS. GROSSMAN)  And, so, when he comes back in, is
3    that -- that's when you began the booking process, right?
4        A   Attempted to begin, yes.
5        Q   Okay.  Can you tell me what you remember from that
6    interaction when he comes back?
7        A   Okay.  I'm sorry, we talked about it before but --
8        Q   Yes.
9        A   The interaction of -- well, he came back.  The
10   officer did his prebooking where he answers key information.
11   He comes out.  I pat help down, and I begin my booking process.
12           I was asking him the questions to begin with.  You
13   know, the information page and about him.  And he was just
14   agitated with my questions, and he wasn't really responding to
15   my questions.
16           So, from my experience, I took that as he just
17   doesn't wanna talk.  So I asked him, "Mr. Newman, do you wanna
18   continue talking to me, or do you just wanna go lay down and we
19   can finish this later?"
20           And he said, "I'd like to lay down, and we can
21   complete this later."
22           So I said, "Okay."  I wasn't gonna force him to stand
23   there.  So I took him down -- I took him and then -- he grabbed
24   his stuff, and he went into Hold 6 for -- he took a nap.
25       Q   He was tired and wanted to lay down?
```

Page 76

```
1        A   Yes.
2        Q   And what questions were you asking him that he was
3    just kind of getting frustrated with answering?
4        A   It was the beginning -- I -- if I could have it in
5    front of me, I could tell you.  But it's the information page
6    where I ask him his name, date of birth, his mailing address --
7    or his address, his education, religious preference.  All that.
8            And then once I got to his medical part, that's where
9    he was -- when I completed his medical page -- he was agitated
10   during that, and that's when I stopped.
11       Q   And when you first -- I didn't ask you this, I don't
12   think.  But before you sent him out to get a medical clearance,
13   what conversation -- can you tell me about the conversations
14   you had with Mr. Newman at that point?
15       A   The conversations I had was asking him the COVID-19
16   Screening, and that was it.
17       Q   Okay.  And did he appear -- he was obviously highly
18   intoxicated, right?
19           MS. SMITH:  Form.
20       A   Well, he was intoxicated, yes.
21       Q   (BY MS. GROSSMAN)  Was he slurring his speech at all?
22   What -- like, what were the obvious signs of intoxication to
23   you, other than, of course, the .421?
24       A   I could smell it, the alcohol coming from him.  And I
25   can't quite remember if he was slurring his words or not.
```

19 (Pages 73 to 76)

**ANIMAS REPORTING SERVICE**
animas@animas.net

1.877.385.4268                    **ZACKARY SUMMERS**                    970.385.4268

---

**Page 81**

1  drug influence, right?
2        A    That's what he checked.
3        Q    Or drug influence.  And that the person -- and that
4  Mr. Newman had complained of pain, right?
5        A    It's what he checked.
6        Q    And that there was "...Visible Trauma Or Bleeding,"
7  right?
8        A    That's what he checked.
9        Q    And this is all officer visual observations --
10       A    Uh-huh.
11       Q    -- right?
12       A    Yes.
13       Q    And, so, that was something you could see as well,
14  correct?
15             MS. SMITH:  Form and foundation.
16       A    Yes.
17       Q    (BY MS. GROSSMAN)  Okay.  And did you in fact see
18  that there was evidence of swelling, infection, or skin marks?
19       A    Well, he has bruises from a fight, so...
20       Q    Okay.  And, obviously, you saw that there were signs
21  of alcohol intoxication, right?
22       A    He -- I mean, you could smell it off of him.
23       Q    Okay.  And that -- did he complain of pain to you?
24       A    No, not to me.
25       Q    But in --

---

**Page 82**

1        A    Well, during this process, no.
2        Q    At -- okay.  At any point while he was being booked
3  in, did you hear that he was complaining of pain?
4        A    No.
5        Q    And what about visible signs of trauma?  Would that
6  go the head injuries?
7        A    Yes.
8        Q    And one of the reasons that you had him to be
9  medically cleared?
10       A    Yes.
11       Q    And when you got a medical clearance, did you also
12  assume that he was safe to be housed in the jail related --
13  related to his facial injuries?
14             MS. SMITH:  Form.
15             MR. COLLIER:  Object to the form.
16       A    From the medical clearance, yes.
17       Q    (BY MS. GROSSMAN)  Then, under "Medical Information,"
18  you checked positive to whether he used alcohol; is that right?
19       A    Yes.
20       Q    And that he had a recent head injury?
21       A    Yes.
22       Q    And that he feels he has a problem with alcohol,
23  right?
24       A    Yes.  So I ask him those questions, and he responds
25  to those.

---

**Page 83**

1        Q    Okay.
2        A    It's not me just marking that off.
3        Q    So you ask him all of these questions under "Medical
4  Information"?
5        A    Yes.  And at the end of it, he was already agitated
6  because it's a lot of questions.
7        Q    Sure.  I see that.  The question, "Do you go through"
8  -- after the question on birth control, what's that next
9  question?
10       A    "Are You On Birth Control?"  "Do You Go Through DTs?"
11       Q    And is that the delirium tremors, or does it refer to
12  the alcohol withdrawal that you have mentioned, the DTs?
13       A    What I associate DTs with.  Withdrawals, yes.
14       Q    Did you get to the question -- did you get for --
15  from Mr. Newman?  (Sic.)
16       A    Yes, at the bottom, you see "Medical Detail."  It
17  says "All Medical Questions Asked."  So, yes, I asked him all
18  these questions.  He answered "No" to it or did not answer.  So
19  that's why that box is not checked off.
20       Q    And he was getting frustrated at that time with the
21  medical form?
22       A    After the medical form was completed.
23       Q    And he told you "...He Drinks Every Other Day."  He
24  "Got Into A Fight Today And Was" in -- "Was Hit In The Head"?
25       A    Yes.

---

**Page 84**

1        Q    Okay.  Was there any other conversations or questions
2  about -- before he went and lied down on July 17, 2021, that
3  you haven't told me about?
4        A    Not that I'm aware of.
5        Q    Was there any other deputy present during that
6  process?
7        A    No.
8        Q    If you go to Exhibit 8.
9        A    (Turning to.)  Okay.
10       Q    I understand this is the "Shift Change Briefing Log,
11  and Radio Sign Out."  And if you'll look at Page 2 --
12       A    (Turning to.)  Oh.
13       Q    -- it talks about what's left over for Mr. Newman to
14  do in booking.  Is that -- am I reading that right?
15       A    Yeah, these are inmates that are left over.
16       Q    Okay.
17       A    Inmates that need to be booked in.
18       Q    Okay.  And, so, Newman is one of those, right?
19       A    Yes.
20       Q    And what does "minimal" mean?
21       A    They had minimal booking information on him.
22       Q    So, basically, it means he's minimally booked in?
23       A    Yes.
24       Q    Okay.  And, so, at the time he was booked in, there
25  wasn't yet a picture taken of him, right?

---

21 (Pages 81 to 84)

1.877.385.4268        **ZACKARY SUMMERS**        970.385.4268

**Page 85**

1  A  No.
2  Q  And there wasn't a fingerprint?
3  A  No.
4  Q  And there wasn't an intake screening done?
5  A  What are you referring to as an intake screening?
6  Q  The medical intake screening.
7  A  The --
8  Q  Exhibit 22 that we looked at, the "Inmate Medical
9  Screening Form."
10  A  No.
11  Q  I just wanna -- and Exhibit 20 is the "Booking Check
12  List."
13  A  (Turning to.)  Okay.
14  Q  And that shows everything you did and didn't do at
15  the time of booking; is that fair?
16  A  Yes.
17  Q  And then the supervisor on duty is Daulton.  Is that
18  Deputy Daulton?  I'm looking at the bottom.
19  A  It says "Supervisor on Duty at Time of Release."
20  Q  What does that mean?
21  A  That means when -- it's the supervisor on duty when
22  the inmate was released.
23  Q  Oh, when he died?
24  A  Yes.
25  Q  Okay.  Is he -- and I'm trying to understand.  Is

**Page 86**

1  Deputy Daulton -- was he your supervisor, or was this like the
2  shift supervisor role that we just -- that you talked about
3  that deputies were assigned to on each shift?
4  A  No, Daulton was not my supervisor.  It was Deputy
5  Jewell.  Daulton was the next shift supervisor after 1:00
6  o'clock.
7  Q  Okay.  And then -- but he's not actually like your
8  supervisor at work, right?  It's just that's the supervisor on
9  that shift?
10  MS. SMITH:  Form.
11  A  For his shift, yes.
12  Q  (BY MS. GROSSMAN)  Are you ever the shift supervisor?
13  A  Yes.
14  Q  Okay.  And then if you were the shift supervisor, it
15  would say that you were the supervisor on duty at that time; is
16  that right?
17  A  Yes.
18  Q  I'm really trying to understand how the word
19  "supervisor" is used 'cause it's used differently there.
20  A  Well, there's sergeants or OICs.  If neither of those
21  guys are available, then it's the next senior deputy.
22  Q  Was -- were you a senior deputy when you were -- in
23  July of 2021?
24  A  Yes, I was a senior deputy.  But we had a sergeant,
25  and then Jewell was the OIC, and then I was third.  So I was

**Page 87**

1  the next senior deputy under Jewell.
2  Q  What does it mean to be a senior deputy?
3  A  Most experienced.
4  Q  And how -- is it a title that's reflected in your
5  personnel file or --
6  A  (Shaking head.)
7  Q  No?
8  A  No, it's not.
9  Q  How many years does it take to be a senior deputy?
10  MS. SMITH:  Form.
11  A  That depends if you're -- become really good at the
12  job or not.
13  Q  (BY MS. GROSSMAN)  And then do they tell you in some
14  way or -- like, how do you know that you're a senior deputy?
15  A  You just know through the job, and then they'll
16  notify you that you'll be doing OIC stuff.  So officer in
17  charge when the sergeant is not there --
18  Q  Okay.
19  A  -- and nobody else is available.
20  Q  So, on the shift on the morning of July 18, 2021, you
21  worked your normal 5:00 a.m. to -- well, you probably worked
22  later that day, but you came in at 5:00 a.m., July 18, 2021?
23  MS. SMITH:  Form.
24  A  No.  I had actually came in early that shift.  I had
25  worked -- I came in at 1:00 a.m.

**Page 88**

1  Q  (BY MS. GROSSMAN)  On the 18th?
2  A  Yes.
3  Q  Okay.  So you came in at 1:00 a.m. on the 18th?
4  A  Yes, I came in at 1:00 a.m.  And I was in booking
5  originally, but the supervisor didn't wanna keep me down there
6  'cause we had to train the new guy, which was Raygoza.  So they
7  moved me from booking to the rover deputy.
8  Q  And why did you come in so early that day?
9  A  Because they -- one of their deputies had called out.
10  I can't quite remember, but...
11  Q  Okay.  You came in to help with staffing issues that
12  day early?
13  A  Yes.
14  Q  And, so, you came in at 1:00 a.m., and I assume
15  stayed past when Mr. Newman passed away?
16  A  Yeah.  After he passed away, we had a couple of
17  hours.
18  Q  And who was the -- and you were the rover on that
19  shift?
20  A  Yes.
21  Q  And who was the booking -- or who was the booking
22  deputy on that shift?
23  A  On which shift?
24  Q  The July --
25  A  My shift, 5:00 a.m. to 1:00?

**ANIMAS REPORTING SERVICE**
animas@animas.net

1.877.385.4268                    ZACKARY SUMMERS                    970.385.4268

---

Page 125

1   A   Well, to me, it did.
2   Q   Okay. Anyway, it's a pretty quick check, right?
3   A   Yes.
4   Q   Was that check, and what you've done in every check
5   that you did with Mr. Newman, consistent with how you were
6   trained at the jail?
7   A   It's -- it was --
8       MS. SMITH: Form. Go ahead.
9   A   It's consistent.
10  Q   (BY MS. GROSSMAN) No one ever said anything to you
11  that it wasn't enough time or that you should have done
12  anything differently; is that fair?
13  A   No one told me I should've done anything different.
14  Q   And between 7:41 a.m. when Mr. Newman asked to see a
15  doctor and then until he died, there was no verbal checks done
16  on him; is that right?
17      MS. SMITH: Form and foundation.
18  A   There was other deputies who would open the cell
19  door. So I don't know.
20  Q   (BY MS. GROSSMAN) It would've been other deputies
21  that did the verbal checks?
22      MS. COOK OLSON: Erica, can you state the
23  last two questions. You're just coming in garbled.
24  Q   (BY MS. GROSSMAN) I said between 7:41 a.m., when
25  Mr. Newman asked to go to a -- asked to go see the doctor, and

---

Page 126

1   between when he was found unresponsive, there was no verbal
2   checks on him?
3       MS. SMITH: Form and foundation.
4   A   And other deputies had opened the cell door, so I
5   don't know what they would've done or what they did. So I
6   don't know.
7   Q   (BY MS. GROSSMAN) What -- and what's the -- that's
8   your statement that they opened the door based on?
9   A   Because what you showed me in the video. You showed
10  Konami exiting the cell and then coming back into the cell, and
11  Raygoza was standing there at the door talking to whoever was
12  inside the cell. So I don't know what he did.
13  Q   Had you told Raygoza that Mr. Newman should be
14  checked on and asked how he was doing anyway?
15  A   The supervisor would've notified him, but I don't
16  know if he did.
17  Q   Did you tell anyone else that Mr. Newman had said his
18  head hurt and asked to see a doctor that morning?
19  A   Yes, I did.
20  Q   And who did you tell?
21  A   The supervisor, Deputy Jewell.
22  Q   When did you tell Deputy Jewell that?
23  A   I notified Jewell right after I'd spoke with
24  Mr. Newman. And that we were advised that, whenever we have
25  the next shift come in, which is more people, we could take him

---

Page 127

1   to the hospital.
2   Q   Who advised you that? Deputy Jewell?
3   A   Yes.
4   Q   And, so, they were saying that we could take -- that
5   you could take him over to the hospital, but you had to wait
6   until the next shift came in?
7       MS. SMITH: Form.
8   A   Not that the next shift could come in. Just for
9   manpower.
10  Q   (BY MS. GROSSMAN) That's what I meant, I'm sorry.
11  And can you tell me everything about that conversation that you
12  had and what time it was with Deputy Jewell?
13  A   I don't know exactly what time. But I told Jewell
14  exactly what I had -- or what Newman had told me, and what I
15  had told Newman.
16      He said, "Okay. That is correct, you know, he was
17  seen at the hospital," and everything and what-such.
18      And that we discussed it wasn't an immediate
19  emergency thing, where we needed to, you know, stop everything
20  and take him to the hospital immediately. But as for
21  precautionary, that whenever we have more people come in, we
22  could take him just to get checked up again.
23  Q   Did he look sick to you?
24  A   Newman?
25  Q   Yes.

---

Page 128

1   A   No. He just had bruises from his -- his bruises were
2   more clear from his altercation he had.
3   Q   And what was -- was the reason that you were talking
4   to Deputy Jewell about it is to get a second opinion about what
5   to do, since Mr. Newman had asked to go to the -- go see a
6   doctor?
7       MS. SMITH: Form.
8   A   No, just to notify the supervisor of what -- what was
9   said.
10  Q   (BY MS. GROSSMAN) Would it be partly his decision,
11  or it'd be his decision about what to do at that -- at that
12  point?
13  A   He is the supervisor, yes.
14  Q   And, so, you were notifying him of what you had said
15  to Mr. Newman. And then, as a supervisor, Deputy Jewell said,
16  "We can take him on the next shift; but it is right, there's no
17  immediate emergency because he'd been cleared at the hospital
18  the night before"?
19      MS. SMITH: Form.
20  A   You're making it seem like you're trying to -- make
21  it seem like we were trying to push it to the next shift by
22  saying that.
23      No, we were trying to wait for other deputies to show
24  up on the next shift so one of us could stay afterwards and
25  take him to the hospital.

---

32 (Pages 125 to 128)

1.877.385.4268                                                          970.385.4268

## ZACKARY SUMMERS

### Page 129

1    Q   (BY MS. GROSSMAN)  Okay.  So your interpretation of
2    my question is -- as --
3    A   I'm not trying to push it off, yeah.
4         MS. GROSSMAN:  For the record, I was
5    trying to ask him whether he was interpreting my question as
6    trying to pass it off to the next shift.  I apologize.
7         THE WITNESS:  Yeah.
8         MS. GROSSMAN:  I'm not trying to say that.
9         THE WITNESS:  Yeah.
10        MS. GROSSMAN:  So let me rephrase it --
11        THE WITNESS:  Yeah.
12        MS. GROSSMAN:  -- 'cause I'm not trying to
13   say that.
14        Q   (BY MS. GROSSMAN)  Shortly after Mr. Newman asked to
15   go to the hospital or asked to see a doctor, and you told him
16   he had been cleared at the hospital the night before, you went
17   and talked to Deputy Jewell about your conversation, right?
18        A   Yes.
19        Q   And then you have a conversation about -- and you
20   tell him what Mr. Newman said, that he asked to see a doctor,
21   and that you had told him he'd been cleared the night before.
22        And he, Deputy Jewell, the supervisor, said, "Okay.
23   Well, I agree.  There's no immediate urgency since he had been
24   medically cleared," but "better safe than sorry" kind of --
25   type of conversation.  "We will wait until there's more

### Page 130

1    deputies that come on from the next shift, and then you guys
2    can stay after and take" --
3         A   Yes.
4         Q   -- "him to the hospital"?
5         A   Yes.
6         MS. SMITH:  Form.
7         THE WITNESS:  Okay, yeah.
8         MS. SMITH:  That's all right.
9         Q   (BY MS. GROSSMAN)  Did I miss anything about that
10   conversation?
11        A   No.
12        Q   And I understand that that was frustrating to you, because
13   you were trying to work later --
14        A   Yeah, I was trying to stay afterwards to help and
15   take him to the hospital instead of trying to pass it off to
16   another shift.
17        Q   Right.  I understand.
18        Did you have any other conversations with any other
19   deputies about Mr. Newman's medical condition or his request to
20   go to the doctor that morning?
21        A   No.
22        Q   Is one of the reasons that Deputy Jewell decided that
23   it wasn't an immediate emergency because of how you felt, which
24   is that the hospital had medically cleared him the night
25   before, said he was safe to be in jail, and so there's probably

### Page 131

1    no immediate need?
2         MS. SMITH:  Form and foundation.
3         A   I can't tell you exactly what Deputy Jewell was
4    thinking, but we all had the same paperwork and information to
5    work with.
6         Q   (BY MS. GROSSMAN)  Did it feel like you were in
7    agreement on that?
8         A   Yes.
9         Q   And I know you wrote an Incident Report in this case,
10   and -- when -- when do you write Incident Reports?
11        A   Immediately after of the incident.
12        Q   And is it immediately after something significant
13   happens?
14        A   When I start to write a report?
15        Q   Just -- in the circumstance -- you don't always write
16   Incident Reports.  You write Incident Reports after something
17   significant happens; is that right?
18        A   Yes.
19        Q   Okay.  And, of course, a death would qualify for
20   that, right?
21        A   Yes.
22        Q   And the video shows -- the video that you reviewed
23   can show important details about what happens in a death or an
24   incident; is that fair?
25        MS. SMITH:  Form.

### Page 132

1    A   I can review back to the video to look at times in
2    the video, when certain things had happened.
3         Q   (BY MS. GROSSMAN)  And that that was important for
4    you in order to know what times they were and you wanted to be
5    accurate, right?
6         A   Yes.
7         Q   And there was video footage preserved of the booking
8    area on July 17, 2021; is that right?
9         MS. SMITH:  Form and foundation.
10        A   I -- I don't know.
11        Q   (BY MS. GROSSMAN)  Okay.  Well, either way, the video
12   would be the only way to know exactly what happened in terms of
13   timing and whether any verbals were done on the 17th; is that
14   fair?
15        MS. SMITH:  Form and foundation.
16        A   I mean, you can review the footage to see what was
17   shown, but I don't know.
18        Q   (BY MS. GROSSMAN)  After Mr. Newman died, what
19   conversations did you have with people about the circumstances
20   surrounding his death and what happened?
21        MS. SMITH:  Form.
22        A   After his death, obviously, as the shift together we
23   sort of talked with our boss, which is Staff Sgt. Endres, about
24   the incident.  We sort of did a debrief of what happened.
25   That's pretty much -- and we'd check in with each other.  "Hey,

33 (Pages 129 to 132)