```
 1            IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLORADO
 2
      Civil Action No. 22-cv-1763-PAB-KLM
 3   _____
 4   ESTATE OF KELROY NEWMAN by and through, putative
     personal representative, Bryanne Watts-Lucero;
 5   J.W., a minor child, by and through next friend and
     mother, Elisa Wilson;
 6
     Plaintiffs,
 7
     vs.
 8
     BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF
 9   MONTEZUMA, COLORADO; SHERIFF STEVEN NOWLIN;
     individually and in his official capacity;
10   ZACHARY SUMMERS, individually;
     ANDREW DAULTON, individually;
11   SOUTHWEST HEALTH SYSTEM, INC. d/b/a Southwest Memorial
     Hospital;
12   RANDY GENE DAVIDSON, MD, individually,
13            Defendants.
     _____
14
      REMOTE DEPOSITION OF RANDY GENE DAVIDSON, M.D.
15
                    MONDAY, MAY 8, 2023
16   _____
17   REMOTE APPEARANCES:
     ON BEHALF OF THE PLAINTIFFS:
18   ERICA GROSSMAN, ESQ.
     ANNA HOLLAND EDWARDS, ESQ.
19   DAN WEISS, ESQ.
     RACHEL KENNEDY, ESQ.
20   Holland, Holland Edwards & Grossman, LLC
     1437 High Street
21   Denver, Colorado  80218
     Phone: 303-860-1331
22   Email: Erica@hheglaw.com, Anna@hheglaw.com,
     Dan@hheglaw.com, Rachel@hheglaw.com
23
24
25
                                                      Page 1
```

Randy Gene Davidson, M.D. - May 8, 2023     Exhibit 15

**Page 42**

1  alcohol intoxication is at the moment, or what it's
2  going to go to.
3     Q    How about just this question then: Alcohol
4  withdrawal can be a potentially serious and
5  life-threatening condition; is that fair?
6          MR. COLLIER: Form.
7          THE WITNESS: Yes, alcohol withdrawal can,
8  yes.
9     Q    (BY MS. GROSSMAN) And you would agree that
10 in certain cases, lack of monitoring and treatment for
11 withdrawal can lead to serious or fatal consequences;
12 it is that fair?
13         MR. COLLIER: Form and foundation.
14         THE WITNESS: Well, once again, it's not
15 consistent with every patient. You can't say that
16 monitoring and that type of thing is necessary of
17 every patient to prevent him from becoming a dangerous
18 condition; it's individual.
19    Q    (BY MS. GROSSMAN) I did say -- let me just
20 restate it, but in certain cases, depending on the
21 individual, withdrawal can constitute -- alcohol
22 withdrawal can constitute an emergency medical
23 condition that requires monitoring and treatment; is
24 that fair?
25    A    Yes, it can.

**Page 43**

1     Q    And how do you rule out alcohol withdrawal
2  as a potential emergency condition with a patient?
3     A    Alcohol withdrawal is a wide constellation
4  of symptoms, basically, I mean, you're looking at the
5  patient's mental status, you're looking at his vital
6  signs, you're looking at his physical exam. There are
7  a number of things that constitute the degree and
8  presentation of alcohol withdrawal.
9     Q    Well, you said vital signs, mental status
10 and exam to rule out alcohol withdrawal. Did you --
11 is that what you just said?
12    A    I think that's what I just said.
13    Q    But a lot of -- like if a person is
14 intoxicated and currently drunk, or under the
15 influence of a lot of alcohol, they're not going to be
16 experiencing withdrawal at that very moment, right,
17 withdrawal is something that comes after alcohol
18 begins to leave your system; is that right?
19         MR. COLLIER: Foundation.
20         THE WITNESS: Yes, withdrawal usually
21 occurs with the alcohol level going down.
22    Q    (BY MS. GROSSMAN) And so when someone's
23 intoxicated, how do you rule out the potential that
24 when they're no longer intoxicated or with access to
25 alcohol, withdrawal is not going to be a potentially

**Page 44**

1  emergent condition?
2     A    You know, you can't predict, and you can't
3  say in the future what's going to happen, I mean, in a
4  case specific, I mean, you're seeing the patient at a
5  point in time. You can't predict whether this
6  patient's going to go into alcohol withdrawal or not.
7     Q    What makes it more likely that a person
8  would go into alcohol withdrawal?
9     A    I'm not sure that there is anything that
10 would necessarily predict that any specific person
11 will go into withdrawal.
12    Q    Is there any factors that you can tell me
13 right now that would make it more or less likely that
14 a person would experience alcohol withdrawal?
15    A    No, there's not anything specific that
16 would tell you any one person was going to go into
17 alcohol withdrawal.
18    Q    Okay. Well, how much a person drinks on a
19 daily basis, that would affect whether or not a person
20 would experience withdrawal, right?
21         MR. COLLIER: Object to the form.
22 Foundation.
23         THE WITNESS: How much they drink and their
24 tolerance can definitely change how much a person can
25 tolerate as far as an amount of alcohol in their

**Page 45**

1  system.
2     Q    (BY MS. GROSSMAN) A person's use of alcohol
3  influences withdrawal, and a person's -- that's right,
4  right? A person's use, the amount that they use
5  alcohol and their tolerance for it affects whether or
6  not they might go into withdrawal, right?
7          MR. COLLIER: Object to the form.
8          THE WITNESS: Not necessarily. There's no
9  consistency that how much a person drank this time and
10 how much they drank before will say they're going to
11 go into withdrawal. You can't draw a direct line that
12 way.
13    Q    (BY MS. GROSSMAN) Is there any -- I mean,
14 if you're sitting there as the ER physician just
15 deciding whether or not withdrawal might be a
16 potential complication before you discharge someone,
17 what factors do you consider?
18    A    I do consider whether they are a chronic
19 drinker, but I can't predict what's going to go on
20 after they leave my emergency department.
21         I have to work on what I have facing in
22 front of me, which is, you know, the history that I
23 have, the vital signs, the physical exam that I have.
24    Q    I mean, current and whether someone's a
25 chronic drinker or not, that would increase the

12 (Pages 42 - 45)

**Page 50**

1  in that situation?
2     A    I can't tell you. I have no idea.
3     Q    Is it something you -- is it something that
4  you do so many times you can't remember, like, you
5  couldn't estimate it? Is it a more rare occasion?
6  Can you just put it on a spectrum for me?
7     A    It depends on the patient's presentation
8  and the situation. I can't give you a number. It's
9  more relevant to how they present and what the
10 situation is.
11          MS. GROSSMAN: We'll come back to it, but
12 why don't we take a five minute break and then we can
13 reconvene. You can take longer if you want, I just
14 said five minutes because I was the one initiating it.
15          MR. COLLIER: That's okay.
16          (Recess taken.)
17    Q    (BY MS. GROSSMAN) I want to change topics
18 and talk about your understanding of the Montezuma
19 jail. Okay?
20    A    Okay.
21    Q    What is your understanding of the medical
22 care that can be provided at the jail in July of 2021?
23    A    I don't have a good idea of what exactly
24 goes on and what their schedule is.
25    Q    Are you aware that the jail doesn't have a

**Page 51**

1  medical unit?
2     A    I'm not aware of that.
3          MS. SMITH: Form.
4     Q    (BY MS. GROSSMAN) I'm sorry, what?
5          MS. SMITH: I said form. Sorry.
6     Q    (BY MS. GROSSMAN) And I didn't hear your
7  answer, Doctor, so that's why I was asking.
8          MR. COLLIER: I don't think he answered
9  yet.
10    Q    (BY MS. GROSSMAN) Okay.
11    A    I don't think they have a medical unit.
12    Q    And you also know they don't have a
13 detoxification center, right?
14    A    They don't have a detoxification center
15 that I know of.
16    Q    You knew in July of 2021 that they didn't
17 have any doctors or mid-level providers working in the
18 jail?
19         MS. SMITH: Form.
20         THE WITNESS: That I didn't -- that I'm not
21 sure of but I didn't think so.
22    Q    (BY MS. GROSSMAN) And why didn't you think
23 so?
24    A    I just had never heard that there were, but
25 I'm not sure what goes on at the county jail. I don't

**Page 52**

1  know their policy.
2     Q    They frequently -- and then they come to
3  get inmates medically cleared at the Southwest
4  Memorial ER, right?
5     A    Yes.
6     Q    And they do that frequently, right?
7          MS. SMITH: Form.
8          MR. COLLIER: Join.
9          THE WITNESS: I don't know what the term
10 frequently would mean to you, but they do bring
11 patients here to be cleared for jail.
12    Q    (BY MS. GROSSMAN) In your shifts, they're
13 24 hours, about seven or eight days a month that you
14 work at the hospital, how often are you medically
15 clearing patients for incarceration?
16    A    I can't give you an exact number.
17    Q    I was about to clarify, I'm sure you can't
18 give me an exact number, but can you give me an
19 estimate?
20    A    It depends on the day. Some days there may
21 be none, some days there may be five or six would
22 probably be a good range.
23    Q    Are weekends times in which you're clearing
24 more people than others?
25    A    I don't -- I can't give you an answer to

**Page 53**

1  that.
2     Q    Either way, it was your understanding in
3  July of 2021 that the jail didn't have any doctors or
4  medical unit or detox center or a medical staff
5  working in the jail?
6          MS. SMITH: Form.
7          MR. COLLIER: Form. Asked and answered.
8          THE WITNESS: I thought there was no detox
9  center; I'm not sure whether they had anybody there on
10 staff there at the time as far as your mid level or
11 your doctor.
12    Q    (BY MS. GROSSMAN) Have you ever seen -- is
13 there any policies that the hospital has in terms of
14 medical clearance for incarceration?
15    A    I don't think that the hospital has a
16 specific policy for that.
17    Q    What about a care of prisoners policy?
18 Have you ever seen anything like?
19    A    I have not seen anything that's specific
20 for care of a prisoner.
21         (Exhibit 26 was marked.)
22    Q    Okay. I'm just going to share this policy.
23 It's Exhibit 26. The title is, Care of Prisoners
24 Southwest Health Systems. Have you ever seen this
25 policy? I could go down if you need me to as well.

**Page 54**

1  A   I'm really not sure whether I've seen this
2  before or not.
3  Q   Either way, it's a policy about how
4  Southwest Memorial Hospital was to work with the
5  county in caring for and treating prisoners. Is that
6  a fair description?
7       MS. SMITH: Form.
8       MR. COLLIER: Object to form and
9  foundation.
10      MS. COOK OLSON: Join.
11      THE WITNESS: Ask the question again.
12 Q   (BY MS. GROSSMAN) The policy about how
13 Southwest Memorial Hospital works with the county in
14 caring for and treating prisoners?
15      MS. SMITH: Form.
16      MS. COOK OLSON: Objection. Form. Lack of
17 foundation.
18      MR. COLLIER: Join.
19      THE WITNESS: What it says in the policy
20 written in front of me is it's to assist in the care
21 of a patient under arrest or hold by law enforcement.
22 Q   (BY MS. GROSSMAN) Says also in the policy
23 that it's the goal of the Southwest Health Systems
24 under the direction of legal authorities and
25 coordination with law enforcement to make every

**Page 55**

1  reasonable effort to provide safe and appropriate care
2  for the forensic patient. Do you see that?
3  A   I do see that.
4  Q   And if you look at page 3 it says a nurse
5  is available for calls Monday and Friday from the
6  hours of 8:00 a.m. to 4:00 p.m.; is that right? Under
7  little G?
8  A   Okay. I see that.
9  Q   It also says under F that nurse to nurse
10 contact can be made by dialing the sheriff's
11 department directly. Do you see that?
12 A   I see that.
13 Q   Have you ever talked to anyone at the
14 county about follow-up for a patient or what needs to
15 happen when the person is gone, is being discharged?
16 A   I have not.
17 Q   Have you ever talked to anyone at the
18 county about -- received a call from them saying,
19 Something's going on with the patient, I want some
20 advice, or perhaps the nurse received it and you were
21 then asked about it relaying it back to the county?
22      MS. SMITH: Form.
23      THE WITNESS: I'm not aware of that, no.
24 Q   (BY MS. GROSSMAN) Have you ever
25 communicated with any county employee at all or anyone

**Page 56**

1  at the jail about a person's medical condition when
2  the -- yeah.
3  A   If you're explicitly saying received a
4  phone call from them and talked to them about a
5  patient they have a question about?
6  Q   Yes.
7  A   Not that I remember.
8  Q   And I'm including in that someone else from
9  the hospital receives a phone call and then asks you
10 because often you don't just get the doctor directly,
11 right? So it's often passed on to you, so I would
12 include in that question whether you've ever
13 communicated about a patient with the jail through
14 other members of the hospital as well.
15      MS. SMITH: Form and foundation.
16      MR. COLLIER: Join.
17      THE WITNESS: Not that I remember.
18      (Exhibit 29 was marked.)
19 Q   (BY MS. GROSSMAN) I want to show you what's
20 been produced in this case as a memorandum of
21 understanding between the hospital and the county.
22 It's marked as Exhibit 29 and it's titled, Memorandum
23 of Understanding between the Montezuma County
24 Sheriff's Office Detention Center and Southwest
25 Memorial Hospital. Do you see that?

**Page 57**

1  A   Yes.
2  Q   Have you ever seen this document before?
3  A   No.
4  Q   Okay. If you look at A, it says, The
5  detention center shall use the primary care clinic for
6  non-emergency health care needs Monday through Friday
7  during clinic hours. Do you see that?
8  A   Yes.
9  Q   From your working at the hospital and your
10 experience there, does the jail use a non-emergency
11 primary clinic at the hospital Monday through Friday?
12      MR. COLLIER: Form and foundation.
13      MS. COOK OLSON: Join.
14      MS. SMITH: Join.
15      THE WITNESS: I have no information about
16 how much they use the health care clinic, just what
17 they bring into us.
18 Q   (BY MS. GROSSMAN) Do they bring in people
19 Monday through Friday to the primary care clinic?
20      MR. COLLIER: Object to the form and
21 foundation. Asked and answered.
22      MS. COOK OLSON: Join.
23      THE WITNESS: I don't know if they take
24 patients over there or not. I couldn't answer that.
25 Q   (BY MS. GROSSMAN) You never see anybody?

**Page 62**

1  jail versus evaluating, assessing, and screening a
2  person who comes into the ED voluntarily and
3  discharging them to home?
4     A    There's no difference in the process. I go
5  through the same thing with patients that are brought
6  -- they come in on their own volition as well as the
7  ones that are brought in by the law enforcement.
8     Q    And you've conducted, at this point,
9  hundreds of medical clearances for jail, right?
10    A    I'm sure I have.
11    Q    What -- is there a usual amount of time
12 those clearances take?
13    A    I can't give you a specific time. It can
14 be a matter of, you know, minutes to hours depending
15 on what I find as their presentation, their vital
16 signs, their history, whether I decide there's a -- a
17 medical emergency condition exists or not.
18    Q    How do you find out why a person is being
19 brought to you to be medically cleared for
20 incarceration?
21    A    Assumption most of the time is that it is
22 for intoxication for them to be cleared for jail
23 unless they have a specific complaint.
24    Q    Can you elaborate on that?
25    A    Some patients they bring in because they

**Page 63**

1  have an injury or they have -- the patient's
2  complaining of a specific thing from the jail. Some
3  patients they bring in because they have been at the
4  jail and they have an elevated alcohol level and they
5  have to be brought to us to be cleared to go back to
6  the jail.
7     Q    What's the alcohol level that requires them
8  to come to you before going back to the jail, like, at
9  the elevated alcohol level?
10         MS. SMITH: Form and foundation.
11         MR. COLLIER: Join.
12         THE WITNESS: I'm not certain what that is.
13    Q    (BY MS. GROSSMAN) But most of the time many
14 of the clearances are done for intoxication because it
15 was too high of an alcohol level for the jail to keep
16 without taking them to the hospital first; that's
17 fair?
18    A    I think they have a specific number that
19 they're require to bring the patient to be cleared.
20    Q    Does .2 and over sound familiar?
21    A    No, I do not know what that level is that
22 they go by.
23    Q    What number do you consider to be
24 potentially dangerous level of alcohol in the system?
25         MR. COLLIER: Form and foundation.

**Page 64**

1          MS. SMITH: Join.
2          MS. COOK OLSON: Join.
3          THE WITNESS: I don't consider any specific
4  number. It's -- it depends on the patient, the
5  situation. Everyone is different. There's no
6  specific number that I consider dangerous.
7     Q    (BY MS. GROSSMAN) Would you consider .4 and
8  above to be potentially dangerous?
9     A    I just answered that.
10         MR. COLLIER: He also overstepped and took
11 over my objection that I was going to make before I
12 was able to say it. So objection to form.
13    Q    (BY MS. GROSSMAN) Okay. So are you
14 testifying then that .4 and over you can't say would
15 be potentially dangerous?
16    A    I think it depends on the patient and the
17 situation. You can't just say this is definitely
18 potentially dangerous. It depends on the patient,
19 depends on their situation.
20    Q    If someone had a .4 and was walking around
21 and not totally slurring the words that you had no
22 idea what they were saying, would that be an
23 indication to you that they must use alcohol pretty
24 frequently?
25         MR. COLLIER: Form and foundation.

**Page 65**

1          THE WITNESS: I really need you to rephrase
2  that for me again. I'm not sure what you're asking me
3  to answer.
4     Q    (BY MS. GROSSMAN) Well, a lot of times, you
5  know, you say understandably that it depends on the
6  patient, some patients can have this high of a number
7  and they would be okay and some patients wouldn't have
8  that high of a number and it would be dangerous for
9  one patient and not another, and so what I'm asking
10 and what my question is, if someone presented with a
11 .4 or over at the emergency department and wasn't --
12 and was responsive and you understood them and
13 mentally alert, even if they're a little drunk or
14 they're appearing drunk, would that be an indication
15 to you that they're -- they must use alcohol pretty
16 frequently?
17         MR. COLLIER: Form and foundation.
18         MS. SMITH: Join.
19         THE WITNESS: No, you can't assume that,
20 I mean, that's -- there's not always a direct
21 correlation.
22    Q    (BY MS. GROSSMAN) Is it -- sorry. Were you
23 done?
24    A    Yes, ma'am.
25    Q    Is there any number that you consider this

17 (Pages 62 - 65)

```
 1  is a real big problem, we have to do something about
 2  this, any BAC content?
 3      A    There is not a number; it's the
 4  presentation of the patient and all of the things that
 5  go into deciding whether this patient is an emergent
 6  situation or not.  It's not just a number.
 7      Q    So when a person -- and I know when I asked
 8  you this before you said intoxication is a big reason
 9  that people present to the ER, who tells you why the
10  person's being presented?  The officer?
11      A    It's not always the same person.
12      Q    Can you give me the various people it might
13  be?
14      A    Sometimes I get the information from the
15  nurse, sometimes I get the information from the
16  officer.
17      Q    And I believe you said in your discovery
18  responses that you may ask the police officer who
19  brought the patient to the hospital why clearance is
20  being requested, and the officer will typically tell
21  you the reason why clearance is requested; Is that
22  true?
23      A    Sometimes I do, sometimes I don't.
24      Q    And if you didn't ask the police officer
25  it's because you got the information from someone
                                                  Page 66
```

```
 1  else, either a nurse or someone at the hospital,
 2  right?
 3      A    Not necessarily.  Sometimes I assume that
 4  he's there for intoxication.
 5      Q    Okay.  So if no one specifically tells you
 6  otherwise, you can -- and you safely assume it's for
 7  intoxication, then you don't have that conversation;
 8  is that right?
 9      A    That's not necessarily true either, I mean,
10  it doesn't depend on that.
11      Q    That was honestly a bad question so let me
12  try that one again.
13           At some point you figure out why the person
14  is there for medical clearance, right?
15      A    Yes.
16      Q    Okay.  And that can be from the officer or
17  that can be from someone working at the hospital,
18  right?
19      A    It can be.
20      Q    And it also can be for your understanding
21  of why the person is there because you've done a lot
22  of clearances, and it might just be, yeah, you know
23  they're there for intoxication, right?
24      A    That can be true, yes.
25      Q    Do officers usually accompany patients who
                                                  Page 67
```

```
 1  are being seen for medical clearance into your
 2  examination room?
 3      A    Yes, they usually do.
 4      Q    So, are they there the whole time,
 5  generally?
 6      A    Depends on the situation.  I think most of
 7  the time they are there.
 8      Q    Can you tell me when you're conducting this
 9  clearance for -- just let's do an intoxication one --
10  what does your exam entail?
11      A    My usual exam would be to go in and
12  introduce myself, ask them if I can have permission to
13  check them over, I ask them specific questions
14  depending on what they look like in their
15  presentation, but, you know, basically do they have
16  any complaints.
17           I do a physical examination on them that
18  usually involves, you know, examining their body
19  habitus, do a neurological exam, listen to their
20  heart, lungs, and look at their vital signs.  That
21  would be probably the gist of most of my exam just as
22  a general rule.
23      Q    How long would you say your intoxication
24  clearances generally take?  And I understand it will
25  be an estimate and it will depend, but generally.
                                                  Page 68
```

```
 1      A    It could be probably, you know, three to
 2  ten minutes depending on what the patient looks like
 3  and what their situation is.
 4      Q    Under what circumstances do you order your
 5  own BAC?
 6      A    That just depends on the patient and the
 7  situation.  There's not any specific thing that makes
 8  me do that.
 9      Q    Have you done that before?
10      A    I've ordered blood alcohol from patients
11  before.
12      Q    And what were the reasons for ordering them
13  then?
14      A    Well, it depends on the patient and the
15  situation.
16      Q    I'm saying when did you order them.
17      A    What patient?  I mean --
18      Q    I'm asking you for an example?
19      A    An example would be a patient that they
20  brought in that is not able to walk, that is not able
21  to talk, that has signs to me from that and physical
22  exam and vital signs that there was an emergent
23  condition.  There may be a need to do a blood alcohol
24  to discern whether his level of consciousness is due
25  to a high alcohol level or whether it from possibility
                                                  Page 69
```

18 (Pages 66 - 69)

**Page 74**

1  second box there was. So can you tell me the
2  difference between the first and second box from your
3  understanding?
4      A    Well, the second box is for specific
5  treatments, you know, if I feel like a patient needs a
6  specific treatment, not a specific observation or a
7  specific -- or a general look at the patient; it's
8  for -- the second box is for specific treatment for a
9  condition that the patient has.
10     Q    Have you ever prescribed any medicine for
11 alcohol withdrawal as a follow-up into your medical
12 clearances?
13     A    Are you talking about when I send a patient
14 back to the jail?
15     Q    Yes, I was trying to distinguish between
16 ever in your life have you ever prescribed a medicine
17 of alcohol withdrawal versus when you're sending a
18 patient back to a jail have you ever prescribed a
19 medicine for alcohol withdrawal?
20     A    I'm not sure whether I have or not, to be
21 honest with you. I know I have treated them when they
22 were in the emergency department if they were in
23 withdrawal. Does that answer your question?
24     Q    Yeah, I can ask another one as well.
25          It's -- in your intoxication clearances,

**Page 75**

1  have you ever checked the second box, which is, I have
2  examined the prisoner and find him or her acceptable
3  for admission to the jail. I suggest treatment for
4  the prisoner's condition as described below.
5          MR. COLLIER: Form and foundation.
6          THE WITNESS: Not for the specific alcohol
7  intoxication, but for other things that they may have
8  going on as I stated before as far as, like, wound
9  care, or something of that sort if I thought that was
10 necessary.
11     Q    (BY MS. GROSSMAN) For intoxication
12 clearances, there's never been a time in which you've
13 suggested various treatment or follow-up at the jail?
14          MR. COLLIER: Object to the form and
15 foundation. Asked and answered.
16          THE WITNESS: Not -- I mean not, in
17 follow-up. There's always instructions if there's any
18 problem for them to return, but specific treatment,
19 I'm not sure. I don't remember that I have.
20     Q    (BY MS. GROSSMAN) And then the third
21 paragraph says, I have examined the prisoner and find
22 him or her acceptable for admission to the jail
23 provided the conditions described below are met. What
24 does that box refer to based on your understanding?
25     A    I haven't used that box that I know of, but

**Page 76**

1  -- so I'm not sure where I would use that.
2      Q    What about the fourth one, I've examined
3  the prisoner and find him or her medically
4  unacceptable for admission to the jail. Have you ever
5  used that?
6      A    I have used that, I think, in clearances
7  where patients have such severe injuries, or whatever,
8  that they need to be admitted to the hospital longer
9  than just in the emergency department or transferred
10 somewhere.
11     Q    Have you ever used that in an intoxication
12 clearance?
13     A    I'm not sure.
14     Q    Do you have any memory of ever saying this
15 person's too drunk to go to the jail, or withdrawal's
16 going to be too much of a problem -- actually, I want
17 to break that up.
18          Have you ever used that when you decided a
19 person's too drunk to go to the jail?
20     A    There are times when they bring patients in
21 that they are -- their level of consciousness or
22 ability to ambulate are not sufficiently safe for them
23 to leave the emergency department at that time.
24     Q    Has there ever been a time that you can
25 remember that a person has been too intoxicated that

**Page 77**

1  you're worried about alcohol withdrawal and so you do
2  not clear them for jail and you keep them instead?
3      A    Once again, that's one of those questions
4  that -- or questions that it's individual to the
5  patient, and I can't answer that with just a general
6  statement whether I thought of that with a patient. I
7  would have to know the patient.
8      Q    Well, no, I'm trying to ask you based on
9  your doing the medical clearances whether or not in
10 the years that you worked there, the nine and a half
11 years you worked at Southwest Memorial and you've
12 conducted medical clearances, I'm asking have you ever
13 said this person is not safe to go to the jail -- or
14 this person can't go to the jail because of alcohol
15 withdrawal potential?
16     A    I can't predict whether they're going to
17 have withdrawal or not, whether they're going to have
18 DTs, or whatever. I pretty much do it for -- it's an
19 isolated time in space, you know, this patient right
20 now either looks stable or doesn't look stable. I
21 can't predict whether they're -- and I don't try to
22 predict whether they're going to go into withdrawal or
23 not.
24     Q    I think -- I don't know -- I think my
25 question might not -- I might not be asking it the

20 (Pages 74 - 77)

**Page 82**

1  you knew it?  Would that be -- would that trigger
2  something where you would say I can't clear this
3  person because that is too high of a BAC to medically
4  clear someone?
5        MS. SMITH:  Form.
6        THE WITNESS:  It would not have changed my
7  disposition.
8    Q   (BY MS. GROSSMAN) And it would not have
9  changed your decision to discharge him at that time?
10       MS. SMITH:  Form.
11       THE WITNESS:  It would not have.
12   Q   (BY MS. GROSSMAN) And would that have
13 changed anything with respect to whether or not you
14 thought he might be going into -- he could go into
15 alcohol withdrawal?
16       MS. SMITH:  Form.
17       THE WITNESS:  It would not change that.
18   Q   (BY MS. GROSSMAN) And can you tell me why
19 it would not change that?
20   A   Because you can't draw a direct correlation
21 between blood alcohol level and whether somebody's
22 going to go into withdrawal.
23   Q   We've talked about medical clearances for
24 jail and I'm just wondering about -- forgetting --
25 when someone comes in for intoxication and it's not

**Page 83**

1  about a medical clearance.  You said it's the same
2  process.  Would you -- have you actually admitted
3  patients to the hospital for potential alcohol
4  withdrawal then if they're not currently exhibiting
5  signs of withdrawal?
6        MR. COLLIER:  Object to the form.
7        THE WITNESS:  I need clarification on the
8  question.
9    Q   (BY MS. GROSSMAN) Yeah, I wanted to ask it
10 a different way.  I think you kind of understand what
11 I'm going at, but I would rather get a cleaner
12 question, which is:  I believe you testified that
13 you've never not given -- you've never admitted
14 someone to the hospital or not admitted, but they're
15 medically cleared to go to jail, based on a prediction
16 of future withdrawal; is that fair?
17   A   That is fair.
18   Q   And so I think you testified as well that
19 you've only stopped a -- to the extent that you've
20 stopped a medical clearance for potential withdrawal
21 it's been someone that's currently exhibiting the
22 signs of withdrawal, right?
23   A   That would be a fair answer.
24   Q   And is that the same for when someone comes
25 in voluntarily for intoxication or withdrawal?  Have

**Page 84**

1  you ever admitted someone to the ER or not discharged
2  them because of potential future withdrawal concerns
3  based on their intoxication level?
4    A   I have patients that come in that are in
5  withdrawal that I treat in the emergency department
6  until they are safe to be discharged.
7    Q   But if they're not currently in withdrawal
8  but they're just currently very, very intoxicated
9  is -- have you ever kept them there because of
10 concerns that they could go in withdrawal if their
11 blood alcohol content dropped?
12   A   Not that I know of.
13   Q   An alcohol withdrawal can be life
14 threatening, right?
15   A   Excuse me.
16   Q   Alcohol withdrawal can be life threatening,
17 right?
18       MR. COLLIER:  Form.  Asked and answered.
19       THE WITNESS:  Yes, it can be life
20 threatening.
21   Q   (BY MS. GROSSMAN) And I'm trying to
22 understand why is it that you've never considered
23 about future withdrawal as a problem in whether either
24 conducting medical clearances or when someone comes in
25 voluntarily?

**Page 85**

1    A   Because you can't predict which patients
2  are going to go into withdrawal, and you can't admit
3  everybody that's intoxicated.
4    Q   What are some of the symptoms of alcohol
5  withdrawal?
6    A   You can have tremors, confusion, agitation,
7  headache.  Those are just some of those.
8    Q   If someone's a chronic drinker, does that
9  make it more likely that withdrawal would be a
10 problem?
11   A   I've answered this before.  You can't make
12 a direct correlation between that.
13   Q   Okay.
14       MR. COLLIER:  Maybe we can take a break.
15 Let's take a break.
16       Let's try to streamline this so we're not
17 asking the same questions over and over again.  You've
18 just started repeating the questions you asked him the
19 first hour of the deposition.
20       MS. GROSSMAN:  Do you want to -- I was
21 going to talk about medicines for alcohol withdrawal,
22 but if you want to move for a protective order, go for
23 it.
24       MR. COLLIER:  Okay.  Thanks.
25       (Recess taken.)

22 (Pages 82 - 85)

**Page 90**

1 clearance for facial trauma or facial injury, right?
2   A   Correct, Mr. Newman was picked up randomly
3 for a warrant. He wasn't -- he didn't present to
4 anyone with any complaint of any kind. He wasn't on
5 his own volition coming to the emergency department.
6   Q   And he was not -- I mean, he wasn't coming
7 there for ruling out facial injury problems; he was
8 coming there because he was too intoxicated for the
9 jail to keep him without getting a medical clearance
10 first, right?
11   A   He was brought to the emergency department,
12 I guess, per their protocol because of whatever his
13 blood alcohol content was there to be cleared.
14   Q   And so, I mean, because you know -- you
15 don't know what that blood alcohol content is that
16 required him to come to the ER, you know it's some
17 number that triggers that, right?
18   A   Yes, I know that.
19   Q   And so why didn't you ask him -- or I'm
20 assuming you didn't ask him. Did you ask the officer?
21   A   I don't remember that I did.
22   Q   It's the officer's testimony that his
23 general practice is to convey the blood alcohol
24 content to a medical professional. Is it possible
25 that it was conveyed to you?

**Page 91**

1   A   I do not remember it being conveyed to me.
2   Q   Either way, would it have changed what you
3 did with Mr. Newman that night?
4       MR. COLLIER: Form. Asked and answered.
5       MS. SMITH: Join.
6   Q   (BY MS. GROSSMAN) If the .421 was conveyed
7 to you, would it have changed anything you did with
8 Mr. Newman?
9       MR. COLLIER: Same objection. It was the
10 same question that was asked right before the break.
11      MS. SMITH: Join.
12      THE WITNESS: It would not have changed
13 anything.
14   Q   (BY MS. GROSSMAN) If you knew that
15 Mr. Newman was a chronic alcohol user and had a .421,
16 would it have changed anything with what you did with
17 him?
18      MR. COLLIER: Form. Foundation, asked and
19 answered.
20      MS. SMITH: Join.
21      THE WITNESS: It would not have changed my
22 screening exam or my disposition.
23   Q   (BY MS. GROSSMAN) And it wouldn't have
24 changed your screening exam or disposition if he had a
25 .421, was a chronic alcohol user and was going to jail

**Page 92**

1 where, of course, held not have access to alcohol; is
2 that fair?
3       MS. SMITH: Form.
4       MR. COLLIER: Foundation.
5       THE WITNESS: I don't know what would be
6 available for him at the jail, but it would not have
7 changed my disposition just because he had a .421.
8   Q   (BY MS. GROSSMAN) Is it your understanding
9 that you don't get access to alcohol in jail though?
10  A   I'm not aware that you are available to
11 have it, no, but I don't know what goes on at the
12 jail.
13  Q   And can you tell me why it wouldn't have
14 changed your disposition if you knew that he had a
15 .421 and was a chronic alcohol user and was appearing
16 from your physical exam the way that he was appearing
17 to you on a .421?
18      MR. COLLIER: Form. Foundation.
19      THE WITNESS: The .421 is a number that is
20 not relevant to making that decision. It's more how
21 he presents to me.
22  Q   (BY MS. GROSSMAN) Isn't whether someone's
23 dependent on alcohol and addicted to alcohol relevant
24 to whether or not they're going to experience
25 withdrawal?

**Page 93**

1       MR. COLLIER: Object to the form.
2       THE WITNESS: We've answered this before,
3 there is no direct correlation. For each individual
4 episode there's not.
5   Q   (BY MS. GROSSMAN) Okay. I don't think I
6 used the word addicted before, so I apologize if I'm
7 asking the same question.
8       So it's the same thing with addiction,
9 there's no correlation if they're addicted to alcohol
10 and withdrawal?
11  A   I would not know that he was addicted.
12  Q   And I'm just saying if you had known he was
13 addicted, would that have changed anything?
14      MS. SMITH: Form.
15      THE WITNESS: There's a difference
16 between -- to me, between being a chronic drinker and
17 being addicted, and I wouldn't have that information.
18  Q   (BY MS. GROSSMAN) If you suspected him of
19 being addicted to alcohol, would that have changed
20 anything for you?
21      MS. SMITH: Form.
22  Q   (BY MS. GROSSMAN) I'm not asking if you --
23 I'm saying if you had suspected it, would that change
24 your -- would that change your view as a doctor?
25      MR. COLLIER: Form.

```
 1       MS. SMITH:  Same objection.
 2       THE WITNESS:  Once again, I'm looking at
 3  this patient at a specific period of time, he has no
 4  signs of anything except -- he's not showing anything
 5  that would make me think there was an emergent
 6  condition going on, and I cannot predict regardless
 7  what is going to happen down the road.
 8   Q   (BY MS. GROSSMAN) Isn't the fact that
 9  someone has a .421 and is able to walk around and not
10  slurring his speech, isn't falling over, comatose,
11  doesn't that fact indicate to you that a person has --
12  uses alcohol frequently?
13   A   Didn't we answer before about the fact that
14  people metabolize differently, may have a different
15  tolerance?  You can't draw a direct correlation.
16   Q   But I'm trying to -- you say tolerance and
17  I'm trying -- and maybe this is your memory, so I'm
18  trying to I understand it.
19       Doesn't tolerance have -- like isn't the
20  fact that someone is able to be -- present not
21  severely intoxicated with a .421, doesn't that suggest
22  to you or does it suggest to you that the person
23  drinks frequently?
24   A   It does not tell me how much he has to
25  drink to reach a tolerance or to reach a level.  There
```
Page 94

```
 1  is no correlation that is specific for everybody.
 2  It's dependent on the person, the situation.
 3   Q   Did -- thank you.
 4       Did Mr. Newman exhibit any clinical signs
 5  of acute alcohol intoxication to you?
 6   A   Because of his presentation with the police
 7  officers for clearance for jail, I mean, that was a
 8  big tip that he's probably intoxicated, but as far as
 9  on physical exam, to me, he did not exhibit signs and
10  symptoms of significant intoxication.
11   Q   And I believe you said you did not look at
12  his chart showing that he had been there for a medical
13  evaluation for -- or medical clearance for
14  intoxication a month earlier when you were treating
15  him; is that right??
16   A   I'm not sure whether I actually looked at
17  it or not.  I can't say for sure.
18   Q   If you had seen that he had been there for
19  a medical clearance for incarceration a month earlier,
20  would that have changed anything that you had done
21  with your discharge instructions that day?
22       MS. SMITH:  Form.
23       THE WITNESS:  Most likely it would not have
24  changed what my disposition was.
25   Q   (BY MS. GROSSMAN) Did Mr. Newman display
```
Page 95

```
 1  any signs of alcohol withdrawal when you saw him?
 2   A   To me he did not display any signs of
 3  alcohol withdrawal.
 4   Q   How often does it normally take for a
 5  person to experience alcohol withdrawal once their BAC
 6  starts to drop, once they stop drinking?
 7       MR. COLLIER:  Form and foundation.
 8       THE WITNESS:  I don't think there's any
 9  specific time frame that they have to.  It's a big
10  variable time period that they can do that.
11   Q   (BY MS. GROSSMAN) Can you give me a range
12  of that variable?
13   A   A few hours to many hours to days.
14   Q   And it's possible in a span of 18 hours for
15  a person's blood alcohol content to drop from a .421
16  to zero in just over -- or in around 18 to 24 hours;
17  is that right?
18   A   Once again, I would have to know the
19  specific, you know, situation and patient, and I can't
20  predict that.  There's no way to predict that.
21   Q   Could it be dangerous for a person's
22  alcohol to drop from .421 to zero in 18 to 24 hours?
23  Is that potentially dangerous?
24       MR. COLLIER:  Form and foundation.
25       MS. SMITH:  Join.
```
Page 96

```
 1       THE WITNESS:  Once again, it's the same
 2  thing.  It depends on the patient and the situation.
 3  Not everybody is going to react the same.  Not
 4  everybody is going to have the same symptomatolgy in a
 5  certain time frame.
 6   Q   (BY MS. GROSSMAN) Either way, people have
 7  to stop -- when someone stops drinking, then the
 8  potential for withdrawal sets in, right?
 9       MR. COLLIER:  Form and foundation.
10   Q   (BY MS. GROSSMAN) That's when withdrawal
11  sets in, when the person stops drinking; is that fair?
12       MR. COLLIER:  Form and foundation.
13       THE WITNESS:  I'm sorry, which question do
14  you want me to answer?
15   Q   (BY MS. GROSSMAN) Just answer both if you
16  can tell me.  Just answer what you -- just answer the
17  question.
18       MR. COLLIER:  No, we're not going to do it
19  that way.  You're going to give him a question, he's
20  going to answer a question, so let's start over and
21  ask a question and then he'll answer a question.
22   Q   (BY MS. GROSSMAN) What questions do you
23  feel like I've asked you that you want clarification
24  on?  I'm confused.
25   A   Just ask me the first question, again
```
Page 97

25 (Pages 94 - 97)

**Page 98**

1  please.
2  Q    Sure.  Alcohol withdrawal sets in -- if
3  alcohol withdrawal is going to set in, it sets in once
4  a person has stopped drinking, right?
5  A    Or decreased drinking.
6  Q    Decreased drinking.
7       And so isn't it always when the person
8  leaves and is no longer drinking after they're
9  intoxicated that withdrawal would be a problem rather
10 than at the hospital?
11      MR. COLLIER:  Form and foundation.  Asked
12 and answer so many times now.
13      MS. SMITH:  Join.
14      THE WITNESS:  Alcohol withdrawal does not
15 always set in.  Alcohol withdrawal is associated with
16 the alcohol level going down, but it doesn't always
17 happen.
18 Q    (BY MS. GROSSMAN) It sometimes happens,
19 right?
20 A    Yes.
21 Q    And it sometimes is dangerous, right?
22 A    Sometimes it's dangerous.
23 Q    And it sometimes causes delirium tremens,
24 right?
25 A    It can cause delirium tremens.

**Page 99**

1  Q    And it sometimes causes withdrawal
2  seizures, right?
3  A    Depending on the patient and the situation,
4  some patients do have seizures.
5  Q    And some patients do die from alcohol
6  withdrawal, right?
7  A    Some patients can die from alcohol
8  withdrawal.
9  Q    And with Mr. Newman, your discharge
10 instructions were that there were no follow-up that
11 you recommended, right, at the jail?
12      MR. COLLIER:  Object to form.  Misstates
13 evidence.
14 Q    (BY MS. GROSSMAN) Well, you checked the
15 box -- let me just restate it because -- and I can
16 show you the exhibit, but you did check the box that
17 Mr. Newman was safe to be admitted to jail and that
18 you had no specific suggestions regarding the care of
19 for the condition for which you've examined him,
20 right?
21      MR. COLLIER:  I think you should show the
22 form because I don't think that's what the form says
23 actually.
24 Q    (BY MS. GROSSMAN) Hold on one second.
25      Can you read that, or do you want me to

**Page 100**

1  make it bigger?  I can't tell how it looks to other
2  people.
3  A    I can read it.
4  Q    So you checked the first box.  This is your
5  clearance form for Mr. Newman on July 17, 2021, right?
6  A    Yes.
7  Q    And you checked the first box for
8  disposition, right?
9  A    Yes.
10 Q    And the first box means -- it says that
11 you've examined the prisoner and find him acceptable
12 for admission to the jail and that you had no specific
13 suggestions regarding the care or this prisoner for
14 the condition for which you examined him, right?
15 A    That's what it says.
16 Q    And the condition for which you examined
17 him was for intoxication, right?
18 A    Yes.
19 Q    And then you gave no instructions for his
20 care related to this alcohol intoxication for which
21 you examined him, right?
22      MR. COLLIER:  Form.  Foundation.  Asked and
23 answered.
24      THE WITNESS:  My dismissal sheet is return
25 with any needs or any problems that the patient would

**Page 101**

1  have.  This patient's going back to a structured
2  environment where there are people who will observe
3  and watch him.  They are familiar with this type of
4  patient.
5       So, yes, the answer is that there's nothing
6  specific, if he has any complaints or conditions that
7  they consider to be -- he would be returned to the
8  emergency department, which they do.
9  Q    And there's standard instructions, aren't
10 there, to come back if there's a problem?
11 A    That can be a standard instruction, yes.
12 Q    Would anything have been different here if
13 you knew that he wasn't going to jail but going home,
14 or, I mean, would this clearance have been different
15 because, you know, he would be monitored at the jail,
16 or would you have discharged him anyway if you're
17 doing a screening for someone who came in voluntarily
18 at the ER?
19 A    I would give them the same dismissal
20 instructions.
21 Q    And so it's not as if someone -- I know
22 I've asked you would your treatment have been
23 different if you knew he had a .421, you knew he was a
24 chronic alcohol user and you said it wouldn't have
25 been different, and now my question's a little bit

26 (Pages 98 - 101)

```
 1  kinds of symptoms and signs they exhibit?
 2     A    They can have the exact same signs.
 3     Q    Did -- as what? As what we just went over
 4  with cirrhosis?
 5     A    Yes.
 6     Q    Okay. Did Mr. Newman exhibit signs or
 7  symptoms of acute alcoholic hepatitis to you?
 8     A    From my examination for a screening exam,
 9  he did not reveal any signs that made me think acute
10  alcoholic hepatitis.
11     Q    And if he would have exhibited those signs,
12  you would have some follow-up and other testing before
13  you medically cleared him, right?
14     A    Well, once again, it would have still
15  depended on his presentation and the rest of the exam
16  and rest of the information.
17     Q    I mean, if you suspected something going on
18  that was more dangerous to him, you would follow that
19  up and perform more tests depending on his
20  presentation to you, right?
21     A    Well, that would be with anything, not just
22  liver, I mean, if I suspected that there was an
23  emergent condition going on at the time, that's what
24  leads me to go on and do further examination rather
25  than just the focus -- I mean the screening
                                              Page 106
```

```
 1  examination and leaving it there.
 2     Q    What about alcoholic pancreatitis? Can you
 3  tell me -- describe patients with acute alcoholic
 4  pancreatitis?
 5     A    Once again, it's a broad range of symptoms.
 6  They can -- alcoholic hepatitis, they can have nausea,
 7  vomiting, abdominal pain and have altered vital signs.
 8  They don't necessarily have to have any kind of
 9  jaundice, any of that.
10     Q    Did Mr. Newman exhibit any signs or
11  symptoms of acute alcoholic pancreatitis when you
12  examined him?
13     A    From the information that I collected from
14  him, I did not see anything that made me think acholic
15  pancreatitis.
16     Q    How long would you say your exam of
17  Mr. Newman was?
18     A    Look at the chart, I'm not sure. Probably
19  somewhere in the range of three to ten minutes,
20  something like that. I can't be sure.
21     Q    I didn't see it. That's basically what I
22  estimated, around three to ten minutes, or three to --
23  I can't see in the chart how long, at least from my
24  understanding, that you exactly spent with him. I can
25  really only kind of guess or see how long he was at
                                              Page 107
```

```
 1  the ER. Is there some chart that you've seen where
 2  you can tell exactly how long your exam was?
 3     A    No, and I'm not sure how those time frames
 4  are actually put into the chart.
 5     Q    Okay. Your estimation is anywhere from
 6  three to ten minutes; is that right?
 7     A    That would be my usual, yes.
 8     Q    Okay. I don't have too much more. I kind
 9  of just want to go over a few things and see what
10  other topics. Can we take five minutes and then I'll
11  gather myself and see what else I might have?
12          MR. COLLIER: Sure.
13          (Recess taken.)
14     Q    (BY MS. GROSSMAN) When you clear someone
15  for jail, you -- do you expect them to be brought back
16  if they develop symptoms of withdrawal, or -- they
17  develop symptoms of withdrawal?
18          MS. SMITH: Form.
19     Q    (BY MS. GROSSMAN) At the jail, at the jail?
20          MS. SMITH: Form.
21          MR. COLLIER: Form and foundation.
22          THE WITNESS: When I discharge patients
23  back to the jail, I know that I'm sending them back to
24  an environment where they're -- they do have a
25  structured environment, they are observed, the
                                              Page 108
```

```
 1  officers there are familiar with this -- this medical
 2  condition of intoxication. So, I expect if there is a
 3  change that -- or the patient has a complaint that
 4  they will return the patient to me to be checked.
 5     Q    And I wanted to show you Deputy Summers'
 6  incident report in this case, which is the deputy that
 7  was working at the jail that night that Mr. Newman was
 8  booked in.
 9          Exhibit 15, have you ever seen this
10  document before?
11     A    I'm aware of it, but I have not read it
12  through.
13     Q    You're aware of it in what sense? What do
14  you mean?
15     A    I think I have seen this but, I have not
16  read it.
17     Q    In what context have you seen it?
18          MR. COLLIER: Again, I mean, if that
19  includes conversation between me and you, you can't
20  disclose that. If you've seen the document, you can
21  talk to her about that, but not any conversations that
22  we may have had about it.
23          THE WITNESS: Sorry.
24     Q    (BY MS. GROSSMAN) That's okay.
25     A    I am aware of the existence of the
                                              Page 109
```

28 (Pages 106 - 109)

**Page 110**

1 document.
2  Q   Okay. Why did -- I thought it was Deputy
3 Summers, but I guess I was wrong. It's written by
4 Yvonne McClelland, who was the investigator, so I
5 apologize. Can you take a minute and just read the
6 first four paragraphs?
7  A   Okay.
8  Q   Once you get to the next page you can stop.
9  A   I've read the first four paragraphs.
10  Q   Can you see in the first paragraph where it
11 says, On arrival of the detention center, I contacted
12 MCSO detention deputy, Detention Deputy Summers.
13 Deputy Summers told me that at 7:41 that same morning,
14 Newman told him that his head hurt and wanted to go to
15 the hospital. Deputy Summers told him he just came
16 from the hospital (medical clearance.) Did I read
17 that correctly?
18  A   Yes.
19  Q   Okay. So Mr. Newman was saying his head
20 hurt at 7:41 in the morning. Would it be your
21 expectation then that he be brought back to the
22 hospital or the hospital be called and that -- would
23 that be your expectation?
24      MS. SMITH: Form.
25      MR. COLLIER: Join.

**Page 111**

1      THE WITNESS: You know, I can't account for
2 what happened at the jailhouse. There are a lot of
3 reasons that he could have had a headache. I don't
4 know what their policy is in terms of if the patient
5 says, I have a headache, or what complaint triggers
6 them to bring him back to the emergency department to
7 be seen.
8  Q   (BY MS. GROSSMAN) When you clear someone,
9 you're clearing them at the time of booking, and I
10 think what you testified is that you would except then
11 that if he was experiencing a change in condition or
12 such as withdrawal, you would expect him to be brought
13 back for you to see him, or for the doctor on call to
14 see him; is that correct?
15      MS. SMITH: Form.
16      THE WITNESS: My expectation would be that
17 he's observed at the jail and if there is a problem
18 that he would be brought back for me to be seen or
19 brought back to be re-evaluated.
20  Q   (BY MS. GROSSMAN) And that would include
21 vomiting, right? That would be something that you
22 should be notified of the change in condition from
23 when you saw him, right?
24      MS. SMITH: Form.
25      MR. COLLIER: Join.

**Page 112**

1      THE WITNESS: There are a number of
2 complaints or conditions that could be possible for
3 him to be brought back, and not necessarily specific
4 to the intoxication.
5  Q   (BY MS. GROSSMAN) Well I am asking specific
6 to the intoxication. I am asking specific to
7 intoxication.
8  A   Okay.
9  Q   If a patient is experiencing going through
10 alcohol withdrawal or showing signs and symptoms of
11 alcohol withdrawal, is that something that you would
12 expect them to be brought back to the hospital?
13      MS. SMITH: Form.
14      THE WITNESS: Once again, it's -- it
15 depends on the complaint, the situation, the timing,
16 what their policy is, you know, when they would bring
17 the patient back.
18  Q   (BY MS. GROSSMAN) The fact that he's been
19 medically cleared by you doesn't mean that he
20 shouldn't -- that doesn't mean that if he experiences
21 later signs and symptoms of withdrawal that he
22 shouldn't come back, right?
23      MS. SMITH: Form.
24      THE WITNESS: When I've cleared a patient
25 to go to the jail, it means at that time for me that

**Page 113**

1 he's safe to go there. What changes at the jail and
2 what their policy is would determine when he brings
3 them back.
4  Q   (BY MS. GROSSMAN) And when you clear
5 someone for intoxication, as you said, you're not
6 going to consider whether or not they potentially will
7 go through withdrawal later, right?
8      MR. COLLIER: Object to form. Misstates
9 his testimony.
10      THE WITNESS: I am just -- I am basically
11 just clearing him for the time period that he's there,
12 that there does not appear to be any specific
13 immediate emergency condition existing. I can't
14 predict, again, happens later on down the road or what
15 will happen in the jail.
16  Q   (BY MS. GROSSMAN) As we went over,
17 I believe, multiple times, if you knew he had a .421,
18 if you knew he was a chronic drinker, if you had that
19 information at the time to clear him, you still would
20 not -- you still would have cleared him for jail
21 because you believe that you would not have changed
22 what you did in terms of predicting whether he might
23 go through withdrawal; is that fair?
24      MS. SMITH: Form.
25      MR. COLLIER: Form. It's been asked and

29 (Pages 110 - 113)