```
 1            IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF COLORADO
 2
      Civil Action No. 22-cv-1763-PAB-KLM
 3    _____
 4    ESTATE OF KELROY NEWMAN by and through, putative
      personal representative, Bryanne Watts-Lucero;
 5    J.W., a minor child, by and through next friend and
      mother, Elisa Wilson;
 6
      Plaintiffs,
 7
      vs.
 8
      BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF
 9    MONTEZUMA, COLORADO; SHERIFF STEVEN NOWLIN;
      individually and in his official capacity;
10    ZACHARY SUMMERS, individually;
      ANDREW DAULTON, individually;
11    SOUTHWEST HEALTH SYSTEM, INC. d/b/a Southwest Memorial
      Hospital;
12    RANDY GENE DAVIDSON, MD, individually,
13              Defendants.
      _____
14
           REMOTE DEPOSITION OF TODD FOWLER, M.D.
15
                    THURSDAY, MAY 11, 2023
16    _____
17    REMOTE APPEARANCES:
      ON BEHALF OF THE PLAINTIFFS:
18    ANNA HOLLAND EDWARDS, ESQ.
      ERICA GROSSMAN, ESQ.
19    DAN WEISS, ESQ.
      RACHEL KENNEDY, ESQ.
20    Holland, Holland Edwards & Grossman, LLC
      1437 High Street
21    Denver, Colorado  80218
      Phone: 303-860-1331
22    Email: Anna@hheglaw.com, Erica@hheglaw.com
      Dan@hheglaw.com, Rachel@hheglaw.com
23
24
25

                                                      Page 1
```

**Page 10**

1  and work a shift or two a month.  So, we're trying get
2  away from the locums and have full-time staff.
3     Q    And why try to get away from the locums?
4     A    Just because we want people who are -- I
5  guess it's hard to always staff it with locums because
6  there's such variability in their availability.  So,
7  to have enough full-time people that we can staff it
8  appropriately, and I think the hospital will save
9  money not paying -- we have the pay the locums
10 providers more.
11    Q    Do you think it's fair to say there's also
12 a benefit to having emergency room doctors who are,
13 you know, familiar with the community?
14    A    Yeah, that's certainly a bonus.
15    Q    Because it's -- you know, Cortez is not a
16 huge town, right?
17    A    Correct.
18    Q    So, I imagine there are a fair number of
19 repeat players, people coming into the emergency room,
20 that it's nice to kind of have that institutional
21 knowledge of someone who's there more often, fair?
22    A    Sure.
23    Q    In 2021 what shifts were you working?
24    A    I was working typically six 24 hour shifts
25 a month.

**Page 11**

1     Q    Were they regular days, or how was it
2  scheduled?
3     A    It's pretty random scheduling, but 24 hours
4  weekdays and weekends.
5     Q    That sounds like a brutal shift, like, is
6  there any reason why it's in 24 hour segments that you
7  know about?
8         MS. COOK OLSON:  Objection to form.
9         THE WITNESS:  Yeah, it's the way -- rural
10 hospitals often staff like that partly I think because
11 of the locums providers coming in, they're able to get
12 24 hours of shift work for, you know, their travel so
13 it makes it easier to travel, and it's a place that
14 isn't typically so busy that it's overwhelming.
15    Q    (BY MS. HOLLAND EDWARDS) Is there an
16 opportunity of rest in that time period usually?
17    A    Correct.
18    Q    What do the shifts run, like, is it
19 morning?  What time do they start?
20    A    8:00 a.m. to 8:00 a.m.
21    Q    And you mentioned it's not so busy you
22 can't rest.  Is there -- can you give me a sense of,
23 like, how many emergency room patients you would have
24 in a typical day?
25    A    A typical day is probably in the 40s, maybe

**Page 12**

1  45 patients in 24 hours, but there is a lot of the
2  variability there.
3     Q    Sure.  And, you know, I'm sure that's
4  always the case.  I'm trying to get a sense of kind of
5  averages and typical experience.  I understand on a
6  given day it could be very different, but you would
7  consider a typical shift if you saw 40 to 45 patients,
8  right?
9     A    Total.  We typically have a mid-level
10 shift, or a second shift, 9:30 a.m. to 9:30 p.m.
11 staffed by a PA or a nurse practitioner or sometimes
12 another physician.  So, during those hours we're
13 splitting patients.  So, I'm not seeing 45 in a
14 typical shift; I'm probably seeing more like 25 to 30
15 maybe.
16    Q    Okay.  So 40 to 45 was an estimate of a
17 typical shift of kind of the ER's load, not your
18 personal -- how many patients you see personally?
19    A    Correct.
20    Q    And on a typical shift, how many medical
21 clearances would you say for jail you would get in
22 2021?
23    A    That, again, is really variable.  It may be
24 zero, it could be five.
25    Q    Fair to say most 24 hour shifts you would

**Page 13**

1  have at least a couple?
2     A    Probably one or two.
3     Q    And is that -- do you see more on nights
4  and weekends?
5     A    Not necessarily.
6     Q    What were the most -- what do you consider
7  the typical or most likely medical need for the
8  clearance that you would see?
9         MS. COOK OLSON:  Objection.  Form.
10        THE WITNESS:  What we see most typically is
11 someone who's intoxicated without a specific
12 complaint.
13    Q    (BY MS. HOLLAND EDWARDS) Okay.  So most
14 clearances are related to intoxication?
15    A    Correct.
16    Q    And is there a drug of choice in the area
17 that you feel like is the most common type of
18 intoxication you're evaluating for?
19    A    It's most commonly alcohol.
20    Q    What street drugs are -- do you see with
21 any kind of regularity?
22    A    Well lots of fentanyl and opioids,
23 occasional cocaine, lots of methamphetamines.
24    Q    Okay.  I've seen a couple medical charts
25 from the hospital related to clearances, and it looks

### Page 18

1  A   I did not think that, no.
2  Q   Did you know at that point that any
3  monitoring of patients that were sent in -- you know,
4  inmates that were brought in on nights or weekends
5  would be monitored by deputies only?
6      MS. SMITH:  Form.  Foundation.
7      THE WITNESS:  That's my understanding, yes.
8  Q   (BY MS. HOLLAND EDWARDS) And that was your
9  understanding then?
10  A   Correct.
11  Q   I'm going to come back to that.  I have
12  some questions about the policies of the hospital
13  before we talk specifically about these inmates.
14      Are you on any committees at the hospital?
15  A   I am, I'm on the medical executive
16  committee.
17  Q   What does that committee do?
18  A   Basically monitors and makes policy for the
19  medical staff.
20  Q   And when you say monitors, how do you
21  monitor?
22  A   Well, if -- if there's -- if an issue
23  arises with a provider, it may ultimately come to the
24  medical executive committee who weighs in to make a
25  decision, how to best deal with that provider.

### Page 19

1  Q   And is that only provider level, or do you
2  do that with nurses also?
3  A   No, not nursing.
4  Q   And then you also make policies for the
5  hospital?
6  A   Approve policies, maybe make policies, but
7  often we're approving policies that another committee
8  writes, essentially.
9  Q   So there are other committees that might
10  write policies, but is your committee kind of the
11  final decision making on whether the policy gets put
12  into place or not?
13  A   Yes.
14  Q   How long have you been on that committee?
15  A   I served two years a few years ago and then
16  I've been on it again for about a year, so three years
17  total.
18  Q   Three years total, so '22 to '23 was one of
19  the years you've served?
20  A   Correct.
21  Q   And then approximately when were the other
22  two years?
23  A   I'm not sure, maybe '16 to '18.
24  Q   As a member of the medical executive
25  committee, are you familiar with the policies of the

### Page 20

1  hospital?
2  A   I'm certainly not familiar with every
3  policy, but many of the policies, yes.
4  Q   Do policies come up for periodic review?
5  A   They do.
6  Q   Do you know how often that is?
7  A   I think most policies get reviewed every
8  two years, but we don't -- we don't have to approve
9  every policy.  There's only certain policies that the
10  medical executive committee has to approve.
11  Q   What type of policies are those?
12  A   Such as credentialing, maybe impaired
13  provider, like policies relating to performance plans
14  if someone is put on a performance improvement plan.
15  Q   What about policies about, you know,
16  what -- guidelines for when patients should be
17  discharged or admitted?  Is that something that would
18  come in front of the medical executive committee?
19      MS. COOK OLSON:  Objection to form.
20      THE WITNESS:  I don't think so.  Not that I
21  can recall.
22  Q   (BY MS. HOLLAND EDWARDS) Let me -- I have
23  never really mastered this, like, I have stuff on
24  paper and on Zoom, so let me try and make a plan that
25  works here, but I'm going to show you some exhibits on

### Page 21

1  the screen, and I want to start with Exhibit 26,
2  page 1, so let me pull it up for you.  And do you have
3  a screen that you can see easily?
4  A   Hopefully.
5  Q   Hopefully, yes.  Let me pull it up first
6  and then ask.
7      Okay.  Can you see this Exhibit 26, Care of
8  Prisoners policy?
9  A   Yeah, it's a little small.
10  Q   How's that?
11  A   That's better.
12  Q   Okay.  Have you seen this policy before?
13  A   I have.
14  Q   And where have you seen it?
15  A   I saw it recently in regards to preparation
16  for this deposition.
17  Q   That reminds me of a question I really
18  meant to ask, which I forgot, is what have you
19  reviewed for this deposition?
20  A   I reviewed the medical charts and I
21  reviewed a couple of the hospital policies, including
22  the one.
23  Q   What medical charts do you mean?
24  A   My chart when I saw this patient,
25  Dr. Davidson's chart, Dr. Mathers'.  That's it.

```
 1  right?
 2          MS. COOK OLSON:  Objection to form.
 3          THE WITNESS:  I can't say what they know
 4  about nystagmus or why they would have put that in
 5  there.
 6     Q    (BY MS. HOLLAND EDWARDS) It says the
 7  patient should be able to tolerate oral fluids.  Do
 8  you agree with that?
 9     A    Yeah, I think that's -- I think that's
10  good.
11     Q    And how do you test that?
12     A    You could have them drink something, or if
13  they're not having nausea and vomiting, I don't know
14  that it's necessarily relevant, but if you wanted to
15  test that, you could give them something to drink.
16     Q    Well, there would be no way to test it
17  without giving them something to drink and then
18  waiting to see if they throw it up, right?
19          MR. COLLIER:  Form and foundation.
20          MS. COOK OLSON:  Join.
21          THE WITNESS:  I think it could by history,
22  too, if they're not nauseated, not vomiting, it's
23  pretty likely they're going to be able to tolerate
24  oral fluids.
25     Q    (BY MS. HOLLAND EDWARDS) Okay.  But, I
                                                  Page 34
```

```
 1     A    That's what it says.
 2     Q    So there's some acknowledgment of
 3  considering where the -- where and how the patient is
 4  going when they're discharged intoxicated, right?
 5          MS. COOK OLSON:  Objection to form.
 6          THE WITNESS:  Certainly.  We wouldn't want
 7  an intoxicated individual to get behind the wheel.
 8     Q    (BY MS. HOLLAND EDWARDS) But there's no
 9  specifics about forensic patients in this policy,
10  right?
11     A    Not that I see.
12     Q    At any point have you seen any policy
13  regarding intoxicated -- discharging intoxicated
14  patients to jail?
15     A    Not to my knowledge.
16     Q    You talked about this emergency director
17  explaining -- Buckwalter -- talking about the jail
18  policies.  Do you recall that testimony?
19     A    Yes.
20     Q    What else were you instructed?  What else
21  did you learn from anyone at the hospital about --
22  about jail policy and medical clearances?
23     A    I guess that's pretty general, I guess hard
24  to answer that.  I don't know that -- yeah, I guess I
25  don't have an answer for that.
                                                  Page 36
```

```
 1  mean, at least the policy as written doesn't say they
 2  don't have nausea and vomiting, right?  It says they
 3  have the ability to tolerate oral fluids?
 4     A    That's the way the policy is written.
 5     Q    And do you agree with me -- you don't have
 6  to accept this as what you think it should be, but if
 7  you have to find out if someone can tolerate oral
 8  fluids, there's no way to do that besides giving them
 9  oral fluids, right?
10          MS. COOK OLSON:  Objection -- form --
11          MR. COLLIER:  Form.  Foundation.  Asked and
12  answered.
13          MS. COOK OLSON:  -- asked and answered.
14          MS. HOLLAND EDWARDS:  Sounds like passover
15  in here.
16          THE WITNESS:  If you wanted --
17          THE COURT REPORTER:  Sorry, one at a time,
18  please.
19          THE WITNESS:  If you wanted to test if
20  someone could tolerate oral fluids, you would give
21  them oral fluids.
22     Q    (BY MS. HOLLAND EDWARDS) Section -- or
23  number 8 of this policy has if the patient arrived by
24  private vehicle they'll be accompanied by a driver at
25  discharge, right?
                                                  Page 35
```

```
 1     Q    Were there any -- have you ever had a
 2  training session on what the hospital's role is in
 3  medical clearances for jail?
 4     A    Not to my knowledge.
 5     Q    Have you ever talked to anybody at the jail
 6  about what their expectations of what's getting --
 7  what's happening at the hospital?
 8     A    I haven't specifically; my understanding is
 9  there's been discussions at higher levels.
10     Q    Tell me what you understand about that
11     A    I think related to the policy and related
12  to what's expected of the jail and what's expected of
13  the hospital, and my understanding is those
14  discussions have taken place at higher levels.
15     Q    And who would be -- who was your
16  understanding was involved in those from the hospital
17  side?
18     A    I don't know specifically.
19     Q    Where did you get this understanding that
20  there have been discussions about the expectations?
21     A    I think probably from Buckwalter years ago,
22  but I can't remember specifically.
23     Q    Is he still there?
24     A    He's not.
25     Q    When did he leave?
                                                  Page 37
```

10 (Pages 34 - 37)

## Page 38

1  A  Again, I can't recall. I think maybe 2018.
2  Q  Do you know where he is?
3  A  Somewhere on the east coast.
4  Q  What's his first name?
5  A  David.
6  Q  David Buckwalter?
7  A  Correct.
8  Q  And was he an ER doctor?
9  A  Correct.
10 Q  Is Buckwalter, B-u-c-k-w-a-l-t-e-r?
11 A  Yes.
12 Q  Have you -- did anyone relay any of what
13 that understanding was to you?
14 A  I think the discussions were around the
15 time that the policy changed from having a cutoff of a
16 blood alcohol or a breathalyzer of 300 versus 200.
17 Q  Were you given any understanding of why
18 that change was made?
19     MS. SMITH: Form and foundation.
20     THE WITNESS: I'm not sure why it was made,
21 no.
22 Q  (BY MS. HOLLAND EDWARDS) Okay. And what
23 did you learn at that time about what the expectations
24 were for an intoxication clearnace at the jail -- or
25 at the hospital, excuse me.

## Page 39

1     MS. COOK OLSON: Object to form.
2     MS. SMITH: Join.
3     THE WITNESS: I don't -- I don't think
4  there was any change in what was expected. Basically
5  the emergency department's going to evaluate these --
6  evaluate these patients brought in by law enforcement
7  and essentially try to rule out an emergency medical
8  condition before they were incarcerated.
9  Q  (BY MS. HOLLAND EDWARDS) Right, and an
10 emergency medical condition, I mean, that's just the
11 EMTALA requirement, right?
12    MS. COOK OLSON: Objection to form.
13    MR. COLLIER: Join.
14    THE WITNESS: Well, it's an EMTALA
15 requirement, but it's something we're going to do with
16 every patient.
17 Q  (BY MS. HOLLAND EDWARDS) Right, I guess
18 that's what I mean, it's something you would do with
19 every patient, right?
20 A  Correct.
21 Q  And so what are you doing for inmates for
22 clearance that's different than what you would do for
23 every patient?
24    MS. SMITH: Form.
25    THE WITNESS: Nothing, really. We're

## Page 40

1  evaluating the same as we would anyone else. I think
2  the difference is most people come in with an actual
3  complaint, and most of these jail clearances are
4  coming in with no complaints.
5  Q  (BY MS. HOLLAND EDWARDS) And most of them
6  are coming in with either signs of intoxication or
7  high blood alcohol levels, right?
8     MS. COOK OLSON: Object to form. What
9  bucket are you talking about?
10    MS. HOLLAND EDWARDS: I don't understand
11 the question.
12    MS. COOK OLSON: Yeah, objection to form.
13    THE WITNESS: A lot of patients are coming
14 in intoxicated, yes.
15 Q  (BY MS. HOLLAND EDWARDS) And, you know, I
16 think we've talked about how there's a lot of alcohol
17 -- maybe it's fair to say that there's a fair amount
18 of alcoholism in the Cortez community?
19    MS. COOK OLSON: Objection to form.
20 Foundation.
21    THE WITNESS: I think just like any
22 community there's a lot of alcoholism, yes.
23 Q  (BY MS. HOLLAND EDWARDS) And what are the
24 dangers medically of alcoholism?
25    MS. COOK OLSON: Objection to form.

## Page 41

1  Danger.
2     MR. COLLIER: Join.
3     MS. SMITH: Join.
4     THE WITNESS: Well, alcoholism is a chronic
5  disease that certainly will progress with continued
6  use, so people can develop severe complications
7  leading to death over time.
8  Q  (BY MS. HOLLAND EDWARDS) Okay. So one
9  danger of alcoholism is the chronic disease component
10 that can have a long-term deleterious effect on your
11 health and lead to death or serious medical
12 conditions, right?
13    MS. COOK OLSON: Objection to form.
14 Danger.
15    THE WITNESS: Yes, over time it can lead to
16 death, yes.
17 Q  (BY MS. HOLLAND EDWARDS) Another potential
18 complication of alcoholism is acute intoxication
19 leading to injury or death, right?
20 A  Correct.
21 Q  And then a third danger or a third
22 potential complication of alcoholism is withdrawal,
23 which can also lead to death, right?
24    MS. COOK OLSON: Object to form.
25    MR. COLLIER: Join.

**Page 42**

```
 1        THE WITNESS:  Withdrawal can lead to death,
 2  it's very rare, and it takes some time, but it can if
 3  left untreated.
 4     Q   (BY MS. HOLLAND EDWARDS) How much time does
 5  it take?
 6        MS. SMITH:  Form.
 7        MR. COLLIER:  Form.
 8        THE WITNESS:  If someone's going to develop
 9  delirium tremons, that usually progresses over a
10  number of days, three to four days.
11     Q   (BY MS. HOLLAND EDWARDS) What about just
12  vomiting, dehydration?  What's the timeline for that?
13        MS. SMITH:  Form.
14        THE WITNESS:  Vomiting and dehydration
15  could start in 12 to 48 hours I think would be what's
16  typically quoted in the literature.
17     Q   (BY MS. HOLLAND EDWARDS) And what about
18  seizures?  What's the timeline for that?
19        MS. SMITH:  Form.
20        MR. COLLIER:  Form and foundation.
21        THE WITNESS:  12 to 40 hours, but seizures
22  rarely cause death.  Seizures are typically short
23  lived and self-limited.
24     Q   (BY MS. HOLLAND EDWARDS) Right, so with
25  treatment most withdrawal from alcohol is not fatal,
```

**Page 43**

```
 1  right?
 2        MS. SMITH:  Form.
 3        THE WITNESS:  Correct.
 4        MR. COLLIER:  Form and foundation.
 5        THE WITNESS:  Without treatment, most
 6  alcohol withdrawal is not fatal.
 7     Q   (BY MS. HOLLAND EDWARDS) Right.  Okay.
 8  Good.
 9        Okay.  What do -- when do you have a
10  concern about a patient having -- being at risk for
11  withdrawal?
12        MS. COOK OLSON:  Object to form.
13        THE WITNESS:  I have concern for someone
14  being at risk for withdrawal in any chronic user of
15  alcohol.
16     Q   (BY MS. HOLLAND EDWARDS) And how do you
17  evaluate if someone in the emergency room is a chronic
18  user of alcohol?
19     A   It can be history or just presentation.
20     Q   What about presentation would indicate that
21  someone's a chronic user of alcohol?
22     A   A high alcohol level and functioning
23  relatively normally, not appearing significantly
24  intoxicated.  I would think that person may have a
25  high tolerance, which would likely have been built up
```

**Page 44**

```
 1  from chronic use.
 2     Q   All right.  And where -- like, you know, if
 3  somebody has over 200 but is talking and walking and
 4  doesn't appear intoxicated, is that a high enough
 5  blood alcohol level combined with functioning that
 6  gives you -- that indicates potential chronic use of
 7  alcohol?
 8        MS. SMITH:  Form.
 9        THE WITNESS:  I don't think 200 would be a
10  level that I would say this person must use
11  chronically.  I think plenty of people who don't drink
12  alcohol chronically can have a level like that and
13  function relatively normally.
14     Q   (BY MS. HOLLAND EDWARDS) What about,
15  like -- what about 300?  Does 300 and behaving
16  normally start to give you concern or indicate a
17  chronic use issue?
18        MR. COLLIER:  Form.  Foundation.
19        THE WITNESS:  Not necessarily.  There's a
20  lot of individual variability on what someone can
21  tolerate.
22        I think if you're getting up to -- for me,
23  probably, we know level is 500 and they're functioning
24  well, that would probably lead me to think this person
25  is well versed in alcohol and uses regularly, but
```

**Page 45**

```
 1  there is a lot of individual variability in what
 2  someone can tolerate.
 3     Q   (BY MS. HOLLAND EDWARDS) Sure.  But so
 4  there is -- there are times when knowing the blood
 5  alcohol level is -- you know, there's -- a mantra in
 6  this case is blood alcohol levels don't mean anything,
 7  and so I -- here this is at least one instances where
 8  a blood alcohol level is diagnostically relevant to
 9  whether someone has a chronic alcohol abuse problem in
10  that you compare how high their blood alcohol level is
11  with their behavior; is that fair?
12        MR. COLLIER:  Form.
13        MS. SMITH:  Form and foundation.
14        MS. COOK OLSON:  Objection to form and
15  foundation.  Combination.
16        THE WITNESS:  I'm not going to order a
17  level to try to determine if someone is a chronic
18  abuser of alcohol, but if a level is obtained or we
19  know the level, and they're functioning well and don't
20  seem overly intoxicated, that's something I'm
21  thinking, but there's certainly many other factors
22  that go into knowing if someone's a chronic abuser of
23  alcohol.
24     Q   (BY MS. HOLLAND EDWARDS) Like history,
25  right?
```

## Page 46

1  A  Like history.
2  Q  So do you agree with me that if you're
3  evaluating an intoxicated patient, it is important to
4  find out how often they report drinking?
5      MS. COOK OLSON: Objection.
6      MR. COLLIER: Form and foundation.
7      MS. SMITH: Join.
8      THE WITNESS: I don't think that's
9  necessarily important. It depends on what they're
10 presenting for.
11 Q  (BY MS. HOLLAND EDWARDS) Well, if they're
12 presenting -- sorry, go ahead.
13 A  I was going to say if they're intoxicated
14 but maintaining their airway, have a relatively normal
15 neurologic exam, have a steady gate, are able to
16 answer questions and follow commands in the emergency
17 department I'm not necessarily concerned depending
18 what their presentation is if they use alcohol
19 chronically or not.
20 Q  Is fair to say that in the emergency
21 department at Southwest in 2021 if you're evaluating
22 an intoxicated inmate, you're not considering
23 withdrawal potential at all?
24     MS. SMITH: Form.
25     MS. COOK OLSON: Objection to form.

## Page 47

1      THE WITNESS: No, we're always considering
2  what could happen, and we're considering is this
3  patient withdrawing, what's the potential for
4  withdrawal. We consider that.
5  Q  (BY MS. HOLLAND EDWARDS) Okay. So you do
6  think it's important to consider in clearing an
7  intoxicated patient for jail what the potential
8  withdrawal is?
9      MR. COLLIER: Form and foundation.
10     THE WITNESS: I think it's more important
11 when we're evaluating that patient to decide are they
12 in withdrawals currently and do they need emergent
13 treatment for it.
14 Q  (BY MS. HOLLAND EDWARDS) Okay. So that's
15 what I'm trying to understand. If an intoxicated
16 patient is presenting for clearance for jail, do you
17 -- is your examination and your understanding of what
18 you're supposed to be doing in that examination
19 limited to are they going -- are they -- do they have
20 an emergency condition related to their intoxication?
21     MS. COOK OLSON: Objection to form.
22     MR. COLLIER: Join.
23     MS. SMITH: Join.
24     THE WITNESS: My initial priority is to
25 rule out an emergency condition and then we can move

## Page 48

1  on from there to does this patient need any treatment
2  for conditions that aren't emergent and what are the
3  risks with discharge.
4  Q  (BY MS. HOLLAND EDWARDS) So it is part of
5  your duty, in your view, to evaluate what may develop
6  from this intoxication and whether there's a risk of
7  withdrawal?
8      MS. COOK OLSON: Object to form. This is
9  asked and answered, now you've added duty. Form.
10     MR. COLLIER: Join.
11     MS. SMITH: Join.
12     THE WITNESS: I'm going to evaluate the
13 patient. Is the patient in withdrawals now, and
14 certainly I'm going to consider what are the risks
15 with discharging any patient and what could develop,
16 and we give return precautions and instructions and
17 encourage the patient to come back if they have a
18 change in their medical condition or concerning
19 symptoms.
20 Q  (BY MS. HOLLAND EDWARDS) So, what do you do
21 to evaluate them once you've ruled out an emergency
22 condition from intoxication the likelihood of
23 withdrawal symptoms?
24     MS. COOK OLSON: Form.
25     THE WITNESS: As far as if the patient

## Page 49

1  isn't actively withdrawing, we're likely not going to
2  treat them for withdrawals.
3  Q  (BY MS. HOLLAND EDWARDS) Okay.
4  A  We're not going to prophylax them for
5  withdrawals, and medications for prophylaxis can
6  certainly be dangerous, and in a jail setting -- I
7  don't think -- in our jail setting I don't think it's
8  warranted or recommended and we're going to give them
9  return precautions if they start to develop withdrawal
10 symptoms.
11 Q  Is that the extent of the -- of what you do
12 to ascertain whether someone is likely to go through
13 withdrawal?
14     MS. COOK OLSON: Object to form.
15     THE WITNESS: If I'm evaluating someone to
16 ascertain if this patient at risk for withdrawals it
17 can be -- history is probably going to be the primary
18 thing to assess that.
19 Q  (BY MS. HOLLAND EDWARDS) Okay. And so do
20 you take a history of intoxicated patients that is
21 designed to elicit whether you think they are at risk
22 for withdrawals?
23 A  It depends on the individual patient.
24 Q  When do you do it?
25 A  It depends on the presentation.

13 (Pages 46 - 49)

## Page 50

```
 1   Q    What presentations prompt the history
 2  questions designed to ascertain risk of withdrawal?
 3        MS. COOK OLSON:  Object to form.
 4        MR. COLLIER:  Join.
 5        THE WITNESS:  Someone who is bringing up
 6  concern for a history of withdrawal, someone who is
 7  presenting potentially in early withdrawal, someone
 8  who has nonspecific symptoms that could be a sign of
 9  withdrawal.
10   Q    (BY MS. HOLLAND EDWARDS) Okay.  So several
11  of those were about, like, being in the process of
12  withdrawal, and I'm trying to understand if there's
13  times when someone is not in withdrawal but is acutely
14  intoxicated that you ask withdrawal related -- the
15  questions designed to elicit, you know, a history of
16  withdrawal or a concern for withdrawal.  Do you ever
17  do that analysis on an intoxicated patient who is not
18  showing any signs of withdrawal at that moment?
19        MS. COOK OLSON:  Objection.  Form.  Asked
20  and answered.
21        MS. SMITH:  Join.
22        THE WITNESS:  Yes, we'll often see patients
23  who present complaining that they think they're in
24  withdrawal, and they may not be.  They might be highly
25  intoxicated, but we get into that history.
```

## Page 51

```
 1   Q    (BY MS. HOLLAND EDWARDS) So it's when the
 2  patient brings it up?
 3   A    Often.
 4   Q    Do you routinely ask intoxicated patients
 5  do you have a history of deliriums tremens?
 6   A    Do I -- was the question do I routinely?
 7   Q    Yes.
 8   A    I didn't -- it, again, depends on the
 9  situation, depends on their presentation.
10   Q    Have you ever asked an inmate being cleared
11  for jail based on intoxication about their history of
12  withdrawal without them bringing it up?
13        MS. COOK OLSON:  Form.
14        THE WITNESS:  Yeah, I think I have.
15   Q    (BY MS. HOLLAND EDWARDS) Couple times?
16  Lots of times?  Too many to remember?
17        MS. COOK OLSON:  Object to form.
18        THE WITNESS:  I can't say.
19   Q    (BY MS. HOLLAND EDWARDS) Is it commonly
20  part of your history in those circumstances?
21   A    It's not commonly part of the history
22  because if the patient isn't actively withdrawing, I
23  would want them to return if they start to have
24  symptoms of withdrawal.  I'm not going to treat them
25  based on their history or send them with medications
```

## Page 52

```
 1  to the jail.  I would want to them return, so --
 2   Q    You could -- sorry.
 3   A    So, we give them instructions and ask them
 4  to return if they start to have symptoms.
 5        So, whether they have a history of it or
 6  not, they may have never had withdrawal symptoms and
 7  they start to have symptoms in the jail for the first
 8  time withdrawing, I would want them to return.
 9        They may have a history of multiple
10  episodes of withdrawal and they start to have
11  significant withdrawal symptoms in the jail, I would
12  want them to return.  So it's not really pertinent to
13  the disposition.
14        MS. HOLLAND EDWARDS:  Did you need to say
15  something, Amy?
16        MS. COOK OLSON:  Yeah, I thought he was
17  done.  Sorry.
18        Yeah, can we go ahead and a take a break?
19  It's been an hour.
20        MS. HOLLAND EDWARDS:  Sure.  Let me ask one
21  follow-up to that and then we will take a break.
22        It's going to be more than one question.
23  How long do you want, Amy?
24        MS. COOK OLSON:  Just five minutes to get a
25  stretch real quick.
```

## Page 53

```
 1        (Recess taken.)
 2   Q    (BY MS. HOLLAND EDWARDS) So we were
 3  discussing medical screening or medical clearance
 4  related to intoxication, and I'm going to ask you a
 5  couple questions about whether you agree certain
 6  things should be part of an exam related to acute
 7  intoxication.
 8        Do you agree that a medical screening exam
 9  for an intoxicated patient should include at least a
10  breathalyzer?
11        MR. COLLIER:  Form and foundation.
12        THE WITNESS:  No, I don't.  I don't think
13  that a number is necessarily going to change the
14  disposition for a patient.  It's more how is this
15  acting clinically, do they have a steady gate, Are
16  they able to maintain their airway, those kinds of
17  things.
18   Q    (BY MS. HOLLAND EDWARDS) Do you agree that
19  it is important for a medical screening exam for an
20  intoxicated patient to know whether a BAC is going up
21  or down?
22        MR. COLLIER:  Form and foundation.
23        THE WITNESS:  Again, I think a medical
24  screening exam for an intoxicated patient should be
25  based on clinical grounds, and not on a breathalyzer.
```

14 (Pages 50 - 53)

**Page 58**

1  specific instructions to monitor for withdrawal at the
2  jail if you're discharging an intoxicated patient?
3    A    The jail is well versed in dealing with
4  alcohol and alcohol-related complications, so often
5  it's not specific instructions related to every
6  complication that could happen, but it's more relying
7  on the jail to bring the patient back if they start to
8  have acute or concerning symptoms related to anything.
9    Q    Why do you think that the jail staff is
10 experienced and skilled at recognizing withdrawal
11 symptoms?
12        MS. SMITH:  Form.
13        THE WITNESS:  I would think they would be
14 well versed in alcohol and alcohol-related
15 complications because I would say that a significant
16 number of their inmates arrive intoxicated.
17   Q    (BY MS. HOLLAND EDWARDS) Well, why does
18 that mean they're familiar with withdrawal?
19   A    Because they're dealing with alcohol and
20 alcohol-related complications on a daily basis.
21   Q    Right, but that's the same population
22 you're evaluating for intoxication, right?  So you're
23 similarly aware that withdrawal is likely in this
24 population?
25        MS. COOK OLSON:  Object to form as to

**Page 59**

1  likely.
2         THE WITNESS:  Withdrawal is possible in
3  this population.  It's likely in some patients, it's
4  unlikely in other patients, and it's really variable
5  even in the same patient.
6    Q    (BY MS. HOLLAND EDWARDS) Right, but just as
7  a point of mental matter of logic, if the reason the
8  jail is skilled at monitoring for withdrawal because
9  they have so many patients who come in drunk and then
10 withdrawal and drunk patients have to be evaluated by
11 the hospital first, the hospital staff is equally
12 aware that these patients are likely to withdrawal as
13 the jail staff, right?
14        MS. COOK OLSON:  Objection to form.
15 Combination.  He's not a spokesperson for the
16 hospital.
17        MR. COLLIER:  Join.
18        THE WITNESS:  As a provider, I'm aware that
19 any alcohol user has the potential for withdrawal.
20   Q    (BY MS. HOLLAND EDWARDS) And so what -- you
21 know, you're saying that you don't -- that it's --
22 well, so you discharge to the jail and your
23 expectation is the jail brings them back if there's
24 any change in condition, right?
25        MS. SMITH:  Form.

**Page 60**

1         THE WITNESS:  I expect that the jail brings
2  the patient back if there's a concerning change in
3  condition, yes.
4    Q    (BY MS. HOLLAND EDWARDS) And if the person
5  says, I need to go to the hospital, you would expect
6  that person to be brought back, right?
7         MS. SMITH:  Form.
8         MS. COOK OLSON:  Form.
9         THE WITNESS:  I can't speak for the jail, I
10 guess.  That's our instructions to them.
11   Q    (BY MS. HOLLAND EDWARDS) Right, I mean,
12 your instruction to these patients is be sure to come
13 back if something gets worse, right?
14   A    Yes, if you have concerning symptoms, we
15 want you to return.
16   Q    Right.  And so based on that, your
17 instruction to the patient is in your discretion, if
18 you have symptoms that are worsening, we want you come
19 back to the ER?  That's what you say to all of your
20 patients on discharge, right?
21        MS. SMITH:  Form.
22        THE WITNESS:  Yes, that's what we say.
23   Q    (BY MS. HOLLAND EDWARDS) And your clearance
24 -- sorry.
25   A    I think I said yes, if you're worsening, we

**Page 61**

1  want to see you back.
2    Q    And so in your clearance for jail, you're
3  not doing anything different than you're doing for
4  someone who's not going to jail in terms of saying
5  this person is safe not to come back at their own
6  discretion, right?
7         MS. SMITH:  Form.
8         THE WITNESS:  I don't understand the
9  question.
10   Q    (BY MS. HOLLAND EDWARDS) So, I always think
11 clearance for incarceration is suggesting it's safe to
12 hold this person, not just it's safe to book them in,
13 but what I'm hearing is that the instructions are the
14 same for everybody.  My patient -- if you leave and
15 you have a worsening of your condition, you should
16 come back, right?
17        MS. SMITH:  Form.
18        MS. COOK OLSON:  Form.
19        THE WITNESS:  Yes, those are general
20 instructions we would tell anybody.
21   Q    (BY MS. HOLLAND EDWARDS) And you're not
22 saying to the jail, You can supplant -- like, I am
23 promising to you this person is safe from this
24 condition, you know, even if he wants to come back,
25 they'll bring him back?  That's not what you mean to

16 (Pages 58 - 61)

## Page 62

1  imply to the jail, right?
2      MS. SMITH: Form.
3      THE WITNESS: No, we certainly don't imply
4  that to the jail, and when I discharge somone to the
5  jail, I have instructions specifically saying to the
6  contrary. We can't say that an emergency medical
7  condition won't arise, and if you have a change, you
8  need to come back.
9      Q   (BY MS. HOLLAND EDWARDS) And so are you
10 aware that in this case Kelroy Newman asked to come
11 back to the hospital before he died?
12     A   I'm not aware of that, no.
13     Q   But your discharge instructions for your
14 patients is if you feel worse, you need to come back
15 to me, right?
16     A   Yes, our discharge instructions say to
17 notify the jail staff if you're incarcerated, or if
18 you're not, come back to the emergency department.
19     Q   And so your expectation would be then if
20 someone's withdrawing from alcohol that there would be
21 some type of regular checks at the jail, right?
22     MS. COOK OLSON: Object to form.
23 Foundation.
24     THE WITNESS: Yes, I would assume that
25 everyone in jail would be checked on at some interval,

## Page 63

1  yes.
2      Q   (BY MS. HOLLAND EDWARDS) And do you ever
3  direct the interval to the jail?
4      A   I probably have related to certain medical
5  conditions when we send someone -- if they're going to
6  jail and they're suicidal, certainly we make sure
7  they're on a suicide watch with all those precautions.
8      Typically with an intoxicated patient, we
9  don't specify how often they need to be checked on.
10 We leave that to the jail protocols.
11     Q   And do you think there are some?
12     MS. SMITH: Form and foundation.
13     THE WITNESS: I would have to assume there
14 are, but I'm not well versed on jail protocols and how
15 frequently an inmate is laid eyes upon.
16     Q   (BY MS. HOLLAND EDWARDS) Did you also
17 assume in 2021 that any jail protocols would involve
18 evaluating for withdrawal symptoms?
19     MS. SMITH: Form.
20     THE WITNESS: I guess I'm not saying
21 they're going to evaluate specifically for withdrawal
22 symptoms at a certain interval, but they -- I have to
23 assume that the patient's going to be seen and checked
24 on at some interval.
25     Q   (BY MS. HOLLAND EDWARDS) When you say

## Page 64

1  checked on, what do you mean?
2      A   Just observed. Is the patient walking, is
3  the patient shaking, is the patient actively vomiting,
4  does the patient have concerning symptoms that they
5  need to come back for.
6      Q   Do you lay those symptoms out in your
7  discharge instructions?
8      A   Often our discharge instructions are more
9  general. We're not specifying every potential adverse
10 outcome that can happen, but more if you're starting
11 to have symptoms that are concerning to you, we ask
12 that you talk to the jail staff and return.
13     Q   I marked some deposition exhibits ahead of
14 time to try to facilitate, so these are going to be
15 used out of order, but I'll use all of them so that
16 they end up all used.
17     (Exhibit 32 was marked.)
18     Q   This is -- I'm marking this Exhibit 32, an
19 affidavit that you gave in the Harrison Begay case.
20 Can you see this, Doctor?
21     A   Yeah, it's -- yeah, I can see it now.
22     Q   Okay. Do you remember this affidavit?
23     A   Yes.
24     Q   And Mr. Begay was an alcoholic who was
25 discharged to the jail and died there, right?

## Page 65

1      A   Yes, eventually. He had an extended course
2  in the emergency department before that.
3      Q   Right, he came to the ER, was cleared, left
4  came back, was cleared, went to jail, and died the
5  next day, right?
6      A   Correct.
7      Q   And you say in here -- let me get down to
8  this paragraph 21. In paragraph 21 you say, I knew
9  Mr. Begay was going to be discharged to law
10 enforcement and he was under arrest. He therefore was
11 going to a structured environment where he would be
12 observed and evaluated by jail personnel who have
13 extensive experience with detainees with alcoholism,
14 acute intoxication, and withdrawal issues, correct?
15     A   Yes, that's what I'm reading.
16     Q   And when you said here under oath that he
17 was going to be observed and evaluated by personnel
18 with extensive experience with detainees with
19 alcoholism, that was based on your assumption that
20 they know how to manage withdrawal in the jail?
21     A   I'm not saying they know how to manage
22 withdrawal.
23     Q   Okay.
24     A   But they deal with alcohol and
25 alcohol-related complications frequently and should be

17 (Pages 62 - 65)

**Page 66**

1 able to recognize someone who needs to come back to
2 the emergency department.
3 Q  After he died, did you look into what
4 happened to him at all in the jail?
5 A  I -- I don't know that anyone knows for
6 sure. I got the autopsy report. It didn't show any
7 specific cause of death to my knowledge, and I
8 understand he was in a cell with other inmates, so
9 it's hard to speculate what may have happened.
10 Q  Did you learn that he was so drunk when he
11 came in that 12 hours later he still was blowing a .15
12 at the jail?
13    MS. SMITH: Objection to form.
14    MS. COOK OLSON: Object to form.
15 Foundation.
16    THE WITNESS: I'm not sure if I knew that,
17 but that wouldn't necessarily surprise me. Everyone
18 metabolizes alcohol at a different rate.
19 Q  (BY MS. HOLLAND EDWARDS) Well, you have to
20 start out pretty high to get to a .15 in 12 hours,
21 right?
22    MS. SMITH: Form.
23    THE WITNESS: You have to start out
24 certainly higher than .15.
25 Q  (BY MS. HOLLAND EDWARDS) Like, probably

**Page 67**

1 higher than .18, right?
2 A  I don't know what level he was when he
3 started.
4 Q  Well you know that in the ER he was like
5 almost 4 -- he was, like, .37 something, right, when
6 you saw him?
7    MS. SMITH: Form. Foundation.
8    MS. COOK OLSON: Objection. Form.
9 Foundation. Do you have a medical record he could
10 look at?
11 Q  (BY MS. HOLLAND EDWARDS) Do you remember
12 that, Doctor?
13 A  No, I don't remember those specifics.
14 Q  I'll show you a record in a little bit.
15    Did you, after learning that this patient
16 had died, ask any questions about what type of medical
17 protocols or protocols at all they had for withdrawal
18 in the jail?
19 A  I guess I'm not convinced he died of
20 withdrawal. I don't know why he died, but I didn't --
21 I didn't seek out protocols.
22 Q  (BY MS. HOLLAND EDWARDS) Yeah, I mean, the
23 death certificate just says, like, advanced
24 complications of alcohol use, or something, right?
25 Something vague?

**Page 68**

1    MS. COOK OLSON: Can you state --
2    THE WITNESS: I would have to see --
3    MS. SMITH: Form and foundation.
4    MS. COOK OLSON: (Cross talk) -- that
5 question?
6    THE WITNESS: I would have to see it.
7 Q  (BY MS. HOLLAND EDWARDS) I can't understand
8 what anyone said, but I think people want to see the
9 autopsy, so I can pull it up.
10    MS. COOK OLSON: I didn't hear your
11 question. Can you state your question again just so
12 I have a --
13 Q  (BY MS. HOLLAND EDWARDS) I'm just saying
14 that -- do you recall that his cause of death was
15 something nonspecific related to alcoholism?
16    MS. SMITH: Form and foundation.
17    THE WITNESS: I would have to see it.
18 Q  (BY MS. HOLLAND EDWARDS) Do you recall
19 anything about what his cause of death was?
20 A  My understanding is they didn't know what
21 his cause of death was.
22 Q  And so when you said that you're not
23 convinced it was from withdrawal, what was that based
24 on?
25 A  Because it's -- I just can't say. He

**Page 69**

1 was -- to my recollection, he died about 24, 26 hours
2 after I saw him, and that would be pretty quick to go
3 into DTs and be the cause of death. I would expect
4 that to be starting another day -- another day later.
5 Q  Well, didn't you tell me before though that
6 seizures and vomiting and dehydration could set in at
7 any time from 12 to 48 hours?
8 A  Yes, it can, and death due to seizures from
9 alcohol are extremely rare, and I don't know that his
10 autopsy showed an obstructed airway or a lot of
11 vomitus or anything like that, so I'm just not sure.
12 Q  When you discharge someone to the hospital
13 -- I mean to the jail, there's a form that you check
14 off and give to the officer, right?
15 A  Correct.
16 Q  And it has several options for -- like, you
17 know, whether there's any recommendations or not,
18 right?
19 A  Yes.
20 Q  The only forms I've seen -- well, let's
21 just find -- just hang on. I'm going to show you
22 Exhibit 5, page 122.
23    Okay. Do you see this sheriff's office
24 form, prisoner medical clearance report?
25 A  I do.

**Page 70**

1  Q   And it has your name on it as the name of
2  the examining physician, right?
3  A   Correct.
4  Q   And is that your handwriting?
5  A   Yes.
6  Q   And you didn't -- well no one filled out
7  the top, right?
8  A   Well, there's a sticker on it, so it's --
9  and there is a second page, so the name of the inmate
10 is above and the date.
11 Q   Does it say anywhere what the reason is for
12 the clearance?
13 A   Often it will on the second page.
14 Q   This is the second page?
15 A   Yes.
16 Q   Okay. So where here does it say what
17 condition?
18 A   Purpose for making request.
19 Q   Incarceration?
20 A   Uh-huh.
21 Q   I mean, that's always the purpose of making
22 the request, right? They're always going to be
23 incarcerated?
24 A   At times it's more specific.
25 Q   Okay.

**Page 71**

1  A   If there's a specific complaint.
2  Q   So this form doesn't tell us it's for
3  intoxication, right?
4  A   Not the way this one's filled out, no.
5  Q   And then there is your section which has a
6  disposition, and you had five options for this
7  disposition, right?
8  A   Right.
9  Q   And the second one allows for suggesting
10 treatment for a condition, right?
11 A   Yes.
12 Q   Do you ever utilize the second option and
13 give specific things to look for for withdrawal?
14 A   I don't --
15 Q   Why?
16 A   I don't typically use that specifying what
17 to look for for withdrawal. I leave it to the jail
18 and their protocols and their normal monitoring.
19 Q   Right, I mean, you say you leave it to
20 their protocols, but you don't know if they have any
21 medical withdrawal protocols, right, in 2021?
22 A   I'm not -- I don't know their specific
23 protocols.
24 Q   So you're not leaving it to a protocol that
25 you know to exist, you're just not giving instructions

**Page 72**

1  about withdrawal, right?
2      MS. COOK OLSON: Object to form.
3  Argumentative. Misstates his prior testimony.
4      THE WITNESS: I'm not giving specific
5  instructions on withdrawal, and I'm not giving
6  specific instructions on any other medical condition
7  that could develop, but what I am saying is if you
8  have concerning symptoms or your symptoms worsen, we'd
9  ask that you return.
10 Q   (BY MS. HOLLAND EDWARDS) Do you agree with
11 me that withdrawal is more rationally related to the
12 reason for this visit of intoxication than, like, some
13 other medical condition that we don't know about yet?
14     MS. COOK OLSON: Object to form.
15     MR. COLLIER: And foundation, join.
16     THE WITNESS: I would agree that any --
17 person who is intoxicated or a chronic abuser of
18 alcohol is more likely to withdrawal than have certain
19 other medical conditions present acutely.
20 Q   (BY MS. HOLLAND EDWARDS) Right. So when I
21 ask, like, like you're not giving instructions on
22 withdrawal, you're saying I'm not giving written
23 instructions on any medical condition, but I'm talking
24 about the one that's logically related to the
25 condition you're treating them for. Don't you agree

**Page 73**

1  that it would make sense here to say this person's
2  intoxicated. You should watch them for either signs
3  of increasing intoxication, or withdrawal?
4      MS. COOK OLSON: Object to form.
5      MS. SMITH: Join.
6      THE WITNESS: I'm a not writing additional
7  instructions on this sheet. We are giving the patient
8  discharge instructions that get printed out and
9  sent -- sent with the patient.
10 Q   (BY MS. HOLLAND EDWARDS) Okay. But on the
11 clearance report where there's a spot for physician
12 remarks on the document that goes to the sheriff's
13 office, you don't include any specifics, right, about
14 withdrawing alcohol. Sorry.
15 A   Typically I don't for withdrawal in
16 alcohol, no.
17 Q   And have you ever?
18 A   I can't recall if I ever have for those
19 specific diagnoses.
20 Q   Let's look at the discharge papers that you
21 sent with Kelroy.
22     Do you see this medical screening exam?
23 A   I do.
24 Q   All right. And this is part of the
25 discharge documentation that you gave to the officer

**Page 74**

1  with Mr. Newman, right?
2   A   Yes.
3   Q   And you explain in this -- for the record,
4  this is Exhibit 5, page 126. Is this big enough to
5  see, Doctor?
6   A   I can see it.
7   Q   You say to get help right away if your
8  condition gets worse, or you develop new or troubling
9  symptoms, right?
10   A   Yes.
11   Q   And you understand just -- you understand
12  that an inmate can't do that on their own without the
13  permission of their jailers, right?
14   A   Correct.
15   Q   And so you are relying in this -- in these
16  discharge instructions on the jail to follow them,
17  right?
18       MS. SMITH: Form.
19       THE WITNESS: Yes, I have to rely on the
20  jail to bring a patient back if they need to be
21  brought back.
22   Q   (BY MS. HOLLAND EDWARDS) And do you explain
23  that alcohol intoxication occurs when a person no
24  longer thinks clearly or functions well after drinking
25  alcohol, right?

**Page 75**

1   A   That's what's written in these
2  instructions.
3   Q   Well, these are your discharge instructions
4  to Kelroy Newman, right?
5   A   Right, these are the prepopulated alcohol
6  intoxication instructions in our medical record.
7   Q   Okay. So there's nothing in here specific
8  to Kelroy other than that he was drunk when you saw
9  him?
10   A   Not -- not in this specific instruction,
11  no.
12   Q   And then the place where there is room for
13  specific instructions, that was left blank, right?
14   A   No, it was not left blank.
15   Q   The physician's notes of recommendations
16  was left blank that we just looked at, right?
17   A   On that form, but I documented other
18  instructions that were sent with the patient.
19   Q   Where are those documented?
20   A   You're going to have to scroll down.
21   Q   Down? Okay.
22   A   I don't know if it's on this page or not.
23  It's in my medical record and the discharge
24  instructions that he was sent with.
25   Q   Okay. All right. Let's finish talking

**Page 76**

1  about these generic ones, and then we'll go look at
2  what you said specifically in your medical note.
3       In this document, you -- or the hospital
4  says -- why can't I find -- hang on a second. I can't
5  find the quote I want.
6       MS. COOK OLSON: I'm going to object to
7  your comments. Can you just ask a clean question?
8       MS. HOLLAND EDWARDS: I don't know what
9  that means, Amy.
10       MS. COOK OLSON: Well, you're just talking
11  and commenting and so I would move to strike the
12  comments preceding the question. So I'm asking that
13  you just, now that you've taken a pause, just ask a
14  clean question.
15   Q   (BY MS. HOLLAND EDWARDS) On Exhibit 5, page
16  129, the instructions -- the discharge instructions
17  say that intoxication change can quickly from mild to
18  severe, right?
19   A   That's what I'm reading.
20   Q   Do you agree with that statement?
21   A   It depends on -- on the patient in the
22  clinical scenario.
23   Q   Right, I mean, it doesn't always change
24  quickly from mild to severe, but do you agree that it
25  can change quickly from mild to severe?

**Page 77**

1   A   I agree that it can.
2   Q   And that it can cause coma or death,
3  especially in people who are not exposed to alcohol
4  often?
5   A   I would agree with that.
6   Q   And did you do anything in your exam of
7  Mr. Newman to determine whether he was exposed to
8  alcohol often?
9   A   Anything in my exam?
10   Q   Or your history?
11   A   No, I asked him -- I confirmed that he had
12  been drinking alcohol, and I did a physical exam, but
13  I didn't take a lengthy alcohol history and ask him
14  how much he drinks and how often.
15   Q   Did you take any alcohol history besides
16  have you drank today?
17   A   Not to my recollection because it wasn't
18  going to change my disposition.
19   Q   Okay. But it does change the likelihood,
20  according to the discharge paperwork, the level of
21  intoxication causing coma or death, right?
22       MS. COOK OLSON: Object to form.
23       THE WITNESS: I wouldn't necessarily agree
24  with that.
25   Q   (BY MS. HOLLAND EDWARDS) Like, you don't

**Page 78**

1  agree with this comment, it can cause coma or death
2  especially in people who are not exposed to alcohol
3  often?
4    A   Yeah, I agree in someone who's naive to
5  alcohol if they drink a significant amount of alcohol
6  they can have complications, which could lead to coma
7  or death, but that's not how this patient was
8  presenting.
9    Q   Say more about that.  What in his
10 presentation made it seem like he wasn't naive to
11 alcohol?
12   A   Well, he didn't appear overly intoxicated
13 that I thought he was going to progress to coma or
14 death.
15   Q   Okay.  But do you have some reason to think
16 he was or wasn't naive to alcohol?
17       MS. COOK OLSON:  Asked and answered.
18       THE WITNESS:  I did not think he was naive
19 to alcohol.
20   Q   (BY MS. HOLLAND EDWARDS) And what was that
21 based on?
22   A   It's just based on my experience in
23 clinical evaluation.
24   Q   Well, you had never seen him before, right?
25   A   I had never seen him before.

**Page 79**

1    Q   You didn't know his blood alcohol level,
2  right?
3    A   I don't know if I did or not.  I don't
4  think I did.
5    Q   And so you can't compare his presentation
6  to his blood alcohol level without knowing the level,
7  right?
8    A   Correct.  If I didn't have the level.  I
9  can't recall if they told me his level or not.
10   Q   Can you recall any reason you had to
11 believe that Mr. Newman was a common drinker?
12       MS. COOK OLSON:  Again, asked and answered.
13 He's already addressed this numerous times.  It's
14 getting to be abusive.
15       MS. HOLLAND EDWARDS:  You can call the
16 Court if you think I'm being abusive.  If I'm going to
17 keep asking questions until I understand.
18       MS. COOK OLSON:  Well, I would ask that you
19 listen to the answers.  He's stated this numerous
20 times based on his clinical evaluation and his
21 experience in the practice of medicine.
22       MS. HOLLAND EDWARDS:  Not your answer, Amy.
23   Q   (BY MS. HOLLAND EDWARDS) Dr. Fowler, did
24 you have any reason that you can name about Mr. Newman
25 to believe that he was a chronic drinker?

**Page 80**

1       MS. COOK OLSON:  Same objection.
2       THE WITNESS:  My clinical gestalt told me
3  he was probably a chronic drinker, but whether he was
4  or wasn't, he presented in a stable fashion, he did
5  not seem overly intoxicated, he was not withdrawing
6  from alcohol, so whether he was or wasn't, that wasn't
7  going to change my disposition.
8    Q   (BY MS. HOLLAND EDWARDS) So then that same
9  clinical gestalt would put him in the category of more
10 likely to withdrawal in jail, right?
11       MS. SMITH:  Form.
12       MR. COLLIER:  Join.
13       THE WITNESS:  Someone who's a chronic
14 abuser of alcohol is more likely to withdrawal.
15   Q   (BY MS. HOLLAND EDWARDS) And so -- but
16 tying that from your clinical gestalt here, you
17 thought -- you would think that about Mr. Newman based
18 on your evaluation and acumen?
19       MS. SMITH:  Form.
20       THE WITNESS:  He -- he would fit into that
21 category, yes, more likely to withdrawal than someone
22 who is naive to alcohol.
23   Q   (BY MS. HOLLAND EDWARDS) Okay.  Under the
24 section in this document, How is this diagnosed, one
25 of the ways it can be diagnosed is a blood test that

**Page 81**

1  measures BAC, right?
2    A   Yeah, of course.
3    Q   Why do you not think it's relevant -- or
4  why do you not get it routinely in these medical
5  clearances for intoxication?
6        MR. COLLIER:  Form and foundation.  Asked
7  and answered.
8        THE WITNESS:  It isn't clinically relevant;
9  it's not going to change what we do, it's not going to
10 change his disposition, and I don't feel we need to
11 order unnecessary tests that aren't going to change
12 the outcome.
13   Q   (BY MS. HOLLAND EDWARDS) In the Harrison
14 Begay case, you did order a BAC, right?
15   A   I did.  He presented significantly
16 different than this patient.  He was --
17   Q   What was it -- oh, sorry, sir.
18   A   He was altered, he was combative, he
19 couldn't walk well from my recollection, and he had a
20 hematoma on his head, so we were doing an evaluation
21 to rule out other pathology, and the blood alcohol was
22 going to be a part of that evaluation, was he actually
23 just overly intoxicated or is his blood alcohol so low
24 that it wouldn't account for his altered mental status
25 and something else is going on.

21 (Pages 78 - 81)

```
 1        THE COURT REPORTER: She started asking
 2   questions right when you logged back in, but I'm happy
 3   to read back to you what was asked or have her repeat
 4   it.
 5        MS. COOK OLSON: Yeah, I'll have to hear
 6   everything. So, you've been deposing him without me
 7   on the record?
 8        MS. HOLLAND EDWARDS: No, when you came on.
 9   I didn't know that you weren't hearing. When I saw
10   your face --
11        MS. COOK OLSON: Got it. Okay.
12   Q    (BY MS. HOLLAND EDWARDS) Let me just --
13   okay.
14        So I'm going to turn to page 2 of this
15   Exhibit 30, and now that you've read the whole thing,
16   do you see this, you know, Indeed, with calls for
17   reducing prisoner health care costs growing ever more
18   vociferous, many detention facilities are implementing
19   even stricter parameters before the incarcerated can
20   obtain permission to approach external EDs. Do you
21   see that?
22   A    Yes, I see that.
23   Q    Have you participated in any conversations
24   at the hospital about whether Montezuma County Jail is
25   reluctant to send people back out of concern for
                                                    Page 114
```

```
 1   costs?
 2        MS. SMITH: Form.
 3        THE WITNESS: No, I've never had any
 4   conversation or heard of any conversation regarding
 5   that. We see plenty of prisoners coming from the
 6   jail.
 7   Q    (BY MS. HOLLAND EDWARDS) Do you see plenty
 8   coming back after they've been cleared?
 9        MS. SMITH: Form.
10        THE WITNESS: We see plenty that are
11   incarcerated more long term, so yeah, a lot of them
12   probably have been cleared at some point through the
13   emergency department.
14   Q    (BY MS. HOLLAND EDWARDS) Okay. I guess
15   that wasn't very artful, I mean, did you -- is it
16   frequent that people are cleared and then sent back
17   kind of in the same time period where -- based on, you
18   know, returning for worsening symptoms, or something
19   like that?
20        MR. COLLIER: Object to form.
21        THE WITNESS: I wouldn't say that's common.
22   Q    (BY MS. HOLLAND EDWARDS) Under, Additional
23   Considerations, did you see this sentence -- or I'd
24   like to direct your attention to this sentence, A
25   further and even more controversial challenge for ED
                                                    Page 115
```

```
 1   providers lies in the question of what follow-up care
 2   the incarcerated patient should receive upon leaving
 3   the ED. Many ED providers have cultivated an
 4   "in-and-out" mindset emphasizing quick treatment of
 5   patients and referral of serious cases to specialists.
 6   While such a mentality is generally fine for patients
 7   with freedom of movement and the ability to access
 8   better care, the incarcerated often receive
 9   substandard care at correctional facilities and face a
10   unique set of personal and environmental challenges,
11   and it goes on to describe suicidality. Did you read
12   that paragraph when we were off the record?
13   A    Yes, I read it.
14   Q    Do you agree that it is a challenge for ED
15   providers to consider what follow-up care incarcerated
16   patients will receive when they leave?
17        MS. SMITH: Form and foundation.
18        MR. COLLIER: Join.
19        THE WITNESS: Sometimes we have to get
20   creative in how we're going to have these patients
21   follow-up.
22        It really depends on how long they're going
23   to be incarcerated and what medical condition they're
24   being treated for. Some -- some folks are in and out
25   in a day or two and don't necessarily need close
                                                    Page 116
```

```
 1   follow-up so we're not arranging follow-up for them,
 2   but other people have a condition where they do need
 3   close follow-up, and we try to get that arranged.
 4   Q    (BY MS. HOLLAND EDWARDS) Have you taken any
 5   steps for yourself since the death of Mr. Newman to
 6   learn what medical care was available at the jail and
 7   what follow-up care was available there?
 8   A    My understanding is there's not a lot of
 9   follow-up care at the jail, so it's going to be
10   outside, like, in one of the clinics or seeing one of
11   the specialists in clinic or returning to the
12   emergency department, and so at times we'll work to
13   arrange that kind of thing.
14   Q    So then do you see the general guidelines
15   that are listed at the bottom of this article?
16   A    Yes.
17   Q    And drawing your attention to number 7, do
18   you agree that if frequent observation of the detainee
19   is necessary or concern exists about the progression
20   of a medical problem that will require the patient
21   return in relatively short amount of time, the patient
22   should be admitted?
23        MS. COOK OLSON: Objection to form.
24   Foundation.
25        You can answer.
                                                    Page 117
```