# ZOOM VIDEOCONFERENCE DEPOSITION OF JENNIFER GADDIS

## 2/17/23

Civil Action No. 22-cv-1763-PAB-KLM

**ESTATE OF KELROY NEWMAN, et al. vs BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF MONTEZUMA, COLORADO, et al.**

United States District Court
District of Colorado

ANIMAS REPORTING SERVICE
919 County Road 142
Durango, Colorado 81303
877.385.4268/970.385.4268
animas@animas.net
animasreporting.com

Page 21

1  emergency department?  And if it's -- if it's changed, I really
2  just wanna know about July 2021.
3       A    Okay.  We have a ten-bed ER.  We are a rural-access
4  facility.  We have two larger rooms in front for our more
5  critical patients.  We have five more private rooms, as well as
6  the triage room.
7       Q    So, the two larger rooms in front, those each have
8  one bed in them?
9       A    Room 7 has two beds.  So, two bays.  Room 6 has three
10 beds or three bays.
11      Q    And then you said there's five more private rooms.
12 So I assume each of those has one bed in them?
13      A    Yes, sir.
14      Q    And are those numbered?
15      A    1 through 5 --
16      Q    Makes sense.
17      A    -- uh-huh.
18      Q    And then you said there's a triage room?
19      A    Uh-huh.
20      Q    I'm sorry, was that a "Yes"?
21      A    Yes.
22      Q    Where is the triage room in comparison to the other
23 rooms?
24      A    It is up front by the nurses station.
25      Q    Is there a standard progression where a -- where each

Page 22

1  patient will go to the triage room first before going into one
2  of the other rooms, or is there a specific acuity level that
3  determines that?  How -- how is it determined where a patient
4  goes?
5       A    There's multiple things that determine patient
6  placement.  Ideally, patients are brought back as soon they're
7  registered.  They just get their name and date of birth, chief
8  complaint at registration.  Nothing further.
9            The nurse will go out, lay eyes on the patient.
10 Start -- bringing them back, and usually we take them directly
11 to a room for further assessment.  If rooms are not available,
12 then that's when we utilize our triage room to start initial
13 assessments.
14      Q    So you said nurse goes out and lays eyes on the
15 patient.  Does that happen in the --
16      A    We walk --
17      Q    -- registration?
18      A    We walk the patient back -- sorry.
19      Q    You can't --
20           MS. COOK OLSON:  Just so you don't talk
21 over him, just allow him to finish.
22           THE WITNESS:  Okay.
23           MS. COOK OLSON:  And then -- then give me
24 a moment to object, too.  Just --
25           THE WITNESS:  Sorry.

Page 23

1            MS. COOK OLSON:  You're doing great;
2  you're doing great; you're doing great.
3            MR. HOMIAK:  You're doing great.  And I will do
4  better about not stepping on your words, too.  So I apologize
5  for that.
6       Q    (BY MR. HOMIAK)  So we were talking about going out
7  and laying eyes on the patient and where that -- where that
8  happens.  Where do you meet the patient?
9       A    So the patients are sent to the waiting room.
10      Q    And you said it's the nurse who goes out and escorts
11 them back into the ED?
12      A    Most -- yes.  Most often, yes.
13      Q    Okay.  If it's not the nurse, who would it be?
14      A    We have a paramedic on staff.
15      Q    Was that paramedic on staff in July of 2021?  Or was
16 there a paramedic on staff in July of 2021?
17      A    That's a good question.  There may not have been.
18      Q    And if you don't remember, that's okay, too.  You can
19 say that.
20      A    I'm sorry.
21      Q    That's totally fine.  I know I'm asking you a lot of
22 stuff about a couple years ago.
23      A    I don't -- I don't recall for sure.
24      Q    Okay.  That's totally fine.  So, if it's -- in the
25 July 2021 time frame -- let's focus on that --

Page 24

1       A    Uh-huh, yes.
2       Q    -- if a patient is going to be brought back from the
3  waiting room --
4       A    Most likely it's gonna be the emergency room nurse.
5       Q    Okay.  And if it's not the nurse and there was a
6  paramedic working at the time, it may have been the paramedic?
7       A    May have been.
8       Q    Anybody else who would've brought a patient back from
9  the waiting room into the ED in July to 2021?
10      A    Not that I can recall.
11      Q    And you said there's a number of things that goes
12 into which room the patient goes into.  Can you just list for
13 me what that -- what that -- what are the factors as far as
14 that decision?
15           MS. COOK OLSON:  Form.  You can answer.
16      A    So, initial impressions of the patient.
17      Q    (BY MR. HOMIAK)  Whose initial impressions?
18      A    The person who's first contact.  So the emergency
19 room nurse.  Any patient who has -- such as like more
20 specifics.  Complaints such as like shortness of breath, chest
21 pain.  We tend to put them in the rooms -- in the bays that are
22 closer.  Patients that we suspect might be higher-acuity
23 patients.
24           And so our -- our initial assessment is, you know:
25 Does the patient converse with us?  Are they, you know, able to

Exhibit 17

1.877.385.4268    970.385.4268

**JENNIFER GADDIS**

Page 37

1  findings upon assessment and procedures.  I -- I can't say, you
2  know, I'm aware of any policy that talks about discharge to
3  detox dependent upon a BAC.
4      Q   (BY MR. HOMIAK)  Are you familiar with the symptoms
5  of alcohol withdrawal?
6          MS. COOK OLSON:  Objection, form, foundation.
7      Q   (BY MR. HOMIAK)  You can answer.
8      A   Uhmm, I -- I am aware of symptoms associated with
9  alcohol withdrawal, yes.
10     Q   What are those symptoms?
11     A   Uhmm --
12         MS. COOK OLSON:  Objection to form, foundation.
13     A   They vary depending upon the patient.  It can be
14 jittery, anxiousness, tachycardia, abdominal pain, nausea.
15 Everything as far as seizures.  It's really patient-dependent,
16 though.
17         A thorough examination, assessment can prove a
18 whole -- like a whole realm of symptoms, depending on the
19 patient.
20     Q   (BY MR. HOMIAK)  So you mentioned jittery, anxious,
21 tachycardia, seizures.  Anything else that comes to mind as far
22 as symptoms of alcohol withdrawal?
23     A   I'm sure that there's a ton more.
24     Q   Anything else you can think of right now?
25     A   (No response.)

Page 38

1      Q   When you say tachycardia, what do you mean by that?
2      A   Uhmm, so, a normal adult heart rate is between 100,
3  110.  A patient can experience a fast heart rate for various
4  reasons.
5      Q   So what do you consider to be tachycardic?
6      A   Clinically, a fast heart rate is anything above a
7  hundred.
8      Q   So tachycardia is anything above a hundred?
9      A   Uh-huh.
10     Q   I'm sorry, was that a "Yes"?
11     A   Yes.
12     Q   Would you expect to see any difference in other vital
13 signs, like respiratory rate or blood pressure for a patient
14 who's experiencing alcohol withdrawal?
15         MS. COOK OLSON:  Objection to form, foundation.
16     A   There's potential for that, yes.
17     Q   (BY MR. HOMIAK)  What in particular?
18         MS. COOK OLSON:  Same objection.  Form.
19 foundation.
20     A   And, again, it's very patient-dependent.
21     Q   (BY MR. HOMIAK)  When you see a difference in blood
22 pressure with a patient who is experiencing alcohol withdrawal,
23 what -- what is it?  I mean, is a -- is the clearance lower?
24 Help me understand.
25         MS. COOK OLSON:  Again, objection to form

Page 39

1  and foundation.
2      A   So, as a nurse, I'm gonna gather information through
3  an assessment.  And that does include vital signs.  Any
4  abnormalities that I find I will take to my provider and allow
5  them to further assess the patient and take this information
6  and apply it accordingly.
7          So, when you're asking me to look at, like, specific
8  vital signs and symptoms and such -- let's say with alcohol
9  withdrawal.  Again, it's a very broad spectrum.
10         What I will do, is I will take my findings through my
11 assessment, or reassessment, note any changes.  And I will give
12 them to the doctor, to then apply to that diagnosis.
13     Q   (BY MR. HOMIAK)  So is it fair to say that a
14 tachycardic heart rate is something that you would report to
15 the provider?
16         MS. COOK OLSON:  Objection, form.
17     A   Yes, it is.  We review vital signs when I give report
18 to the provider.
19     Q   (BY MR. HOMIAK)  And what would you consider to be --
20 you said, "Any abnormalities I find I would notify the
21 provider."
22     A   Yes.
23     Q   That makes sense.  What would you consider to be an
24 abnormal blood pressure?
25     A   Depends on the patient's age, their history, their

Page 40

1  current conditions, if they're symptomatic.
2      Q   So, in an otherwise healthy 30-year-old, what would
3  you consider to be an abnormal blood pressure?
4      A   I'm sorry, I --
5          MR. COLLIER:  Form and foundation.
6          MS. COOK OLSON:  Join.
7      A   I can't answer that question.  It's very -- it's --
8  it's too broad of a question to answer.
9      Q   (BY MR. HOMIAK)  What additional information would
10 you need?
11     A   A patient.
12     Q   Sorry, go ahead.
13         MS. COOK OLSON:  She said a patient.
14     Q   (BY MR. HOMIAK)  Yes, so help me -- help me
15 understand that.
16         MR. COLLIER:  Object to the form.
17         MS. COOK OLSON:  Object to form.  Can you
18 ask a clean question?
19         MR. HOMIAK:  I'm asking a question.
20     Q   (BY MR. HOMIAK)  Help me understand what you mean by
21 you would need a patient.
22         MR. COLLIER:  It's not a question.
23         MS. COOK OLSON:  Objection to form.
24     Q   (BY MR. HOMIAK)  What do you mean by you would need a
25 patient?

10 (Pages 37 to 40)

## Page 61

1  THE WITNESS: Uh-huh.
2  Q  (BY MR. HOMIAK) So you're notified if it's a
3  critical blood test result?
4  A  Yes. And it's my duty to report that to the
5  provider.
6  Q  Who notifies you?
7  A  We have our lab. As results come, they'll call over.
8  Q  In your experience, how long does it take for a blood
9  alcohol test to come back?
10     MS. COOK OLSON: Objection to form, lack of
11  foundation.
12  A  I can't answer that.
13  Q  (BY MR. HOMIAK) Have you ever been told by a doctor
14  to essentially not release a patient or keep a patient in the
15  ED until their blood alcohol test results come back?
16     MS. COOK OLSON: Objection to form.
17  Q  (BY MR. HOMIAK) Go ahead.
18  A  I -- that -- that's never been a concern. I've never
19  had -- can you please state the question again? I'm quite
20  confused.
21  Q  Sure, yeah. Have you ever been told that a patient
22  is being held or should be kept in the ED until their blood
23  test results -- their blood alcohol test results come back?
24     MS. COOK OLSON: Form.
25  A  It's -- it's customary to have all diagnostic results

## Page 62

1  back before the provider provides a disposition. So, to say
2  that we let anybody go without lab results that are done
3  in-house, it -- it -- that's not an occurrence.
4  Q  (BY MR. HOMIAK) Got it. Okay, that makes sense.
5  Thank you.
6  A  Okay.
7  Q  Have you ever been told that a patient needs to stay
8  in the E-day -- ED, excuse, until their BAC comes down?
9  A  That's -- so the only occurrence I can relate to that
10  is gonna be our behavioral patients who need mental health
11  assessments. And mental health professionals do not assess
12  until the BAC is below a certain number.
13  Q  Do you know what that number is?
14  A  I can't recall right now, no.
15  Q  When you perform -- well, actually, let me -- let me
16  take a step back.
17     So we talked earlier about the jail medical clearance
18  process.
19  A  Yes, sir.
20  Q  And I'm wondering when you first heard of the phrase
21  "medical clearance" or you first became aware that the
22  hospital -- or that medical clearances for the jail were being
23  performed at the hospital.
24  A  Upon employment.
25  Q  And what do you recall about that?

## Page 63

1  A  I'm sorry?
2  Q  How was that -- how were you notified of that, or how
3  were you educated about that?
4     MS. COOK OLSON: Form.
5  A  How am I notified about a medical clearance?
6  Q  (BY MR. HOMIAK) Sorry. I'll ask a better question.
7     So you said you first became aware about the medical
8  clearance process upon employment. And what I'm wondering is
9  how you became aware of that. Did somebody tell you about it?
10  It just happened where somebody showed up? How did you first
11  become aware of that?
12  A  Orientation.
13  Q  What do you recall from that orientation?
14  A  Initially, working in the emergency room. I was on
15  orientation for -- I can't remember how long. At least a
16  six-month period. And I was taught patients come in with
17  officers.
18     We perform our triage assessment, just like any other
19  patient. We take our concerns to the provider, if there are
20  any, just like any other patient. There's other clerical work
21  involved. The provider will see the patient. Act accordingly
22  on their end.
23     The specific clerical work is done by our emergency
24  room clerk. And outcomes are just like any other patient.
25  Concerns are addressed.

## Page 64

1  Q  Was this orientation in a specific class, or was this
2  information just shared with you informally through various
3  shifts?
4     MS. COOK OLSON: Form.
5  A  This is through hands-on experience while working
6  with my preceptor on shift.
7  Q  (BY MR. HOMIAK) So there was no specific class or
8  webinar on "This is medical clearance, and this is how it
9  works"?
10  A  We don't have specific classes or webinars.
11  Q  Did you get any sort of handout or policy or written
12  materials on the clearance process?
13  A  Not that I recall.
14  Q  In your experience, does a medical clearance
15  examination always include a nursing assessment and a physician
16  assessment?
17     MS. COOK OLSON: Objection, form. You can
18  go ahead.
19  A  In my experience, yes, as long as the patient allows
20  for that.
21  Q  (BY MR. HOMIAK) Do you recall ever speaking to
22  anybody at the jail, Montezuma County Detention Center, about a
23  specific patient or detainee?
24  A  I don't understand the question.
25  Q  Yeah. So I think you said that, as part of the

16 (Pages 61 to 64)

1.877.385.4268                                                                970.385.4268

## JENNIFER GADDIS

Page 65

1  medical clearance process, there's a police officer that comes
2  in with the patient?
3      A   Yes.
4      Q   I'm asking about something a little bit different,
5  which is:  Do you ever pick up the phone or have any sort of
6  communications directly with somebody at the jail about someone
7  who's being medically cleared?
8      A   So you're asking me if I talk to someone at the jail
9  while the jailer or officer that is there with the patient?  Is
10 that your question?
11     Q   At any point in time in the medical clearance
12 process.
13     A   Not that I can recall.
14     Q   And it's my understanding that the police officer
15 stays with the patient throughout the medical clearance
16 process?
17     A   Yes, sir.
18     Q   And is that individual typically handcuffed
19 throughout the medical clearance process?
20     A   I would say yes.  Not an absolute.  But, yes,
21 typically.
22     Q   And I think you said earlier that there's -- well, I
23 may have taken it away from your answer.  You said a few times,
24 as with any other patient, you would approach the medical
25 clearance process.

Page 66

1          It sounds like -- maybe I'll ask a better question.
2  Are there any differences between your nursing assessment for a
3  medical clearance as opposed to a nursing assessment for a
4  patient you take back from the waiting room?
5      A   So, all of --
6          MR. COLLIER:  Form, foundation.
7      A   Sorry.  So, all of my patients are treated the same.
8  They all receive an assessment.  I inquire about concerns.
9  Vital signs are taken.  Information is relayed to the provider.
10     Q   (BY MR. HOMIAK)  Did anyone ever explain to you why
11 medical clearances for the jail were performed at the hospital
12 instead of at the jail?
13         MS. COOK OLSON:  Foundation.
14     Q   (BY MR. HOMIAK)  You can answer.
15     A   I don't believe so.
16     Q   Did you know that the jail did not have any full-time
17 medical providers in July 2021?
18         MS. COOK OLSON:  Form.
19     A   I was not aware of that.
20     Q   (BY MR. HOMIAK)  Did you know that the jail did not
21 have any medical providers at all on the weekends or before
22 7:00 a.m. or after 4:00 p.m. in July 2021?
23         MR. SMITH:  Form and foundation.  This is Ann
24 Smith.
25         MS. COOK OLSON:  So loud.

Page 67

1          MR. SMITH:  I didn't mean to startle anybody.
2          MR. COLLIER:  You startled all of us, Ann.
3          MS. COOK OLSON:  And I would say assumes facts
4  not in evidence.  Can we turn this down?
5          (Comments off record, adjusting volume on
6          laptop.)
7          MS. COOK OLSON:  I think we're good now.
8  That was surprising.
9      Q   (BY MR. HOMIAK)  Do you need me to repeat my
10 question?
11     A   Please.
12     Q   Sure.  Did you know that the jail did not have any
13 medical providers at all before or -- excuse me -- between --
14 on the weekends or -- before 7:00 a.m. during the week or after
15 4:00 p.m.?
16         MS. SMITH:  Misstates evidence.
17         MS. COOK OLSON:  Yeah, objection, form.
18 Misstates the evidence.
19     A   I was not aware.
20     Q   (BY MR. HOMIAK)  And I guess the better way to phrase
21 that is:  You know that in July 2021 the jail did not have
22 medical providers between 4:00 p.m. and 7:00 a.m. during the
23 week or at all on the weekends?
24         MS. COOK OLSON:  Same objections.
25         MS. SMITH:  (Inaudible.)

Page 68

1          THE REPORTER:  Did she say something?
2          THE WITNESS:  Yes.
3          MS. COOK OLSON:  She said objection.
4          MR. SMITH:  I said same objections.
5          THE REPORTER:  I gotta be able to hear
6  her.
7          MR. HOMIAK:  It's quiet; it just isn't
8  loud enough.
9          (Ms. Cook Olson adjusting volume on
10         laptop.)
11     A   I was not aware of the medical staffing schedule at
12 the jail, no.
13     Q   (BY MR. HOMIAK)  Is there or was there in July of
14 2021 a form or standard set of paperwork that you would receive
15 from the police officer as part of the medical clearance
16 process?
17     A   Not that I recall.
18     Q   Was it your understanding that -- in July 2021, that
19 every detainee for the jail had to be medically cleared at the
20 hospital first?
21         MR. SMITH:  Sorry, everyone, this is Ann.  I
22 can't hear the witness at all anymore.  It's not on mute, but
23 there's no sound.
24         THE WITNESS:  Oh, no.
25         MS. COOK OLSON:  Can you hear now?  Can you hear

17 (Pages 65 to 68)

ANIMAS REPORTING SERVICE
animas@animas.net

7b5466e8-77e5-4636-ba38-b5c0b39434e7

Exhibit 17

1.877.385.4268                                                                                          970.385.4268

**JENNIFER GADDIS**

Page 69

1  me, Ann?
2         MR. HOMIAK:  I didn't touch anything.
3         (Comments off record, interruption in
4     deposition.)
5         MR. SMITH:  Got it.  It just -- it just came
6  back.
7         THE WITNESS:  Okay.
8     Q   (BY MR. HOMIAK)  Yeah.  So, in July 2021, did you
9  have an understanding of whether every jail detainee was being
10 medically cleared at the hospital before being booked into the
11 jail?
12        MS. COOK OLSON:  Form.
13    A   I cannot answer that.
14    Q   (BY MR. HOMIAK)  Did you have any understanding as to
15 whether there were certain conditions or certain reasons that
16 would lead a detainee to need to be medically cleared by the
17 hospital before going to the jail?
18        MS. SMITH:  (Inaudible.)
19        MS. COOK OLSON:  Foundation.
20        THE REPORTER:  I can't hear her.
21        MR. SMITH:  Sorry.  I was saying form and
22 foundation.
23    A   I can't answer that either.
24    Q   (BY MR. HOMIAK)  Got it.  When detainees would come
25 into the hospital for medical clearance, would there be a

Page 70

1  specific purpose or reason that was given to you for the
2  clearance?
3     A   As per my assessment process, I do address the
4  officer and ask their reason for being there.  It's not always
5  a medical clearance.  Sometimes they'll tell me medical
6  clearance.  And they'll give me a little insight into the
7  reason for visit.
8         On this particular case with Mr. Newman, it was for
9  medical clearance with visible injuries to the face.
10    Q   So do you recall Mr. Newman?
11    A   I -- I do remember bits of Mr. Newman's visit, yes.
12    Q   And what do you remember?
13    A   I -- I remember assessing the abrasions and
14 contusions to his face, him sitting independently in the triage
15 room, and conversing.
16    Q   Sorry, I don't think I caught exactly what you said.
17 You said sitting independently in the --
18    A   In the triage room.
19    Q   And when you say independently, as in --
20    A   Sitting up on his own.
21    Q   And do you recall a specific conversation with
22 Officer Osborn, who was the officer with him, about the reason
23 for the medical clearance?
24    A   I do not remember that specific conversation.  What's
25 charted is that the patient was brought in for medical

Page 71

1  clearance and presents with contusions and abrasions to his
2  face.
3     Q   Do you recall any conversations with Officer Osborn
4  at all?
5     A   I do not.  I'm sorry.
6     Q   We're talking about a few years ago, so that's okay.
7  What else -- is there anything else about Mr. Newman's visit
8  that you remember, other than what you've already mentioned?
9     A   No.
10    Q   When you perform a nursing assessment for a medical
11 clearance, do you have a standard set of questions that you
12 ask?
13    A   It's a standard set of questions for all of my
14 patients.
15    Q   And does that standard set of questions include
16 questions about alcohol intake?
17    A   There is a medical history and previous diagnoses,
18 and then there's also a social history.
19    Q   What questions do you ask about alcohol intake as
20 part of the medical clearance?
21    A   For the medical history, a lot of times I will just
22 start out by asking if the patient does have any medical
23 concerns, such as seizures, asthma, diabetes, anything of that
24 nature.
25        During the social history, I will ask about alcohol

Page 72

1  consumption and document what's reported to me.  Tobacco use,
2  illicit drug use.  And I will again document what's reported to
3  me.
4     Q   What questions do you ask about alcohol consumption
5  in the "Social History" section?
6     A   If the patient states that they use alcohol, I'll ask
7  if it's once-a-month, once-a-week, daily.
8     Q   Anything else?
9     A   If it's beer, wine, or liquor.
10    Q   Anything else?
11    A   No, sir.
12    Q   Does your standard set of questions include whether
13 they've had their blood alcohol content tested?
14    A   No, that is not a standard question.
15    Q   Did you know that the jail performs blood alcohol
16 testing on every detainee?
17    A   I did not know that.
18    Q   If the jail has a blood alcohol level for a patient
19 that you're performing a medical clearance nursing assessment
20 for, is that information that would that be helpful for you to
21 have?
22        MR. COLLIER:  Form, foundation.
23    A   I need you to rephrase the question, please.
24    Q   (BY MR. HOMIAK)  Sure.  If blood alcohol testing has
25 been performed on -- at the jail, on someone who you're

18 (Pages 69 to 72)

**ANIMAS REPORTING SERVICE**
animas@animas.net

7b5466e8-77e5-4636-ba38-b5c0b39434e7

Exhibit 17

**1.877.385.4268**                                                                                                              **970.385.4268**

# JENNIFER GADDIS

Page 73

1   performing a medical clearance nursing assessment of, is that
2   blood alcohol content, that blood alcohol level, information
3   that would be important for you to have?
4           MR. COLLIER: Form and foundation.
5   A   Quite possibly, depending upon what my assessment
6   findings were.
7           At the time of Mr. Newman's assessment, he was noted
8   to be alert and oriented, answering questions, rating his pain.
9   I would say in this particular case I don't know that -- that
10  it would've indicated anything different for my assessment.
11  Q   (BY MR. HOMIAK) If the patient's BAC level at the
12  jail is above .2, is that information that you would want to
13  have as part of your medical clearance nursing assessment?
14          MS. COOK OLSON: Uhh, I'm sorry.
15          MR. COLLIER: Form and foundation.
16          MS. COOK OLSON: Form -- form and
17  foundation.
18  A   That information is not gonna change how I perform my
19  assessment, or my findings.
20  Q   (BY MR. HOMIAK) If the patient's BAC is .421, is
21  that information that you would wanna have as part of your
22  medical clearance nursing assessment?
23  A   It's information that would be documented and
24  reported to the provider.
25  Q   I guess what I'm wondering is: Is that information

Page 74

1   that would be helpful from your perspective as a nurse to
2   perform --
3   A   And I'm trying to explain only in specific
4   situations.
5   Q   Okay. And those situations are?
6   A   Where we find altered mental status, airway concerns,
7   unstable vital signs, or abnormal vital signs. I would report
8   that to my provider, and my provider would use that
9   appropriately.
10  Q   Is that information that you would expect to be
11  shared with you, either by the jail or the police officer as
12  part of the medical clearance process?
13          MR. SMITH: Form.
14  A   I can't answer that.
15  Q   (BY MR. HOMIAK) What do you mean?
16  A   Expect?
17  Q   Yes.
18  A   If they had a concern with Mr. Newman -- again, he
19  was talking, conversing, alert and oriented to person, place,
20  time, and event. His Glasgow Coma Score was 15. My nursing
21  assessment didn't indicate that there was concerns for -- any
22  emergency concerns at that time associated with his BAC.
23          THE REPORTER: I didn't hear the last
24  part.
25          THE WITNESS: I -- if --

Page 75

1           THE REPORTER: Emergency concerns...
2   A   Yes. So, if -- if it's reported, it is charted
3   appropriately that it's a concern with the officers. It's
4   reported to the provider, as well as any abnormal findings that
5   I find on my assessment.
6           With Mr. Newman, it didn't change my assessment.
7   Does that make sense?
8   Q   (BY MR. HOMIAK) So I understand what you're saying.
9   A   Okay.
10  Q   And I -- I promise I'm not gonna spend a lot of time
11  on this. I just -- I -- I kinda wanna just get this one piece
12  which is: If -- just in general, if a patient's BAC is .421
13  coming from the jail for a medical clearance, you're doing a
14  nursing assessment for, is that information that you would
15  expect to be shared with you as a nurse?
16  A   In general, no, I don't expect that.
17  Q   And why is that?
18  A   Because I'm gonna perform my own independent
19  assessment. Speak with my patient, find factual concerns that
20  way, and report it to my provider appropriately.
21  Q   And, so, if that information were shared with you,
22  that's something that you would document, right?
23  A   Yes.
24          MR. COLLIER: Asked and answered.
25  Q   (BY MR. HOMIAK) And that's information that you said

Page 76

1   you'd also report to the physician or mid-level provider,
2   right?
3   A   Yes, sir.
4           MR. HOMIAK: I think this is the copy --
5           MS. HOLLAND EDWARDS: Original.
6           MR. HOMIAK: -- for the witness, okay.
7   Q   (BY MR. HOMIAK) I'm going to give this to you. This
8   will be your copy. I haven't marked this one. And I'm going
9   to show you what's previously been entered as Exhibit 5. The
10  moment that everybody in this room has been waiting for
11  anxiously.
12          MS. COOK OLSON: A break? Can we take a quick
13  break?
14          MR. HOMIAK: Yeah, of course. Absolutely.
15          (Recess taken at 12:33 p.m. and back in
16  session at 12:39 p.m.)
17          MR. HOMIAK: We back on the record?
18          THE REPORTER: (Nodding head.)
19          MR. HOMIAK: Thank you.
20  Q   (BY MR. HOMIAK) So, Ms. Gaddis, I wanna make sure I
21  understood that -- now I've lost my question. Uhmm. So I
22  think you said earlier that, as part of the medical clearance
23  nursing assessment, a reason for the medical clearance is
24  shared with you by the police officer. Did I hear that
25  correctly

19 (Pages 73 to 76)

**ANIMAS REPORTING SERVICE**
**animas@animas.net**

7b5466e8-77e5-4636-ba38-b5c0b39434e7

Exhibit 17

**1.877.385.4268**  **970.385.4268**

**JENNIFER GADDIS**

Page 77

1  A  I'll ask the officer, you know, "Why are you here,
2  reason for visit?"
3  .     And oftentimes they'll say, "For medical clearance."
4  Q  And is the reason for the medical clearance typically
5  shared with you by the officer?
6  A  If there's concerns, they will share that with me.
7  Q  So, if the jail or the officer has concerns about the
8  individual's intoxication, is that information that you would
9  expect to be shared with you?
10  A  If there's --
11         MR. SMITH:  Form.
12  Q  (BY MR. HOMIAK)  Go ahead.
13  A  Again, if there's a concern for the patient's
14  well-being or health, that is shared with me.
15  Q  So what I'm asking is:  If there is a concern that
16  the police officer or the jail has about a patient who's going
17  through medical clearance, is that something that you expect to
18  be shared with you?
19  A  Yes.
20  Q  So you have in front of you Exhibit 5, which
21  hopefully is the same as the Exhibit 5 I have in front of me.
22  Do you recognize at least the first page of this document?  I
23  know it's a pretty lengthy document.
24  A  Yes, I recognize the first page.
25  Q  What is the first page?

Page 78

1  A  This is the patient's face sheet.
2  Q  And I wanted to ask, if you know, what -- if you look
3  at the bottom, under "Encounter Information," do you know who
4  inputs the information under "Encounter Information" on the
5  first page of Exhibit 5?
6         MS. COOK OLSON:  Foundation.
7  A  I'm not aware, no.
8  Q  (BY MR. HOMIAK)  Do you know what "Reg Dt/Tm" means?
9  A  That looks like that would be registration date and
10  time.
11  Q  So what does that mean to you as far as what the
12  patient is actually doing?
13  A  That's when the registrar enters the information into
14  our computer and generates a visit.
15  Q  And can you tell, based on the line of "Reg Clerk,"
16  that the registrar for this visit was "Patient Access Rep Tyler
17  Walker"?
18  A  That's what the paperwork -- I'm sorry.
19         MS. COOK OLSON:  Objection to form.
20         MR. HOMIAK:  So now it's okay to laugh?
21         MS. COOK OLSON:  I know, I'm sorry.
22  A  That's -- that's what's on the face sheet.
23  Q  (BY MR. HOMIAK)  Does Mr. Walker sit in the waiting
24  room?  I'm just trying to picture where he is in this process.
25  A  I believe our registrar does have their own

Page 79

1  independent office, and it is near the waiting room.
2  Q  Do you know what "OF" next to "Rm/Bed" means?
3  A  Uhmm, I'm honestly not sure.
4  Q  Have you seen that before?
5  A  I can't say that I've paid much attention to that
6  before.
7  Q  Is that where you would expect the patient's room
8  number to be?
9         MS. COOK OLSON:  Foundation.
10  A  Again, I can't say that I've paid much attention to
11  that before.
12  Q  (BY MR. HOMIAK)  So you at least can't think of a
13  time where you've seen "OF" under "Rm/Bed" or next to "Rm/Bed"
14  under the "Encounter Information"?
15  A  On the face sheet, again, I don't pay much attention
16  to that area.
17  Q  Is there a place that you would normally -- and I
18  guess we can go to the next page.
19  A  (Turning to.)
20  Q  Do you see how up at the top it has "Admission Date,"
21  "Discharge Date," "Attending Dr," and "Location"?  It says
22  "SWMH ER; OF."  Does that mean anything to you?
23  A  Not that I recall.  I'm sorry.
24  Q  That's okay.  I don't know what it means either, so
25  that's -- that's why I'm asking you.

Page 80

1  A  Okay.
2  Q  So we talked about "Reg Dt/Tm," and then -- if we go
3  back to the first page, I have a few more questions for you.
4  A  (Turning back.)
5  Q  It says "Disch Dt/Tm."  What does that mean to you?
6  A  So that might appear to be the discharge date and
7  time.
8  Q  And then I haven't -- in all of these records, I
9  haven't seen anything under "Observation Dt/Tm."  Does that
10  mean anything to you?
11  A  Huh-uh.
12  Q  Sorry, was that a "No"?
13  A  "No."  I'm sorry.
14  Q  And then "VIP Indicator," does that mean anything to
15  you?
16  A  No, I'm sorry.
17  Q  That's everything I have on this page.  If you can go
18  to -- you see at the bottom there's "SWMH" hyphen and then a
19  series of numbers?
20  A  Yes.
21  Q  So those are called Bates numbers, and we use them in
22  these cases to help us keep track of where we are.  Or if
23  it's easier, we can use --
24  A  Which number would you like me to go to?
25  Q  Yeah.  So there's also numbers at the top that Anna

JENNIFER GADDIS

Page 97

1  significant.
2      A   So it says "ED Triage and Assessment Adult
3  Entered..."
4      Q   Is there a different type of nursing assessment you
5  perform in the ED other than triage and assessment?
6      A   For patients that are needing repeated assessments,
7  if they're there for a longer stay of time.
8      Q   Okay.
9      A   If they're of higher acuity, changes in assessments
10 are noted.  That's all documented in different nursing
11 assessments.
12     Q   Got it.  So this would indicate your first encounter
13 or your first nursing assessment of a patient if it's labeled
14 "ED Triage and Assessment"?
15     A   That's correct.
16     Q   And then subsequent, if there are any nursing
17 assessments, would just be labeled "Assessment"?
18     A   That's correct.
19     Q   Got it.  What does the date and time next to your
20 name here, July 17, 2021, 10:57 MDT, signify?
21     A   Okay.  So that is when I began to enter my triage
22 findings and assessment findings into the Cerner program.
23     Q   Basically, when you opened the note in the EMR?
24     A   Uh-huh.
25     Q   Sorry, is that a "Yes"?

Page 98

1      A   Yes.
2      Q   And then "Chief Complaint Onset," that's -- looks
3  like it's consistent with that similar time frame?
4      A   Yes.  So my routine -- I'm not too sure if this is
5  what you're asking.  My routine is to obtain information,
6  assess my patient, and at a good point to access the Cerner
7  chart and start entering it.
8          So the actual, you know, performing the assessment
9  occurred before this 10:57.
10     Q   So does the timing of this, that we've covered,
11 indicate that you would have written down information about
12 Mr. Newman, his vital signs, some sort of clinical information,
13 before you opened the note and put this information into the
14 electronic medical record?
15     A   Quite possibly, yes.
16     Q   Do you have any recollection one way or another?
17     A   Again, it's my habit to assess, obtain vital signs,
18 and then open my triage.
19     Q   And if you had done or taken some notes on one of the
20 forms we discussed, or somewhere else, what do you typically do
21 with those?
22     A   Shred them.
23     Q   Okay.  Immediately after --
24     A   Yes.
25     Q   -- the encounter?  Sorry.

Page 99

1      A   No, yes.  (Sic.)
2      Q   So if we can go to Page 113 --
3      A   (Turning to.)
4      Q   -- under "Social History," it has "Tobacco" and then
5  "Electronic Cigarette/Vaping."  Based on your answers earlier,
6  I assume if you had gotten the information from Mr. Newman
7  about alcohol use, this is where it would be documented?
8      A   Yes, sir.
9      Q   And as far as -- so I'm -- I'm trying to figure
10 out -- is this a situation -- or, in your experience, are these
11 areas only populated when you actually have information to
12 enter?
13     A   Okay.  So the histories are often auto-populated from
14 previous visits if the patient has been at our facility before.
15     Q   And then do you go in and -- and update it if --
16     A   If new information is given, yes, sir.
17     Q   Okay.  So, based on what I'm seeing here under
18 "Social History," there's really no indication, at least based
19 on this documentation, whether you talked to Mr. Newman about
20 alcohol use?
21     A   It's my habit to talk to him about alcohol use in
22 social history.
23     Q   And if he had said "No alcohol use," is that
24 something that would be populated here?
25     A   That is an option, "Never," yes.

Page 100

1      Q   Can you go to --
2          MS. COOK OLSON:  Just -- just -- I know you're
3  not looking at the clock.  We've got about 15 minutes left.
4          MR. HOMIAK:  I'm looking at the clock and making
5  sure I'm not gonna make anybody miss their flight.
6          MS. COOK OLSON:  Thanks.
7          MR. HOMIAK:  (Conferring with Ms. Holland
8  Edwards.)  Sorry about that.  Oh, there it is.  Okay.  Oh, got
9  it.
10     Q   (BY MR. HOMIAK)  So, to make things even more
11 confusing, we're going to switch to the page numbers at the top
12 right-hand corner.  And ask you to go to Exhibit 5, Page 109.
13     A   (Turning to.)
14     Q   Let me know once you're there.
15     A   I'm there.
16     Q   Do you see at the bottom it says "Rm/Bed" and then it
17 says "Triage"?  Does that mean anything to you, under
18 "Encounter Information"?
19     A   Again, I'm not acquainted with this area, but -- so,
20 on our Cerner board, the patient's name was moved to triage.
21     Q   Is there an option on the Cerner board for "OF" that
22 you've seen?
23     A   That's what I'm thinking about now.  I need to go
24 down and check.
25     Q   Unfortunately, I don't think we have the time --

25 (Pages 97 to 100)

ANIMAS REPORTING SERVICE
animas@animas.net

7b5466e8-77e5-4636-ba38-b5c0b39434e7