**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 22-cv-1763-PAB-KAS

ESTATE OF KELROY NEWMAN, et al

      Plaintiffs,

v.

BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF MONTEZUMA,
COLORADO, et al,

      Defendants.

---

**PLAINTIFFS' RESPONSE TO DEFENDANT DR. RANDY GENE DAVIDSON'S
MOTION FOR SUMMARY JUDGMENT [Doc. #194]**

---

      Plaintiffs, by and through counsel, respectfully respond to Defendant Dr. Randy Gene Davidson's Motion for Summary Judgment (Doc. #194) and in support thereof state as follows:

      Dr. Davidson stepped into Montezuma County's ("County") shoes and acted under color of state law when he authorized Mr. Newman's admission to Montezuma County Detention Center ("MCDC" or "Jail"). In so doing, he assumed the duty of providing constitutionally adequate medical care to Mr. Newman, but failed to do so. There is a surfeit of evidence demonstrating that Dr. Davidson knew of and disregarded an excessive risk to Mr. Newman's health and safety when he recklessly ignored Mr. Newman's critically high blood alcohol content ("BAC") and facial injuries, and completely failed to screen him, ask any questions about the quantity and duration of alcohol abuse, or prior history of alcohol withdrawal, or treat him in any way. Any medical professional would have recognized the obvious indicators that Mr. Newman was likely a chronic drinker, as demonstrated by his conscious state and ability to communicate despite his .421 BAC

1

level, that would put many people in a coma. Any reasonably trained doctor also knows that chronic drinkers are at risk of experiencing withdrawal if they stop drinking, which can result in seizures, delirium tremens, and other severe, life-threatening conditions. Despite this knowledge, Dr. Davidson did not provide MCDC any discharge instructions to ensure that Mr. Newman was properly monitored and treated for alcohol withdrawal. From these facts a jury could easily find Dr. Davidson knew of and disregarded an excessive risk to Mr. Newman's health and safety.

## I. RESPONSE TO STATEMENT OF UNDISPUTED FACTS ("SUMF")

**SUMF 1:**     Admit.

**SUMF 2:**     Admit.

**SUMF 3:**     Deny. Dr. Davidson also saw Mr. Newman for medical clearance for incarceration, which is not the same as a medical screening exam for non-custodial patients, as evidenced in part by the Hospital's practice of coding and billing MSEs and medical clearance exams separately. **Ex. 1**, p. 3 (listing various reasons for visit and discharge diagnosis of "medical clearance for incarceration").[1] Medical clearance exams are intended to ensure the patient can be safely housed in the jail setting for the foreseeable future, and are not performed with patients who are not in custody. **Ex. 2**, Davidson Depo 87:16-22; 88:10-17; Doc. # 104, ¶ 13; **Ex. 3**, Dr. Becker 04/01/24 Report, ¶¶ I.8, 12; **Ex. 4**, Nowlin Depo, 95:24-96:17, 102:7-14; **Ex. 5**, Hernandez Depo, 85:25-87:17; **Ex. 6**, Summers Depo, 36:16-39:21, 84:13-87:17; **Ex. 7**, Durbin Depo, 9:5-10:8 (Inmates with a BAC over .2 have to be medically cleared to "make sure that they're – we are cleared to hold them inside our facility, that he is healthy enough to come in."); **Ex. 8**, Guttridge Depo, 14:16-16:20 (Deputies get medical clearances to ensure "they're fit enough to be incarcerated" at the

---

[1] *See also*, **Ex. 38**, attorney affidavit.

jail), 93:11-94:18; 15:17-16:17 (when inmates are sent for medical clearances for intoxication, it is to obtain a "more in-depth investigation if they're fit to be incarcerated they are "being evaluated for whether they can safely detox in a jail."). Medical clearance exams at SWMH, including those performed by Dr. Davidson, are usually done within ten minutes, making them shorter in duration than medical screening exams. *See* ADMF 17, 27; **Ex. 9**, Felty 04/01/24 Report, p. 7 (short duration of clearance exams "raises the question of a different standard of care provided to patients like Kelroy Newman who are in police custody."); **Ex. 2**, 68:23-69:3 (intoxication clearances generally take three to ten minutes); **Ex. 10**, Osborn Depo, 29:15-30:7, 36:22-24 (nursing and doctor portion of intoxication clearances each take around five minutes); **Ex. 3** at ¶ V.

**SUMF 4:**    Admit officers will accompany custodial patients into the exam room for medical screening/medical clearance exams.

**SUMF 5:**    Deny that these two memoranda of understanding did not apply to the emergency room at SWMH, and the evidence relied on by Defendant for this fact is unsworn statement of counsel in discovery responses. *See also* contradictory evidence at Resp. to SUMF 6.

**SUMF 6:**    Deny. There is no sworn evidence establishing this fact – the materials cited are unsworn statements of counsel. *See also* SUMF 5.  Sheriff Nowlin did not testify that the MOUs did not apply to medical clearances. Rather, he testified the 2010 agreement was not in effect, testimony directly contradicted by the Hospital 30(b)(6) witness, who testified both MOUs were still in effect in 2021. *See* ADMF 8.

**SUMF 7:**    Admit.

**SUMF 8:**    Admit MCDC staff directed that Mr. Newman be brought to SWMH for medical clearance pursuant to MCDC policy. *See* ADMF 1, 5-8, 16.

**SUMF 9:**  Admit Dr. Davidson so testified. Deny this is an accurate or complete description of Newman's condition and presentation. *See* ADMF 15 & 29.

**SUMF 10:**  Admit Mr. Newman was acutely intoxicated at the time Dr. Davidson saw him, and therefore not yet experiencing alcohol withdrawal. Deny Mr. Newman did not display any signs of alcohol withdrawal, as he was tachycardic, which can be a sign of either acute intoxication or an early sign of alcohol withdrawal. **Ex. 11**, Dr. Becker 05/01/24 Report, ¶ 2.

**SUMF 11:**  Deny. Dr. Davidson's only instruction to Mr. Newman was to "return to this practice" "within as necessary." *See* ADMF 27. Dr. Davidson's only instructions to deputies were that Mr. Newman was "acceptable for admission to the jail," and that he had "no specific suggestions regarding the care of this prisoner for the condition for which [he] examined [him]." Doc. # 104, ¶ 14; **Ex. 12**, Dr. Thornton Report, pp. 4, 7-8; **Ex. 13**, Dr. Kerbel 03/29/24 Report, p. 3; **Ex. 1**, pp. 1, 3-4) (showing medical clearance disposition, discharge instructions to "return to this practice . . . within as needed," and no other patient education materials); **Ex. 10**, 66:14-67:19; **Ex. 2**, 100:4-18; **Ex. 3**, ¶¶ I.12, 20; **Ex. 9**, p. 7; **Ex. 14**, Dr. Roscoe 03/29/24 Report, p. 6.

**SUMF 12:**  Deny. *See* Resp. to **SUMF 11**. Dr. Davidson did not collect sufficient information to determine whether an emergency medical condition did or did not exist and did not give any instructions about what problems to look for or when to bring Mr. Newman back. **Ex. 3**, ¶¶ I.2-5, 7, 11, 15, 17-19; **Ex. 9**, p. 6.

**SUMF 13:**  Admit Dr. Davidson so testified. Deny that Dr. Davidson did not know that Mr. Newman had a dangerously high and potentially fatal blood-alcohol concentration of 0.421%. **Ex. 10**, 23:16-21, 45:5-23.

**SUMF 14:**  Admit Dr. Davidson had no further contact with Mr. Newman after he was discharged

on July 17, 2021. Deny Dr. Davidson, or anyone, gave Mr. Newman or police instructions to return if his condition worsened. *See* Resp. to **SUMF 11**.

**SUMF 15:**   Admit.

**SUMF 16:**   Admit that Mr. Newman complained his head hurt and asked to see a doctor. *See* **Ex. 6**, 105:22-106:3; 126:17-21; **Ex. 15**, Salt Depo, 28:14-29:20; **Ex. 16**, Salt Declaration ¶¶ 8-15; **Ex. 17**, Huff Depo, 8:17-11:11; **Ex. 18**, Incident Report, p. 2. *See* ADMF 31-32.

**SUMF 17:**   Admit.

**SUMF 18:**   Admit Dr. Davidson discharged Mr. Newman as "acceptable for admission to the jail." The remainder of this paragraph is argument, and therefore denied. The experts retained in this case vigorously disagree about whether the discharge was "correct" and whether the standard of care was met. **Ex. 3**, ¶¶ II-III; **Ex. 9**, p. 7.

## II.   STATEMENT OF ADDITIONAL DISPUTED MATERIAL FACTS ("ADMF")

**ADMF 1:**   In 2021, Montezuma County Detention Center ("MCDC" or "Jail") policy required certain arrestees, including those with a blood alcohol content ("BAC") greater than 0.2% or obvious head injury, be medically cleared as part of the intake and booking process. 197.1 at p. 2; **Ex. 19**, Jail Policy; **Ex. 8**, 26:13-22, 62:16-63:2; Doc. # 198, p. 3, ¶ 5.

**ADMF 2:**   Medical clearances for incarceration are intended to assess whether inmates can be safely housed in jail. They involve assessing both whether the patient has an emergency that moment, (such as acute alcohol intoxication), and also whether they are likely to suffer an emergency in the near future from the natural consequence of their known condition (such as a .421 BAC and the abrupt cessation of alcohol in jail). **Ex. 33**, Fowler Depo, 56:25-57:24, 76:15-77:5, 80:8-22 (chronic abusers of alcohol are more likely to experience withdrawal, which can lead

to coma or death, ER doctors are supposed to consider whether condition will progress and become more serious); **Ex. 9**, pp. 5-6; **Ex. 3**, ¶ II; Doc. # 115, AMF 6.

**ADMF 3:**  The County requires medical clearance exams to ensure that the "inmate is safe to be housed at the jail from a medical perspective." **Ex. 4**, 96:17 ("Yes, that's what it is intended for."). Sheriff Nowlin, and 30(b)(6) witness, testified that when the hospital says an intoxicated inmate is "medically cleared for jail," it is his understanding that the hospital had "evaluated the emergent conditions associated with that acute intoxication, which is intoxication problems and withdrawal problems." **Ex. 4**, 102:7-14; 95:24-96:17.

**ADMF 4:**  Nurse Hernandez testified that a medical clearance means that the inmate has been deemed "medically stable" and that it's safe to maintain them in the jail "for the rest of their stay." **Ex. 5**, 84:14-87:17.

**ADMF 5:**  County policy dictated that medical clearances were to be "done by the facility nurse when on duty, otherwise Southwest Memorial Hospital shall be utilized." **Ex. 20**, Jail Admission Policy, p. 3.

**ADMF 6:**  The Jail had one nurse who worked from 7 a.m. to 4 p.m. on weekdays. **Ex. 5**, 20:19-22, 31:14-19. MCDC did not have a medical unit or doctor, and there was no health care staff at the Jail on nights or weekends. **Ex. 4**, 23:3-13, 30:14-31:5; **Ex. 5**, 20:19-25, 23:5-25, 31:14-19, 54:20-55:3.

**ADMF 7:**  Thus, all night/weekend medical clearances, medications, and doctor-level care for inmates was outsourced to Southwest Health System, Inc.'s [2] emergency room and clinics. **Ex. 5**,

---

[2] Southwest Health System does business as Southwest Memorial Hospital and walk in clinic. *See* **Ex. 25**, Secretary of State Records.

37:25-38:10, 39:10-22, 61:21-24; **Ex. 7**, 17:3-18, 70:8-14; **Ex. 21**, Ruiz Depo, 40:10-14.

**ADMF 8:** This arrangement was codified in two Memoranda of Understanding ("MOUs") between Southwest Health Systems and Montezuma County, executed in 2010 and 2018, which remained in effect in 2021. **Exs. 22 & 23**, 2010 & 2018 MOUs; **Ex. 24**, 30(b)(6) deposition of SWMH, 64:7-20; 67:22-70:5.

**ADMF 9:** In agreeing to perform medical clearances for admission to jail, the Hospital and its employees, including Dr. Davidson, had a duty to perform constitutionally adequate exams, which must consider the patient's propensity to develop emergent conditions while incarcerated and give individually tailored discharge instructions. Emergency Medicine Expert, Dr. Becker states:

> The 2018 MOU between the County and SWMH regarding medical clearance of prisoners for incarceration demonstrates that both parties to that agreement were aware of the necessity for clear communication between the medical staff carrying out the clearances and the staff at the jail about the history and potential medical needs of each patient being cleared and discharged for incarceration, including potential risks or dangers for each patient that might develop based on the findings of the physician during the clearance examination. Discharge instructions must address these risks or dangers and any further treatment that the patient may need to receive and where and when that treatment will be available (e.g. return to the Emergency Department if certain signs or symptoms develop with a clear timeline for the development of those signs and symptoms and plan for further assessment and intervention). The physician discharging the patient has the responsibility to insure that the prison staff receiving the discharged patient understands the instruction and has the resources at the facility to provide additional evaluation and treatment, and a clear grasp of what signs and symptoms should precipitate return to the hospital and Emergency Department.

**Ex. 3**, ¶¶ I.12, II.2-3. *See* **Ex. 9**, p. 7.

**ADMF 10:** The County and Southwest Health Systems agreed to share inmate medical information and history in the interest of providing adequate care to detainees. **Exs. 22 & 23**.

**ADMF 11:** Thus, when a medical clearance was required as part of the Jail's admission process, deputies and SWMH providers were required to jointly complete a "Prisoner Medical Clearance

Report" that is on Montezuma County Sheriff's Office letterhead, printed at the Hospital, and brought to the Jail with the cleared patient. **Ex. 26,** Prior Medical Clearances; **Ex. 7**, 9:15-10:8, 12:4-10; Doc. # 104, ¶ 14 (acknowledging medical clearance forms are Sheriff's Office forms).

**ADMF 12:** In performing medical clearances for intoxication, SWMH staff and providers were responsible for and had a duty to direct the detoxification and withdrawal care of inmates. **Ex. 27**, County Response to ROG No. 16; **Ex. 5**, 37:25-38:10, 64:4-16; **Ex. 7**, 25:19-27:2; **Ex. 19**; Doc. #115, AMF 5. **Ex. 14**, pp. 6, 10; **Ex. 3**, ¶¶ II.2-3; **Ex. 9**, p. 7; **Ex. 28**, Caruso 03/22/24 Report, ¶70.

**ADMF 13:** The County form SWMH providers were required to fill out as part of the clearance process prompts providers to consider the patient's evolving condition and future care needs in jail. **Ex. 1**; Doc. #115, AMF 9.

**ADMF 14:** On Saturday, July 17, 2021, Mr. Newman was arrested and taken to MCDC. During initial processing at the Jail, Deputy Summers performed a COVID-19 screening, took Mr. Newman's temperature, and measured his BAC. **Ex. 6**, 76:11-25; **Ex. 29**, Covid Screening Form; **Ex. 10**; 15:11-22; **Ex. 21**, 27:14-28:2.

**ADMF 15:** Mr. Newman smelled of alcohol, and his potentially fatal BAC of 0.421% was the highest BAC Officer Osborn had ever seen. **Ex. 10**, 44:25-45:4, 50:4-19, 51:9-15; **Ex. 6**, 76:17-77:3, 81:20-22; **Ex. 29**. Doc. # 115, AMF 20.

**ADMF 16:** Pursuant to MCDC policy, Deputy Summers directed that Mr. Newman be taken to SWMH for medical clearance for intoxication, recent trauma, and obvious facial injuries. **Ex. 30**, Booking Report; **Ex. 29**; **Ex. 6**, 67:10-69:8, 81:6-82:16.

**ADMF 17:** At SWMH, Mr. Newman was first seen by Nurse Gaddis, who spent roughly five minutes with him. **Ex. 10**, 28:21-30:7; **Ex. 2**, 68:23-69:3, 107:16-20; **Ex. 9**, p. 7. Nurse Gaddis did

not confirm the conditions that triggered the medical clearance or include Mr. Newman's intoxication in her documentation of his evaluation. **Ex. 31**, Gaddis Depo, 71:10-72:17, 99:4-25

**ADMF 18:** During the minutes she spent with Mr. Newman, Nurse Gaddis did not conduct any nursing assessment of Mr. Newman's alcohol intoxication or potential for withdrawal. **Ex. 31**, 69:24-71:2; **Ex. 32**, June July Records, pp. 1-36. During her nursing assessment she took no social history and did not inquire at all about Mr. Newman's alcohol intake status, his head and facial trauma, or his history of substance abuse. Doc. #115, AMF 21, 23; **Ex. 32**, pp. 1-36. **Ex. 31**, 71:10-72:17, 99:4-25. She charted that he needed medical clearance for MCDC because of facial injury, and didn't even mention his .421 BAC. **Ex. 31**, 69:24-71:2; **Ex. 32**, pp. 23-24; **Ex. 10**, 42:13-21.

**ADMF 19:** Mr. Newman was then seen by Dr. Davidson, who knew Mr. Newman was too intoxicated to be admitted to the jail directly, and that the medical clearance exam was requested to determine whether Mr. Newman was safe for incarceration. **Ex. 2**, 62:18-63:19, 87:16-22, 88:10-17, 90:6-18; Doc. #104, ¶ 13.

**ADMF 20:** Dr. Davidson knows alcohol abuse and withdrawal can cause emergent conditions and serious injuries, including death. **Ex. 3**, ¶ I.7; **Ex. 2**, 31:5-32:8, 41:4-42:8; **Ex. 13**, § VI.8.

**ADMF 21:** Officer Osborn testified it is his practice to tell SWMH staff a patient's BAC. **Ex. 10**, 23:6-21, 45:5-23. He likely conveyed Newman's BAC was 0.421% to SWMH staff, including Dr. Davidson. *Id.*; *see* **Ex. 31**, 73:20-24 (patient's BAC would be reported to provider).

**ADMF 22:** A BAC of 0.421% is dangerously high and likely to cause a non-habitual drinker to suffer a coma, respiratory depression, or death. **Ex. 32**, p. 40; **Ex. 33**, 43:9-45:2, 77:25-78:8. The fact that Mr. Newman was walking and talking with such a high BAC is a well-known indication that he was a habitual drinker at substantial risk of experiencing alcohol withdrawal. **Ex. 34**,

Becker Depo, 64:5-16; **Ex. 33**, 43:9-45:2.

**ADMF 23:** Dr. Davidson did not repeat the breathalyzer or draw a blood alcohol level in the Emergency Department and, thus, was not able to ascertain whether the level obtained by Deputy Summers was going up at the time of Mr. Newman's ED evaluation, increasing his risk of complications from severe alcohol intoxication, or was going down, increasing his risk of alcohol withdrawal. **Ex. 3**, at ¶ I.3; **Ex. 35**, Dr. Peerwani 03/29/24 Report, p. 10.

**ADMF 24:** Dr. Davidson did not even inquire about Mr. Newman's BAC, drinking habits, withdrawal history, or polysubstance use. Doc. # 115, AMF 24; Doc. # 104, ¶¶ 13, 16; **Ex. 32**, pp. 1-36; **Ex. 13**, § VI.2; **Ex. 3**, ¶¶ I.4, 11, 17-18, V. Despite Mr. Newman's obvious face and head injuries, Dr. Davidson also did not order any imaging studies to evaluate these injuries or rule out a brain bleed. **Ex. 2**, 38:7-39:8; **Ex. 34**, 79:24-80:13; **Ex. 3**, ¶ I.4.

**ADMF 25:** Dr. Davidson knew that medically clearing Mr. Newman for admittance to MCDC meant that Mr. Newman "could neither drink alcohol nor come back to the hospital of his own volition." **Ex. 3**, ¶¶ I.6, 17-22.

**ADMF 26:** Mr. Newman was cleared for incarceration after about 10 minutes with Nurse Gaddis and Dr. Davidson, who asked no questions and ordered no tests related to alcohol intoxication. **Ex. 2**, 68:23-69:3; **Ex. 10**, 29:15-30:7, 36:22-24; **Ex. 36**, Hospital Supplemental Response to RFA 1-2; **Ex. 31**, 71:10-72:17, 99:4-25; **Ex. 32**, p. 4.

**ADMF 27:** Dr. Davidson discharged Mr. Newman after spending three to ten minutes with him, and without having collected information that was critical to determining whether an emergency condition existed. **Ex. 2**, 68:23-69:3; **Ex. 3**, ¶ I.7. On Mr. Newman's medical clearance form, Dr. Davidson selected the disposition "I have examined the prisoner and find him/her acceptable for

admission to the jail. I have no specific suggestions regarding the care of this prisoner for the condition for which I have examined him/her," and did not add any "physician's remarks" that might have guided Mr. Newman's care and monitoring in MCDC. **Ex. 1.**

**ADMF 28:** Dr. Becker, an expert in Emergency Medicine, opined that "Dr. Davidson's inadequate and unacceptably cursory exam of Mr. Newman" is most likely part of a "dangerous and degrading pattern of shoddy medical practice and willful neglect directed at Mr. Newman and other prisoner patients." Clearing those under arrest in such a manner, "especially in regards to alcohol intoxication and withdrawal" to go to a facility with such limited medical personnel, "creates an obvious and unreasonable risk of serious harm and death." **Ex. 3**, ¶V. *See Id.* at ¶ I.10.

**ADMF 29:** Mr. Newman was returned to MCDC approximately 40 minutes after he was sent out for medical clearance. **Ex. 10**, 43:18-44:3. Deputies could not take Mr. Newman's mugshot or complete the booking process because he was too intoxicated and unable to stand for the picture. **Ex. 8**, 37:5-24, 67:4-20, 68:7-69:23; **Ex. 6**, 31:4-32:12, 34:9-10; **Ex. 7**, 89:24-91-3.

**ADMF 30:** The morning after Mr. Newman was cleared, he was experiencing acute alcohol withdrawal. **Ex. 35**, p. 12, ¶ 5; **Ex. 3**, ¶ I.6; **Ex. 13**, ¶¶ 7-8. His head hurt badly, he had nausea, dry heaving, sweating, anxiety, and dehydration that went unnoticed by deputies, because they had no direction from Dr. Davidson about what symptoms to monitor. **Ex. 16**, ¶¶ 8-12; **Ex. 2**, 85:4-7; **Ex. 31**, 37:4-19; **Ex. 37**, CIWA Protocol. The deputies performed 30 minute "checks" on Mr. Newman that were essentially limited to making sure he was still breathing. **Ex. 6**, 55:20-56:5; **Ex. 7**, 34:4-6; **Ex. 21**, 46:13-47:1.

**ADMF 31:** Mr. Newman told Deputy Summers that his head hurt and he wanted to see a doctor but Deputy Summers denied the request, telling him he had already been cleared by Dr. Davidson.

**Ex. 17**, 8:17-11:11; **Ex. 18**, p. 2; **Ex. 15**, 29:6-20, 78:6-79:16; **Ex. 16**, ¶¶ 11-12. Deputy Summers knew he had been cleared for a very high BAC and head/facial injuries the day before and "relied" on the medical clearance "paperwork" to indicate that he was "safe to be housed at the jail;" could "safely come down and withdraw from that acute intoxication of the high .421 in the jail;" and was "safe to be housed in the jail … related to his facial injuries." **Ex. 6**, 73:22- 75:1, 82:11-16.

**ADMF 32:** Deputy Summers discussed Mr. Newman's request to go to the hospital with Shift Supervisor, Deputy Jewell, and they both determined to take Mr. Newman to the hospital later that day, because there was "no immediate urgency" as Dr. Davidson had "medically cleared him the night before, said that he was safe to be in jail." **Ex. 6**, 126:17-128:2; 129:14-131:8.

**ADMF 33:** Mr. Newman died just a few hours later from complications from alcohol withdrawal. **Ex. 35**, p. 12, ¶ 5 ("Newman's death is due to Sudden Unexpected Cardiac Death During Alcohol Withdrawal and not due to 'cirrhosis with severe fatty metamorphosis' as opined by Dr. Michael Arnall."); **Ex. 13**, p. 5 ("It is more likely than not, that Mr. Newman likely died secondary to complications of Acute Alcohol Withdrawal.").

**ADMF 34:** Mr. Newman "would not have died had he been maintained in the hospital for monitored detox or if the officers at Montezuma County Detention Center had brought Mr. Newman back to Southwest Memorial Hospital for treatment of acute alcohol withdrawal on the morning of 7/18/21." **Ex. 13**, p. 7; **Ex. 35**, p. 13, ¶ 6.[3]

### III. ARGUMENT

### *A. Dr. Davidson acted under color of state law in authorizing Newman's incarceration.*

---

[3] In its March 27, 2024, Order the Court previously ruled the following ADMFs admitted or partially admitted by SWMH: 2, 12, 13, 15, 18, 24, 26, 30-31, 33. See Doc. # 115, pp. 4-13; 127, pp. 1-3; 181, pp. 3-4, n. 5-9.

Section 1983 protects an individual's constitutional rights from harm committed "under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). Private individuals may be sued for their actions under § 1983 if "the conduct allegedly causing the deprivation of a federal right [is] fairly attributable to the State." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982). The Tenth Circuit has held that acts of a private individual can be attributable to the state under one of four tests: the nexus test, the symbiotic relationship test, the joint action test, or the public function test. *Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442, 1447 (10th Cir. 1995); *Janny v. Gamez*, 8 F.4th 883, 919 (10th Cir. 2021).

"Under the nexus test, a plaintiff must demonstrate that there is a sufficiently close nexus between the government and the challenged conduct such that the conduct may be fairly treated as that of the State itself." *Gallagher*, 49 F.3d at 1448. The symbiotic relationship test finds state action when "the [S]tate has so far insinuated itself into a position of interdependence with a private party that it must be recognized as a joint participant in the challenged activity." *Id.* at 1451. "The joint action test extends § 1983 liability to a 'willful participant in joint action with the State or its agents.' Under the public function test, a private individual may be deemed a state actor if the state delegates to that individual a function 'traditionally exclusively reserved to the State." *Bledsoe v. Schlachtenhaufen*, 829 F. App'x 383, 384-85 (10th Cir. 2020) (*quoting Gallagher* at 1453, 1456.

### 1. <u>Dr. Davidson is a state actor under the public function test.</u>

Montezuma County has a constitutional obligation to provide adequate medical care to people in its charge, which includes ensuring that people are safe to be incarcerated at their facility

through intake screenings and medical clearances.[4] *See, e.g.*, *Dawson v. Kendrick*, 527 F. Supp. 1252, 1308 (S.D. W. Va. 1981) ("The court concludes that the denial of adequate medical screening . . . and timely access to care at the Mercer County Jail constitutes deliberate indifference to the potentially serious medical needs of the pre-trial detainees and convicted prisoners alike in violation of the Eighth Amendment."). **ADMF 1-4, 9**. Thus, MCDC's written policies dictate that certain detainees, including those with a BAC greater than .2% or head injuries, must be medically cleared as part of the intake and booking process. **ADMF 1**. These policies make expressly clear that medical clearances will be "done by the facility nurse when on duty" and "otherwise Southwest Memorial Hospital shall be utilized." **ADMF 5**. Thus, when Mr. Newman registered a BAC of .421% during initial processing at the jail on a Saturday (when no jail nurse was on duty), Deputy Summers directed that he be taken to SWMH for medical clearance, as required by County policy. **ADMF 6-7, 14-16**.

At the Hospital, Dr. Davidson medically cleared Mr. Newman for admission to jail after spending about three to ten minutes with him. **ADMF 27**. Dr. Davidson understood he was acting on behalf of the County, that his role in the jail admission process was to determine whether Mr. Newman was safe for incarceration, and that he was responsible for directing his detoxification and withdrawal care in the Jail. **ADMF 10-13**, **19**. Indeed, the "Prisoner Medical Clearance Report" Dr. Davidson signed is on Sheriff's Office letterhead, and prompts the provider to give specific post-discharge treatment instructions to deputies. **ADMF 10-11, 13**. Mr. Newman's

---

[4] For purposes of the state actor analysis, it does not matter whether Mr. Newman was in the Cortez Police Department's custody or Montezuma County's custody. Either way, he was in the government's custody and Dr. Davidson performed a public function traditionally exclusively reserved to the State when he authorized Mr. Newman's admission to MCDC.

medical clearance occurred at the County's direction, pursuant to County policy, to satisfy the County's constitutional obligation. **ADMF 1-4, 9, 14, 15-16**. Per MCDC policy, Mr. Newman's medical clearance would have been performed at the Jail by the jail nurse, but was outsourced to Dr. Davidson because she was unavailable on weekends. **ADMF 5-8, 14-16, 19**. Such a deliberate substitution of a private actor for a public one, when performing a traditional governmental function, is a quintessential example of private action under color of state law.

The color-of-state-law analysis "is not a mono-factored analysis of the relationship between the doctor and the State. Instead…the state action question requires a multi-factored, flexible analysis, tailored to the specific facts of the case at hand." *Anglin v. City of Aspen*, 552 F. Supp. 2d 1229, 1242-43 (D. Colo. 2008) (citation omitted). The *Anglin* court explains that the doctor-state relationship is not, in fact, central to this analysis. Rather, "the dispositive issue concerns the relationship among the State, the physician, *and the prisoner*." *Id*. (italics in original) (quoting *West v. Atkins*, 487 U.S. 42, 55-56 (1988)). This inquiry should be a substance-over-form analysis of the *function* performed by a defendant physician in the larger jail medical system in which they are embedded. *Id*. at 1242-43.[5]

Dr. Davidson offers a number of reasons why he should not be considered a state actor under the complained-of circumstances: i) he was not free to refuse to treat Mr. Newman because

---

[5] *See McKenney v. Greene Acres Manor*, 650 A.2d 699, 701-02 (Me. 1994) (quoting *West v. Atkins*, 487 U.S. 42, 55 (1988) and *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)) (explaining that "it is the provider's function within the state system that determines whether his actions can be fairly attributable to the State," not his terms of employment, his relationship with the State, or the precise location where the treatment was offered); *see also Audette v. Carrillo*, Civil Action No. 15-cv-13280-ADB, 2019 U.S. Dist. LEXIS 1447, at *17 (D. Mass. Jan. 4, 2019) (holding physician at hospital acted under the color of state law when she "provided Plaintiff with medical care as part of the state's standard system for providing medical care to inmates.").

of his obligation as an ER physician to treat everyone; ii) he did not have a contract with the State or any governmental entity to provide medical care to incarcerated individuals; iii) he was treating patients at a public hospital, not onsite at a jail or prison; and iv) he did hot have ongoing communication with officers after discharging Mr. Newman. [Doc. # 194, p. 10].

These are red herrings that improperly ask this Court to turn the "public function" test on its head by elevating *the form of Dr. Davidson's terms of employment* over *the substance of the doctor's role* in the Montezuma County/MCDC/SWMH jail medical system.[6] The record shows that when Dr. Davidson medically cleared Mr. Newman for admission to the jail, pursuant to a contract or informal arrangement between the County and the Hospital, he was performing a public function and stepping into the shoes of the lone MCDC nurse who was not available on weekends.

Dr. Davidson was thus in the same position as the Defendant ER doctor in *Anglin*. Then Chief Judge Nottingham found, for purposes of summary judgment, that a private physician who subcontracted with a medical group to provide emergency room services, was a state actor when he telephonically ordered a detainee's sedation. *Anglin* at 1244-45. AEM had a contract with the hospital to provide services, but the physician did not. *Id.* at 1245. In finding that the physician was a state actor, the court held that a contractual relationship was unnecessary, emphasizing:

> a contractual relationship between a physician and the State is *not* required in order to find a physician acts under color of state law when treating an inmate. I agree with Fourth Circuit that nothing in *West* suggests that a physician must have a direct contractual relationship with the State in order to establish state action. Instead, the Court makes clear that "[i]t is the physician's function within the state system, not

---

[6] Dr. Davidson argues that the two MOUs did not cover medical clearances, and points out that he did not personally contract with the County to provide medical care to persons in custody. Doc. # 194, p. 10. However, it is not at all a requirement that there be a contractual relationship between Dr. Davidson and the County, or the Hospital and the County, for him to be a state actor under *West v. Atkins* and its progeny. 552 F. Supp. 2d at 1242-43 (italics in original) (referencing *Conner v. Donnelly*, 42 F.3d 220, 225 (4th Cir. 1994) and quoting *West*, 487 U.S. at 55-56).

the precise terms of his employment, that determines whether his actions can fairly
be attributed to the State."

*Id.* at 1242-43 (emphasis in original); *see also Conner v. Donnelly*, 42 F.3d 220, 225 (4th Cir. 1994). The court also found that in authorizing the physician to provide healthcare to the detainee, "the State delegated its constitutional duty to provide adequate medical care to those in custody[,]" and the detainee had no choice but to accept the treatment. *Id.* at 1244.

Here, as in *Anglin*, if Dr. Davidson's cursory screening violated Mr. Newman's constitutional rights, the deprivation "was caused, in the sense relevant for state-action inquiry, by the State's exercise of its right to punish [plaintiff-inmate] by incarceration and to deny him a venue independent of the State to obtain needed medical care." *Anglin*, 552 F. Supp. 2d. at 1243 (quoting *West*, 487 U.S. at 55). In performing a medical clearance that authorized Mr. Newman's admission to MCDC and directed his detoxification and withdrawal care in the Jail, Dr. Davidson was "fully vested with state authority to fulfill essential aspects of the duty, placed on the State by the Eighth Amendment and state law, to provide essential medical care to [detainees]." *West*, 487 U.S. at 57. As in *Anglin*, a contrary conclusion "would effectively serve to insulate the State from any liability for constitutional harms flowing from" these situations. 552 F. Supp. 2d at 1246.

### 2. Dr. Davidson is a state actor under the nexus and symbiotic relationship tests

Although Plaintiff need not show state action under more than one test, Dr. Davidson's role in the medical clearance process constitutes state action under both the nexus and symbiotic relationship tests as well. "No one criterion must necessarily be applied, as each test really gets at the same issue—is the relation between a nominally private party and the alleged constitutional violation sufficiently close as to consider the nominally private party a state entity for purposes of section 1983 suit?" *Janny v. Gamez*, 8 F.4th 883, 919 (10th Cir. 2021) (internal quotes omitted).

Each test requires a fact-specific analysis. *Gallagher* at 1448; *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 939 (1982) (describing the state actor assessment as a "necessarily fact-bound inquiry"). In this case, there is a "sufficiently close nexus between the government and [Dr. Davidson's] conduct such that the conduct may be fairly treated as that of the State itself." *Gallagher* at 1448.

Dr. Davidson relies on under *Blum v. Yaretsky* to argue that because he exercised medical judgment in performing a medical clearance exam and "the State is not responsible for a physician's medical decisions," he was not a state actor under the nexus test. Doc. # 194, pp. 7-8. Importantly, however, the *Blum* case did not involve a patient in state custody, and the Fourth Circuit has expressly rejected extending *Blum* to cases like this, which involve treating a custodial patient to whom the state owes a constitutional duty. *Conner v. Donnelly*, 42 F.3d 220, 227 (4th Cir. 1994) ("The physician and nursing home administrators in *Blum*, although paid by the state to provide medical services to Medicaid patients, were not employed by the state to fulfill its constitutional obligations."). The *Conner* court reasoned that because a physician treating a prisoner is engaged to fulfill the state's constitutional obligations, "the fact that the physician . . . exercises his own independent professional judgment does not mean that he does not act under color of state law." *Id.*; *see West v. Atkins*, 487 U.S. 42, 53, n.10 (1988) (distinguishing *Blum*).

As in *Conner*, Dr. Davidson was engaged "by the state to fulfill the state's constitutional obligations to its prisoners." *Conner* at 227. As detailed above, Mr. Newman was brought to SWMH in state custody, pursuant to a County policy, in the interest of satisfying the County's constitutional obligation to provide adequate medical care. **ADMF 1-4, 9, 14, 15-16**. The County's policy made expressly clear that this entire process would have taken place at MCDC, with a government employee, if available, and Dr. Davidson signed a County medical clearance form at

the end of his three-to-ten-minute visit with Mr. Newman, which authorized Mr. Newman's admission to MCDC. **ADMF 5-8, 10-11, 19-29;** Resp. to **SUMF 18**. Although Dr. Davidson did not contract directly with the County, "the determinative fact is that he was delegated, through his employer, [Montezuma] County's constitutional duty to provide prisoners at the jail with" adequate medical care. *Woodstock v. Shaffer*, 169 F. Supp. 3d 1169, 1171 (D. Colo. 2016). Because there is a nexus between Dr. Davidson's conduct and the state, he is properly considered a state actor. *Woodstock* at 1171 (denying summary judgment to employee of private corporation delegated a traditional state function under nexus test).

Dr. Davidson is also a state actor under the symbiotic relationship test, which "starts by asking whether and to what extent the state's relationship with the private actor goes beyond the mere private purchase of contract services." *Wittner v. Banner Health*, 720 F.3d 770, 778 (10th Cir. 2013) (internal quotes omitted). A "public-private relationship can transcend that of mere client and contractor if the private and public actors have sufficiently commingled their responsibilities." *Id.* By utilizing SWMH for all doctor-level care, medications, and night/weekend medical care, the County "has so far insinuated itself into a position of interdependence with [SHS] that there is a symbiotic relationship between them." *Gallagher* at 1447 (internal quotes omitted).

The unpublished decision, *Wilkins v. Chrisman*, 665 F. App'x 681 (10th Cir. 2016), relied on by Dr. Davidson to argue otherwise, is distinguishable. There, an inmate was in an accident while in a transport van and was taken to the ER. *Id.* at 682. The *Wilkins* court affirmed the district court's determination that the ER physician, who worked at a private medical center and treated the plaintiff, had insufficient contacts with the state to be a state actor. *Id.* at 684. The court so ruled in the absence of facts showing any connection between the physician or the medical center

and the state regarding the inmate's treatment. *Id.* That is far different than the instant case, wherein SWMH was an integral part of MCDC's standard system for providing medical care to detainees, as described above. *See Audette v. Carrillo*, 2019 U.S. Dist. LEXIS 1447, at *17.

Mr. Newman had a right to constitutionally adequate medical care. Defendant Southwest Health Systems contracted to provide health services to detainees when the facility nurse was unavailable. **ADMF 1-8**. Therefore, like *West*, this case is based upon the provision of services, pursuant to state contract, which the state is constitutionally obligated to provide. Further, while Dr. Davidson did not have a direct contractual relationship to provide services to MCDC's detainees, *Anglin* made clear that Dr. Davidson's affiliation as an ER physician with SWMH, which had such a contractual relationship, was sufficient. *See* 552 F. Supp. 2d at 1244-45 ("Dr. Martinez was not simply a private physician working for a private hospital[;] [a]lthough he did not contract directly with the State to provide medical services, he did contract *indirectly* with the State— through AEM—to provide such services." (emphasis in original)). Dr. Davidson was aware he was acting on behalf of the County when he signed Mr. Newman's medical clearance form, authorizing his admission to MCDC, and decided not to give deputies any specific instructions concerning Mr. Newman's care in the Jail. **ADMF 10-13**, **19**, **26-27**; Resp. to **SUMF 3**, **11-12**, **14**, **18**. He is a state actor under multiple tests, and liable under § 1983 for his deliberate indifference to the substantial risk that Mr. Newman would suffer significant harm.

### B. Dr. Davidson was deliberately indifferent to the substantial risk Newman would suffer serious harm.

Detainees have a Fourteenth Amendment right to be free from deliberate indifference to their known serious medical needs. *Estelle v. Gamble*, 429 U.S. 97 (1976). Deliberate indifference is shown when a defendant "knows of and disregards an excessive risk to [a detainee's] health or

safety." *Olsen v. Layton Hills Mall, 312 F.3d 1304*, 1315-16 (10th Cir. 2002). Constitutional liability under the deliberate indifference standard contains an objective and a subjective component. "The focus of the objective component is the seriousness of the plaintiff's alleged harm, while the focus of the subjective component is the mental state of the defendant with respect to the risk." *Prince v. Sheriff of Carter Cty.,* 28 F.4th 1033, 1044 (10th Cir. 2022).

Mr. Newman was known to be dangerously acutely intoxicated when he presented to Dr. Davidson with obvious facial injuries. **ADMF 14-16**, **19-22**. Hospital staff were told about his critically high BAC of .421, and Dr. Davidson knew that acute intoxication may be an emergency medical condition that can result in death. **ADMF 19-22**. Thus, Mr. Newman presented to Dr. Davidson with a sufficiently serious medical need to meet the objective prong. Moreover, contrary to Dr. Davidson's argument that "the objective prong must be satisfied by looking at Mr. Newman's condition when he was examined by Dr. Davidson on July 17, 2021," Doc. # 194, p. 15, the objective prong of the deliberate indifference test is satisfied if the ultimate harm suffered is sufficiently serious. In *Mata v. Saiz*, the Tenth Circuit expressly rejected this position, writing:

> [O]n several occasions our published opinions have defined a *sufficiently serious medical need* as "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." The problem with this formulation is that it can be read to say that the determination whether a medical need is sufficiently serious is to be made exclusively by the symptoms presented at the time the prison employee has contact with the prisoner. Indeed, that is how Judge Baldock interprets the test in his dissent. We do not view the objective test as so limited. For example, when delay by prison employees results in damage to a prisoner's heart, the question raised by the objective prong of the deliberate indifference test is whether the alleged harm (such as heart damage) is sufficiently serious (which it undoubtedly is), rather than whether the symptoms displayed to the prison employee are sufficiently serious (as argued by Judge Baldock). In this context, the symptoms displayed are relevant only to the subjective component of the test: were the symptoms such that a prison employee knew the risk to the prisoner and chose (recklessly) to disregard it?

427 F.3d 745, 753 (10th Cir. 2005) (internal quotes omitted). It is well-established that "death qualifies as a 'substantial harm' that satisfies the objective component." *Paugh v. Uintah Cty.*, 47 F.4th 1139, 1155-56 (10th Cir. 2022) (collecting cases). Thus, the objective component is satisfied where, as here, the claim is that the detainee died as a result of Dr. Davidson's conduct. *Stella v. Anderson*, 844 F. App'x 53, 56 (10th Cir. 2021); **ADMF 27-34**.

To satisfy the subjective component, a plaintiff "need not show that a prison official acted or failed to act believing that harm actually would befall an inmate." *Farmer*, 511 U.S. at 842. Rather, it is enough that an official "merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist." *Id.* at 843 n.8; *Paugh v. Uintah Cty.*, 47 F.4th 1139, 1159 (10th Cir. 2022) (*citing Burke*, 935 F.3d at 993 ("We have found deliberate indifference when jail officials confronted with serious symptoms took no action to treat them.") and *Jones v. Minn. Dep't of Corr.*, 512 F.3d 478, 482 (8th Cir. 2008) ("If prison officials have actual knowledge of a serious medical need, and fail to take reasonable measures to address it, they may [be] held liable for deliberate indifference.")).

Whether a defendant "had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Paugh* at 1156; *Hudak v. Miller*, 28 F. Supp. 2d 827, 831 (S.D.N.Y. 1998) (Sotomayor, J.) ("[I]f the evidence shows that the risk of serious medical problems was so obvious that a reasonable factfinder could infer actual knowledge of them on [defendant's] part, this Court must deny summary judgment."). Additionally, a medical professional's "heightened knowledge and training can be highly relevant and may tend to show awareness of and disregard of a substantial risk." *Lucas v. Turn Key Health Clinics, LLC*, 58 F.4th 1127, 1139 (10th Cir. 2023). A defendant

disregards risk when he fails to take reasonable measures to abate it. *Quintana v. Santa Fe Cnty. Bd. of Comm'rs*, 973 F.3d 1022, 1029 (10th Cir. 2020).

Plaintiff has put forth a surfeit of evidence showing that Dr. Davidson "refused to verify underlying facts that he strongly suspected to be true, [and] declined to confirm inferences of risk that he strongly suspected to exist." *Farmer*, 511 U.S. at 842.[7] At the time he authorized Mr. Newman's admission to MCDC without any specific monitoring or treatment instructions, Dr. Davidson had spent a total of three-to-ten minutes with Mr. Newman – a man who had visible wounds to his face and head, whose breath smelled of alcohol, and who had just recorded a dangerous and potentially fatal BAC of .421%, which was relayed to hospital staff. **ADMF 14-16, 21-27**. Despite knowing Mr. Newman was too intoxicated to complete the intake and booking process without medical clearance, and noticing few clinical indications of intoxication, Dr. Davidson did not order any tests or other diagnostic imaging. **ADMF 19, 22-23**. He didn't order Newman any medications or transfer him to a detox center, make any attempt to determine whether Mr. Newman's already potentially lethal BAC was rising or falling, inquire about polysubstance use, ask common-sense questions about his history with alcohol use and withdrawals, or even direct Nurse Gaddis to collect such information. **ADMF 17-20, 23-28**. Despite Mr. Newman's obvious face and head injuries, Dr. Davidson also did not order any imaging studies to evaluate these injuries or rule out a brain bleed. **ADMF 24**. After this recklessly insufficient examination, the doctor then authorized Mr. Newman's admission to MCDC, without any specific care or monitoring instructions, despite knowing that Mr. Newman's BAC would drop rapidly with no

---

[7] A state actor knew an inmate faced a substantial risk of significant harm if she (1) was aware of the inmate's symptoms or condition; and (2) knew that such symptoms or condition posed a substantial risk of significant harm to the inmate's health. *Mata*, 427 F.3d at 758-59.

access to alcohol at the jail, and that Newman could not come back on his own. **ADMF 17-28**.

From these facts, a jury could reasonably infer that Davidson knowingly turned a blind eye to Newman's substantial risk of serious harm. As many courts have held, once a state actor becomes aware of a risk of harm, that individual cannot avoid a finding of deliberate indifference by simply burying his head in the sand and refusing to look into the matter. *Farmer*, 511 U.S. at 843; *McGill v. Duckworth*, 944 F.2d 344, 351 (7th Cir. 1991); *Makdessi v. Fields*, 789 F.3d 126, 133-34 (4th Cir. 2015). Dr. Davidson stuck his head in the sand when he refused to investigate Mr. Newman's intoxication, likelihood of withdrawal, and head injuries after learning that he was too intoxicated to be admitted to the Jail and had recently experienced head trauma. As a trained medical professional, Dr. Davidson knew, *inter alia*, that Mr. Newman was very likely alcohol dependent as he was too intoxicated to be safely admitted to MCDC and was not exhibiting many clinical signs of intoxication, that habitual drinkers face a substantial risk of experiencing withdrawal upon cessation, that alcohol withdrawal can be lethal, and that Mr. Newman would not have access to alcohol in MCDC. **ADMF 20, 22, 25**. Dr. Davidson was similarly aware that he was authorizing Mr. Newman's release "not to caring family members or a medical detox facility, but rather to a jail, where his condition might not be well monitored, without doing any diagnostic testing to rule out a head injury. . . ." *Estate of Began v. Lake Cty.*, No. 07-cv-01786-WDM-CBS, 2008 U.S. Dist. LEXIS 51146, at *12 (D. Colo. July 3, 2008); **ADMF 25**.

This is not a mere negligence or 'disagreement with diagnosis' case as Defendant Davidson suggests. The line of cases Dr. Davidson cites address situations where a provider demonstrates an intent to treat, and then treats or diagnoses a person with the wrong condition, as opposed to what happened here, where the doctor made a *choice not to treat a person* for his known

intoxication and extreme danger for withdrawal. This does not come close to the case where a "doctor orders treatment consistent with the symptoms presented and then continues to monitor the patient's condition," such that liability can be avoided. *See Self v. Crum,* 439 F.3d 1227, 1232 (10th Cir. 2006); *compare* Dr. Davidson's care to that of the doctors in *Paugh v. Uintah Cty.*, 47 F.4th 1139 (10th Cir. 2022) and *Estate of Began v. Lake Cty.*, No. 07-cv-01786-WDM-CBS, 2008 U.S. Dist. LEXIS 51146 (D. Colo. July 3, 2008). Rather, Dr. Davidson's decision to rubber stamp Mr. Newman's admission to MCDC after three-to-ten minutes, and without collecting crucial information, constitutes medical care "so cursory as to amount to no treatment at all." *Ancata v. Prison Health Servs., Inc.,* 769 F.2d 700, 704 (11th Cir. 1985); *see also Lancaster v. Monroe County, Ala.*, 116 F.3d 1419, 1426 (11th Cir. 1997) (A person "who is aware of but ignores the dangers of acute alcohol withdrawal and waits for a manifest emergency before obtaining medical care is deliberately indifferent to the inmate's constitutional rights."). Dr. Davidson disregarded a substantial risk of serious harm when he recklessly cleared Mr. Newman for jail admission and did not provide any direction for his care, monitoring, or treatment.

WHEREFORE, the Plaintiffs respectfully request that this Court deny Defendant Davidson's Motion in its entirety.

Respectfully submitted this 29th day of August, 2024.

*/s/ Rachel Kennedy*
Rachel Kennedy
Anna Holland Edwards
Erica Grossman
HOLLAND, HOLLAND EDWARDS & GROSSMAN, LLC
1437 High Street
Denver, CO 80218
*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 29th day of August, 2024, the foregoing was filed using the CM/ECF system. I hereby certify I will send electronic notification of said filing to the following recipients.

Amy Cook Olson
Angela Lund Klein
KLEIN COOK OLSON, LLC
acookolson@kco-law.com
aklein@kco-law.com
*Attorneys for Southwest Health Defendant*

Mark B. Collier
Julia Morgenthau
CHILDS MCCUNE
mcollier@childsmccune.com
jmorgenthau@childsmccune.com
*Attorneys for Defendant Davison*

Ann B. Smith
VAUGHAN & DEMURO
asmith@vaughandemuro.com
*Attorney for County Related Defendants*

*/s/ Brooke Thiele-LaForest*
Brooke Thiele-LaForest, Paralegal