# Stella v. Davis Cnty.

United States Court of Appeals for the Tenth Circuit

November 13, 2024, Filed

No. 23 -4122

**Reporter**

2024 U.S. App. LEXIS 28720 *

 Christopher M. Wolpert CYNTHIA STELLA; ESTATE OF HEATHER MILLER, Plaintiffs - Appellees, v. DAVIS COUNTY; MARVIN ANDERSON, Defendants - Appellants, and SHERIFF TODD RICHARDSON; JAMES ONDRICEK, Defendants.

**Notice:** Decision text below is the first available text from the court; it has not been editorially reviewed by LexisNexis. Publisher's editorial review, including Headnotes, Case Summary, Shepard's analysis or any amendments will be added in accordance with LexisNexis editorial guidelines.

## Opinion

 [*1] **ORDER AND JUDGMENT\***

_____

Before **HARTZ**, **PHILLIPS**, and **EID**, Circuit Judges.

_____

This appeal challenges a jury verdict based on a finding of deliberate

indifference to the medical needs of a detainee, Heather Miller, resulting in her

\*This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

Appellate Case: 23-4122 Document: 86-1 Date Filed: 11/13/2024 Page: 2

death.1The two parties found liable for the constitutional violations suffered by Miller are Davis County and a jail nurse, Marvin Anderson. They appeal, arguing for a new trial, an altered judgment, and judgment as a matter of law under a host of issues, including evidentiary rulings, evidence sufficiency, qualified immunity, jury instructions, verdict inconsistency, prejudicial inclusion of claims, damages, and the attorney-fees award. For each issue, we find no grounds to reverse. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

**BACKGROUND**

2024 U.S. App. LEXIS 28720, *1

Because Miller prevailed at trial, we consider all the evidence in the light most favorable to her. [*2] *Escue v. N. Okla. Coll.*, 450 F.3d 1146, 1156-57 (10th Cir. 2006). The procedural background is undisputed.

## I. Factual Background

On December 20, 2016, twenty-eight-year-old Heather Miller was booked into the Davis County Jail and assigned a bunkbed in a cell on the second floor. About 6:00 p.m. the next day, Miller fell from the top bunk and landed on the concrete floor. Miller's cellmate sought help by "pounding on the [cell] window." App. vol. XI, at 2230-33. A jail deputy arrived and, on seeing Miller, radioed for medical help.

1Because Miller is deceased, the Estate of Heather Miller brought her claims. Both Miller and her estate are referred to as "Miller."

2

Appellate Case: 23-4122 Document: 86-1 Date Filed: 11/13/2024 Page: 3

Nurse Anderson arrived in a few minutes. Miller still lay on the floor, complaining of pain in her side. Miller's cellmate told Anderson that Miller had fallen from the top bunk and landed on her left side. Anderson began talking to Miller. She told him that she was "coming off" methamphetamine, that she was dizzy and nauseous, that she had hurt her side in the fall. App. vol. XII, at 2323-24. Even so, Anderson did not take her vitals, call a physician, or transport her to the medical unit for monitoring.

As Miller lay on [*3] the floor, Anderson decided to move her to a clean, one-person cell on the other side of the jail, even though the medical unit had an empty bed. At trial, Anderson said he chose this course because he believed that she was "withdrawing" from methamphetamine. As Anderson and another jail staffer began to move Miller, she became even more dizzy and nauseous. She needed assistance walking, so Anderson and a guard helped her, holding her under her shoulders.

During the twenty-second walk along the catwalk to the stairs, Miller twice stopped moving and bent over from pain in her midsection. At the top step of the stairs, the guard helped Miller sit down. She hunched over, head down, and waited for Anderson, who had gone after a wheelchair. When Anderson arrived with the wheelchair, Miller could not stand or step down the stairs. Again helped by a guard, Miller managed to scoot down the stairs on her rear end one step at a time. Reaching the bottom, again with help, she flopped into the wheelchair. Her body went limp, her head lolled backward and

3

Appellate Case: 23-4122 Document: 86-1 Date Filed: 11/13/2024 Page: 4

remained there, and her eyes rolled skyward. Anderson later recalled that

[*4] Miller's dizziness and difficulty moving scared him.

Anderson then wheeled her across the jail and left her in a one-person

cell. Here too, Anderson did not take her vitals, call for medical assistance, take her to an open bed in the medical unit, or have her be medically monitored.2 Instead, he left her in the cell and returned to the medical unit, where he scheduled her for a next-day, in-person appointment with a doctor. An hour passed. Anderson never checked on Miller, but about 7:30 p.m. a deputy walked past Miller's cell without stopping. Then, about 8:20 p.m., the deputy again walked by Miller's cell. He saw that she was lying on the ground, naked from the waist down, with blood on her chin and one foot up on the toilet. He called the medical unit and told Nurse Daniel Layton about Miller's condition. Nurse Layton did not think medical intervention was necessary. A guard overheard the deputy ask Nurse Layton, "[S]o you just don't want me to think too much about it?" App. vol. XII, at 2286-87; App. vol. VII, at 1329.

2 The County contends that Anderson ordered that Miller be monitored after he dropped her off in the cell. Though Anderson testified that he asked a nonmedical guard to check on [*5] Miller every thirty minutes, it is undisputed that he did not make any efforts to have Miller *medically* monitored, something that guards could not do. App. vol. XII, at 2333; *see also* App. vol. XIII, at 2586, 2641 (explaining the difference between medical observation and guards walking past a cell). In any event, the jury could have disbelieved that Anderson requested even nonmedical monitoring because no one checked on Miller for over an hour, no one testified they received such an order, and no documentary record supported the existence of such an order.

4

Anderson overheard part of the phone call in which the deputy said Miller had "blood on her chin," but Anderson felt it was not serious.

Despite Nurse Layton's response, the deputy was concerned about Miller and sought help from two other guards, who arrived minutes later. They observed that Miller was cold to the touch, that her skin was gray and clammy, that her hair was sweat soaked, and that she was in pain. They picked her up and took her by wheelchair to the jail's medical unit.

Anderson was there when the guards wheeled Miller into the medical unit. Seeing [*6] her, he thought she was dead. He called for an ambulance. While being transported, Miller stopped breathing and entered cardiac arrest. She lacked a pulse on arriving at the ER. The ER team officially declared Heather Miller dead at 10:06 p.m.

The blunt force trauma from the fall fractured and ruptured Miller's spleen, which caused internal bleeding and her death. A doctor testified that the injury from the fall was "very highly treatable." App. vol. XIII, at 2543. With "proper assessment and monitoring," she had a "very high probability of survival." *Id.* at 2586. If Anderson had taken her vitals after arriving at Miller's cell, he at the least would have established a baseline from which to monitor. Medical monitoring or a hospital visit would likely have shown clear signs of internal bleeding, leading to her receiving life-saving medical care. But, according to one nursing expert, by not having her vitals taken and by not receiving routine medical monitoring, Anderson provided Miller "no medical

5

care" after her fall. *Id.* at 2653. Anderson's lack of treatment, according to that expert, was "a dereliction of duty." [*7]  *Id.* at 2601-02. An emergency medicine physician testified that Miller was provided "little to no medical care because there wasn't really any concern about [her risk of injury]." *Id.* at 2518-19.

Yet neither Nurse Anderson's nor Nurse Layton's actions and inactions violated any written jail nursing protocols-because the jail had none. This failure left the nurses with no "structure" or "step-by-step instruction" to follow when "presented with a common problem." App. vol. XII, at 2349. But it hadn't always been that way.

For years, the jail had in place a set of written nursing protocols. But in 2012, according to the sheriff's testimony, the Department of Professional Licensing instructed the jail to "get rid of" its nursing protocols and to "strike them completely" on grounds that the existing protocols gave nurses too much "leeway" and were potentially "in conflict with state licensure requirements."

*Id.* at 2415-18, 2420, 2387. The jail did so but did not update or replace its nursing protocols. One jail expert testified that he had never heard of a jail abandoning nursing protocols and that the absence of any written protocols was dangerous and made mistakes "highly likely." App. vol. [*8]  XIII, at 2707-09. Likewise, the sheriff-who was responsible for establishing nursing protocols-acknowledged during his testimony that a jail without any nursing protocols ran the risk of missing "basic steps" in providing detainees' minimum medical care. App. vol. XII, at 2427-28.

6

The County contended that it had *unwritten* nursing protocols for how to treat and monitor detainees in situations like Miller's, but if so, the nursing staff received no training on it. The jail's director of nursing testified that the jail trained nurses in CPR and sent them to annual nursing conventions, but it provided no other nursing training, let alone training on unwritten nursing protocols. We see no sign of any nursing training or nursing protocols at Davis County Jail in the years preceding Miller's death.

## II. Procedural Background

After Miller's death, her mother, Cynthia Stella, sued in the United

States District Court for the District of Utah on behalf of herself and her

daughter's estate, alleging violations of the United States Constitution and the

Utah State Constitution. Defendants were Davis County, Nurse Marvin

Anderson, Nursing [*9] Supervisor James Ondricek, and Sheriff Todd Richardson.

Jurisdiction was proper for the federal claims under 28 U.S.C. § 1331, and

supplemental jurisdiction was available for the state claims under 28 U.S.C.

§ 1367.

The case proceeded past discovery, summary-judgment motions, an

unavailing interlocutory appeal seeking qualified immunity, and many pretrial

motions.3 Trial began on July 18, 2022. The Estate presented three claims: (1) a

3Anderson appealed the district court's denial of qualified immunity at summary judgment. *Stella v. Anderson*, 844 F. App'x 53, 54 (10th Cir. 2021). We rejected that interlocutory appeal because Anderson raised a factual dispute

(*footnote continued*)

7

Appellate Case: 23-4122 Document: 86-1 Date Filed: 11/13/2024 Page: 8

42 U.S.C. § 1983 claim that Anderson had acted with deliberate indifference to Miller's serious medical needs in violation of the Fourteenth Amendment to the United States Constitution; (2) a § 1983 claim that the County was deliberately indifferent to Miller's serious medical needs through its policies and training in violation of the Fourteenth Amendment to the United States Constitution; and

(3) a state-law claim that the County, Anderson, Richardson, and Ondricek had subjected Miller to "unnecessary rigor" in her confinement in violation of Article 1, Section 9 of the Utah Constitution. The third claim was brought by Stella too.

During trial, the district court made many rulings on the admissibility of [*10] evidence. After the close of evidence, the County and Anderson jointly filed a written Motion for Judgment as a Matter of Law under Rule 50(a) of the Federal Rules of Civil Procedure. The written motion requested that the court strike the punitive damages claim as well as Stella's claim under the Utah Constitution. During oral argument on the motion, they further asserted that the Estate had presented insufficient evidence to find that Anderson had been deliberately indifferent to Miller's

serious medical needs. The court deferred ruling on these issues until after the jury returned its verdict.

The jury found (1) Anderson liable under § 1983 and awarded Miller $300,000, (2) the County liable under § 1983 and awarded Miller $3,850,000,

about his state of mind, and we lacked interlocutory jurisdiction to review the sufficiency of evidence of subjective knowledge. *Id.* at 57.

8

and (3) the County liable under the Utah Constitution and awarded Miller $3,850,000 and Stella $2,000,000. All damages were compensatory, no punitive damages were awarded. No individual defendant was found liable for the state-law claims.

After the verdict, the district court struck Stella's state-law claim as [*11] a matter of law, reducing the verdict against the County by $2,000,000. *Stella v.Davis Cnty.*, No. 1:18-CV-00002-JNP-DBP, 2022 WL 3043092, at *3 (D. Utah Aug. 1, 2022). The district court also denied qualified immunity to Anderson.

*Stella v. Davis Cnty.*, No. 1:18-CV-00002-JNP-DBP, 2022 WL 4235141, at *6 (D. Utah Sept. 14, 2022).

On September 27, 2022, the court entered its judgment. The County and Anderson timely filed post-judgment Rule 59(a)-(e) motions. The arguments raised in those motions largely mirror those on appeal. In its motion, and for the first time during the litigation, the County argued that the "existing remedies" element of the state-law claim meant that the state-law claim could not coexist with the federal claim.

The district court denied the County's and Anderson's motions. *Stella v.Davis Cnty.*, No. 1:18-CV-00002-JNP-DBP, 2023 WL 5334421, at *1 (D. Utah Aug. 18, 2023) (denying the County's Rule 59 motions); *Stella v. Davis Cnty.*, No. 1:18-CV-00002-JNP-DBP, 2023 WL 5334188, at *1 (D. Utah Aug. 18, 2023) (denying Anderson's Rule 59 motions). At the same time, on Miller's motion and a hearing, the district court awarded Miller's counsel $728,256 in

9

attorneys' fees. *Stella v. Davis Cnty.*, No. 1:18-CV-00002-JNP-DBP, 2023 WL 5334427, at *12 (D. Utah Aug. 18, 2023).

Anderson and the County jointly appealed, listing twelve issues. Stella also appealed, asserting that her jury award from her claim under the Utah Constitution should have stood, but she later voluntarily dismissed her appeal.

*Stella v. Davis Cnty.*, No. 1:18-CV-00002-JNP-DBP, 2024 WL 1329735, at *1 (10th Cir. Feb. 29, 2024) (granting dismissal). The district court stayed the judgment pending appeal.

## STANDARD OF REVIEW

We review for an abuse [*12] of discretion a district court's denial of a Rule 59(e) motion to alter or amend the judgment. *Etherton v. Owners Ins. Co.*, 829 F.3d 1209, 1228 (10th Cir. 2016). To reverse, we must have "a definite and firm conviction that the lower court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." *Headwaters Res., Inc.v. Ill. Union Ins. Co.*, 770 F.3d 885, 899 (10th Cir. 2014) (internal quotation marks omitted). "The abuse of discretion standard includes review to determine that the discretion was not guided by erroneous legal conclusions." *ClearOneCommc'ns, Inc. v. Biamp Sys.*, 653 F.3d 1163, 1178 (10th Cir. 2011) (internal quotation marks omitted). "Pure questions of statutory interpretation are reviewed de novo." *Stickley v. State Farm Mut. Auto Ins. Co.*, 505 F.3d 1070, 1076 (10th Cir. 2007). So we review de novo for errors of law. *Burke v.Regalado*, 935 F.3d 960, 1044 (10th Cir. 2019).

10

Likewise, we review for an abuse of discretion a district court's denial of a Rule 59(a) motion for a new trial. *M.D. Mark, Inc. v. Kerr-McGee Corp.*, 565 F.3d 753, 762 (10th Cir. 2009). A Rule 59(a) motion for a new trial "normally involves a review of the facts presented at trial, and thus involves the discretion of the trial court." *Escue*, 450 F.3d at 1157 (internal quotation marks omitted). If a new-trial motion challenges the sufficiency of the evidence, the verdict must stand "unless it is clearly, decidedly, or overwhelmingly against the weight of the evidence." *M.D. Mark*, 565 F.3d at 762 (internal quotation marks omitted).

Anderson and the County dispute the district court's [*13] denials of motions for judgment as a matter of law, a new trial, and alterations to judgment. But the issues include challenges about evidentiary rulings, evidence sufficiency, qualified immunity, jury instructions, verdict consistency, existing remedies, apportionment, excessive damages, prejudicial inclusion of later-dismissed claims, and attorney fees. We set forth the standard of review for each discrete challenge in its respective section.

## DISCUSSION

The County and Anderson list twelve issues on appeal. Some of these issues overlap. Others contain sub-arguments that present issues of their own. Collectively, the issues sprawl across many subject areas, standards of review, and procedural postures.

11

We address the issues in these eight groups: (I) evidentiary rulings; (II) sufficiency of the evidence; (III) jury instructions; (IV) inconsistent state-law verdict; (V) relationship between federal and state-law claims; (VI) double recovery and excessive verdict; (VII) Stella's dismissed state-law claim; and (VIII) attorney fees. Largely for the same reasons provided by the district court's many detailed rulings in [*14] this case, we find no reversible error and affirm.

**I. Evidentiary Rulings**4

We review for an abuse of discretion a district court's evidentiary

rulings.5 *United States v. Silva*, 889 F.3d 704, 709 (10th Cir. 2018). "A district court abuses its discretion when it renders an arbitrary, capricious, whimsical, or manifestly unreasonable judgment." *Id.* (internal quotation marks omitted). If the district court abused its discretion in its evidentiary rulings, we then determine whether the error was harmless, and we reverse only "if the error affects a substantial right of the party." Fed. R. Evid. 103. "An error affecting a

4 This section addresses Appellants' issues A, F, and G. Op. Br. at ii.

5 The County and Anderson argue for a different standard of review: "Evidentiary rulings are normally reviewed for abuse of discretion. In this case, however, the standard of review is *de novo* because the Court's exclusion of evidence resulted in a denial of due process." Op. Br. at 42. In support, the County and Anderson cite *United States v. Boigegrain*, 155 F.3d 1181, 1185 (10th Cir. 1998), an unhelpful Sixth Amendment right-to-counsel case. Other than that, they cite nothing to support their position that we should review de novo or that an erroneous evidentiary ruling in a civil case can amount to a cognizable violation of due process. Without adequate [*15] argumentation, we will not adopt de novo review of the trial court's evidentiary rulings.

12

substantial right of a party is an error which had a substantial influence or

which leaves one in grave doubt as to whether it had such an effect on the

outcome." *McInnis v. Fairfield Cmtys., Inc.*, 458 F.3d 1129, 1142 (10th Cir.

2006) (cleaned up). When determining whether an error was harmless, "we

review the record as a whole." *Id.* (internal quotation marks omitted).

The County and Anderson argue that much evidence was improperly

excluded and admitted at trial, including: (1) excluded "impeachment" evidence

about Miller's drug-use history, prostitution-solicitation history, and mental-

health diagnoses; (2) excluded testimony about the effects of mental-health

diagnoses and drugs on Miller's life expectancy and earning potential; and

(3) admitted evidence about non-constitutional medical standards of care, like

nursing standards.

The district court's reasoning for each ruling was sound and within its

considerable discretion.6 First, the court properly excluded evidence of Miller's

prostitution-solicitation acts and her mental-health status under Federal Rule of

Evidence 403. Further, the court disallowed [*16] the evidence for impeachment of

Stella, ruling that Stella's previous statements about her daughter's health and

6The district court addressed all these issues. *See Stella v. Davis Cnty.*, No. 1:18-CV-00002-JNP-DBP, 2022 WL 766401, at *1 (D. Utah Mar. 14, 2022) (substance abuse, mental health, criminal history); *Stella v. Davis Cnty.*, No. 1:18-CV-00002-JNP-DBP, 2022 WL 773242, at *1 (D. Utah Mar. 14, 2022) (non- constitutional medical standards of care); *Stella*, 2023 WL 5334421, at *8-9 (impeachment).

13

Appellate Case: 23-4122 Document: 86-1 Date Filed: 11/13/2024 Page: 14

lifestyle were not inconsistent with her trial testimony. Second, the accountant's testimony about the effects of Miller's mental-health diagnoses and drug usage on her life expectancy was properly excluded because the accountant lacked expertise in that field and could not reliably introduce the hearsay statements of drug-addiction and mental-health experts under Rule 703.

*See TK-7 Corp. v. Est. of Barbouti*, 993 F.2d 722, 732-33 (10th Cir. 1993)(explaining that a declarant cannot circumvent hearsay prohibitions by invoking Rule 703 where the declarant cannot demonstrate that the hearsay was reliable).

Finally, the admission of medical-standards evidence was not erroneous given its purpose and place in the case. Of course, violations of non-constitutional medical standards do not set the standard for deliberate indifference to serious medical needs. But evidence [*17] of non-constitutional medical standards can "certainly provide circumstantial evidence that a prison health care [official] knew of a substantial risk of serious harm" for purposes of the deliberate-indifference inquiry. *Mata v. Saiz*, 427 F.3d 745, 757 (10th Cir. 2005). Admitting such evidence in this case was for a proper purpose and not an abuse of discretion.

Even if any of the challenged evidence were improperly excluded or admitted, we would find that any such abuse was harmless. Nearly all the evidentiary challenges concern excluded evidence-such as Miller's history with drugs-the purpose of which was to reduce life-expectancy and lost-income damages. But the County tackled this point at length in closing, arguing

14

Appellate Case: 23-4122 Document: 86-1 Date Filed: 11/13/2024 Page: 15

that Miller was a "person who uses methamphetamine" and that it was beyond belief that Miller would "never get loaded" or "never get fired" because "she's on drugs." App. vol. XV, at 3069-70. Reviewing the whole record, we are confident that all challenged evidentiary rulings were harmless as well as errorless. *McInnis*, 458 F.3d at 1142. We affirm those rulings.

## II. Sufficiency of the Evidence

The County and Anderson argue that the jury had insufficient evidence to conclude [*18] that they violated the United States Constitution.7The district court rejected both contentions. We do too. First, the evidence sufficed for a reasonable juror to find Anderson acted with deliberate indifference to Miller's serious medical needs in violation of the Fourteenth Amendment. Second, the evidence sufficed for a reasonable juror to find the County causally culpable for that violation. We explain both points in turn.

## A. Anderson8

After the close of evidence, Anderson filed a motion under Rule 50(a) for judgment as a matter of law, requesting dismissal of the availability of punitive

7 Though the County off-handedly asserts that insufficient evidence shows that it violated Miller's "state constitutional rights," the County's argument and citations target the federal claim. Op. Br. at 48-49. So we decline to address a direct sufficiency-of-evidence challenge to the state claim. *Bronson v. Swensen*, 500 F.3d 1099, 1104 (10th Cir. 2007).

8 This section addresses Appellants' issue C, "Whether the Verdict Against Anderson [] Is Supported By The Evidence," and issue B, "Whether The Court Erred When It Denied Anderson Qualified Immunity." Op. Br. at ii.

15

damages and Stella's state-law claim. Later, arguing the [*19] motion, Anderson added that he was entitled to judgment as a matter of law on the § 1983 deliberate-indifference claim because of insufficient evidence. Implicit in this sufficiency-of-the-evidence argument was a request for qualified immunity, limited to the first prong of the analysis on whether Miller had shown a constitutional violation. After trial, the district court concluded that the evidence sufficed to support the § 1983 claim and that Anderson was not entitled to qualified immunity. *Stella v. Davis Cnty.*, No. 1:18-CV-00002-JNP-DBP, 2022 WL 4235141, at *6 (D. Utah Sept. 14, 2022) (qualified-immunity opinion). Anderson appeals those decisions, and we review de novo. *Arnold OilProp. LLC v. Schlumberger Tech. Corp.*, 672 F.3d 1202, 1206 (10th Cir. 2012). We agree with the district court.

"A prison official's deliberate indifference to an inmate's serious medical needs violates the Eighth Amendment." *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000). The deliberate indifference standard applies to pretrial detainees, such as Miller, through the Fourteenth Amendment. *Paugh v. UintahCnty.*, 47 F.4th 1139, 1153-54 (10th Cir. 2022). A claim alleging deliberate indifference to a detainee's serious medical needs has two components, one objective and one subjective. *Id.* at 1154-55.

To satisfy the objective component the medical need must be "sufficiently serious." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). A "medical need is sufficiently serious 'if it is one that has been diagnosed by a

16

Appellate Case: 23-4122 Document: 86-1 Date Filed: 11/13/2024 Page: 17

physician as [*20] mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Sealock*, 218 F.3d at 1209 (quoting *Hunt v. Uphoff*, 199 F.3d 1220, 1224 (10th Cir. 1999)). Relatedly, a delay in medical care that results in substantial harm, such as "considerable pain" or death while awaiting treatment, can satisfy the objective component. *Paugh*, 47 F.4th at 1155 (internal quotation marks omitted). Here, the objective component is not in dispute. Stella undoubtedly experienced considerable pain before her death.

To satisfy the subjective component, the official must have (1) known the detainee faced a "substantial risk of serious harm" and (2) "disregard[ed]" that risk by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 847. The official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Self v. Crum*, 439 F.3d 1227, 1231 (10th Cir. 2006) (internal quotation marks omitted). "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Farmer*, 511 U.S. at 842. "[A] licensed medical professional's heightened knowledge and training can be highly relevant and may tend to show awareness [*21] of and disregard of a substantial risk; especially so when the injuries, like here, are internal . . . ." *Lucas v. Turn Key Health Clinics, LLC*, 58 F.4th 1127, 1139 (10th Cir. 2023). At the same time, a factfinder may "conclude that a prison

17

Appellate Case: 23-4122 Document: 86-1 Date Filed: 11/13/2024 Page: 18

official knew of a substantial risk from the very fact that the risk was obvious."

*Farmer*, 511 U.S. at 842.

The jury had sufficient evidence to find that Anderson knew Miller faced

a substantial risk of serious harm from the fall, and that Anderson disregarded

that risk by consciously failing to take reasonable measures to abate it.9

First, Anderson knew Miller had just fallen from the top bunk onto a

concrete floor. He knew that the left side of her stomach was hurting, that it

was painful to the touch, that she was dizzy, that she was nauseated, that she

struggled to walk even with substantial help from a guard and him, that she

could only sit and slowly slide down each stair, and that she could not hold her

head up when she was placed in a wheelchair twenty minutes after the fall.

2024 U.S. App. LEXIS 28720, *21

Those facts cumulatively suffice for a reasonable juror to determine both that

the risk of harm was obvious and that Anderson, a medical professional

9 Two special interrogatories were submitted to the jury: [*22]

Do you find by a preponderance of the evidence that Anderson was aware that Miller faced a substantial risk of serious harm or is there enough circumstantial evidence to support an inference that Anderson failed to verify or confirm a strongly suspected serious risk to Miller? . . .

Do you find by a preponderance of the evidence that Anderson consciously failed to take reasonable measures to address the substantial risk of harm to Miller despite his knowledge of a substantial risk of serious harm?

App. vol. VIII, at 1443. The jury answered yes to both. *Id.*

18

Appellate Case: 23-4122 Document: 86-1 Date Filed: 11/13/2024 Page: 19

familiar with the risks of internal bleeding, was subjectively aware that Miller faced a substantial risk of serious harm from injuries caused by her fall.

Second, despite this knowledge, Anderson did not take a complete medical evaluation or even assess Miller's vitals. He did not take her to the jail's medical unit or get her to an outside hospital. He did not call a physician who could have diagnosed her. He did not conduct any sustained medical monitoring of her or ensure that some other medical professional would routinely monitor her. Rather, he left her alone [*23] in a one-detainee cell. One medical expert testified that besides administering Ibuprofen, Anderson provided "little to no medical care" after Miller's fall. App. vol. XIII, at 2518. Another testified that Anderson provided Miller "no medical care." *Id.* at 2653. Together, the evidence is legally sufficient for a reasonable factfinder to conclude that Anderson deliberately ignored the known risk of harm to Miller.

*See Lucas*, 58 F.4th at 1139 (holding that doing "functional[ly]" nothing in the face of a known, serious medical need is sufficient to establish deliberate indifference).

Anderson contests this conclusion and claims qualified immunity on grounds that his belief that Miller was "withdrawing" from methamphetamine kept him from having acted with deliberate indifference. But this belief was a disputed fact question for the jury. The jury heard expert testimony (1) that dizziness and nausea were inconsistent with methamphetamine withdrawal, and

(2) that Miller's advising that she was "coming off" methamphetamine does not 19

Appellate Case: 23-4122 Document: 86-1 Date Filed: 11/13/2024 Page: 20

equate to saying she was withdrawing from it. App. vol. XIII, at 2627-28.

Further, because Miller's internal-bleeding [*24] symptoms emerged soon after her

fall, the jury could have reasonably found that Anderson also knew of a

substantial risk of harm from the fall and treated it with deliberate indifference.

In sum, the evidence sufficed for the jury to find that Anderson was deliberately indifferent to Miller's serious medical needs in violation of the Fourteenth Amendment. We note that Anderson has not disputed the clearly-established-law prong of qualified immunity. So Anderson was not entitled to qualified immunity.10 *See Quintana v. Santa Fe Cnty. Bd. of Comm'rs*, 973 F.3d 1022, 1028 (10th Cir. 2020) (explaining qualified immunity). We affirm the judgment against Anderson.

10 Anderson has conceded the second prong of the qualified-immunity analysis-clearly established law. Indeed, he conceded it during his previous interlocutory appeal too. *Stella*, 844 F. App'x at 56. Even if he had argued qualified immunity's second prong, our precedent clearly establishes, in sufficiently similar circumstances, that ignoring a detainee's obvious and serious medical needs violates the detainee's constitutional rights. *Paugh*, 47 F.4th at 1169; *see, e.g.*, *Prince v. Sheriff of Carter Cnty.*, 28 F.4th 1033, 1047 (10th Cir. 2022) (collecting several cases that were published before the alleged violation in this case); *see also Al-Turki v. Robinson*, 762 F.3d 1188, 1194 (10th Cir. 2014) ("[A] deliberate indifference claim will [*25] arise when 'a medical professional completely denies care although presented with recognizable symptoms which potentially create a medical emergency, e.g., a patient complains of chest pains and the prison official, knowing that medical protocol requires referral or minimal diagnostic testing to confirm the symptoms, sends the inmate back to his cell.'" (quoting *Self*, 439 F.3d at 1232)).

20

## B. The County11

At trial, Miller claimed that the County's deliberately indifferent policies and failures to train its nurses caused Anderson to ignore Miller's serious medical needs in violation of the Fourteenth Amendment. The jury agreed and found the County liable. After trial, the district court rejected the County's motion for judgment as a matter of law because the evidence supported federal municipal liability against it. The County reasserts its argument on appeal: "The evidence does not support a finding that the County, by way of an official policy or lack thereof, was deliberately indifferent to Miller's serious medical needs . . . ." Op. Br. at 48. Reviewing de novo, we agree with the district court.

To attach municipal liability under Miller's single-incident [*26] failure-to-train theory, the evidence must have been enough to show: (1) the existence of a municipal policy or custom involving deficient training; (2) an injury caused by the policy that is "obvious" and "closely related"; and (3) the municipality's adoption of the "policy or custom with deliberate indifference" to the injury. *Valdez v. Macdonald*, 66 F.4th 796, 816-17 (10th Cir. 2023) (quoting *Lance v. Morris*, 985 F.3d 787, 800 (10th Cir. 2021)).

The first two elements are not in dispute. First, a reasonable juror could conclude that the County lacked a policy for providing nursing care. The jail had no written nursing protocols, and it did not train its nurses. As mentioned,

11This section addresses Appellants' issue D, "Whether The Verdict Against The County Is Supported By The Evidence." Op. Br. at ii.

21

the jail had written nursing protocols for several years, but, the sheriff testified, eliminated them after the state licensure board found them inadequate. Rather than replacing those protocols with ones that would comply with the licensure board's requirements, the jail went forward with no protocols, despite such an approach being unheard of and inherently "dangerous." App. vol. XIII, at 2707-09. Second, a jury could [*27] reasonably determine that Miller's death-which the testimony confirmed could have been prevented had she been medically observed after she fell- was caused by the County's no-protocol approach and the absence of training on how to respond to trauma patients at risk of internal bleeding. *Id.* at 2586 (medical expert explaining that, with minimum medical monitoring, Miller had a "very high probability of survival").

For the third element, deliberate indifference, the Tenth Circuit has a three-part test: "(i) the municipality's policymakers know to a moral certainty that their employees will confront a given situation; (ii) the situation presents the employee with a difficult choice of the sort that training or supervision will make less difficult; and (iii) the wrong choice will frequently cause the deprivation of a citizen's constitutional rights." *Valdez*, 66 F.4th at 817 (quoting *Lance*, 985 F.3d at 802) (cleaned up). Here, the evidence sufficed for a reasonable juror to conclude that this test was met by a preponderance of the evidence.

First, a reasonable factfinder could conclude that the County knew to a moral certainty that jail nurses would need to assess a detainee's medical

22

condition for internal bleeding caused by physical trauma, including falls or assaults. Second, a factfinder could likewise have reasonably determined that written nursing protocols and training would help the County's nurses determine whether a patient at high-risk of internal bleeding needed to be monitored longer or taken to a doctor or hospital. App. vol. XIII, at 2707-09 (jail-operations expert explaining that the absence of nursing protocols made mistakes "highly likely"). Third, a factfinder could reasonably determine that the jail's lack of nursing protocol and the nurses' "lack of training would frequently lead to disregard of serious pain complaints, violating detainees' constitutional right to medical care." *Lance*, 985 F.3d at 803.

Put differently, the jury had sufficient evidence to conclude that Anderson's deliberate indifference and Miller's resulting death were "plainly obvious" consequences of the County's lack of nursing protocols and training on how to handle an inevitably recurring medical situation like assessing and monitoring trauma patients for internal bleeding. *Barney v. Pulsipher*, 143

F.3d 1299, 1307-08 (10th Cir. 1998). Thus, the evidence was sufficient for the jury to find in Miller's favor as to her municipal liability [*29] failure-to-train claim against the County. We affirm.

23

Appellate Case: 23-4122 Document: 86-1 Date Filed: 11/13/2024 Page: 24

**III. Jury Instructions**12

We review for an abuse of discretion a district court's decision on

whether to give a particular jury instruction. *Jensen v. W. Jordan City*, 968 F.3d 1187, 1197 (10th Cir. 2020). We review de novo whether the jury instructions "as a whole" correctly stated the governing law and provided the jury with an understanding of the issues and principles. *Id.* The jury instructions "need not be flawless," but we must be satisfied "the jury was [not] misled in any way."

*Id.* (internal quotation marks omitted).

We find no issues with the whole jury instructions. They correctly stated the governing law and provided the jury with a clear understanding of the issues and principles. That said, the County and Anderson argue that the district court abused its discretion in refusing several specific jury instructions.

First, the County and Anderson sought an instruction stating the well-established legal principle that violations of non-constitutional medical standards do not necessarily amount to deliberate indifference. *Riddle v.Mondragon*, 83 F.3d 1197, 1203 (10th Cir. 1996) ("Conduct which, at most, is medical malpractice redressable in state court does not represent cruel [*30] and unusual punishment."). Though such an instruction may reduce any risk of a jury conflating non-constitutional medical standards with the deliberate-indifference standard, we have never required such an instruction. Here, the

12This section addresses Appellants' issue J: "Whether The Court Erred By Failing To Properly Instruct The Jury." Op. Br. at iii.

24

Appellate Case: 23-4122 Document: 86-1 Date Filed: 11/13/2024 Page: 25

district court properly instructed the jury on the deliberate-indifference standard. And it went further with this instruction: "Federal law does not allow plaintiffs to create a federal case out of every violation of internal policy or state law. But a violation of internal policy or state law can serve as circumstantial evidence of a federal claim." App. vol. VIII, at 1510. The district court did not abuse its discretion by declining to give a more specific instruction than those given, especially when the County, while referencing the above instruction, reiterated the sought-after principle in closing. *See* App. vol. XV, at 3042 ("Whether someone may have committed malpractice or negligence does not matter . . . .").

Second, the County and Anderson sought an instruction [*31] that contained the elements of qualified immunity, or an interrogatory asking the jury whether Anderson held a reasonable belief that Miller was withdrawing from methamphetamine. They contend that if Anderson held a reasonable belief that Miller was going through withdrawal, then Anderson could not have been deliberately indifferent and was thus entitled to qualified immunity. But that reasoning is wrong. As we have explained, Anderson could have held a reasonable belief that Miller was withdrawing from methamphetamine while also being deliberately indifferent to Miller's serious medical needs related to the fall. The district court did not abuse its discretion in declining to ask a nondispositive fact question that could have confused the jury. And it did not abuse its discretion in declining to instruct the jury on the elements of qualified

25

Appellate Case: 23-4122 Document: 86-1 Date Filed: 11/13/2024 Page: 26

immunity, because qualified immunity's ultimate issue is a legal question for the court. *Gonzales v. Duran*, 590 F.3d 855, 860 n.4 (10th Cir. 2009).

Finally, the County and Anderson argue that the district court abused its discretion by not giving a "personal consumption" instruction directing the jury to reduce Miller's loss-of-income [*32] damages by her lifetime expenses had she lived. We have never required that a court instruct on personal consumption for a § 1983 claim. Under the instructions given, the jury could reduce damages for personal consumption; it may have done so, given that the damages awarded were less than Miller requested. And the County argued in closing for a reduction in damages based on personal consumption. App. vol. XV, at 3069- 70. We find no abuse of discretion for declining to give a personal-consumption instruction.

In sum, the district court did not abuse its discretion in declining any proposed jury instruction, and the instructions given correctly stated the law and gave the jury ample understanding of the principles and issues. *Jensen*, 968 F.3d at 1197. We affirm.

## IV.Inconsistent State-Law Verdict13

The County argues that the jury's treatment of the state-law claim rendered an inconsistent verdict, warranting relief under Rule 59 of the Federal Rules of Civil Procedure. If there "is any plausible theory that supports the

13This section addresses arguments made in Appellants' issue E: "Whether Miller Had A State Civil Rights Claim." Op. Br. at ii.

26

Appellate Case: 23-4122 Document: 86-1 Date Filed: 11/13/2024 Page: 27

verdict," then we must affirm the judgment. *Johnson v. Ablt Trucking Co., Inc.*, 412 F.3d 1138, 1144 (10th Cir. 2005). But [*33] irreconcilable inconsistency warrants a new trial. *Id.* To be irreconcilably inconsistent, the verdict must be "logically incompatible, thereby indicating that the jury was confused or abused its power." *Id.* (internal quotation marks omitted).

The jury found that the County was liable to Miller under the Utah Constitution. But the jury did not find any of the named individual defendants liable for denying Miller her state constitutional rights. After trial, the County asserted that this verdict was inconsistent and moved under Rule 59 for dismissal of the state-law claim because, the County argued, a municipality may not be liable under Utah law for a constitutional violation without an underlying constitutional violation by any of its officers. The district court denied the motion because Utah law does not necessarily require an underlying violation by a specific municipal employee before holding a municipality liable for violating someone's constitutional rights. The County appeals this decision, arguing that Utah law requires a jury finding that a specific employee violated the plaintiff's state constitutional rights. We agree with the district court. Utah law has no such requirement.

We [*34] apply a two-step process for determining whether a municipality can be held liable for constitutional violations under Utah law. "The first prong of [Utah's] common law test for assessing municipal liability requires the court to determine whether the plaintiff's constitutional rights were violated."

27

Appellate Case: 23-4122 Document: 86-1 Date Filed: 11/13/2024 Page: 28

*Kuchcinski v. Box Elder Cnty.*, 450 P.3d 1056, 1069 (Utah 2019). "[T]his threshold determination does not answer who was responsible for the violation, especially in cases involving multiple state actors that acted in concert to effect a deprivation of a protected right." *Id.* "Instead, it focuses on what occurred to the plaintiff through state action." *Id.*

Second, once a violation has been established, the court must then determine whether the municipality "should be held responsible, through the imposition of tort liability, for that violation." *Id.* at 1072. To prevail on municipal liability, a plaintiff must establish that "the constitutional violation [she] suffered was a flagrant violation." *Id.* When a municipality is the alleged violator, a flagrant violation can be shown "by proving that a deliberately indifferent County policy caused the violation." *Id.* To so prove, a plaintiff must [*35] establish "(1) the existence of a municipal policy or custom, (2) that this policy or custom evidences a deliberate indifference to the plaintiff's constitutional rights, and (3) that this policy or custom was closely related to the ultimate injury." *Id.* at 1067 (cleaned up). A "policy of inaction," such as an unwritten policy or lack of policy, can be "sufficient to establish municipal liability." *Id.* at 1068 n.53, 1072. If there is an issue of fact as to whether a municipal policy was deliberately indifferent to a plaintiff's constitutional rights, then that question should be determined by a jury. *Id.* at 1072-73.

So there must be an underlying constitutional violation. But again, "a plaintiff does not have to identify a specific municipal employee in order to

28

Appellate Case: 23-4122 Document: 86-1 Date Filed: 11/13/2024 Page: 29

demonstrate that a flagrant violation of his or her constitutional rights

occurred." *Id.* at 1064. Rather, in the absence of a specific-employee violator, a

municipality's deliberately indifferent policies of inaction that obviously caused plaintiffs' injuries can suffice to attach municipal liability. *Id.* at 1072. This understanding of Utah law forecloses the County's argument that "[w]ithout a violation of [Miller's] [*36] rights by a County employee, Miller had no state constitutional claim." Reply Br. at 22. Viewing the verdict in the most reconcilable way, the jury could have found that the County itself, "act[ing] in concert" through Nurse Layton and the named policymaker defendants, flagrantly violated Miller's right to be free from unnecessary rigor by having deliberately indifferent policies of inaction that caused Miller's suffering and death. *Kuchcinski*, 450 P.3d at 1069.

Neither Miller's claim for relief nor the jury's verdict depended on any particular County employee-named or otherwise-having violated Miller's state constitutional rights. Verdict consistency on the state-law claim is not metaphysically impossible. *See Johnson*, 412 F.3d at 1143-44 (obligating courts to reconcile verdicts by "exegesis if necessary"). Accordingly, we cannot reverse.14 *Id.*

14Though not at issue on appeal, if the County wanted an "Underlying Constitutional Violation"-type of instruction on the state-law claim, like the one given on the federal claim, it could have requested one. *See* App. vol. VIII, at 1518 ("If you find that no Davis County employee violated Miller's [federal] constitutional rights, then . . . Davis County did not commit a [federal]

(*footnote continued*)

29

**V. Relationship Between Federal and State-Law Claims**15

As mentioned, the County was found liable under both state and federal law. On appeal, the County contends that the $3,850,000 award for the federal claim and the $3,850,000 award for the state-law claim constitute an improper double-recovery by redressing the same injury.

Working from this premise, the County asserts (1) that the state-law

claim should have been dismissed because once the jury awarded relief on the

federal claim, the state claim was no longer viable, because the federal claim

provided "existing remedies"; and (2) that even if both the federal and state

claims were viable, the verdict form should not have allowed the jury to

apportion damages between the two. Each argument will be addressed

separately but fail for the same reason: the County waived the arguments. And

even if we considered them, we see a plausible basis to conclude that the

awards under each claim were for different injuries.

constitutional violation."). But it did not. Had the County made such a request, the parties could have argued over whether that instruction was appropriate and whether the state-law [*38] claim necessarily depended on an underlying violation by a County employee. *See Crowson v. Washington Cnty. Utah*, 983 F.3d 1166, 1191-93 (10th Cir. 2020) (explaining that, in the § 1983 context, some claims do not require an underlying employee violation but that other claims, by the very nature of the claim, are "dependent upon a predicate violation by [a specific employee]").

15 This section addresses arguments contained in Appellants' issue E, "Whether Miller Had A State Civil Rights Claim," and Appellants' issue K, "Whether The Court Erred With Respect To The Verdict Form." Op. Br. at ii- iii.

30

Appellate Case: 23-4122 Document: 86-1 Date Filed: 11/13/2024 Page: 31

## A. Utah's Existing-Remedies Element16

Under Utah law, a plaintiff seeking damages for any state constitutional violation must show, among other things, "that existing remedies do not redress his or her injuries." *Spackman ex rel. Spackman v. Bd. of Educ. of Box ElderCnty. Sch. Dist.*, 16 P.3d 533, 538-39 (Utah 2000). So if an existing remedy redresses the same injuries as does a claim under the Utah Constitution, then the Utah-Constitution claim is no longer viable. *Id.*

The County contends that Miller's § 1983 claim redressed the same injuries underlying her Utah-Constitution claim and was thus an "existing remedy" that precluded liability on the Utah-Constitution claim. We conclude that the jury had a plausible [*39] basis to find, as it did, that the federal and state injuries differed from each other. Even so, we do not delve far on that point, because the County waived the existing-remedies argument.

The County waived the argument by failing to raise it in the district court before the entry of judgment. Before final judgment, the County could have contended that Miller's § 1983 remedies precluded the Utah "unnecessary rigor" claim. Instead, the County chose not to object to (1) the

existing-remedies instruction, or (2) the "Relationship Between Federal and State Constitutional Claims" instruction, which authorized the jury to find a violation of "both Miller's state and federal constitutional rights." App. vol. VIII, at

16This section addresses arguments contained in Appellants' issue E: "Whether Miller Had A State Civil Rights Claim." Op. Br. at ii.

31

Appellate Case: 23-4122 Document: 86-1 Date Filed: 11/13/2024 Page: 32

1510, 1525. Further, the County did not object to the verdict form's allowance of liability for the federal and state claims.

Rather, the County first raised the existing-remedies issue after entry of judgment, in its Rule 59(e) motion. Rule 59(e) motions may not assert arguments "that could have been raised [*40] prior to the entry of judgment," *ExxonShipping Co. v. Baker*, 554 U.S. 471, 485 n.5 (2008) (internal quotation marks omitted), or to "advance arguments that could have been raised in prior briefing," *Nelson v. City of Albuquerque*, 921 F.3d 925, 929 (10th Cir. 2019) (internal quotation marks omitted). Because the County could have raised its existing-remedies argument before the entry of judgment, the County waived it.

*Exxon*, 554 U.S. at 485 n.5; *Nelson*, 921 F.3d at 930 (reversing district court for granting an "improper motion under Rule 59(e)"); *Johnson*, 412 F.3d at 1141 (explaining in the Rule 59 and Rule 49 context that "a party waives the right to object to inconsistencies in a general verdict with special interrogatories if it does not object on that ground before the jury is discharged" unless the verdict is plain error).

Even if we treated the existing-remedies argument as preserved, the County would still need to show that Miller's injuries were identical for her federal § 1983 claim and her Utah unnecessary-rigor claim. And on this record, we would reject that argument. An unnecessary-rigor claim under the Utah Constitution can remedy different injuries from those redressed by a deliberate-indifference claim under § 1983. *Cf. Dexter v. Bosko*, 184 P.3d 592, 596 (Utah

32

Appellate Case: 23-4122 Document: 86-1 Date Filed: 11/13/2024 Page: 33

2008) (hypothesizing that requiring silence of an inmate during certain hours may impose unnecessary [*41] rigor but not cruel and unusual punishment). In fact, in closing argument, Miller's counsel asserted that Miller's pre-death "pain and suffering" was a distinct injury from her ultimate death. App. vol. XV, at 3028, 3031. The Utah-Constitution claim could have redressed "intermediate harm[s]" leading to her death, while the federal claim redressed her death. *Mata*, 427 F.3d at 753-54 (holding that a plaintiff selects "what harm to claim," which could be severe pain waiting for treatment or an "ultimate harm," like death).

"We do not eavesdrop on juries." *Thompson v. State Farm Fire &*

*Cas. Co.*, 34 F.3d 932, 945 (10th Cir. 1994). So we cannot be certain how the jury found different injuries for the two claims, but it had a plausible basis to do so given the differences between the claims, the theories pursued at trial, and the specific evidence viewed in the light most favorable to Miller.

## B. Apportionment[17]

Relatedly, the County contends that the district court erred by using a verdict form that allowed for separate monetary awards under the federal and state claims, rather than one total award. Whereas the existing-remedies argument concerned whether federal-claim *liability* barred state-claim *liability*, this argument assumes that liability could exist [*42] for both, but that the verdict form should not have permitted apportioned *damages*. Like the existing-

[17]This section addresses Appellants' issue K: "Whether The Court Erred With Respect To The Verdict Form." Op. Br. at iii.

33

remedies argument, the apportionment argument rests on the premise that the jury's separate awards were for an identical injury, Miller's death, and was thus an impermissible double recovery. Again, the County's problem is twofold: (1) it waived an apportionment challenge to the verdict form, and (2) even if it were not waived, we could find that there was a plausible basis for the jury to redress one injury under the state claim and a separate injury under the federal claim.

The final verdict form allowed the jury to assign monetary damages to both the federal and state claims against the County. In contrast, the County proposed a verdict form that had all compensatory damages for violating "Ms. Miller's civil rights" collected in a single line, irrespective of the claim. App. vol. III, at 520. Despite tendering a proposed verdict form, the County never objected to the apportionment of damages. [*43] The County filed written objections to the verdict form, and lodged many oral objections to the verdict form and jury instructions, but the County never objected to the district court's multi-lined approach to compensatory damages.

Under Rule 51(c)(1) of the Federal Rules of Civil Procedure, a "party who objects to an instruction or the failure to give an instruction must do so on the record, stating distinctly the matter objected to and the grounds for the objection." And under Rule 51(d)(1), a party may assign as error "a failure to give an instruction, if that party properly requested it and-unless the court rejected the request in a definitive ruling on the record-also properly

34

objected." As we have repeatedly held, tendering a proposed instruction or verdict form cannot preserve a challenge to the court's instructions absent a specific objection. *First Am. Title Ins. Co. v. Nw. Title Ins. Agency*, 906 F.3d 884, 895 (10th Cir. 2018). Here, the County simply

tendered a verdict form that did not apportion damages. It made no proper objection that the verdict form or instructions should prohibit the apportionment of damages.18 *Cf. Osterhout v.Bd. of Cnty. Comm'rs of LeFlore Cnty., Okla*., 10 F.4th 978, 994 (10th Cir. 2021) (properly objecting to whether the verdict form should have one line or multiple lines for compensatory damages).

When a party fails [*44] to object to a verdict form or jury instructions, we review for plain error. *See* Fed. R. Civ. P. 51(d)(2). To establish plain error, one must show "(1) error, (2) which is plain, (3) which affects substantial rights, (4) and which seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Somerlott v. Cherokee Nation Distribs.,Inc*., 686 F.3d 1144, 1151 (10th Cir. 2012). But the County does not argue plain error on appeal. Because the County failed not only to properly raise the issue in the district court but also to request our review for plain error, it has waived any argument that the verdict form's multi-lined approach to compensatory

18Though the County generally objected to the district court's failure to adopt its proposed verdict form, the County never specifically objected before entry of judgment to the verdict form on apportionment grounds.

35

damages warrants reversal.19 *See United States v. Leffler*, 942 F.3d 1192, 1196 (10th Cir. 2019) (stating that the failure to argue plain error on forfeited issues waives those issues).

At any rate, even if the County had not waived the argument, the district court did not plainly err by submitting an apportioned verdict form. Damages are to be apportioned among two or more causes where "there are distinct [*45] harms" or "there is a reasonable basis for determining the contribution of each cause to a single harm." *Jensen*, 968 F.3d at 1197 (quoting Restatement (Second) of Torts § 433A (1965)) (internal quotation marks omitted). Here, apportionment was appropriate because there could have been distinct harms. As discussed above, the jury could have found (1) that Miller's pre-death suffering was a harm covered by the state-law claim, and (2) that Miller's death was a distinct, ultimate harm covered by the federal claim.

The County waived its apportionment objection to the verdict form. Likewise, it waived plain-error review. Even if it preserved that burdensome standard of review, we could find that the district court did not plainly err when it submitted a verdict form that had a multi-lined approach to compensatory damages because there is a plausible basis that the claims addressed distinct harms. So we affirm the district court's approach to the verdict form.

19 Had the district court adopted the single -line approach that the County now advocates, and had the jury awarded the same total damages (beneath plaintiffs' request), then the County would have had no apportionment argument now.

36

**VI.Double Recovery and Excessive Verdict**20

In its Rule 59(a) motion for a new trial, the County argued that the verdict was duplicative and excessive. The district court rejected these arguments, finding the evidence in the light most favorable to the jury verdict established (1) that each $3,850,000 award was plausibly for a distinct harm, and (2) that the award did not shock the judicial conscience and was not excessive. *Stella v. Davis Cnty.*, No. 1:18-CV-00002-JNP-DBP, 2023 WL 5334421, at *9-10 (D. Utah Aug. 18, 2023). Neither finding was in error.

The County first argues that the $3,850,000 awards for both the state and federal claim against it constitutes an impermissible double recovery for the same injury. Unlike the related existing-remedies and apportionment arguments, which were waived, this evidentiary argument became available only after the verdict, so the County has not waived this issue. And courts have an obligation to reduce duplicative damages, so we consider it. *See UnitedPhosphorus, Ltd. v. Midland Fumigant, Inc.*, 205 F.3d 1219, 1235 (10th Cir. 2000).

"Where a single injury gives rise to more than one claim for relief, a plaintiff may recover his damages under any claim, but he may recover them only once." *Jensen*, 968 F.3d at 1197 (internal quotation marks omitted). If a jury awards duplicate damages, "the court, either *sua sponte* or on motion of a

20This section addresses [*47]  Appellants' issue L: "Whether The Jury Awarded Double and/or Excessive Damages." Op. Br. at iii.

37

Appellate Case: 23-4122    Document: 86-1    Date Filed: 11/13/2024    Page: 38

party, should reduce the judgment by the amount of the duplication." *UnitedPhosphorus*, 205 F.3d at 1235 (internal quotation marks omitted). "Whether damage awards are duplicative is a question of fact, which we review for clear error." *Id.* An error is clear "only if the court's finding is without factual support in the record or if, after reviewing all the evidence, we are left with a definite and firm conviction that a mistake has been made." *Aquila, Inc. v. C.W.Mining*, 545 F.3d 1258, 1263 (10th Cir. 2008) (internal quotation marks omitted). "When a jury is instructed not to award duplicative damages and it returns a total damage figure within the range of evidence, [courts] are generally unwilling to disturb or second guess the jury's verdict." *N. Am.Specialty Ins. Co. v. Britt Paulk Ins. Agency, Inc.*, 579 F.3d 1106, 1113 (10th Cir. 2009).

The district court did not err in denying the County's double-recovery motion for three reasons. First, the district court properly (and repeatedly) instructed the jury not to award damages twice for the same injuries. The court gave a written instruction, an oral instruction, and the verdict form itself prohibited duplicative damages. We cannot assume the jury ignored [*48]  these instructions absent evidence to the contrary. *See Youren v. Tintic Sch.*

*Dist.*, 343 F.3d 1296, 1306 (10th Cir. 2003) (reiterating the standard presumption that juries follow their instructions). Second, the jury's "total damage figure" of $7,700,000 against the County was well within "the range of evidence." *N. Am. Specialty*, 579 F.3d at 1113. Miller's counsel carefully

38

2024 U.S. App. LEXIS 28720, *48

detailed the compensatory damages sought-including separate damages for pain and suffering as well as loss of life-all of which amounted to $11,451,698, considerably less than what the jury awarded Miller. And third, as discussed above, the jury might have awarded separate damages for separate injuries. Accordingly, the district court did not clearly err in declining to disrupt the jury's verdict on double-recovery grounds.

Alternatively, the County seeks a new trial because the verdict was "grossly excessive" and "bore no rational connection to the evidence." Op. Br. at 60. For a district court to order a new trial for an excessive verdict, a defendant must meet the "heavy burden of demonstrating that the verdict was clearly, decidedly, or overwhelmingly against the weight of the

evidence." *Blanke v. Alexander*, 152 F.3d 1224, 1236 (10th Cir. 1998) (internal quotation marks omitted). [*49] Except for an award that is "so excessive as to shock the judicial conscience . . . the jury's determination of damages is considered inviolate." *Karns v. Emerson Elec Co.*, 817 F.2d 1452, 1460 (10th Cir. 1987) (cleaned up). A district court's refusal to grant a motion for a new trial asserting excessive damages is afforded "considerable deference on appeal, and will not be disturbed absent a gross abuse of discretion." *Id.*

The jury found the County liable for the death and unnecessary suffering of a twenty-eight-year-old woman, awarding her estate $7,700,000. The district court acted within its discretion by deferring to the jury and ruling that this award was not excessive. Though the County contended that the life of an

39

incarcerated woman like Miller was "worth somewhere in the ballpark of $500,000," the district court "strongly disagree[d]" with that analysis. *Stella*, 2023 WL 5334421, at *10 n.10. Measuring damages is inherently the province of the jury. Unless the jury's determination was so excessive as to "shock the judicial conscience," the verdict must stand. *Karns*, 817 F.2d at 1460. It so stands now.

### VII. Stella's Dismissed State-Law Claim21

Approaching the appeal from a different angle, the County seeks a new trial because the [*50] district court erred by submitting "Stella's non-existent claim" to the jury, which purportedly "inflated the damage award to Miller." Op. Br. at 53-54. We do not reach whether the district court erred by submitting Stella's state-law claim to the jury because any such error would be harmless, meaning a new trial is not warranted. Fed. R. Civ. P. 61.

Stella, Miller's mother, had a single claim for relief: an unnecessary-rigor claim brought under the Utah Constitution. That claim went to the jury and the jury awarded Stella $2,000,000. But before going to the jury, the County moved for judgment as a matter of law. Fed. R. Civ. P. 50(a). The district court declined to rule on the motion before the jury returned its verdict. After the verdict, the district court granted the motion, dismissing Stella's claim and remitting the $2 million award.

21This section addresses Appellants' issue H: "Whether The Court Erred By Submitting Stella's Non-Existent Claim To The Jury." Op. Br. at iii.

40

The County argued that submitting Stella's claim to the jury inflated the total judgment against the County because the jury was forced to consider a claim that was ultimately [*51] dismissed. The district court refused to grant a new trial on those grounds because the County offered "no reasonable explanation as to why [submitting Stella's claim to the jury] would inflate the compensatory damages the jury awarded to Miller's estate." *Stella*, 2023 WL 5334421, at *11.

We agree with the district court. First, the County cites no authority ruling that a district court reversibly errs by taking a pre-verdict Rule 50 motion under advisement and ruling on it after the verdict. We have likewise found no authority for that proposition in a similar case. Indeed, Rule 50(b) permits the very course the district court took. Fed. R. Civ. P. 50(b). Second, the County's argument is flawed. Nothing suggests that the jury increased its damages to Miller because it gave damages to Stella. Third, the jury was instructed to evaluate each claim separately.

We do not address whether Stella's claim was viable. That issue is not on appeal. We conclude only that submitting Stella's claim to the jury and dismissing it after the verdict was not harmful error warranting a new trial. So we affirm.

41

## VIII. Attorney Fees22

Finally, the County and Anderson argue that the district court clearly [*52] erred by awarding Miller's counsel attorney fees under 42 U.S.C. § 1988 "without contemporaneous billing records." Op. Br. at 54. "We review a district court's award of attorney fees for abuse of discretion, which calls for review of the legal analysis de novo and factual findings for clear error." *Valdez*, 66 F.4th at 839. In reviewing an award of attorney fees, we defer to the district court's "superior understanding of the litigation" and recognize the "desirability of avoiding frequent appellate review of what essentially are factual matters."

*Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983).

In moving for attorney fees, counsel "for the party claiming the fees has the burden of proving hours to the district court by submitting meticulous, *contemporaneous* time records that reveal . . . all hours for which compensation is requested and how those hours were allotted to specific tasks." *Case v.Unified Sch. Dist. No. 233, Johnson Cnty., Kan.*, 157 F.3d 1243, 1250 (10th Cir. 1998) (emphasis added). Though contemporaneous time records are not a "per se absolute requirement" to garner attorney fees, "often contemporaneous time records will be necessary in order for the fee applicant [to carry] . . . the burden of establishing entitlement to an award and documenting the appropriate

22 This section addresses Appellants' issue I: "Whether The Court Erred By Awarding Attorney [*53] Fees Without Contemporaneous Billing Records." Op. Br. at iii.

42

Appellate Case: 23-4122   Document: 86-1   Date Filed: 11/13/2024   Page: 43

hours expended and hourly rates." *Carter v. Sedgwick Cnty., Kan.*, 929 F.2d 1501, 1506 (10th Cir. 1991) (cleaned up). When reviewing time records, a district court acts within its discretion if it reduces attorney fees because the attorney's time records are sloppy, imprecise, and fail to document adequately how the attorney used large blocks of time. *Case*, 157 F.3d at 1250.

The district court awarded attorney fees after reviewing the submitted materials, including (1) spreadsheets of counsel's time logs, (2) sworn declarations by counsel that the hours in the time logs were recorded contemporaneously with the work they performed, and (3) counsel's voluntary reduction of twenty-five hours to discount for any clerical errors in the time logs. From this, the district court acted within its discretion in awarding $728,256 in attorney fees. *See Stella v. Davis Cnty.*, No. 1:18-CV-00002-JNP-DBP, 2023 WL 5334427 (D. Utah Aug. 18, 2023) (explaining and detailing the award). We find no error with that judgment nor with the district court's "concise but clear explanation of its reasons for the fee award." *Hensley*, 461 U.S. at 437.

**CONCLUSION**

In sum, the district court's evidentiary rulings were sound; the evidence was sufficient to support liability; the jury instructions [*54] properly set out the law and no particular instruction sought was erroneously excluded; the state-law verdict was not inconsistent; the existing-remedies argument was waived; a challenge to the verdict form on apportionment grounds was waived; the verdict

43

Appellate Case: 23-4122   Document: 86-1   Date Filed: 11/13/2024   Page: 44

was not duplicative or excessive; Stella's dismissed claim did not prejudice the

outcome; and the attorney fee award was supported by the work rendered. For

all these reasons, we affirm.23

Entered for the Court

Gregory A. Phillips

Circuit Judge

23 The County and Anderson argue in their reply brief that even if all the errors they assert were harmless, "the cumulative effect was prejudicial because they had a substantial effect on the verdict and they leave one with grave doubts about whether they had such an effect." Reply Br. at 29. But that argument was not in their opening brief, so we decline to consider it. *Bronson*,

500 F.3d at 1104. Still, because there were not multiple errors related to the trial, any cumulative-error argument would fail.

44

---

**End of Document**