IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Civil Action No. 22-cv-01763-PAB-KAS

ESTATE OF KELROY NEWMAN, by and through putative personal representative, Bryanne Watts-Lucero, and
J.W., a minor child, by and through friend and mother, Elisa Wilson,

    Plaintiffs,

v.

BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF MONTEZUMA, COLORADO, and
SHERIFF STEVEN NOWLIN, individually and in his official capacity,
ZACHARY SUMMERS, individually,
SOUTHWEST HEALTH SYSTEM, INC, d/b/a/ Southwest Memorial Hospital, and
RANDY GENE DAVIDSON, MD, individually,

    Defendants.

---

**ORDER**

---

This matter comes before the Court on Defendant Randy Gene Davidson, M.D.'s Motion for Partial Summary Judgment [Docket No. 194]. Defendant Randy Gene Davidson seeks summary judgment pursuant to Federal Rule of Civil Procedure 56(a) on the fifth claim of the third amended complaint, which asserts a deliberate indifference claim against him under 42 U.S.C. § 1983. Docket No 194 at 1. Plaintiffs filed a response, Docket No. 206, and Dr. Davidson filed a reply. Docket No. 218. The Court has jurisdiction pursuant to 28 U.S.C. § 1331.

## I. BACKGROUND[1]

On Saturday, July 17, 2021, Kelroy Newman was arrested by a Cortez Police Department officer and taken to Montezuma County Detention Center ("MCDC") in Cortez, Colorado. Docket No. 206 at 8, ¶ 14.[2] Mr. Newman's blood-alcohol level ("BAC") was 0.421%. *Id.*, ¶ 15.[3] In 2021, MCDC policy required that certain arrestees, including those with a BAC greater than 0.2% or an obvious head injury, be medically cleared as part of the intake and booking process. *Id.* at 5, ¶ 1.[4] MCDC had an on-staff nurse who worked from 7:00 a.m. to 4:00 p.m., Monday through Friday. *Id.* at 6, ¶ 6. MCDC policy is that the facility nurse performs medical clearances when on duty; otherwise, Southwest Memorial Hospital ("SWMH") is used. *Id.*, ¶ 5. The arresting officer took Mr. Newman to the emergency room at SWMH. Docket No. 194 at 4, ¶ 8. SWMH is a Colorado non-profit corporation. *Id.* at 3, ¶ 1.[5]

---

[1] The following facts are undisputed unless otherwise indicated.
[2] Defendant states that "Defendant does not dispute the information on the COVID-19 screening form." Docket No. 218 at 8, ¶ 14. The screening form is one of the documents cited by plaintiffs in support of the asserted fact. The Court deems this fact admitted.
[3] Defendant disputes plaintiff's characterization of Mr. Newman's BAC as "potentially fatal," Docket No. 206 at 8, ¶ 15, but does not dispute that Mr. Newman's BAC was 0.421%. Docket No. 218 at 8, ¶ 15. The Court deems admitted the portion of the fact relating to the BAC itself.
[4] Defendant's response states that it admits that Deputy Daylan Guttridge testified that arrestees with a BAC over 0.2% were taken to SWMH to be medically cleared. Docket No. 218 at 5, ¶ 1. This is partially non-responsive, as the testimony of Deputy Guttridge is not the only evidence that plaintiffs cited in support of their asserted fact. *See* Docket No. 206 at 5, ¶ 1. The Court deems this fact admitted.
[5] Dr. Davidson supports this asserted fact by citing to SWMH's answer to the third amended complaint, rather than to the evidentiary record. Docket No. 194 at 3, ¶ 1 (citing Docket No. 160 at 3, ¶ 7). Plaintiffs do not dispute this fact. Docket No. 206 at 2, ¶ 1. The Court deems this fact undisputed.

At SWMH, Dr. Davidson, a physician working for SWMH in the emergency room, examined Mr. Newman. *Id.* at 4, ¶ 9.[6] For patients who are in custody, the law enforcement officer will accompany the patient into the examination room for the medical screening examination. *Id.*, ¶ 4. Dr. Davidson found Mr. Newman to be alert, oriented, and not appearing to be in any distress. *Id.*, ¶ 9.[7] Dr. Davidson cleared Mr. Newman for admission to MCDC, finding that "there were no signs of an emergency medical condition." *Id.* at 4-5, ¶¶ 11-12.[8] Dr. Davidson had no further contact with Mr. Newman. *Id.* at 5, ¶ 14.

Mr. Newman was incarcerated for 26 hours. *Id.*, ¶ 15. Around lunchtime on July 18, 2021, over 24 hours after Dr. Davidson's examination, jail deputies found Mr. Newman unresponsive in his cell. *Id.*, ¶ 17.

## II. LEGAL STANDARD

Summary judgment is warranted under Federal Rule of Civil Procedure 56 when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Anderson*

---

[6] Plaintiffs admit that this statement reflects Dr. Davidson's testimony, but deny that Dr. Davidson's testimony is an accurate or complete description of Mr. Newman's condition. Docket No. 206 at 4, ¶ 9. Plaintiffs' denial references Docket No. 206 at 8, ¶ 15, and Docket No. 206 at 11, ¶ 29. *Id.* But neither of the cited paragraphs refutes defendant's assertion. The Court deems this fact admitted.

[7] Plaintiffs admit that this statement reflects Dr. Davidson's testimony, but deny that Dr. Davidson's testimony is an accurate or complete description of Mr. Newman's condition. Docket No. 206 at 4, ¶ 9. Plaintiffs' denial references Docket No. 206 at 8, ¶ 15, and Docket No. 206 at 11, ¶ 29. *Id.* But neither of the cited paragraphs refutes defendant's assertion. The Court deems this fact admitted.

[8] Plaintiffs attempt to dispute this fact by arguing that Dr. Davidson did not collect sufficient information in order to determine whether Mr. Newman had an emergency medical condition. Docket No. 206 at 4, ¶ 12. This argument is non-responsive to the fact asserted – that Dr. Davidson did not find that Mr. Newman had an emergency medical condition and cleared him for admission to MCDC. The Court deems this fact admitted.

3

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986).  A disputed fact is "material" if, under the relevant substantive law, it is essential to proper disposition of the claim.  *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231-32 (10th Cir. 2001).  Only disputes over material facts can create a genuine issue for trial and preclude summary judgment.  *Faustin v. City & Cnty. of Denver*, 423 F.3d 1192, 1198 (10th Cir. 2005).  An issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party.  *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

Where "the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy its burden at the summary judgment stage by identifying a lack of evidence for the nonmovant on an essential element of the nonmovant's claim."  *Bausman v. Interstate Brands Corp.*, 252 F.3d 1111, 1115 (10th Cir. 2001) (quotations omitted).  "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter."  *Concrete Works of Colo., Inc. v. City & Cnty. of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994).  The nonmoving party may not rest solely on the allegations in the pleadings, but instead must designate "specific facts showing that there is a genuine issue for trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quotations omitted).  "To avoid summary judgment, the nonmovant must establish, at a minimum, an inference of the presence of each element essential to the case."  *Bausman*, 252 F.3d at 1115.  When reviewing a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party.  *Id.*

III.  ANALYSIS

"To state a claim under [42 U.S.C.] § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that

4

the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988) (citations omitted).  Dr. Davidson asserts that he was not a state actor when he treated Mr. Newman pursuant to his emergency room duties at a private hospital.  Docket No. 194 at 5-13.  Dr. Davidson argues that since he was not a state actor, he is entitled to summary judgment on the Section 1983 claim. *Id.* at 5.

### A. State Actor

"The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *West v. Atkins*, 487 U.S. 42, 49 (1988) (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)).

Whether particular conduct constitutes state action "frequently admits of no easy answer." *Jackson v. Metro Edison Co.*, 419 U.S. 345, 349-50 (1974).  In order to determine whether Dr. Davidson was a state actor, the Court will first consider the different tests for state action, with a focus on the public function test in *West*.  Second, the Court will review subsequent cases decided under the *West* framework.

#### 1. *West and the Public Function Test*

In *West*, a prisoner received medical treatment at a prison hospital from a private physician who contracted with the state to provide care on a part-time basis.  487 U.S. at 43-44.  The prisoner was unhappy with the doctor's care and filed an action under Section 1983 against the doctor. *Id.* at 45.  The question then arose whether the doctor was a state actor. *Id.* at 45-48.  The Supreme Court held that neither the doctor's contractor status nor the part-time nature of his work for the state automatically shielded

5

him from being considered a state actor. *Id.* at 55-57. Rather, the Court stated, "[i]t is the physician's function within the state system, not the precise terms of his employment, that determines whether his actions can fairly be attributed to the State." *Id.* at 55-56. The Court held that, because the defendant "worked as a physician at the prison hospital fully vested with state authority to fulfill essential aspects of the duty, placed on the State by the Eighth Amendment and state law, to provide essential medical care to those the State had incarcerated . . . . Doctor Atkins must be considered to be a state actor." *Id.* at 56-57.

Courts have since applied the principles found in *West* to various other scenarios. In general, courts take a flexible approach to the state action doctrine based upon the facts of a given case. *Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442, 1447 (10th Cir. 1995). Although courts have described four different tests: 1) the nexus test, 2) the symbiotic relationship test, 3) the joint action test, and 4) the public function test, *id.*, "these formulations are susceptible to semantic variations, conflations and significant overlap in practical application." *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 823 (7th Cir. 2009) (citing *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 294 (2001)).

*West* did not explicitly rely on any of the four tests, but the Supreme Court later clarified that *West* was based on the public function test. *See Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 55 (1999) ("[In *West*,] the State was constitutionally obligated to provide medical treatment to injured inmates, and the delegation of that traditionally exclusive public function to a private physician gave rise to a finding of state action."). Consistent with this reasoning, lower courts have used the public function test in

6

assessing whether a medical provider who cares for an incarcerated individual is a state actor.  *See, e.g.*, *Anglin v. City of Aspen*, 552 F. Supp. 2d 1229, 1240 (D. Colo. 2008) (holding, in a case involving an emergency room doctor's treatment of a pretrial detainee, that "the public functions test [is] the test at issue in the instant case").

*West* states that "the dispositive issue [in the state actor analysis] concerns the relationship among the State, the physician, and the prisoner."  487 U.S. at 55-56.  In assessing that state-physician-prisoner relationship, courts weigh two competing policy concerns.  On one hand, finding that the physician is not a state actor would allow the state to avoid its constitutional obligations – and associated liabilities – by outsourcing medical care to the private sector.  *Rodriguez*, 577 F.3d at 826 (citation omitted).  Such insulation from liability is "exactly the kind of result the Supreme Court sought to avoid in *West*."  *Anglin*, 552 F. Supp. 2d at 1246.  On the other hand, treating doctors as state actors merely because they treat detainees could disincentivize doctors – particularly specialists – from accepting prisoners as patients, therefore worsening the availability of inmate care.  *Phillips v. Tangilag*, 14 F.4th 524, 533-34 (6th Cir. 2021).

### 2.  Factors Considered in Applying the Public Function Test to Detainee Medical Treatment

To guide their analyses in the face of these competing policy concerns, courts consider various factors in determining whether a doctor is a state actor.  One factor considers the location of the care and the extent to which the patient's status as a detainee influences care.  *Anglin*, 552 F. Supp. 2d at 1244 (quoting *West*, 487 U.S. at 57).  The concern underlying this factor is that providing care in an institutional setting "inevitably affects the exercise of professional judgment," since non-medical factors related to incarceration can influence the nature, timing, and form of medical care

7

provided to a detainee.  *Id.*  The Court finds that this factor weighs against state actor status since Dr. Davidson evaluated Mr. Newman in the emergency room of a private hospital.  Docket No. 194 at 4, ¶ 9.

A second factor considers the degree of choice detainees have regarding their medical providers.  *See Conner v. Donnelly*, 42 F.3d 220, 225 (4th Cir. 1994).  The court in *Conner* held this factor to weigh very heavily on the analysis, writing that:

> If the physician . . . demonstrat[es] deliberate indifference to the prisoner's serious medical needs, the prisoner suffers a deprivation under color of state law – not because the state has employed a bad physician, but because the state has incarcerated the prisoner and denied him the possibility of obtaining medical care on his own.

*Id.*  The Court finds that this factor weighs in favor of state actor status.  Mr. Newman was under arrest, Docket No. 206 at 8, ¶ 14, and there is no evidence that he had a choice in medical providers.

A third factor considers the degree to which a private medical provider supplements or replaces the prison medical system.  *Rodriguez*, 577 F.3d at 828.  While *West* made clear that the state cannot contract its obligations away, if the provider merely supplements state efforts to care for prisoners, then "the private entity's responsibility for the level of patient care becomes more attenuated, and it becomes more difficult to characterize its actions as the assumption of a function traditionally within the exclusive province of the state."  *Id.*

The Court finds that this factor weighs against state actor status.  MCDC employed a nurse who provided medical services from 7:00 a.m. to 4:00 p.m., Monday through Friday.  Docket No. 206 at 6, ¶ 6.  MCDC policy is that the facility nurse performs medical clearances when on duty; otherwise, SWMH is used.  *Id.*, ¶ 5.  The

8

medical clearances are not part of the jail medical system per se.  Rather, they are part of a screening system to prevent more highly intoxicated detainees from being booked into the jail.  Thus, the private medical provider is not part of the jail's system to provide medical services to persons in its custody, but rather part of a procedure to medically screen certain detainees whom the jail may not be able to house, which minimizes the medical provider's role in relation to MCDC.

A fourth factor considers the frequency of the doctor's interactions with a patient, with repeated visits weighing in favor of state actor status.  *See Conner*, 42 F.3d at 222 (finding state actor status in a case where the prisoner visited the specialist doctor four times over six months); *Sykes v. McPhillips*, 412 F. Supp. 2d 197, 204 (N.D.N.Y. 2006) (declining to find state actor status in case where the prisoner saw the doctor once).  The Court finds that this factor weighs against a finding of state actor status, as Dr. Davidson saw Mr. Newman only once.  Docket No. 194 at 5, ¶ 14.

A fifth factor considers the doctor's voluntariness in treating the prisoner-patient.  *West*, 487 U.S. at 55-56 ("the State delegated [its obligation to provide care] to [the physician]; and [the physician] *voluntarily* assumed that obligation by contract") (emphasis added).  While *West's* focus on the doctor's "function" within the system made clear that a doctor can become a state actor even without a government contract, a contract may demonstrate that the physician voluntarily assumed the liability at issue.  *Rodriguez*, 577 F.3d at 827.[9]

---

[9] The two cases that the Court has identified where an emergency room doctor was held to be a state actor both involved hospitals that had contracted with the detention facility to provide care.  *See Estate of Prasad ex rel. Prasad v. Cnty. of Sutter*, 985 F. Supp. 2d 1101, 1125 (E.D. Cal. 2013); *George v. Sonoma Cnty. Sheriff's Dep't*, 732 F. Supp. 2d 922, 935 (N.D. Cal. 2010).

9

Voluntariness is almost certainly absent in an emergency-room setting, as the Emergency Medical Treatment and Labor Act ("EMTALA"), 42 U.S.C. § 1395dd, requires hospitals to treat all patients who come to an emergency room. *See Rodriguez*, 577 F.3d at 827-28 ("an emergency medical system that has a preexisting obligation to serve all persons who present themselves for emergency treatment hardly can be said to have entered into a specific voluntary undertaking to assume the state's special responsibility to incarcerated persons."). Most courts that have addressed cases involving a detainee's treatment at the emergency room have held that a doctor does not become a state actor by treating a prisoner at an emergency room. *See, e.g.*, *Sykes*, 412 F. Supp. 2d at 204 (emergency room doctor not a state actor where he was obligated to treat prisoner presenting for emergency treatment); *Estate of Rice ex rel. Rice v. Corr. Med. Servs.*, 596 F. Supp. 2d 1208, 1218-19 (N.D. Ind. 2009) (collecting medical "state actor" cases); *see also Phillips*, 14 F.4th at 533 ("[P]rivate parties do not automatically become 'state' actors simply by caring for prisoners. Consider a hospital with an emergency room [subject to EMTALA]. Does this hospital become a state actor whenever a prisoner gets rushed there for a medical emergency?"). In fact, the two other cases that plaintiffs rely most heavily on concede the point regarding emergency rooms. *See Conner*, 42 F.3d at 228; *Anglin*, 552 F. Supp. 2d at 1245. In *Conner*, the Fourth Circuit discussed *McIlwain v. Prince William Cnty. Hosp.*, 774 F. Supp. 986, 989-90 (E.D. Va. 1991), and agreed with *McIlwain's* finding that a hospital did not assume the state's constitutional obligations when it treated a state prisoner in its emergency room. 42 F.3d at 228. *Anglin* involved an emergency room doctor providing advice to paramedics over the phone and directing the paramedics to sedate a detainee in the

10

county jail. 552 F. Supp. at 1230-38. While the court suggested that EMTALA obligations might not automatically render the doctor's treatment involuntarily – since the doctor had voluntarily chosen to contract with an emergency room where he was "assured to come into contact with inmates from time to time" – the court nevertheless found that the doctor's treating relationship with the patient was involuntary. *Id.* at 1245.

The Court concludes that the fifth factor is the most important factor for the present case. The Court agrees that an emergency room doctor's treatment cannot be considered voluntary when the doctor is under a legal obligation from EMTALA to provide that care. *See Sykes*, 412 F. Supp. 2d at 203 ("it is not likely that Congress intended to confer state actor status through this interpretation of EMTALA."). And the Court finds that Dr. Davidson was under a legal obligation from EMTALA to provide an examination upon a request from law enforcement. Federal regulations state that, if a person arrives at the emergency room requesting examination or treatment, the hospital must provide an appropriate screening for emergency medical conditions for the person, even if the nature of the request makes it clear that the medical condition is not of an emergency nature. *See* 42 C.F.R. § 489.24(c). The parties dispute whether SWMH was bound by any contract or memoranda of understanding with Montezuma County to treat Mr. Newman. *See* Docket No. 194 at 4, ¶¶ 5-6; Docket No. 206 at 3, ¶¶ 5-6. Even if the Court were to assume that SWMH and the county had an agreement regarding emergency medical care, an agreement between those two parties is not relevant to this analysis. At the time of the medical examination, Mr. Newman was not in the county's custody, but in the custody of the Cortez Police Department, Docket No. 194 at 4, ¶ 8,

11

which weighs against state actor status based on Dr. Davidson's relationship with SWMH.

Considering these factors, the Court concludes that Dr. Davidson did not become a state actor when he examined Mr. Newman. The Court finds the fifth factor – voluntariness – to be the most important, and that factor weighs against state actor status. The first, third, and fourth factors – the location of care, replacement of the state's medical system, and the frequency of doctor-patient interactions – also weigh against state actor status. The second factor – choice in provider – weighs in favor of state actor status, but the Court places little weight on this factor because it finds that no one, incarcerated or not, typically has any choice over providers at an emergency room.

Based on the foregoing factors, the undisputed facts demonstrate that Dr. Davidson did not become a state actor when he treated Mr. Newman on July 17, 2021. Since state actor status is a prerequisite to liability under Section 1983, *West*, 487 U.S. at 48 (citation omitted), the Court will grant Dr. Davidson's motion for summary judgment on the deliberate indifference claim.

## IV. CONCLUSION

For the foregoing reasons, it is

**ORDERED** that Defendant Randy Gene Davidson, M.D.'s Motion for Partial Summary Judgment [Docket No. 194] is **GRANTED**. It is further

**ORDERED** that the fifth count of the Third Amended Complaint [Docket No. 154], as alleged against Dr. Randy Davidson, is **DISMISSED with prejudice**.

DATED March 28, 2025.

BY THE COURT:

PHILIP A. BRIMMER
Chief United States District Judge